In re ENRON CORPORATION SECURITIES, DERIVATIVE & ERISA LITIGATION.

This Document Relates to All Cases.

Mark Newby, et al., Plaintiffs,

v.

Enron Corporation, et al., Defendants.

The Regents of the University of California, et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Kenneth L. Lay, et al., Defendants.

MDL No. 1446
Civil Action No. H–01–3624.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 19, 2002.

See also 227 F.Supp.2d 1389.

Eric D. Green, pro se, Resolutions LLC, Boston, MA, for Mediator.

Richard J. Zook, Cunningham Darlow et al, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, William S. Lerach, Milberg Weiss et al, San Diego, CA, Earnest W. Wotring, Connelly Baker et al, Houston, TX, Ira Press, Kirby McInerney et al,

New York, NY, Michael I. Behn, Futterman & Howard Chtd, Chicago, IL, Charles R. Parker, Hill and Parker, Houston, TX, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Lieff Cabraser et al, San Francisco, CA, Stephen Lowey, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Elizabeth Cabraser, Lieff Cabraser et al, San Francisco, CA, Sherrie Savett, Arthur Stock, Berger & Montague PC, Philadelphia, PA, Thomas W. Sankey, Sankey & Luck, Houston, TX, Paul F. Bennett, Gold Bennett et al, San Francisco, CA, Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, Helen J. Hodges, Milberg Weiss et al, San Diego, CA, William B. Federman, Federman & Sherwood, Oklahoma City, OK, Richard A. Speirs, Jeffrey C. Zwerling, Zwerling Schachter et al, New York, NY, Jack Edward McGehee, McGehee & Pianelli, Houston, TX, Robert B. Weintraub, Daniel W. Krasner, Wolf Haldenstein et al, New York, NY, Tom Alan Cunningham, Cunningham Darlow et al, Houston, TX, Martin D. Chitwood, Jeffrey H. Konis, Chitwood & Harley, Atlanta, GA, Sidney S. Liebesman, Grant & Eisenhofer PA, Wilmington, DE, Jay W. Eisenhofer, Grant & Eisenhofer, Wilmington, DC, Edward H. Nicholson, Jr., Chitwood & Harley, Atlanta, GA, Ronald Joseph Kormanik, Sydow Kormanik Carrigan & Eckerson, Gregory Sean Jez, Fleming & Associates, Houston, TX, David C. Mattax, Office of Attorney General, Rose Ann Reeser, Texas Attorney General, Austin, TX, Stephen D. Oestreich, Entwistle & Cappuci LLP, New York, NY, Deborah R. Gross, Law Offices Bernard M. Bross PC, Philadelphia, PA, James F. Marshall, Attorney at Law, San Marino, CA, Meredith Cavallo, Larry E. Klayman, Judicial Watch Inc, Steven J. Toll, Cohen Milstein et al, Washington, DC, Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, David R. Scott, Attorney at Law, Neil Rothstein, James E. Miller, Scott & Scott LLC, Colchester, CT,

John A. Lowther, James I. Jaconette, Alexandra S. Bernay, Milberg Weiss et al, San Diego, CA, Hector G. Gancedo, Gancedo & Nieves LLP, Pasadena, CA, Herbert Blake Tartt, Jr., Beirne Maynard et al, Houston, TX, Robert M. Kornreich, Wolf Popper LLP, New York, NY, Allyson L. Mihalick, Beirne Maynard et al, Houston, TX, Robert C. Finkel, Wolf Popper LLP, New York, NY, Thomas G. Shapiro, Shapiro Haber et al, Boston, MA, Joseph Albert McDermott, III, Attorney at Law, Houston, TX, Jonathan M. Plasse, Goodkind Labaton et al, New York, NY, David B. Kahn, Attorney at Law, Northfield, IL, Saul Roffe, Sirota & Sirota LLP, New York, NY, Sean F. Greenwood, Robins Cloud et al, John G. Emerson, Jr., The Emerson Firm, Richard Frankel, Hackerman Peterson et al, Houston, TX, Aaron Brody, Stull Stull et al, New York, NY, James D. Baskin, III, The Baskin Law Firm, Austin, TX, Klari Neuwelt, Attorney at Law, New York, NY, Michael D. Donovan, Donovan Searles LLC, Philadelphia, PA, Steven E. Cauley, Cauley Geller et al, Little Rock, AR, George M. Fleming, Fleming & Associates, Jeffery B. Kaiser, Sydow, Kormanik, Carrigan & Eckerson, LLP, Houston, TX, Andrew J. Mytelka, Greer Herz & Adams, Galveston, TX, Debra Brewer Hayes, Paul Thomas Warner, Reich & Binstock, Houston, TX, Harvey Greenfield, Attorney at Law, Laura M. Perrone, Law Firm of Harvey Greenfield, New York, NY, Edward Morgan Carstarphen, III, Ellis Carstarphen et al, Houston, TX, Fredrick F. Neid, Ass't Atty Gen, Lincoln, NE, Daniel Dean Gartner, Gartner Law Firm, PC, Robin L. Harrison, Campbell Harrison et al, Houston, TX, Lynn Lincoln Sarko, Derek W Loeser, Britt L. Tinglum, Keller Rohrback LLP, Seattle, WA, Steve W. Berman, Hagens Berman LLP, Erin M. Riley, Keller Rohrback LLP, Seattle, WA, Baxter Ward Banowsky, Banowsky Betz & Levine, Dallas,

TX, Gary Benjamin Pitts, Pitts & Asoc, Houston, TX, Kenneth F. McCallion, McCallion & Associates, New York, NY, Damon Michael Young, Young Pickett et al, Texarkana, TX, Jeffrey R. Krinsk, Attorney at Law, San Diego, CA, Curtis L. Bowman, Cauley Geller et al, Little Rock, AR, Keith Alan Ward, Porter Rogers et al, Austin, TX, Mike Lange, Reinhardt Lange, Fairfield, CT, John Lee Ringgenberg, Attorney at Law, Englewood, CO, John A. Huettner, Attorney at Law, Cleveland, OH, Richard A. Lockridge, Lockridge Grindal et al, Minneapolis, MN, Stanley M. Grossman, Pomerantz Haudek et al, New York, NY, Steven N. Williams, Joseph W. Cotchett, Bruce L. Simon, Mark C. Molumphy, Cotchett Pitre et al, Burlingame, CA, Lynn W. Jinks, III, Jinks Daniel et al, Union Springs, AL, Ted L. Mann, Mann Cowan et al, Birmingham, AL, L. Shane Seaborn, Penn & Seaborn LLC, Clayton, AL, R. Paul Yetter, Yetter and Warden, Houston, TX, Philip T. Reinstein, Reinstein & Sherman, Howard C. Goode, Attorney at Law, Northbrook, IL, John H. Boone, Attorney at Law, Joseph M. Alioto, Alioto Law Firm, San Francisco, CA, Autry W. Ross, Yetter & Warden LLP, Houston, TX, Thomas Walter Umphrey, Provost & Umphrey, Beaumont, TX, Bonnie E. Spencer, Spencer and Associates, Houston, TX, Andy Wade Tindel, Provost & Umphrey Law Firm, Tyler, TX, for Plaintiffs/Consolidated Plaintiffs.

Stephen D. Susman, Susman Godfrey, Scott David Lassetter, John B. Strasburger, Weil Gotshal and Manges, Kenneth S. Marks, Susman Godfrey LLP, Craig Smyser, Jr., Smyser Kaplan & Veselka, Richard Bruce Drubel, Jr., Boies Schiller et al, Hanover, NH, John W. Keker, Jan Nielsen Little, Christa M. Anderson, Keker & Van Nest LLP, San Francisco, CA, James E. Coleman, Jr., Carrington Coleman et al, Dallas, TX, Robin C. Gibbs, Gibbs & Bruns, Houston, TX, Charles F. Richards, Jr., Richards Layton et al, Wilmington, DE, David Clarke, Jr., Keara M. Gordon, Piper Marbury et al, Washington, DC, Glenn E. Coe, Brenda M. Hamilton, Rome McGuigan et al, Hartford, CT, Ronald Gene Woods, Attorney at Law, Houston, TX, Bruce A. Hiler, O'Melveny & Myers, Washington, DC, Jeffrey Kilduff, O'Melveny & Myers, McLean, VA, Robert M. Stern, Attorney at Law, Washington, DC, Russell "Rusty" Hardin, Jr., Rusty Hardin and Associates, Houston, TX, Daniel F. Kolb, Sharon Katz, Davis Polk et al, New York, NY, Theresa Ann Foudy, Benard V. Preziosi, Eliot Lauer, Curtis Mallet–Prevost et al, New York, NY, Warren B. Lightfoot, Lightfoot Franklin et al, Birmingham, AL, Catherine E. Palmer, Latham & Watkins, New York, NY, Miles N. Ruthberg, Latham & Watkins, Los Angeles, CA, Peter Wald, Latham & Watkins, Stan G. Roman, Krieg Keller et al, San Francisco, CA, Turner P. Smith, Samuel Rosenthal, Curtis Mallet–Prevost et al, New York, NY, Barry G. Flynn, Attorney at Law, George W. Billy Shepherd, III, Cruse Scott et al, Houston, TX, Michael D. Warden, Luisa Caro, Sidley Austin et al, Washington, DC, Eric J.R. Nichols, Beck Redden & Secrest, Clayton C. Cannon, Stumpf Craddock et al, Houston, TX, Scott B. Schreiber, John C. Massaro, Justin S. Antonipillai, Arnold & Potter, Washington, DC, Mark K. Glasser, King & Spalding, Charles G. King, III, King & Pennington, Houston, TX, Gregory A. Markel, Cadwalader Wickersham et al, New York, NY, Paul R. Bessette, Brobeck Phleger et al, Austin, TX, Ronit Setton, Nancy I. Ruskin, Cadwalader Wickersham et al, New York, NY, Lawrence David Finder, Haynes & Boone LLP, Houston, TX, Richard W. Clary, Karin A. DeMasi, Margaret K. Dooley, Rachel G. Skaistis, Julie Ann North, Melissa J. Baily, Joseph R. Wallin, Cravath Swaine et al, New York, NY, Barry Abrams, Abrams Scott et al, Houston, TX, David H. Braff, Sullivan & Cromwell, New York, NY, William H. Knull, III, Mayer

Brown et al, Houston, TX, Alan N. Salpeter, Mark McLaughlin, Andrew D. Campbell, Michele L. Odorizzi, Mayer Brown et al, Chicago, IL, Mark F. Pomerantz, Paul Weiss et al, New York, NY, Jacalyn D. Scott, Wilshire Scott et al, Houston, TX, Richard A. Rosen, Claudia Hammerman, Robyn F. Tarnofsky, Jonathan Hurwitz, Michael E. Gertzman, Brad S. Karp, Alyssa A. Qualls, Robert C. Weisz, Margaret E. McGuinness, Todd A. Kipnes, Paul Weiss et al, New York, NY, Joel M. Androphy, Berg & Androphy, Houston, TX, Lawrence Byrne, Owen Pell, Lance Cr/foot–Suede, Timothy Pfeifer, White & Case LLP, New York, NY, Taylor M. Hicks, Jr., Hicks Thomas et al, Houston, TX, Robert F. Serio, Gibson Dunn & Crutcher, Christopher M. Joralemon, Clifford Chance et al, Marshall R. King, Gibson Dunn et al, Herbert S. Washer, James B. Weidner, James D. Miller, Ignatius Grande, Clifford Chance et al, New York, NY, Charles A. Gall, Jenkens & Gilchrist, Dallas, TX, Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX, John D. Roesser, David J. Woll, Thomas C. Rice, Jonathan K. Youngwood, Bruce D. Angiolillo, Christopher M. Caparelli, Jill M. O'Toole, George S. Wang, William M. Tong, Nihara K. Choudhri, Pieter H.B. Van Tol, Simpson Thacher et al, New York, NY, Keith Carter Hannigan, Jenkins & Gilchrist, Chicago, IL, Ronald Earl Cook, Cook Roach et al, Houston, TX, James F. Moyle, James N. Benedict, Rogers & Wells, Mark A. Kirsch, Clifford Chance et al, New York, NY, Kelly M. Klaus, Ronald L. Olson, Dennis C. Brown, John W. Spiegel, Kevin S. Allred, Kristin L. Myles, Munger, Tolles, & Olson, LLP, San Francisco, CA, Jack C. Nickens, Nickens Keeton et al, Houston, TX, Elizabeth T. Parker, Pepper Hamilton LLP, Philadelphia, PA, Stephen J. Crimmins, Pepper Hamilton LLP, Washington, DC, Robert C. Micheletto, Jones Day et al, Chicago, IL, David L. Carden, Jones Day et al, New York, NY, Brian A. Troyer, Jones Day et al, Cleveland, OH, David Elliott Miller, Hugh R. Whiting, Jones Day et al, Houston, TX, William Edward Matthews, Gardere Wynne et al, Harvey G. Brown, Jr., Orgain Bell et al, Matthew D. Shaffer, Schechter McElwee et al, Houston, TX, Michael G. Davies, Hoguet Newman et al, New York, NY, James P. Pennington, King & Pennington LLP, Houston, TX, Paul Vizcarrondo, Jr., Jonathan E. Pickhardt, Wachtell Lipton et al, Max Gitter., Cleary Gottlieb et al, New York, NY, Murray J. Fogler, McDade Fogler et al, Houston, TX, Roger E. Zuckerman, Steven M. Salky, Deborah J. Jeffrey, Amy M. McNamer, Norman L. Eisen, Zuckerman Spaeder LLP, Washington, DC, Barnes H. Ellis, David H. Angeli, Stoel Rives LLP, Portland, OR, Amy Joseph Pedersen, William F. Martson, Zachary W.L. Wright, Tonkon Torp LLP, Portland, OR, Edward John O'Neill, Jr., Jason Carrington Norwood, Clements O'Neill et al, Houston, TX, Jennifer Piskun, John J. McKetta, III, Graves Dougherty et al, Austin, TX, Mark J. Rochon, Emmett B. Lewis, Miller & Chevalier Chartered, Washington, DC, H. Bruce Golden, Golden & Owens LLP, Houston, TX, Dennis H. Tracey, Brad M. Johnston, David Wertheimer, Hogan & Hartson LLP, New York, NY, Amelia Rudolph, Sutherland Asbill et al, Atlanta, GA, Kathryn Schaefer Zecca, Gary A. Orseck, Robbins Russell Englert Orseck & Untereiner, LLP, Lawrence S. Robbins, Robbins Russell et al, Washington, DC, Billy Jack Shepherd, Cruse Scott et al, Houston, TX, Peter Fleming, Jr., Michael J. Moscato, Curtis Mallet–Prevost et al, New York, NY, David E. Ross, Mark C. Hansen, Kellogg Huber et al, Washington, DC, Henry F. Schuelke, III, Janice Schuelke et al, Washington, DC, Robert Hayden Burns, Burns Wooley et al, Houston, TX, J. Clifford Gunter, III, Abigail K. Sullivan, Bracewell & Patterson LLP, Houston, TX, Damon Michael Young, Young Pickett et

al, Texarkana, TX, Walter J. Cicack, Adams & Reese, Houston, TX, Paul D. Clote, Attorney at Law, Rodney Acker, Jenkens & Gilchrist, Dallas, TX, for Defendants/Consolidated Defendants.

William S. Lerach, Milberg Weiss et al, San Diego, CA, Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, Steven G. Schulman, Milberg Weiss Bershad Hynes and Lerach, New York, NY, R. Paul Yetter, Yetter and Warden, Houston, TX, Michael J. Pucillo, Burt & Pucillo, West Palm Beach, FL, Glen DeValerio, Jeffrey C. Block, Berman DeValerio et al, Boston, MA, Vincent R. Cappucci, Entwistle & Cappucci, New York, NY, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Lieff Cabraser et al, San Francisco, CA, Stephen Lowey, Lowey Dannenberg et al, White Plains, NY, Wendy Hope Zoberman, Berman DeValerio et al, West Palm Beach, FL, Johnston de Forest Whitman, Jr., Andrew J. Entwistle, Entwistle & Cappucci LLP, New York, NY, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, Bonnee Linden, Dr, Hewlett, NY, Don R. Sampen, Illinois Ass't Atty Gen, Chicago, IL, Joseph D. Jamail, II, Jamail and Kolius, Houston, TX, John K. Villa, Mary G. Clark, George A. Borden, Williams & Connolly LLP, Washington, DC, Mark D. Starr, Fredrick F. Neid, Don Stenberg, Ass't Atty Gen, L. Steven Grasz, Deputy Atty Gen, Lincoln, NE, Daniel J. Doyle, Office of Atty Gen, Harrisburg, PA, Thomas J. Blessington, Office of Atty Gen, Philadelphia, PA, G. William Scott, Timothy Hauser, Robin Springberg Parry, Michael Schloss, U.S. Dept of Labor, Washington, DC, Damon Michael Young, Young Pickett et al, Texarkana, TX, Jeffrey S. Boyd, Deputy Atty Gen for Litigation, Austin, TX, Brian D. Salwowski, Deputy Atty Gen, Indianapolis, IN, Linda L. Addison, Fulbright and Jaworski, Houston, TX, David H. Donaldson, Jr., George & Donaldson, Austin, TX, James L. Petersen, Ice Miller, Indianapolis, IN, Mike McKool, Jr., McKool Smith, Dallas, TX, George David Gordon, Baggett Gordon & Deison, Conroe, TX, Brian D. Hail, Milbank Tweed et al, New York, NY, for Movants.

Joseph A. Grundfest, Stanford Law School, Stanford, CA, Stephen Webster, SEC, Legal Counsel, Fort Worth, TX, for Amicus.

Carolyn S. Schwartz, pro se, New York, NY, for Trustee.

## MEMORANDUM AND ORDER

## RE SECONDARY ACTORS' MOTIONS TO DISMISS

HARMON, District Judge.

The above referenced putative class action, brought on behalf of purchasers of Enron Corporation's publicly traded equity and debt securities during a proposed federal Class Period from October 19, 1998 through November 27, 2001, alleges securities violations (1) under Sections 11 and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77k and 77o; (2) under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act" or "the 1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; and (3) under the Texas Securities Act, Texas Rev. Civ. Stat. Ann. art. 581-33 (Vernon's 1964 & 2002 Supp.).

■ Pending before the Court *inter alia* are motions to dismiss pursuant to Rules 8(e)(1),[1] 9(b),[2] and 12(b)(6)[3] of the

---

1. "Each averment of a pleading shall be simple, concise, and direct."

2. Rule 9(b) provides,

 **Fraud, Mistake, Condition of Mind** In all averments of fraud, or mistake, the circum-

Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), codified at 15 U.S.C. § 78u–4(b)(3)(A), and *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), filed by the following accounting firms, law firms, and investment banks/integrated financial services institutions ("secondary actors in securities markets"[4]): (1) Canadian Imperial Bank of Commerce ("CIBC")(# 615); (2) CitiGroup Inc. (# 629); (3) J.P. Morgan Chase & Co.(# 632); (4) Vinson & Elkins L.L.P. (# 648); (5) Arthur Andersen LLP (# 650); (6) Barclays PLC (# 653); (7) Credit Suisse First Boston (# 658); (8) Kirkland & Ellis (# 660); (9) Bank of America Corporation (# 664); (10) Merrill Lynch & Co. (# 667); (11) Lehman Brothers Holdings Inc. (# 679); and (12) Deutsche Bank AG (# 716).[5]

stances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In securities fraud actions, the Fifth Circuit applies and strictly interprets Rule 9(b) as requiring a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir.2002); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir.)(*citing Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)), *cert. denied*, 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997).

The Fifth Circuit treats a dismissal for failure to plead fraud with particularity under Rule 9(b) as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir.1996), *citing Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir.1993).

3. In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. *Id.* The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. *Lawal v. British Airways, PLC*, 812 F.Supp. 713, 716 (S.D.Tex. 1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief". *Conley v.*

*Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Nevertheless, conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss. *Fernandez–Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir.1993). Courts need only accept well-pleaded factual allegations as true. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520, 523 (5th Cir.1993); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994)(courts should "not accept as true conclusory allegations or unwarranted deductions of fact.").

In the instant action, as discussed above and below, Plaintiff must also satisfy the pleading requirements of Rule 9(b)(fraud must be pled with particularity) and for scienter under the PSLRA and Rule 10b–5.

4. *Central Bank v. First Interstate Bank*, 511 U.S. at 191, 114 S.Ct. 1439.

5. Plaintiff's consolidated complaint asserts claims against various subsidiaries and affiliates of J.P. Morgan Chase & Co., which Plaintiffs refer to collectively as "JPMorgan Chase." J.P. Morgan Chase & Co. objects that these corporations are separate entities. J.P. Morgan Chase & Co. was formed on December 31, 2000 by the merger of J.P. Morgan & Co. Incorporated and The Chase Manhattan Corporation.

Although the consolidated complaint names Lehman Brothers Holdings Inc. as a defendant, Lehman Brothers asserts, and points to paragraph 108 in the complaint to show that Lead Plaintiff concedes that the banking and advisory services at issue are provided only by its subsidiary, Lehman Brothers Inc.

Similarly in its memorandum supporting its motion to dismiss (# 630 at 10 n. 3), Citigroup writes, "For purposes of this motion only, we accept as true plaintiff's allegation

In essence Lead Plaintiff's consolidated complaint alleges that these and other named Defendants "are liable for (i) making false statements, or failing to disclose adverse facts while selling Enron securities and/or (ii) participating in a scheme to defraud and/or a course of business that operated as a fraud or deceit on purchasers of Enron's public securities during the Class Period. . . ." Consolidated complaint (# 441) at 254.

## APPLICABLE LAW

The rapid collapse of Enron Corporation ("Enron") and the resulting scope, variety, and severity of losses are unprecedented in American corporate history. It is not surprising that this consolidated action raises a number of novel and/or controversial issues that the law has thus far not addressed or about which the courts are in substantial disagreement. Lead Plaintiff Regents of the University of California's claims are grounded in securities statutes, but judicial construction of those statutes spans the full spectrum of possibilities. After a careful review of frequently divergent case law and extensive deliberation, the Court applies the following law to the allegations in the consolidated complaint and, where appropriate, explains the bases for its selection.

## I. Texas Securities Act

Plaintiff the Washington State Investment Board asserts a class action claim under the Texas Securities Act against Defendants Arthur Andersen LLP, JP Morgan, and Lehman Brothers and

against individual Enron Defendants Belfer, Blake, Buy, Causey, Chan, John Duncan, Fastow, Foy, Gramm, Harrison, Jaedicke, Lay, LeMaistre, Meyer, Jeffrey Skilling, Urquhart, Wakeham, Walker, Willison, Winokur in connection with the sale to the Washington Board and proposed subclass of $250 million of 6.95% Notes due July 15, 2028 and $250 million of 6.40% Notes due July 15, 2006.

■ Article 581–33 of the Texas Securities Act, Tex.Rev.Civ. Stat. (Vernon's Supp.2002), provides in relevant portion,

**Civil Liabilities**

A. Liability of Sellers.

(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known of the untruth or omission. The issuer of the security (other than a

---

that the entity that did those things [alleged by plaintiff] was Citigroup, Inc. In fact, however, any business dealings with Enron were those of Citigroup's subsidiaries, including Citibank, N.A. and Salomon Smith Barney, Inc." Bank of America raises a similar challenge with respect to its subsidiary, Bank of America Securities LLC. # 665 at 1 n. 1 and 9–10.

These objections cannot be dealt with in the context of a motion to dismiss. Defendants who remain in this litigation may file an appropriate motion with a supporting brief and evidence challenging Plaintiff's one-entity approach, but for purposes of the motion to dismiss this Court will assume that Plaintiff's characterization is proper.

government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security....

F. Liability of Control Persons and Aiders

(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer....

Tex.Rev.Civ. Stat. art. 581–33(A)(2), (F)(1) and (2)(Vernon Supp.2002). "Person" *inter alia* includes a corporation, partnership, limited partnership, company, and firm. Art. 581–4(B). "Sells" is defined as any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell, and encompasses "subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly by an agent or salesman, by circular, letter, or advertisement or otherwise." *Texas Capital Securities Inc. v. Sandefer,* 58 S.W.3d 760, 775 (Tex.App.-Houston [1st Dist.] 2001, review denied), *citing* art. 581–4(e). Moreover, liability may be imposed against a defendant as long as the defendant constituted any link in the chain of the selling process. *Brown v. Cole,* 155 Tex. 624, 291 S.W.2d 704, 708 (Tex.1956); *Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 922 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.); *Texas Capital Securities, Inc. v. Sandefer,* 58 S.W.3d at 775. The Texas Securities Act is to be construed "to protect investors" and "because article 581–33 is remedial in nature in the civil context, it 'should be given the widest possible scope.'" *Texas Capital Securities,* 58 S.W.3d at 775, *citing* Tex. Rev.Civ. Stat. art. 581–10–1(b)(Vernon 2001) and *Flowers v. Dempsey–Tegeler & Co.,* 472 S.W.2d 112, 115 (Tex.1971).

Article 581–33(A) has some significant differences from § 10(b) and from common law fraud in that it does not require reliance by the purchaser on the seller's material misrepresentation or omission, i.e., the purchaser does not have to demonstrate that it would not have bought the security if it had known of the misrepresentation or omission. *Granader v. McBee,* 23 F.3d 120, 123 (5th Cir.1994); *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 648–49 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.)("An omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest. An investor is not required to prove that he would have acted differently but for the omission or misrepresentation.... [T]he focus under the Texas Securities Act is on the conduct of the seller or issuer of the securities, i.e., whether they made a material misrepresentation, not on the conduct of the individual buyers."); *Anheuser–Busch Companies, Inc. v. Summit Coffee Co.,* 858 S.W.2d 928, 936 (Tex.App.-Dallas 1993, writ denied); *Rio Grande Oil Co.,* 539 S.W.2d at 921; *Summers v. WellTech, Inc.,* 935 S.W.2d 228, 234 (Tex.App.-Houston [1st Dist.] n.w.h.).

Nor does the plaintiff have to demonstrate scienter under the Texas Act. *Wood v. Combustion Engineering, Inc.*, 643 F.2d 339, 345 (5th Cir.1981).[6]

Where there are similarities, Texas courts turn to cases construing federal securities laws for guidance in interpreting the Texas Securities Act. *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000); *Beebe v. Compaq Computer Corp.*, 940 S.W.2d 304, 306–07 (Tex.App.-Houston [14th Dist.] 1997, no writ)("While cases dealing with the federal securities laws are not dispositive concerning our interpretation of the Texas Securities Act, they may provide persuasive guidance."); *Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637, 639 (Tex.1977); *Star Supply Co. v. Jones*, 665 S.W.2d 194, 196 (Tex.App.-San Antonio 1984, no writ); *Campbell v. Payne*, 894 S.W.2d 411, 417 (Tex.App.-Amarillo 1995, writ denied).

■ Thus to prevail under art. 581–33(A)(2), a plaintiff must show that the defendant seller in offering or selling a security made an untrue statement of material fact or an omission of material fact that was essential to make the statement not misleading. *Duperier v. Texas State Bank*, 28 S.W.3d 740, 745 (Tex.App.-Corpus Christi, 2000), *review dismissed by agreement* (Jan. 4, 2001). A misrepresentation or omission is "material if there is a substantial likelihood that proper disclosure would have been viewed by a reasonable investor as significantly altering the total mix of information made available.... In other words, the issue is whether a reasonable investor would consider the information important in deciding whether to invest." *Id.* (and cases cited therein). The investor/buyer has no duty to perform due diligence nor to discover the truth by exercising ordinary care. *Id.; In re Westcap Enterprises*, 230 F.3d at 726.

■ Although the Texas Securities Act does not define "control person," comments to the statute note, "control is used in the same broad sense as in federal securities law" and that "[d]epending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company." Art. 581–33F cmt. "The rationale for control person liability is that a control person is in the position to prevent the violation and may be able to compensate the injured investor when the primary violator (e.g., a corporate issuer which has gone bankrupt) is not." *Summers v. WellTech, Inc.* 935 S.W.2d 228, 231 (Tex.App.-Houston [1st Dist.] 1996); *Texas Capital Securities Management, Inc.*, 80 S.W.3d at 268. To make a *prima facie* case for control person liability under the Texas statute, the plaintiff must demonstrate that the defendant had actual power or influence over the controlled person and that the defendant induced or participated in the alleged violation. *Texas Capital Securities*, 80 S.W.3d at 261, *citing Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir.1990); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981). Status alone is insufficient to establish that a defendant is a control person within the ambit of the statute. *Id.* at 268, *citing Dennis*, 918 F.2d at 509. A control person at a corporation can be sued directly without joining the corporation as a defendant. *Summers v. WellTech, Inc.* 935 S.W.2d at 231. If the buyer still owns the securities at issue, rescission is the sole remedy available; only if he has sold the securities, may he

---

**6.** Article 33(a) was based on § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l*(a)(2), and like § 12(a)(2) is basically a strict liability statute (unless one of the express exceptions applies)

with no scienter requirement. *Texas Capital Securities*, 58 S.W.3d at 775, *citing Flowers*, 472 S.W.2d at 115.

obtain money damages. *Id.; Texas Capital Securities, Inc.*, 58 S.W.3d at 775.

■ To establish aider and abettor liability under art. 581–33(F)(2), a plaintiff must demonstrate (1) the existence of a primary violation of the securities laws, (2) that the aider has a general awareness of its role in the violation, (3) that the aider gave substantial assistance in the violation, and (4) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator. *Frank v. Bear, Stearns, & Co.*, 11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000, writ denied).[7]

## II. Federal Securities Law

### A. Section 10(b) of the 1934 Act and Rule 10b–5

■ Section 10(b) of the Exchange Act states in relevant part,

> It shall be unlawful for any person, directly or indirectly ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative[8] or deceptive[9] device or contri-

---

7. This Court has found no cases addressing the effect of *Central Bank v. First Interstate Bank*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)(holding that a "private plaintiff may not maintain an aiding and abetting suit under § 10(b).") on the Texas Securities Act. Because the Supreme Court relied on the language and legislative history of the federal 1934 Act, and because the Texas statute contains language expressly providing for aiding and abetting liability, this Court assumes the holding of *Central Bank* does not apply to the express provision for such secondary liability under article 581–33(F) in the Texas Securities Act.

8. The United States Supreme Court has held that the term "manipulation" as used in § 10(b) is " 'virtually a term of art when used in connection with securities markets' " and refers to practices "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), *quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)(Market "manipulation" "connotes intentional and willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."). The Supreme Court explained,

> "Wash sales" are transactions involving no change in beneficial ownership. "Matched" orders are orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security. Section 9(a) of the 1934 Act, 15 U.S.C. § 78i(a)(1), proscribes wash sales and matched orders when effectuated "(f)or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or ... with respect to the market for any such security."

*Ernst & Ernst*, 425 U.S. at 205 n. 25, 96 S.Ct. 1375. "[T]he basic aim of the antifraud provisions is to 'prevent rigging of the market and to permit operation of the natural law of supply and demand.' " *SEC v. First Jersey, Inc.*, 101 F.3d 1450, 1466 (2d Cir.1996)(citing *United States v. Stein*, 456 F.2d 844, 850 (2d Cir.)), *cert. denied*, (408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972)), *cert. denied*, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1977). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir.1999).

9. In *Santa Fe* the Supreme Court defined "deception" as used in § 10(b) as the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose. 430 U.S. at 470, 97 S.Ct. 1292. Thus the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative or deceptive act. Because "manipulation" is essentially a limited term of art, the focus in most securities violations is on deception or misrepresentation. *Santa Fe*, 430 U.S. at 476, 97 S.Ct. 1292. *Id.* at 473, 97 S.Ct. 1292

vance[10] in contravention of such rules and regulations as the [SEC] may proscribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5, which implements § 10(b), in turn provides in relevant part,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The scope of Rule 10b–5 is coextensive with the coverage of § 10(b). *United States v. O'Hagan*, 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Ernst & Ernst*, 425 U.S. at 214, 96 S.Ct. 1375; *SEC v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 1901 n. 1, 153 L.Ed.2d 1 (2002).

One objective underlying the enactment of § 10(b) following the 1929 stock market crash was "to insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan*, 521 U.S. at 658, 117 S.Ct. 2199. Furthermore Congress tried " 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.' " *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 150, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), *quoting SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The Supreme Court has indicated that the statute should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. at 151, 92 S.Ct. 1456, *quoting SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 195, 84 S.Ct. 275; *Zandford*, 122 S.Ct. at 1903.

---

(material misstatement (or omission)); at 475–77 (§ 10(b) must be, read flexibly, not technically and provides a cause of action for any Plaintiff who suffers an injury as a result of a deceptive practice touching its sale or purchase of a security. "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."). Nevertheless aiding and abetting liability is not covered by § 10(b). *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. at 177, 114 S.Ct. 1439 ("The [statute's] proscription does not include giving aid to a person who commits a manipulative or deceptive act.").

**10.** In *Ernst & Ernst*, the Supreme Court turned to *Webster's International Dictionary* (2d ed.1934) for definitions of "device" and "contrivance" in concluding that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional conduct," and not merely negligence. 425 U.S. at 197, 199, 96 S.Ct. 1375. The dictionary defined " 'device' as '(t)hat which is devised, or formed by design'; a contrivance; an invention; project; scheme; often a scheme to deceive; a stratagem; an artifice, and 'contrivance' in pertinent part as '(a) thing contrived or used in contriving; a scheme, plan, or artifice.' In turn, 'contrive' in pertinent part is defined as '(t)o devise; to plan, to plot ... (t)o fabricate ... design; invent ... to scheme.' " 425 U.S. at 199 n. 20, 96 S.Ct. 1375.

570

### a. Misleading Statements or Omissions

The PSLRA amends the Exchange Act and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. Pub.L. No. 104–67, 109 Stat, 737, codified at 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1. 78t, 78u, 78u–4, 78u–5.

▮▮▮ Under the PSLRA, 15 U.S.C. § 78u–4(b)(1) & (2),

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

If the facts are not pled with the requisite particularity, the action is to be dismissed. 15 U.S.C. § 78u–4(b)(3)(A). The Fifth Circuit views the standard of the PSLRA

to "at a minimum, incorporate the standard for pleading fraud under" Rule 9(b). ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 349–50 (5th Cir.2002). Thus to plead a false or misleading statement or omission as the basis for a § 10(b) and Rule 10b–5(b) securities fraud claim and avoid dismissal, a plaintiff must

(1) specify ... each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby;

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent .... the 'who, what, when, where, and how' required under Rule 9(b) ... [and] under 15 U.S.C. § 78u–4(b)(1), for allegations made on information and belief, ... and

(7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief.

Id. at 350.

▮▮▮ In most cases, at the pre-discovery stage, the allegations in the complaint are not based upon a plaintiff's personal knowledge and thus are based on "information and belief" regardless of whether they are so characterized. The Fifth Circuit, relying on the Second Circuit's reasoning in Novak v. Kasaks, 216 F.3d 300, 313–14 & n. (2d Cir.2000), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000), has held with respect to the last requirement,

[O]ur reading of the PSLRA rejects any notion that confidential sources must be named as a general matter. In our

view, notwithstanding the use of the word "all," [§ 78u–4(b)(1) ] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs. Accordingly, where plaintiffs rely on confidential sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. Accordingly, a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs.

*Id.* at 352. Nevertheless "if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false *and* the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources." *Id.* at 353.

 Moreover, the Fifth Circuit also noted that where the complaint states that its allegations were made on "investigation of counsel," the same pleading requirements as for "upon information and belief" apply. *Id.* at 351 n. 70, *citing In re Sec. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 885 n. 33 (S.D.Tex.2001).

 To state a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b–5(b), a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied and (5) which proximately caused his injury. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir.2002), *citing Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520–21 (5th Cir.1993); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406–07 (5th Cir.2001). Scienter for a private cause of action under § 10(b), means "intent to deceive, manipulate or defraud" (*Abrams*, 292 F.3d at 430, *citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)) or at least knowing misconduct (*Herman & MacLean v. Huddleston*, 459 U.S. 375, 382–83, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)(mere negligence is insufficient)). Because the PSLRA does not define generally the required scienter for private securities fraud claims under § 10(b) and Rule 10b–5, but only mandates that the plaintiff plead facts with particularity to give rise to a strong inference of the requisite state of mind, the Fifth Circuit has held that severe recklessness, "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it," is sufficient to satisfy the scienter requirement. *Nathenson*, 267 F.3d at 408.

 To survive a motion to dismiss, the plaintiff must plead specific facts with

particularity giving rise to a "strong inference" of scienter. *Nathenson*, 267 F.3d at 407. Circumstantial evidence may be used to give rise to a strong inference of scienter. *Abrams*, 292 F.3d at 430; *Nathenson*, 267 F.3d at 410. Rather than a piecemeal analysis, this court must view the totality of alleged facts and circumstances, together as a whole, to determine whether they raise the requisite strong inference of scienter. *Abrams*, 292 F.3d at 431.

■ Allegations of motive and opportunity to commit fraud, by themselves, are generally insufficient to plead scienter in the Fifth Circuit, but may be employed along with other facts and circumstances to reach the level of severe recklessness. *Abrams*, 292 F.3d at 430; *Nathenson*, 267 F.3d at 410–411. Nor does a conclusory assertion that a defendant should have known about internal corporate problems based merely on his position or status within the corporation suffice. *Id.* at 432. Moreover, "[a]n unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of the allegedly contrary reports, their authors and recipients." *Id.* at 432. Rejecting the need for pleading comprehensive, detailed evidentiary matter in securities litigation and embracing the more "sensible standard" of *Novak*, discussed *supra*, the Fifth Circuit requires "at least some specifics from these reports," such as "who prepared internal company reports, how frequently the reports were prepared and who reviewed them." *ABC Arbitrage*, 291 F.3d at 355.

■ In addition, the Fifth Circuit has concluded that "the mere publication of inaccurate accounting figures or failure to follow GAAP,[11] without more, does not establish scienter; a plaintiff must show that the accounting firm deliberately misrepresented material facts or acted with reckless disregard about the accuracy of its audits or reports. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information." *Abrams*, 292 F.3d at 430.[12] *See also Melder v.*

11. GAAP, or Generally Accepted Accounting Principles, " 'are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").' " *In re K-tel Intern., Inc. Securities Litigation*, 300 F.3d 881, 889 (8th Cir.2002), *quoting Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n. 4 (2d Cir.2000). These rules apply to preparation of regular reports such as the 10–K and 10–Q form statements that publicly traded corporations must file annually or quarterly with the SEC. " 'There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question.' " *Id.* at 889, *quoting Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106

(1995). Thus GAAP " 'are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.' " *Id.*, *quoting Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). " 'When ... conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow.' " *Id.* " 'In the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP.' " *Id.*, *quoting Providence Hosp. of Toppenish v. Shalala*, 52 F.3d 213, 218 n. 7 (9th Cir.1995).

12. In accord on the proposition that allegations of GAAP violations, standing alone, are insufficient to raise an inference of scienter under the federal securities laws are *DSAM*

*Morris,* 27 F.3d 1097, 1103 (5th Cir.1994)("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud").

Allegations that a defendant was motivated to commit fraud to enhance his incentive compensation or to raise capital are also inadequate to establish scienter because "the executives of virtually every corporation in the United States would be subject to fraud allegations." *Abrams,* 292 F.3d at 434 ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.").

■ A plaintiff must also demonstrate that the challenged misrepresentations in dispute were material, that he relied on them, and that as a proximate result, he was damaged. Misrepresentations or omissions are material if there is a substantial likelihood that a reasonable investor would have viewed the allegedly false, misleading or omitted statement as having significantly altered the total mix of information available to him in deciding whether to buy or sell his stock or, phrased another way, "if there was a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Basic Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *ABC Arbitrage,* 291 F.3d at 359. Although materiality is a mixed question of fact and law and generally a decision for the jury, nevertheless, in reviewing a motion to dismiss, the court can determine that representations are immaterial as a matter of law. *ABC Arbitrage,* 291 F.3d at 359; *Nathenson,* 267 F.3d at 422.

■ "Reliance ... generally requires that the plaintiff have known of the particular misrepresentation complained of, have believed it to be true and because of that knowledge and belief purchased or sold the security in question." *Nathenson,* 267 F.3d at 413.[13]

*Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002); *City of Philadelphia v. Fleming Cos., Inc.,* 264 F.3d 1245, 1261 (10th Cir.2001)("Only where such allegations [of violations of GAAP] are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim."); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir.2001); *In re K–tel Intern'l, Inc. Securities Litigation,* 300 F.3d 881; *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996)("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim").

**13.** In *Nathenson,* the Fifth Circuit quotes the following passage from *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1117–18 (5th Cir.1988), *vacated on other grounds sub nom. Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), to explain the meaning of reliance for purposes of § 10(b) and Rule 10b–5:

The element of reliance is the subjective counterpart to the objective element of materiality. Whereas materiality requires the plaintiff to demonstrate how a "reasonable" investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove that it *actually* based its decisions upon the defendants' misstatements or omissions. "Reliance is *causa sine qua non,* a type of 'but for' requirement: had the investor known the truth he would not have acted." ... Thus, [c]ourts sometimes consider the reliance component of the Rule 10b–5 action to be a part of the causation element. In this context, the term "transaction causation" is used to describe the requirement that the defendant's fraud must precipitate the investment decision.... On the other hand, "loss causation" refers to a direct causal link between the misstatement and the claimant's economic loss. [citations omitted]

267 F.3d at 413.

To satisfy the reliance element in § 10(b) and Rule 10b–5 securities violation action, where a plaintiff investor who may not have read or heard the purported misrepresentations, a plaintiff may employ the "fraud-on-the-market" doctrine. The Supreme Court has stated that this theory "is based on the hypothesis that in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. ...." *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978, *citing Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986). Thus the presumption is that the plaintiff relied on the value of the stock, which is the market's reflection of available material information about a company including the company's fraudulent statements. *Fine v. American Solar King Corp.,* 919 F.2d 290, 298 (5th Cir. 1990), *cert. dism'd sub nom. Main Hurdman v. Fine,* 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

■ A defendant may rebut "the presumption of reliance by 'any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'" *Id., citing Basic,* 485 U.S. at 248, 108 S.Ct. 978. Thus the defendant can rebut the presumption by demonstrating that the nondisclosure had no effect on the stock's market price or that the plaintiff would have purchased the stock at the same price even if he had known the information that was not disclosed to the market or that the plaintiff actually knew about the information that was not disclosed to the market when he purchased the stock. *Id.; Nathenson,* 267 F.3d at 414. As a corollary to the fraud-on-the-market doctrine and a defense to rebut that doctrine's presumption that the defendant's misrepresentations af-

fected the price of the company's stock, the truth-on-the-market doctrine views a misrepresentation as immaterial if the information is already known to the market because that misrepresentation therefore cannot defraud the market. *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 905–06 n. 46 (S.D.Tex.2001).

The fraud-on-the-market theory is particularly relevant where a § 10(b) and Rule 10b–5 case alleges market manipulation.

> Market manipulation schemes which are intended to distort the price of a security, if successful, necessarily defraud investors who purchase the security in reliance on the market's integrity. Absent the ... theory, the parties injured by such manipulative schemes could not plead the necessary element of reliance.

*Scone Investments, L.P. v. American Third Market Corp.,* No. 97 CIV 3802(SAS), 1998 WL 205338, *5 (S.D.N.Y. Apr.28, 1998).

■ When the cause of action under § 10(b) is based on an allegation of a material omission, the plaintiff must demonstrate that the defendant had a fiduciary duty to disclose to the plaintiff. *Central Bank,* 511 U.S. at 174, 114 S.Ct. 1439 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). Such a duty to disclose under the federal securities laws "arises from the relationship between parties." *Dirks v. SEC,* 463 U.S. 646, 657–58, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The plaintiff must be "entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States,* 445 U.S. 222, 226, 228, 230 n. 12, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)(holding that when a person engages in insider trading, thus not disclosing inside information, to violate § 10(b) the trader must have an

independent duty of disclosure; in dicta the court observed that corporate insiders violate a fiduciary duty to shareholders when they trade on nonpublic information).[14]

The PSLRA establishes a "safe harbor" shielding a "forward-looking" statement from Rule 10b–5 liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." 15 U.S.C. § 78u–5 and § 78u–5(c)(1)(B)(i). A statement is "forward-looking" if, *inter alia,* it is

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A),(B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer....

15 U.S.C. § 78u–5(i)(1)(A).

■■■ The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(i) and (ii). If a statement is "accompanied by meaningful cautionary statements," the defendants' state of mind is not relevant. *Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999), *citing* H.R. Conf. Rep. 104–369, at 44 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person· making the statement.") *See also Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996)("when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws"). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B).

---

**14.** Corporate insiders do not have a duty to disclose all material information to the public; but rather their duty is either to disclose the confidential information which is the basis for their wanting to sell their stock or to abstain from trading until such disclosure is made. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968)(*en banc*), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108.

■ The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1213 (1st Cir.1996); *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 930 (D.N.J.1998).

The PSLRA restricts review of forward-looking statements to those specified in the complaint. 15 U.S.C. § 78u–4(b)(1). Thus the Court must examine piecemeal the statements made by the company as expressed in the pleadings.

There is a judicially created equivalent to the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine, which the Eleventh Circuit in *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 n. 7 (11th Cir.1999) explains "operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to 'bespeak caution' to investors that actual results may differ, thereby shielding the statements from § 10(b) and Rule 10b–5 liability." *Id.*, citing *Saltzberg v. TM Sterling/ Austin Assoc.*, 45 F.3d 399 (11th Cir. 1995)(*per curiam*)(holding that explicit cautionary language in private placement memorandum rendered alleged misstatements immaterial and made them not actionable under the "bespeaks caution" doctrine).

■ The Fifth Circuit has rejected the application of the "bespeaks caution" doctrine as a *per se* bar to liability. *Rubinstein v. Collins*, 20 F.3d 160, 162 (5th Cir.1994). Observing that the use of the doctrine by district courts "reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law," the Fifth Circuit skeptically comments,

In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language— in particular, relevant specific facts or assumptions—affecting the reasonableness of the reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.

*Id.* at 167 [footnotes and citations omitted]. Under Fifth Circuit precedent, "[C]autionary language is *not necessarily sufficient* in and of itself, to render predictive statements immaterial as a matter of law. Rather, ... materiality is not judged in the abstract, but in light of the surrounding circumstances." *Id.* at 167–68, *citing Krim v. BancTexas Group*, 989 F.2d 1435, 1448–49 (5th Cir.1993). The Fifth Circuit has defined the test: "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.'" *Id.* at 168, *citing Krim*, 989 F.2d at 1445.

Similarly, vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996)(statement that company was " 'optimistic' about [its earnings] in 1993" and "*should* deliver income growth consis-

tent with its historically superior performance" held to be "puffery" and to "lack the sort of definitive positive projections that might require later correction"); *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993)(statements in Annual Report that corporation predicted "10% to 30% growth rate over the next several years" and was "poised to carry the growth and success of 1991 well into the future" held to be mere puffery or immaterial statements); *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 888 (S.D.Tex.2001)("Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts")(*citing Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993)).

**b. Manipulative or Deceptive Contrivance or Scheme to Deceive or Course of Business**

Securities fraud actions under § 10(b) and Rule 10b–5 are not merely limited to the making of an untrue statement of material fact or omission to state a material fact. Section 10(b) prohibits "any manipulative or deceptive contrivance," which, as indicated above, the Supreme Court, relying on *Webster's International Dictionary,* includes "a scheme to deceive" or "scheme, plan or artifice." *Ernst & Ernst,* 425 U.S. at 199 n. 20, 96 S.Ct. 1375. While subsection (b) of Rule 10b–5 provides a cause of action based on the "making of an untrue statement of a material fact and the omission to state a material fact," subsections (a) and (c) "are not so restricted" and allow suit against defendants who, with scienter, participated in "a 'course of business' or a 'device, scheme or artifice' that operated as a fraud" on sellers or purchasers of stock even if these defendants did not make a materially false or misleading statement or omission. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *See also Superintendent of Ins. v. Bankers Life & Cas. Co.* 404 U.S. 6, 11 n.7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)("[I]t [is not] sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception."); *Zandford,* 122 S.Ct. at 1903–04 (broker's "continuous series of unauthorized" sales of securities and personal retention of the proceeds without his client's knowledge to further his fraudulent scheme "are properly viewed" as a " 'course of business' that operated as a fraud or deceit on a stockbroker's customer" in connection with the sale of securities). Novel or atypical methods should not provide immunity from the securities laws.; *Santa Fe,* 430 U.S. at 475–76 and n. 15, 97 S.Ct. 1292 (stating that § 10(b) covers deceptive "practices" and "conduct"); *Central Bank,* 511 U.S. at 177, 114 S.Ct. 1439 ("we again conclude that the statute prohibits only the making of a material misstatement *or the commission of a manipulative act* [emphasis added]."); *In re Splash Technology Holdings, Inc. Sec. Litig.,* 2000 WL 1727377, *13 (N.D.Cal. Sept.29, 2000)("Whereas 10b 5(b) focuses on fraudulent statements, 10b–5(a) and (c) are not by their terms restricted to statements. In this case, plaintiffs allege both fraudulent statements and acts as their requisite manipulative or deceptive practices").

In *Zandford*, a unanimous Supreme Court opinion, leaving aside the misrepresentation and omission language since it was not relevant to the case, the high court focused on § 10(b)'s alternative basis for liability, "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe" and Rule 10b–5's ban on the use, "in connection with the purchase or sale of any security," of "any device *scheme*, or artifice to defraud" or any other "act, practice, or *course of business*" that "operates ... as a fraud or deceit [emphasis added]." 122 S.Ct. at 1903. The Supreme Court held that allegations of a stock broker's fraudulent scheme of "selling his customer's securities and using the proceeds for his own benefit without the customer's knowledge or consent" constituted "fraudulent conduct 'in connection with the purchase or sale of any security'" within the meaning of § 10(b) and Rule 10b–5. 122 S.Ct. at 1900–01. The Court emphasized that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act." 122 S.Ct. at 1903.

Furthermore, employing a flexible approach to construing § 10(b), the Supreme Court clarified the statutory language, "in connection with the purchase or sale of any security." Noting that the stock sales and the broker's fraudulent practices were interdependent, the high court observed that the broker, who had discretion to manage his clients' investment account and a general power of attorney to engage in securities transactions without their prior authorization or approval, wrote checks to himself from the clients' mutual fund account that required the sale of securities to pay him. 122 S.Ct. at 1901. Thus the broker did not merely lawfully sell his clients' stock and then decide to misappropriate the proceeds. 122 S.Ct. at 1904. Instead, the fraud coincided with the sales, each of which furthered his scheme, through a "course of business," to defraud his clients and misappropriate their assets.[15]

An insider's trading in securities of his company based on material non-public information "qualifies as a 'deceptive device' under § 10(b)." *United States v. O'Hagan*, 521 U.S. 642, 643, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), *quoting Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The simple allegation that a defendant was motivated to sell his company stock at a high price without an allegation that the defendant profited from such inflation also will not give rise to a strong inference of scienter. *Abrams*, 292 F.3d at 434. To be probative of scienter, a plaintiff must allege insider trading that occurred in suspicious amounts or at suspicious times, "out of line with trading practices or at times calculated to maximize personal profit. Further, even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period." *Id.* at 435.

---

**15.** Lead Plaintiff has alleged a scheme or course of business in which the various participant Defendants concealed a pattern of creating unlawful SPEs and utilizing fraudulent transactions with these entities as contrivances or deceptive devices to defraud investors into continuing to pour investment money into Enron securities to keep afloat the Ponzi scheme and thereby enrich themselves in a variety of ways. The Court finds that the purchase of Enron securities by misled investors was allegedly an integral part of the alleged scheme and necessary to further that scheme.

■ Market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by § 10(b) [16] and Rule 10b–5 that do not fall within the category of misleading statements and omissions.[17] *See, e.g., United States v. Langford,* 946 F.2d 798 (11th Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1562, 118 L.Ed.2d 209 (1992) [18]; *In re Blech Securities Litigation (Blech III),* No. 94 CIV. 7696 RWS, 2002 WL 31356498, *3 (S.D.N.Y. Oct.17, 2002)(concluding that stock-purchaser plaintiffs' allegations that Bear Stearns & Co.[19] with scienter "directed" or "contrived" and agreed to fund specific fraudulent trades by Blech & Company, which Bear Stearns knew had a history of sham trading, and also processed the transactions, in an attempt to artificially inflate the price of Blech securities and reduce Blech's debit balance, and thereby knowingly engaged in a scheme to defraud through sham transactions, stated a claim for primary liability under § 10(b)); *Scone Investments, L.P. v. American Third Market Corp.,* No. 97 CIV. 3802, 1998 WL 205338, *5 (S.D.N.Y. Apr.28, 1998); *In re Blech Sec. Litig. (Blech II),* 961 F.Supp. 569, 580 (S.D.N.Y. 1997)("a plaintiff asserting a [§ 10(b) and Rule 10b–5] market manipulation claim must allege direct participation in a scheme to manipulate the market for securities"), *citing Ernst & Ernst v. Hochfelder,* 425 U.S. at 199, 96 S.Ct. 1375 (defining market manipulation as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities"). In *Blech III,* the court identified as practices constituting manipulation of the market "trades with controlled entities, fictitious trades, wash sales, prearranged matched trades, and 'painting the tape,'" together with lending money or securities or borrowing money or securities from a customer, guaranteeing any account against loss, entering purchase or sale orders designed to raise or lower the price of a security or to give the appearance of trading for purposes of inducing others to trade (*i.e.,* "marking the close" or "prearranged trading") and "making arrangements to 'park' any security away from the true owner." 2002 WL 31356498, *5. The *Blech* court also made clear that plaintiffs in that suit had to allege facts giving rise to a strong inference of scienter and assert that "Bear Stearns *caused* or *directed* trading by Blech & Co.'s customers or *solicited* or *induced* them to buy Blech Securities at inflated prices," i.e., "in addition to alleging scienter of the Blech scheme, Plaintiffs must also allege that Bear Stearns itself engaged in the kind of manipulative conduct that Section 10(b) prohibits in this context." *Blech II,* 961 F.Supp. at 582–83 (Section 10(b) requires allegation that Bear Stearns "directly and knowingly participated in deceptive or ma-

---

16. 15 U.S.C. § 78j.

17. Common to claims of deceptive statements about the financial condition of an issuing corporation and to claims based on market manipulation through deceptive trading activity is the introduction of inaccurate information into the marketplace. *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 205 (3d Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 2588, 153 L.Ed.2d 778 (2002).

18. Although criminal violations of § 10(b) require a showing that the act was done willfully, the elements of a civil and criminal violations of the statute are otherwise the same, and courts in criminal cases frequently cite civil interpretations of the statute to determine whether there has been a violation.

19. Bear Stearns & Co. is a clearing broker for different brokerage houses.

nipulative conduct that caused damage to the [plaintiff].").

Furthermore, conclusory "allegations that are consistent with the normal activity" of such a business entity, standing alone, e.g., in *Blech* the normal legitimate activity of a clearing broker, are insufficient to state a claim of primary liability under *Central Bank. Blech II*, 961 F.Supp. at 584 ("[T]he Complaint crosses the line dividing secondary liability from primary liability when it claims that Bear Stearns 'directed' or 'contrived' certain allegedly fraudulent trades. Under these circumstances, the Complaint adequately alleges that Bear Stearns engaged in conduct with scienter, in an attempt to affect the price of the Blech securities.")[20]; *McDaniel v. Bear Stearns & Co., Inc.*, 196 F.Supp.2d 343, 353 (S.D.N.Y.2002)("[W]here a clearing firm moves beyond performing mere ministerial or routine clearing functions and [with actual knowledge] becomes actively involved in the introductory broker's [fraudulent] action, it may expose itself to liability with respect to the introductory broker's misdeeds.").

Thus to state a claim for market manipulation under § 10(b) and Rule 10b–5 against parties that employed manipulative and deceptive practices in a scheme to defraud, a plaintiff must allege (1) that it was injured (2) in connection with the purchase or sale of securities (3) by relying on a market for securities (4) controlled or artificially affected by defendants' deceptive and manipulative conduct, and (5) the defendants engaged in the manipulative conduct with scienter.[21] *Blech II*, 961 F.Supp. at 582, *citing Ernst & Ernst v. Hochfelder*, 425 U.S. at 199, 96 S.Ct. 1375.

Furthermore because courts acknowledge the difficulty of satisfying Rule 9(b) in pleading a claim of market manipulation, "where the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Blech II*, 961 F.Supp. at 580; *see also Vandenberg v. Adler*, No. 98 CIV. 3544 WHP, 2000 WL 342718, *5 (S.D.N.Y. Mar.31, 2000); *In re Sterling Foster & Co., Inc. Sec. Litig.*, 222

**20.** In *Blech II*, the complaint alleged that Bear Stearns "acted as a direct participant in the alleged manipulative scheme"; that Bear Stearns "knew that the market prices of Blech Securities had to be maintained at artificially inflated levels in order for Blech to liquidate sufficient amounts of those securities to eliminate the debit balance outstanding at Bear Stearns and thereby eliminate Bear Stearns' own exposure to the risk of incurring losses"; that Bear Stearns had access to insider information about Blech's "financial condition, liquidity and net capital position"; that Blech had pledged its securities as collateral to lending banks and if the price declined, the banks would seize that collateral and sell it, thus lowering the market price; that if the stock went down, so would Blech's ability to borrow from the banks and it would be unable to meet margin calls on its own securities accounts, including accounts at Bear Stearns; that Bear Stearns had the "power to extend or deny credit to Blech …

based on the value of Blech securities held as collateral" and "the power and control to determine whether or not to execute securities transactions on behalf of Blech & Co. and its clients,"; and that Bear Stearns insisted that Blech sell the securities to reduce the debt that Blech owed to Bear Stearns and to eliminate Bear Stearns' exposure. 961 F.Supp. at 577–78. Judge Sweet, in denying Bear Stearns' motion to dismiss, found that the alleged "pressure exerted by Bear Stearns on Blech to reduce his debit balance, when combined with Bear Sterns' knowledge of Blech's sham trading and its clearing of such trades, does not 'reflect .. the standard of [a] clearing broker.' " *Id.* at 585.

**21.** This Court, under the Fifth Circuit, applies a different standard for pleading scienter than the Second Circuit, which regularly allows pleading motive and opportunity by themselves to suffice.

F.Supp.2d 216, 278–79 (E.D.N.Y. 2002)("Courts have found allegations of fraud to have been pled with sufficient particularity when the complaint specifies (1) the manipulative acts performed; (2) which defendants performed them; and (3) the effect the scheme had on the market for the securities at issue.").

Moreover, to effectuate the Congressional purpose behind the 1934 Act of " 'insur[ing] honest securities markets and thereby promot[ing] investor confidence,' " by requiring full disclosure " 'to achieve a high standard of business ethics in the securities industry,' " the Supreme Court has repeatedly "construed [the statute] 'not technically and restrictively, but flexibly. . . .' " *Zandford*, 122 S.Ct. at 1903 (citations omitted). The SEC has also "consistently adopted a broad reading of the phrase, 'in connection with the purchase or sale of any security' " and "maintained that a broker who accepts payments for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds" violates § 10(b) and Rule 10b–5, and the Supreme Court, in deference to the agency, followed suit in *Zandford*. *Id.* at 1903. In *Zandford*, concerned that "this statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)" and focusing on the broker's scheme over a two-year period during which he made a number of transactions and converted the proceeds of the sales of his clients' securities to his own use, the Supreme Court concluded,

> The securities sales and [the broker's] fraudulent practices were not independent events. This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so. Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market. Rather respondent's

fraud coincided with the sales themselves.

> Taking the allegations in the complaint as true, each sale was made to further respondent's fraudulent scheme; each was deceptive because it was neither authorized by, nor disclosed to, the [clients]. . . . In the aggregate, the sales are properly viewed as a "course of business" that operated as a fraud or deceit on a stockbroker's customer. . . . .

> The fact that [the broker] misappropriated the proceeds of the sales provides persuasive evidence that he had violated § 10(b) when he made the sales, but misappropriation is not an essential element of the offense. . . . It is enough that the scheme to defraud and the sale of the securities coincide.

*Id.* at 1903–04. The high court found that this type of fraud, based on silence, "represents an even greater threat to investor confidence in the securities industry" than merely an affirmative misrepresentation, in view of the fiduciary duty owed by a broker to a client with a discretionary account and the fact that this relationship of trust and confidence therefore gives rise to a duty to disclose. *Id.* at 1905. The Supreme Court concluded that because the broker "sold the [clients'] securities while secretly intending from the very beginning to keep the proceeds" and deprive the clients of that benefit, the "SEC complaint describes a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide" and the breaches were thus " 'in connection with' securities sales within the meaning of § 10(b)." *Id.* at 1905–06.

### c. *Central Bank* and Primary Violations

■ Of substantial relevance to the motions this Court now reviews is the Supreme Court's holding in a 5–4 decision in *Central Bank of Denver, N.A. v. First*

*Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), based on the language and legislative history of the statute, that a private plaintiff may not bring an aiding and abetting claim under § 10(b) and Rule 10b–5.[22] The high court construed the general antifraud provision as prohibiting only the making of a material misstatement or a material omission or the commission of a manipulative act; therefore it does not prohibit giving aid to another, who then commits a primary § 10(b) violation. *Id.* at 177, 114 S.Ct. 1439. It further emphasized that none of the express private causes of action in both the Securities Act of 1933 and the 1934 Exchange Act imposes liability on one who aids or abets such primary violators. *Id.* at 179, 184, 114 S.Ct. 1439. Thus it reasoned, "[t]here is no reason to think that Congress would have attached aiding and abetting liability only to § 10(b) and not to any of the express private rights of action in the Act." *Id.* at 180, 114 S.Ct. 1439, *citing Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)(it would be "anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action."). The court rejected as implausible the argument that silence in the statute constituted an "implicit congressional intent to impose § 10(b) aiding and abetting liability." *Id.* Furthermore, the Supreme Court pointed out that the critical element for recovery under Rule 10b–5, reliance, would be eliminated if liability were imposed for aiding and abetting. *Id.* at 180, 114 S.Ct. 1439

("Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions."). Nor did it find that anything in the legislative history "even implies that aiding and abetting was covered by the statutory prohibition on manipulative and deceptive conduct." *Id.* at 183, 114 S.Ct. 1439.[23]

Nevertheless, the Supreme Court did not conclude that secondary actors such as lawyers, accountants, banks, and underwriters were therefore always shielded from § 10(b) and Rule 10b–5 liability:

> Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in securities markets are always free from liability under the securities Act. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. .... In any complex securities fraud, moreover, there are likely to be multiple violators....

*Id.* at 191, 114 S.Ct. 1439.

Furthermore, in *Central Bank* the defendant bank was the indenture trustee for $26 million in bonds issued by a public building authority, some in 1986 and more

---

**22.** From 1966 until 1994, private party suits against secondary actors for aiding and abetting primary violators of Section 10(b) had been allowed to proceed in federal court.

**23.** In contrast, in 1995 the PSLRA authorized the SEC to bring enforcement actions against

those who "knowingly provide[ ] substantial assistance to another person" in violation of the federal securities laws, but did not create a parallel private cause of action. 15 U.S.C. § 78t(f).

in 1988. The bonds were secured by landowner assessment liens and contained covenants requiring that the subject land had to be worth at least 160% of the bonds' outstanding principal and interest and that the developer had to give the defendant bank an annual appraisal showing that the value of the land met this requirement. Even though the developer did so in 1998, the bank learned through the underwriter that the appraisal was questionable and that the value of the property securing the 1996 bonds may have declined, a fact confirmed by the bank's own in-house appraiser. Nevertheless the bank continued working with the developer and delayed obtaining an independent review of the developer's valuation of the land while the bank issued more bonds in 1988. Subsequently the building authority defaulted on the bonds and the bond purchasers did not only sue the authority, the bonds' underwriters, and the land developer, but they also sued the bank, but only as "secondarily liable under § 10(b) for its conduct in aiding and abetting the [other defendants'] fraud." 511 U.S. at 164, 114 S.Ct. 1439. The high court examined only the aiding and abetting claim pled against the bank and did not address the question whether the bank might be a primary violator, since the plaintiffs had not alleged such a claim.

In sum, the Supreme Court left it to the lower courts to determine when the conduct of a secondary actor makes it a primary violator under the statute. In the aftermath of *Central Bank*, two divergent standards, the "bright line" test and the "substantial participation" test, have emerged.

Under the "bright line" test, in order for the conduct of a secondary actor to rise to the level of a primary violation, the secondary actor must not only make a material misstatement or omission, but "the misrepresentation must be attributed to the spe-cific actor at the time of public dissemination," i.e., in advance of the investment decision, so as not to undermine the element of reliance required for § 10(b) liability. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998), *cert. denied*, 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *see also Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997)(" 'If *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be it is not enough to trigger liability under Section 10(b).' ")(*quoting In re MTC Electronic Technologies Shareholders Litigation*, 898 F.Supp. 974, 987 (E.D.N.Y.1995)). For example, according to the investor-plaintiffs' complaint in *Wright*, 152 F.3d 169, Ernst & Young LLP, an outside auditor for BT Office Products, Inc. ("BT"), violated § 10(b) by privately and orally approving false and misleading financial statements that the auditor knew would be passed on to investors. BT subsequently made these statements public during a press release, but represented that the information was unaudited and did not mention Ernst & Young. The district court granted the accounting firm's motion to dismiss based on *Central Bank's* rejection of aiding and abetting liability. On appeal, the Second Circuit affirmed, finding that a contrary result would in effect "revive aiding and abetting liability under a different name, and would therefore run afoul of the Supreme Court's holding in *Central Bank*." *Id.* at 175. It also required that the defendant, to be liable, must have known or should have known that his representation would be disseminated to investors, although the defendant need not communicate the misrepresentation directly to them. *Wright*, 152 F.3d at 175, *citing*

*Anixter v. Home–Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir.1996). The Second Circuit noted that because in BT's press release BT did not mention Ernst & Young, nor Ernst & Young's private prior approval of the statements made in the press release by BT, the auditor

> neither directly nor indirectly communicated misrepresentations to investors. Therefore, the amended complaint failed to allege that Ernst & Young made "a material misstatement (or omission) on which a purchaser or seller of securities relie[d]." Moreover ... because the press release contained a clear and express warning that no audit had yet been completed, there is no basis for Wright to claim that Ernst & Young had endorsed the accuracy of those results.

152 F.3d at 175. The Second Circuit has found that words such as "assisting," "participating in," "complicity in," and synonyms employed throughout a complaint, "all fall within the prohibitive bar of *Central Bank.*" *Shapiro*, 123 F.3d at 720.

Other cases applying the "bright line" test include *In re Kendall Square Research Corporation Securities Litigation*, 868 F.Supp. 26, 28 (D.Mass.1994)(accounting firm's "review and approval" of financial statements and prospectus were not sufficient to impose liability on it under § 10(b)); *Vosgerichian v. Commodore International*, 862 F.Supp. 1371, 1378 (E.D.Pa.1994)(the accountant's advice to and guidance of a client, who then made allegedly false and misleading statements, were not enough to impose primary liability on accountant); *Anixter*, 77 F.3d at 1223–1227 & nn. 7–12; *Ziemba v. Cascade Intern'l, Inc.*, 256 F.3d 1194, 1205, 1207 (11th Cir.2001)("[I]n order for [a secondary actor, such as a law firm or an accounting firm,] to be primarily liable under § 10(b) and Rule 10b–5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the

plaintiff's investment decision was made"; for an omission there must be a duty to disclose as determined by a multi-factor test); *In re Kendall Square Research Corp. Securities Litigation*, 868 F.Supp. 26 (D.Mass.1994)(accountant's review and approval of false or misleading financial statements does not support imposition of primary liability).

Unlike the Second Circuit, the Tenth Circuit does not require attribution of the alleged misrepresentation to the secondary actor at the time of the statement's dissemination to the public. For instance, the Tenth Circuit in *Anixter*, emphasizing that "[t]he critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff," states,

> Clearly, accountants may make representations in their role as auditor to a firm selling securities. *See, e.g., Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)(defendant accountant found primarily liable for violating § 10(b) based on representations filed with the SEC). Typical representations include certifications of financial statements and opinion letters. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). An accountant's false and misleading representations in connection with the sale of any security, if made with the proper state of mind and if relied upon by those purchasing or selling a security, can constitute a primary violation. *Central Bank of Denver*, 511 U.S. at 190–91, 114 S.Ct. at 1455; ... There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach.... Nevertheless, for an accountant's misrepresentation to be ac-

tionable as a primary violation, there must be a showing that he knew or should have known that his representation would be communicated to investors because § 10(b) and Rule 10b–5 focus on fraud made "in connection with the sale or purchase" of a security.

*Id.* at 1225.

The less stringent "substantial participation" test provides for primary liability where there is "substantial participation or intricate involvement" of the secondary party in the preparation of fraudulent statements "even though that participation might not lead to the actor's actual making of the statements." *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir.2000).

Cases applying the "substantial participation" rule include *In re Software Toolworks*, 50 F.3d 615, 628 n. 3, 629 (9th Cir.1994)(accountant may become a primary violator under antifraud provision of § 10(b) where it reviews and plays a "significant role in drafting and editing" two letters, one not identifying the accounting firm, sent by the issuer client to the SEC; a reasonable factfinder could find that the accountants "as members of the drafting group, ... had access to all information that was available and deliberately chose to conceal the truth"), *cert. denied sub nom. Montgomery Securities v. Dannenberg*, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *In re ZZZZ Best Securities Litigation*, 864 F.Supp. 960, 970 (C.D.Cal.1994)(where accounting firm was "intricately involved" in the creation of false and misleading documents and the "resulting deception," it may be liable as a primary violator of § 10(b)); *Cashman v. Coopers & Lybrand*, 877 F.Supp. 425, 432–34 (N.D.Ill.1995)(primary liability may be established against accountants "centrally involved" in preparation of alleged false or misstated information for prospectuses or promotional material issued to investors

that the accounting firm certified, audited, prepared or reported.); *McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396, 426 (E.D.Tex.1999)("if a defendant played a 'significant role' in preparing a false statement actually uttered by another, primary liability will lie").

A number of courts have criticized the substantial participation test as inconsistent with *Central Bank's* prohibition of aiding and abetting liability under § 10(b). *See, e.g., Anixter*, 77 F.3d at 1226 n. 10 ("To the extent that these cases allow liability to attach without requiring a representation be made by defendant and reformulate the 'substantial assistance' element of aiding and abetting liability into primary liability, they do not comport with *Central Bank of Denver*."). Nevertheless the Court notes that this criticism typically issued before *Zandford*, which made crystal clear that a misrepresentation need not be involved and that a suit could be based on Rule 10b–5(a) or (c).

This Court recognizes that without a clearer definition and a narrowing of the kind of conduct and circumstances required to constitute "substantial participation" or "intricate involvement," the substantial participation test may fail to differentiate between primary liability and aiding and abetting, or even unrestricted conspiracy, and that the area of overlap may be significant under such an expansive test. Until or unless Congress addresses the question that definition appears to be the task of the courts.

The SEC, in the role of *amicus curiae*, has filed a brief in this action that warrants consideration because it addresses the reasons why the bright-line test misses the mark. Brief attached to the SEC's motion for leave, as *amicus curiae*, to submit briefs (instrument # 821). The majority of its pleading is a submission filed on behalf of the plaintiffs in a case that was pending in the Third Circuit, but

which was settled before that appellate court could review the issue *en banc. Klein v, Boyd,* 949 F.Supp. 280 (E.D.Pa. 1996), *aff'd,* —— F.3d ——, 1998 WL 55245, Fed. Sec. L. Rep. P 90,136 (3d Cir.1998), *rehearing en banc granted, judgment vacated* (Mar. 9, 1998).[24] As framed by the SEC, the issue is,

> [i]s a person who makes a material misrepresentation, while acting with the requisite scienter, but who does not himself disseminate the misrepresentation to investors, and whose name is not made known to them, only an aider and abettor of the fraud, or is that person a primary violator subject to liability [under § 10(b) ]?

Brief at 5. More specifically, the issue is whether the phrase, "makes a material misstatement (or omission)," in Rule 10b–5 "means that a law firm or other secondary actor can be primarily liable for a misrepresentation only if it signs the document containing the misrepresentation or is otherwise identified to investors," in other words, does not disclose its identity to investors. The SEC argues that such a person is a primary violator under § 10(b), and in doing so, attacks the "bright line" test as an improper reading of *Central Bank.*

First, the SEC highlights the fact that the Supreme Court's use of the word, "makes,"[25] in *Central Bank* does not man-

---

**24.** In *Klein v. Boyd,* a panel of the Third Circuit Court of Appeals found that the law firm in the dispute could be liable as a primary violator of securities fraud even though the attorney did not sign the documents and was never known to the investor as a participant in the documents' creation. The appellate court concluded that once the law firm "elected to speak" by creating or participating in the creation of the documents it could not make material misrepresentations or omit material facts in drafting non-confidential documents such as opinion letters. Fed. Sec. L. Rep. (CCH) ¶ 90,136, 90,323 (3d Cir.1998)(citing and quoting from its earlier opinion, *Kline v. First W. Gov't Sec., Inc.,* 24 F.3d 480, 490–91 (3rd Cir.1994)). The law firm's duty did "not arise from a fiduciary duty to the investors; rather, the duty arose when the law firm undertook the affirmative act of communicating with investors. . . ." *Id.* at 90,323–24. Thus the court concluded that although the firm may not have a duty to blow the whistle on its client, once it chooses to speak, a law firm does have a duty to speak truthfully, to make accurate or correct material statements, even though the document may not be facially attributed to the lawyer. Id. at 90,325. The panel did require that the lawyer's "participation in the statement containing a misrepresentation or omission of a material fact [be] sufficiently significant that the statement can properly be attributed to the person as its author or co-author," so that it would not fall within the parameter of conduct constituting aiding and abetting. *Id.* In sum, the Third Circuit panel held that

when a person participates in the creation of a statement for distribution to investors that is misleading due to a material misstatement or omission, but the person is not identified to the investors, the person may still be liable as a primary violator of section 10(b) and Rule 10b–5 so long as (1) the person knows (or is reckless in not knowing) that the statement will be relied upon by investors, (2) the person is aware (or is reckless in not being aware) of the material misstatement or omission, (3) the person played such a substantial role in the creation of the statement that the person could fairly be said to be the "author" or "co-author" of the statement, and the other requirements of primary liability are satisfied.

*Id.* at 90,325.

The SEC's brief, submitted in this action, was written for the *en banc* review in *Klein,* but the case settled before the entire court could examine the issue.

**25.** As noted, § 10(b) uses the phrase "employs a manipulative device"; Rule 10b–5(b) uses the phrase, "makes a material misstatement (or omission)." As indicated in footnote 9 of this memorandum and order, the Supreme Court has interpreted "deception" as used in § 10(b) as meaning the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose, *Santa Fe,* 430 U.S. at 470, 97 S.Ct. 1292, and has thus concluded that the statute prohibits only the making of a materi-

date that an allegedly material misstatement be signed by or attributed to the secondary party so that the secondary party is identified to investors. Brief at 13–14. The statute only makes it unlawful "for any person, directly or indirectly … [t]o use or employ … any manipulative deceptive device or contrivance" and the interpretation of "makes" must be consistent with that "directly or indirectly" language. *Id.* at 10, 20. The SEC proposes "creates," as opposed to the bright line test's interpretation, "signs," as the appropriate synonym for the term, "makes," in *Central Bank;* the SEC contends that "[a] person who creates a misrepresentation[26] but takes care not to be identified publicly with it, 'indirectly' uses or employs a deceptive device or contrivance and should be liable" under § 10(b). *Id.* at 14. The SEC argues that the bright line test's requirement of identification of the misrepresenter to investors at the time of dissemination

> would have the unfortunate and unwarranted consequence of providing a safe harbor from liability for everyone except those identified with the misrepresentations by name. Creators of misrepresentations could escape liability as long as they concealed their identities. Not only outside lawyers would benefit from such a rule; others who are retained to prepare information for dissemination to investors, including accountants and public relations firms, could immunize themselves by remaining anonymous. Indeed, in-house counsel and other corporate officials and employees could avoid liability for misrepresentations they created, as long as their identities were not made known to the public. In sum, by providing a safe harbor for anonymous creators of misrepresentations, a rule that imposes liability only when a person is identified with a misrepresentation would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws.

*Id.* The SEC maintains that "[t]he Supreme Court did not set forth a bright line rule for liability, much less one that turns on whether the identity of a defendant is disclosed." *Id.* at 15. Moreover, under the SEC's construction of the statute, third-party defendants are still substantially protected from frivolous suits by the scienter requirement. *Id.* at 16. As for the element of reliance, the SEC insists that

> [t]he reliance a plaintiff in a securities fraud action must plead is reliance on a misrepresentation, not on the fact that a particular person made the misrepresentation. The Supreme Court stated in *Central Bank* that liability exists where "[a]ny person or entity, including a lawyer, accountant, or bank … makes a material misstatement (or omission) on which a purchaser or seller of securities relies." … Thus the Court placed the focus on the misrepresentation, not on the fact that a particular person made it.

---

al misstatement (or omission) or the commission of a manipulative act. *Santa Fe,* 430 U.S. at 473, 97 S.Ct. 1292 (holding that § 10(b) does not apply to breaches of fiduciary duty by majority shareholders against minority shareholders without an allegation of misrepresentation or lack of disclosure); *Central Bank,* 511 U.S. 164, 177, 114 S.Ct. 1439 (1994)("The proscription does not include giving aid to a person who commits a manipulative or deceptive act.").

**26.** The requirement that the secondary party, itself, allegedly make a misleading or false representation (or omission) or commit a deceptive act that violates § 10(b) brings the party within the primary liability definition of the statute and avoids aiding and abetting pitfalls of the too expansive "substantial participation" test.

*Id.* at 17, *citing Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439.[27]

The SEC proposes instead the following rule for primary liability of a secondary party under § 10(b): "when a person, acting alone or with others, creates a misrepresentation [on which the investor-plaintiffs relied], the person can be liable as a primary violator … if … he acts with the requisite scienter." Brief at 18. "Moreover it would not be necessary for a person to be the initiator of a misrepresentation in order to be a primary violator. Provided that a plaintiff can plead and prove scienter, a person can be a primary violator if he or she writes misrepresentations for inclusion in a document to be given to investors, even if the idea for those misrepresentations came from someone else." *Id.* Furthermore, "a person who prepares a truthful and complete portion of a document would not be liable as a primary violator for misrepresentations in other portions of the document. Even assuming such a person knew of misrepresentations elsewhere in the document and thus had the requisite scienter, he or she would not have created those misrepresentations." *Id.* at p. 19. Finally, of course, the plaintiff must plead and prove the elements of scienter and reliance.

 Because § 10(b) expressly delegated rule-making authority to the agency,[28] which it exercised *inter alia* in promulgating Rule 10b–5, this Court accords considerable weight to the SEC's construction of the statute since the Court finds that construction is not arbitrary, capricious or manifestly contrary to the statute. *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies …' " if that construction is reasonable); *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)[29]; *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1

**27.** The Attorneys General of a number of states have also submitted an *amicus curiae* memorandum and agree (see instruments # 861 at 9–10 and # 876).

**28.** Section 10(b) makes it "unlawful for any person … [t]o use or employ, in connection with the purchase or sale of any security …, any manipulative or deceptive device or contrivance *in contravention of such rules and regulations as the [SEC] may prescribe* [emphasis added]." 15 U.S.C. § 78j.

**29.** The Supreme Court stated in *Mead,* 533 U.S. at 229, 121 S.Ct. 2164,

This Court in *Chevron* recognized that Congress not only engages in express delegation of specific interpretive authority, but that [s]ometimes the legislative delegation to an agency on a particular question is implicit…. Congress, that is, may not have ex-

pressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not have an intent" as to a particular result…. When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, … but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's inter-

(2002)("[The agency's] interpretation of the ambiguous text of § 10(b), in the context of formal adjudication, is entitled to deference if it is reasonable," *citing Mead*, 533 U.S. at 229–30, 121 S.Ct. 2164).

Furthermore, this Court concludes that not only material misrepresentations, but also the statute's imposition of liability on "any person" that "directly or indirectly" uses or employs "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of security should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" [30] 15 U.S.C. § 78(j)(b); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. at 151, 92 S.Ct. 1456, *quoting SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 195, 84 S.Ct. 275; *Zandford*, 122 S.Ct. at 1903.[31]

pretation is reasonable [citations omitted]....

**30.** Congress passed the post-depression era securities fraud laws to achieve "broad remedial goals." *Pinter v. Dahl*, 486 U.S. 622, 653, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The Supreme Court identified these goals in *Basic*, 485 U.S. at 230, 108 S.Ct. 978:

> The 1934 Act was designed to protect investors against manipulation of stock prices. See S.Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the 'fundamental purpose' of the Act as implementing a 'philosophy' of full disclosure.'" *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 ... (1977), quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 ... (1963).

**31.** The Attorneys General of the States of Arkansas, California, Connecticut, Georgia, Illinois, Louisiana, Massachusetts, Montana, Nebraska, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Washington, West Virginia, and Wisconsin have filed an *amicus curiae* memorandum (# 861), joined by the Attorneys General of Indiana, Kentucky, Louisiana, Maryland, Michigan, Nevada, Oklahoma, and the Commonwealth of Puerto Rico (# 876). The Attorneys General also argue that Defendants have ignored the "scheme" or "course of business" liability or erroneously assumed that subsections (a) and (c) were impliedly struck down in *Central Bank* merely because it addressed only subsection (b) misrepresentation and omission and only secondary (aiding and abetting) liability. They point to the Supreme Court's subsequent opinion in *Zandford*, upholding scheme and course-of-business liability, as indicating that liability under subsections (a) and (c) remains intact. Construing Rule 10b–5 flexibly with a view to Congressional intent behind § 10(b) and noting that Rule 10b–5 was issued by the SEC in 1942 pursuant to § 10(b)'s authorization that the SEC define "manipulative or deceptive devices" or "contrivances" through rules and regulations, the Attorneys General argue, and the Court agrees, that the express language of the Rule's subdivisions, (a)(scheme liability),(b) (misrepresentation or omission liability), and (c)(course of business liability), establishes eight different types of manipulative or deceptive devices or contrivances that Defendants can commit and for which they can be held primarily liable:

1. Employing a device to defraud (Rule 10b–5(a));
2. Employing a scheme to defraud (Rule 10b–5(a));
3. Employing an artifice to defraud (Rule 10b–5(a));
4. Making any untrue statement of material fact (Rule 10b–5(b));
5. Omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (Rule 10b–5(b));
6. Engaging in an act which operates or would operate as a fraud or deceit upon anyone (Rule 10b–5(c));
7. Engaging in a practice which operates or would operate as a fraud or deceit upon anyone (Rule 10b–5(c));
8. Engaging in a course of business which operates or would operate as a fraud or deceit upon anyone (Rule 10b–5(c)).

*Amicus Curiae* Memorandum (# 876) at 4. Thus the Attorneys General concur with this Court, contrary to the arguments of some

This Court finds that the SEC's approach to liability under § 10(b) and Rule 10b–5(b) is well reasoned and reasonable, balanced in its concern for protection for victimized investors as well as for meritlessly harassed defendants (including

Defendants, that liability is not limited to the making of a material misstatement or omission, nor to a few very technical forms of manipulation. *See, e.g., Santa Fe,* 430 U.S. at 477, 97 S.Ct. 1292 ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices"); *Herman & MacLean,* 459 U.S. at 386, 103 S.Ct. 683 ("In furtherance of its objective, § 10(b) makes it unlawful to use '*any* manipulative or deceptive device or contrivance' in connection with the purchase or sale of any security [emphasis in original]"); *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 11 n. 7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)("'10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the *purchase or sale of securities* whether the artifices employed involved a garden type variety of fraud, or present a unique form of deception [emphasis in original]." [citation omitted] ); *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997)(*Central Bank* "does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme"); *ZZZZ Best,* 864 F.Supp. at 971 ("It appears that the scope of deceptive devices or schemes prohibited by subsections (a) and (c) is quite extensive")(rejecting dismissal of plaintiffs' allegations that Ernst & Young was primarily liable for its participation in creating publicly released statements, issuing a review report, and failing to disclose additional material facts because the allegations taken as a whole might make it liable under a scheme to defraud).

This Court does disagree with the Attorneys General where they step over the line to conspiracy and argue that participants in a scheme to defraud, no matter how small, are liable for other participants' conduct in furtherance of the scheme even if the participants did not commit a key act that itself violated § 10(b) and Rule 10b–5. The Court also differs with respect to Lead Plaintiff's analogy of liability under the securities statutes to that for criminal liability under wire fraud or mail fraud statutes in contending that a participant is liable for the conduct of all other participants in the scheme.

The Court observes that in *Central Bank,* in rejecting the argument that the statute's language, "directly or indirectly," shows that the Congress intended to reach everyone who engages even indirectly in the proscribed activities, the Supreme Court noted that "the problem is that aiding and abetting liability extends beyond persons who engage even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." 511 U.S. at 176, 114 S.Ct. 1439. "Aiding and abetting is 'a method by which courts create secondary liability' in persons other than the violator of the statute." *Id.* at 184, 114 S.Ct. 1439 (*quoting Pinter v. Dahl,* 486 U.S. 622, 648 n. 24, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)). The Supreme Court commented that Congress "knew how to impose aiding and abetting liability when it chose to do so, did so in the general criminal statute" in 1995. *Id.* at 176, 114 S.Ct. 1439. Nevertheless Congress did not provide for private aiding and abetting liability in any of the causes of action in the securities statutes nor has it passed a general civil aiding and abetting statute, but has specified, when it desires to impose such liability, such liability in selected, individual statutes. *Id.* at 179, 182–83, 114 S.Ct. 1439. In 1995 in the PSLRA, Congress expressly gave only the SEC the right to pursue enforcement actions against aiders and abettors in securities actions, but did not proffer that right to plaintiffs in private civil actions. *Id.* at 183, 114 S.Ct. 1439; 15 U.S.C. § 78t(f).

As will be further discussed, § 10(b) is silent about conspiracy liability and the securities statutes do not contain any provision authorizing a private cause of action for conspiratorial conduct. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 840–43 (2d Cir.1998)(holding "that where the requirements for primary liability [under § 10(b) ] are not independently met, they may not be satisfied solely on one's participation in a conspiracy in which *other parties* have committed a primary violation"); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1098 (N.D.Cal.1994), *aff'd,* 95 F.3d 922 (9th Cir.1996).

businesses, law firms, accountants and underwriters), in addition to the policies underlying the statutory private right of action for defrauded investors and the PSLRA. Moreover, it is consistent with the language of § 10b(b), Rule 10b–5, and *Central Bank.* Therefore since the SEC's proposed test is a reasonable interpretation of the text of the statute and serves its underlying policies, the Court adopts and applies it in this litigation to claims under § 10(b) and Rule 10b–5(b).

■ *Central Bank's* holding (that there is no cause of action for aiding and abetting under § 10(b) and that "all requirements for primary liability under Rule 10b–5" must be satisfied), 511 U.S. at 191, 114 S.Ct. 1439, affects pleading standards where the plaintiffs allege that a group of defendants participated in a scheme or a course of business to defraud investors under § 10(b) and Rule 10b–5. It is generally agreed that *Central Bank* foreclosed a cause of action merely for conspiracy to violate § 10(b) and Rule 10b–5, in addition to aiding and abetting. *See, e.g., Dinsmore v. Squardron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841 (2d Cir.1998)(and cases cited therein) [32]; *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 592 (9th Cir.1995); *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1243–44 (N.D.Cal.1994)(dismissing scheme claims as recharacterized conspiracy claims); *Stack v. Lobo,* 1995 WL 241448 *10 (N.D.Cal. Apr.20, 1995)(noting that in civil cases, conspiracy is a theory of liability available only after a completed tort exists, so where there is no primary violation pled under § 10(b) and Rule 10b–5, any secondary conspiracy claims must fail as well). Nevertheless, "*Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997). *Cooper* relied on a key passage in *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators....

Thus whether or not the word "conspire" is used, to survive a motion to dismiss, a complaint alleging that more than one defendant participated in a "scheme" to defraud must allege a primary violation of § 10(b) by each defendant.

For example, in *SEC v. U.S. Environmental, Inc.,* 155 F.3d 107 (2d Cir.1998), *cert denied,* 526 U.S. 1111, 119 S.Ct. 1755, 143 L.Ed.2d 787 (1999), the Second Circuit held that the SEC had successfully pled a primary violation of § 10(b) ("the making of a material misstatement (or omission) or commission of a manipulative act") by a secondary actor, i.e., an employee, John Romano, of a securities broker-dealer, Castle Securities Corporation ("Castle").

---

**32.** The *Dinsmore* panel, 135 F.3d at 841, noted that the dissent in *Central Bank* recognized that the majority opinion barred conspiracy as the basis for a securities violation claim: "The Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for conspiring to violate § 10(b) and Rule 10b–5." *Central Bank,* 114 S.Ct. at 1460 n. 12 (Stevens, J., dissenting).

Castle allegedly had agreed to participate in a scheme with other entities to manipulate upward the price of stock of U.S. Environmental, Inc. The complaint asserted that the employee had knowingly and recklessly participated in and furthered the market manipulation in following a stock promoter's directions to execute stock trades that the employee knew, or was reckless in not knowing, were manipulative. In that litigation the district court had dismissed the complaint because it had concluded that the employee was only an aider and abettor because he merely "followed directions ... and 'did not, himself make wash sales, match orders, or use undisclosed nominees to artificially affect the price of securities'" and "did not share the promoter's ultimate 'manipulative ... purpose.'" 155 F.3d at 110. The Second Circuit disagreed. Noting that scienter was a separate issue and not relevant to the Supreme Court's holding in *Central Bank* that aiders and abettors cannot be primary violators under § 10(b), the Second Circuit focused on the complaint's allegations about the nature of the employee's own acts, not his state of mind when he performed them. *Id.* at 111. The SEC claimed that the employee "'participated in the fraudulent scheme,'" by "effecting the very buy and sell orders that artificially manipulated USE's stock price upward," i.e. by "commi[tting] a manipulative act." *Id.* at 112. The appellate court observed, "Indeed, if the trader who executes manipulative buy and sell orders is not a primary violator, it is difficult to imagine who would remain liable after *Central Bank.*" *Id.* It further found "of no relevance that [the stock promoter] masterminded the USE stock manipulation and that the 'stock promoter's' group 'directed' [the employee] to effect the illegal trades." *Id.* The Second Circuit emphasized,

> Like lawyers, accountants, and banks who engage in fraudulent or deceptive practices at their clients' direction, Romano is a primary violator despite the fact that someone else directed the market manipulation scheme. The Supreme Court in *Central Bank* never intended to restrict § 10(b) liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities law. In sum, the complaint alleges that Romano is primarily liable under § 10(b) and Rule 10b–5 for manipulation of USE stock.

*Id.*

Thus secondary actors may be liable for primary violations under an alleged scheme to defraud if all the requirements for liability under Rule 10b–5 have been satisfied as to each secondary-actor defendant and any additional heightened pleading requirements have been met. *Id.* If a plaintiff meets the requirements of pleading primary liability as to each defendant, i.e., alleges with factual specificity (1) that each defendant made a material misstatement (or omission) or committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, (2) scienter, and (3) reliance, that plaintiff can plead a scheme to defraud and still satisfy *Central Bank. See, e.g., Cooper v. Pickett,* 137 F.3d 616 (9th Cir.1997); *Dinsmore,* 135 F.3d at 842 ("We simply hold that where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which *other parties* have committed a primary violation"; "secondary actors who conspire to commit ... violations will still be subject to liability so long as they independently satisfy requirements for private liability."); *Pegasus Holdings v. Veterinary Centers of America, Inc.,* 38 F.Supp.2d 1158, 1163–65 (C.D.Cal.1998).

Lead Plaintiff, using older cases, argues that a defendant that participates in a

scheme to defraud is liable for the damages caused by all the other acts taken by participants in a scheme in furtherance of the fraud. In addition to requiring that each participant be a primary violator of the act by itself making a material misrepresentation or omission or using a deceptive device or contrivance to defraud investors, this Court notes that under § 10(b), the PSLRA provides for joint and several liability only if the defendant is found to have knowingly committed the fraud, and otherwise the defendant, if only reckless, is liable only for the percentage of his responsibility for the fraud, i.e., proportionate liability. 15 U.S.C. § 78u–4(f). This express scheme for damages liability seems incompatible with Lead Plaintiff's argument that a participant is liable for damages caused by all participants, known or unknown, in the scheme.

Since the passage of the PSLRA with its procedural hurdles and stringent pleading standards to eliminate strike suits, this country has been overwhelmed with corporate scandals that place Congress' goal in enacting the PSLRA in a much wider perspective. Given the usual recent judicial focus on dismissing frivolous suits under the PSLRA, Judge Robert M. Parker provided balance in his concurrence in *Abrams*, 292 F.3d at 435–36,

> History reminds us of the consequences when financial statements of publicly held companies do not accord with reality. Indeed it was to protect against them that our nation's securities laws were enacted. At the same time we must pay heed to a different set of consequences—those brought about by the overzealous prosecution of specious securities fraud actions. Congress, in passing the Private Securities Litigation Reform Act of 1995, took pains to deter such strike suits. Its findings and legislative history suggest that the cost of protecting against fraud was unduly impairing the efficient operation of lawful

business. Today, when applying the PSLRA, courts must keep this policy consideration foremost in mind. But we must also recognize that Congress left unaffected shareholders' right to sue for recompense when they are made the victims of self-dealing and deceit. The PSLRA is a mechanism for winnowing out suits that lack a requisite level of specificity. It was not meant to let business and management run amuck to the detriment of shareholders.

The PSLRA's significance as a protective shield for business must be viewed within the context of the private right of action, granted decades before, to defrauded investors injured by corporate management, auditors, outside counsel, and investment bankers where their conduct allegedly violated the federal securities laws. The Supreme Court has repeatedly emphasized the deterrent value of those private rights of action, which "provide 'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to Commission action.'" *J.I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *See also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 729–30, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Randall v. Loftsgaarden*, 478 U.S. 647, 664, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). Indeed, in adopting the PSLRA, Congress emphasized that "[p]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses" and that private lawsuits "promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs." Joint Explanatory Statement of the Committee of Conference, Conference Report on Securities Litigation Reform, H.R. Conf. Rep. No. 104–369, at 31 (Nov. 28, 1995), 1995

U.S.C.A.A.N. at 730. The importance of this tool has been highlighted by recent disclosures of extraordinary corporate misconduct.[33]

## 2. Controlling Person Liability Under the 1934 Act

 Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)(liability of controlling persons and those who aid and abet violations), establishes a derivative liability for persons who "control" those who are primarily liable under the Exchange Act. It provides,

> Joint and several liability; good faith defense
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

liability is an alternate ground for liability from that of a primary violation. Thus a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the same defendant in the perpetration of the fraud. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996), *cert. denied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). A person charged with control liability may assert a defense that he acted in good faith with respect to the securities violation, i.e., that he acted reasonably and did not act recklessly. A defendant can meet the requirements of a good faith defense by showing that he used reasonable care to prevent the securities violation. *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957–58, 960 (5th Cir.1981); *Donohoe v. Consolidated Operating & Prod. Corp.,* 30 F.3d 907, 912 (7th Cir. 1994). Negligence alone is insufficient to support controlling person liability. *Id.*

Although worded in different ways, the control person liability provisions of § 15 of the 1933 Securities Act and § 20(a) of the 1934 Exchange Act are interpreted the same way. *Pharo v. Smith,* 621 F.2d 656, 672, *on rehearing in part,* 625 F.2d 1226 (5th Cir.1980); *First Interstate Bank v. Pring,* 969 F.2d 891, 897 (10th Cir.1992), *rev'd on other grounds,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). *See also Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 n. 15 (5th Cir.1993)("The control person sections of both acts are interpreted the same, at least with respect to the definition of 'controlling person,'" *citing G.A. Thompson,* 636 F.2d at 958 & n. 22), *cert. denied sub nom. Turnbull v. Home Insurance Co.,* 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Further-

---

**33.** In the September 8, 2002 edition of *The New York Times,* which extensively discussed the broad effects of the terrorist attacks on the World Trade Center, including on the stock market, Gretchen Morgenson commented,

> But perhaps a more significant lesson learned by investors is that, fearful though we all are of future attacks, a far greater risk to our continued prosperity and economic strength comes from within our shores, not without. The risk emanates from people in positions of power at corpo-

rations who cheat their shareholders, lie to investors and make millions in outsized compensation or well timed stock sales just before their games are exposed.

Gretchen Morgenson, "Market Watch: Rebound From Ruin, if Not From Distrust," Section 3 (Money and Business) at 1, *The New York Times,* (Sept. 8, 2002). The author included in her indictment "the huge financial institutions ... that appear to have helped companies hide their true financial positions from investors, earning handsome fees for their efforts." *Id.*

more, the provision for controlling person liability under the Texas Securities Act, article 581–33(F), is modeled after and parallel to that for section 15 of the 1933 Securities Act and section 20 of the 1934 Act. Tex.Rev.Civ. Stat. Ann. art. 581–33 cmt; *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 383–84 (Tex.App.-Houston [14th Dist.] 2000, review denied); *Busse v. Pacific Cattle Feeding Fund # 1, Ltd.*, 896 S.W.2d 807, 814 (Tex.App.-Texarkana 1995, writ denied); *Marshall v. Quinn–L Equities, Inc.*, 704 F.Supp. 1384, 1391 (N.D.Tex.1988).

▬▬▬ There is a split among the Circuits as to whether in a *prima facie* case a person must show that the alleged control person actually exercised control over the primary violator's general affairs or merely that the control person had the power to exercise such control. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 n. 8 (10th Cir.1998)(and cases cited and discussed therein). The Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed "the power to control [the primary violator], not the ex-

ercise of the power to control." *G.A. Thompson*, 636 F.2d at 958 (rejecting as a requirement for a *prima facie* case an allegation that the controlling person actually participated in the underlying primary violation); *Abbott v. Equity Group, Inc.*, 2 F.3d at 620. Nevertheless, a plaintiff needs to allege some facts beyond a defendant's position or title that show that the defendant had actual power or control over the controlled person. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509–10 (5th Cir.1990); *Kunzweiler v. Zero.Net, Inc.*, No. CIV. A. 3:00–CV–2553–P, 2002 WL 1461732, *13–14 (N.D.Tex. July 3, 2002). Furthermore, control person liability is derivative; a failure to plead a primary, independent violation by the controlled person § 10(b) and Rule 10b–5 precludes such a claim for secondary liability against the controlling person under § 20(a) of the Exchange Act, or, a violation of §§ 11 or 12 for control person liability under section 15 of the Securities Act of 1933. 15 U.S.C. §§ 78j(b), 78t(a); 15 U.S.C. § 77o; *ABC Arbitrage*, 291 F.3d at 348 n. 57, 362 n. 123.[34]

---

**34.** Although inapplicable to the entities whose motions to dismiss are under review in this memorandum and order, because the Court will be addressing the issue of insider trading in motions filed by individual defendants, it includes relevant law under § 20A of the 1934 Act.

 Section 20A of the Exchange Act, as amended, 15 U.S.C. § 78t–1(a), provides a private cause of action against a corporate insider for insider trading based on contemporaneous trading:

 Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in the possession of material, nonpublic information shall be liable .... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such viola-

tion is based on a purchase of securities) securities of the same class.

Thus to have standing to sue under § 20A, a private plaintiff "must have 'purchased ... or sold ... securities of the same class' 'contemporaneously' with the insider transaction at issue." *Clay v. Intern. Corp.*, 157 F.3d 1259, 1263 n. 5 (11th Cir.1998), *vacated in part on other grounds*, 176 F.3d 1381 (11th Cir.1999). As with control person liability under § 20(a) of the 1934 Act, liability under § 20A is derivative and requires proof of a separate underlying violation of the Act, such as a violation of § 10(b) and Rule 10b–5. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999); *Jackson National Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir.1994)(reference to "this chapter" means that a plaintiff must plead a predicate violation of the 1934 Act or of rules and regulations promulgated thereunder); *In re Veri-Fone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).

### 3. Section 11 of the Securities Act of 1933

Section 11, 15 U.S.C. § 77k(a), creates a private remedy for anyone who purchases a security based on a materially misleading registration statement at the time it became effective against the issuer of the securities, the issuer's directors or partners, the underwriters of the offering, and accountants named as preparers or certifiers of the registration statement. Section 11(a)(1–5) states in relevant part,

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; [and]

(5) every underwriter with respect to such security.

Under § 77k(f), such individuals are jointly and severally liable.

To prevail on a claim under § 11, a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material, that it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir.1994), *cert. denied*, 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir.1993).

■ A plaintiff generally is not required to demonstrate scienter under § 11, and a defendant will be liable for innocent or negligent material misrepresentations. *Id.* Where claims under Sections 11 and 12 of the Securities Act are grounded in negligence rather than fraud, there is no scienter requirement and it need only satisfy the liberal pleading requirements of Fed. R. of Civ. P. 8. *See, e.g., In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314–16 (8th Cir.1997)("the particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act because proof of fraud or mistake is not a prerequisite to establishing liability under § 11"), *cert. denied*, 524 U.S. 927, 118 S.Ct. 2321, 141 L.Ed.2d 696 (1998); *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 277 ("Section 11 violations need not, however, be pleaded with the specificity required of fraud claims governed by Rule 9(b)"), *clarified on other grounds*, 739 F.Supp. 1087 (N.D.Tex.1990); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1310

(S.D.N.Y.1996)(Rule 9(b) does not apply to Sections 11 and 12(2) of the Securities Act of 1933 because proof of scienter is not required).

Nevertheless, where § 11 claims actually sound in fraud rather than negligence, the plaintiff is required to plead the circumstances constituting the alleged fraud with particularity satisfying Rule 9(b). *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994);[35] *In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1405 & n. 3 (9th Cir.1996), *cert. denied sub nom. Anderson v. Clow,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). The Fifth Circuit subsequently limited the holding of *Melder* and made clear that where a complaint does not allege that the defendants are liable for fraudulent or intentional conduct, especially where it disavows and disclaims any allegations of fraud in its strict liability 1933 Securities Act claims, its claims do not "sound in fraud" and they cannot be dismissed for failure to satisfy Rule 9(b) if they can state a negligence claim under § 11. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 368 (5th Cir.2001)("The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated."). *See also In re Stac Electronics Securities Litig.,* 89 F.3d at 1404–05 and n. 3 [36]; *In re NationsMart,* 130 F.3d at 315.

Section 11 of the 1933 Act provides that liability to be imposed on an issuer, underwriter, and anyone that signs a registration statement containing a materially false or misleading statement. All except an issuer may assert certain statutory defenses: (1) the person conducted a "reasonable investigation" under § 11(b)(3)(A)(the "due diligence" defense); (2) the person relied on the opinion of an expert under § 11(b)(3)(B); the person's misconduct did not cause the investors' loss under § 11(e); and the right of contribution from more culpable parties under § 11(f).

■ False statements in a registration statement can create liability under both the 1933 and 1934 Acts. *Huddleston,* 459 U.S. at 382–83, 103 S.Ct. 683. The remedies are cumulative. *Id.* at 383, 103 S.Ct. 683.

### 4. Controlling Person Liability Under the 1933 Act

Title 15 U.S.C. § 77o, Section 15 of the 1933 Securities Act, entitled "Liability of controlling persons," imposes joint and several liability upon controlling persons for acts committed by those under their control that violate §§ 11 and/or 12. Thus if a plaintiff fails to state a primary security violation under Section 77k, the plaintiff also fails to state a claim under § 15. *Lone Star Ladies Investment Club,* 238 F.3d at 369. Specifically § 77o reads,

> Every person, who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the con-

---

**35.** In *Melder,* the Fifth Circuit concluded that Rule 9(b) applied to the plaintiffs' 1933 Securities Act claims because their complaint adopted wholesale all their allegations under the securities fraud claims for purposes of their 1933 Securities Act claims.

**36.** Lead Plaintiff has made such disclaimers in the consolidated complaint regarding its § 11 claims.

trolling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o (West 1997).

██ To survive a motion to dismiss a claim for controlling person liability under Section 15 of the 1933 Act, Lead Plaintiff must allege (1) an underlying primary violation of § 11 by the controlled person, (2) control by the defendant over the controlled person, and (3) particularized facts as to the controlling person's culpable participation in (exercising control over) the "fraud perpetrated by the controlled person." *Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 637–38 (S.D.N.Y.1999)(applying same test to 1933 Securities Act Section 15 claims and 1934 Exchange Act Section 20(a) claims, 15 U.S.C. § 78t(a))("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable"); *Sanders Confectionery Products, Inc. v. Heller Financial Inc.*, 973 F.2d 474, 486 (6th Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

Because a primary violation of § 11 is a necessary element of a § 15 claim, if a plaintiff fails to state a claim for a primary violation, he has also failed to state a claim under § 15. *Cooperman v. Individual, Inc.*, 171 F.3d 43, 52 (1st Cir.1999); *SEC v. First Jersey*, 101 F.3d at 1472.

Although whether a defendant is a control person is usually a question of fact, dismissal is appropriate where the plaintiff fails to plead any facts from which it can reasonably be inferred that the particular defendant was a control person. *Maher v. Durango Metals, Inc.*, 144 F.3d at 1306; *Sanders*, 973 F.2d at 485–86. Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another. *Ellison*, 36 F.Supp.2d at 638.

## C. Professional Conduct/Duty to Nonclient Investors

### 1. Attorneys

The issue of attorney liability involving a duty to disclose nonmisleading information to nonclients and third parties is a thorny one, complicated by tension between the need to provide remedy to parties suffering monetary loss because of a lawyer's conduct and the attorney-client relationship with its attendant confidentiality, loyalty and zealous representation requirements and policy concerns.

██ Ethical rules of conduct such as disciplinary rules do not create corresponding legal duties nor constitute standards for imposition of civil liability on lawyers. *See, e.g., Schatz v. Rosenberg*, 943 F.2d 485, 492 (4th Cir.1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); Preliminary Statement, Model Code of Professional Responsibility (admonishing that the Code does not attempt "to define standards for civil liability of lawyers for professional conduct"); Section 15 of the Preamble to the Texas Disciplinary Rules of Professional Conduct ("These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption

that a legal duty to a client has been breached."). They do, however, reflect public policy concerns. *See, e.g., Law Offices of Windle Turley v. Giunta,* No. 05–91–00776–CV, 1992 WL 57464 (Tex.App.-Dallas Mar. 23, 1992); *Polland & Cook v. Lehmann,* 832 S.W.2d 729, 736 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *Kuhn, Collins & Rash v. Reynolds,* 614 S.W.2d 854, 856 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.).

ABA Model Rule of Professional Conduct 1.6 (2001) states, "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation," except that the lawyer may, but does not have to, reveal confidential information (1) to the extent that the lawyer reasonably believes is necessary to prevent the client from committing a criminal act which the lawyer believes is likely to result in imminent death or substantial bodily harm,[37] or (2) to establish a claim or defense by the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal or civil charge against the lawyer based on conduct in which the client was involved, or to answer any allegations in any proceeding about the lawyer's representation of the client.

Pursuant to ABA Model Rule of Professional Conduct 1.2(d) an attorney "shall not counsel a client to engage, or assist a client in, conduct that the lawyer knows is criminal or fraudulent ...,"[38] but the attorney may discuss the legal consequences of any proposed conduct and help the client make a good faith effort to determine the application of the law to that proposed conduct. Comment 6 to the rule states, "The fact that a client uses advice in the course of action that is criminal or fraudulent does not, of itself, make a lawyer party to the course of action. However, a lawyer may not knowingly assist a client in criminal or fraudulent conduct. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity."

If the attorney learns that his client is involved in ongoing criminal or fraudulent acts, under ABA Model Rule 1.16 (2001),

(a) Except as stated in paragraph (c), a lawyer shall ... withdraw from the representations of a client if: (1) the representation will result in violation of the rules of professional conduct or other law; ...

(b) except as stated in paragraph (c) a lawyer may withdraw from representing a client ... if: (1) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent; (2) the client has used the lawyer's services to perpetrate a crime or fraud; and ...

(c) When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled....

After withdrawal the lawyer must also refrain from disclosing the client's confidences except as allowed under Rule 1.6.

---

**37.** Economic harm is not identified as a basis for the exception.

**38.** The Terminology section defines "knows" as "actual knowledge of the fact in question" and states that a "person's knowledge may be inferred from circumstances."

Model Rule 1.07 also bars a lawyer from representing a party where there is a substantial risk that the lawyer's representation would be materially and adversely affected by the lawyer's or his law firm's own interest.

The Texas Rules of Professional Conduct have similar but not identical provisions. Under Rule 1.02 of the Texas Rules of Professional Conduct (1990)(emphasis added),

. . . . .

(c) A lawyer shall not assist or counsel a client to engage in conduct that the lawyer knows is criminal or fraudulent. A lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel and represent a client in connection with the making of a good faith effort to determine the validity, scope, meaning or application of the law.

(d) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act *that is likely to result in substantial injury to the financial interests or property of another,* the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud.

(e) When a lawyer has confidential information clearly establishing that the lawyer's client has committed a criminal or fraudulent act in the commission of which the lawyer's services have been used, the lawyer shall make reasonable efforts under the circumstances to persuade the client to take corrective action. [emphasis added]

Comment 8 to Rule 1.02 states,

When a client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer may not reveal the client's wrongdoing, except as permitted or required by Rule 1.05. However, the lawyer also must avoid furthering the client's unlawful purpose, for example, by suggesting how it might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposes is legally proper but then discovers is criminal or fraudulent. Withdrawal from the representation, therefore, may be required.

Rule 1.05(c)(7) allows the lawyer to reveal confidential information of the client or former client "[w]hen the lawyer has reason to believe it is necessary to do so in order to prevent the client from committing a criminal or fraudulent act." Only where "the lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in death or substantial bodily harm to a person," must he disclose information adverse to the client; otherwise his first obligation is to try to dissuade the client from continuing is such conduct. Rule 1.05(e) and Comments 18 and 19. Nevertheless, if the client "persists in a course of action involving the lawyer's services that the lawyer reasonably believes may be criminal or fraudulent" or "the client has used the lawyer's services to perpetrate a crime or fraud," the lawyer must withdraw. Rule 1.15(b)(2) and (3) and Comment 2. *See also* Rule 1.15(a)(1) (withdrawal required if "the representation will result in violation of ... rules of professional conduct or other law....").

Relevant to Vinson & Elkins' undertaking of the investigation for Enron in the fall of 2001, Rule 1.06(a)(2) bars a lawyer from representing a client where that representation "reasonably appears to be or becomes limited ... by the lawyer's or law firm's own interests." Comment 5 provides in relevant part,

The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. . . . If the probity of a lawyer's own conduct in a transaction is in question, it may be difficult for the lawyer to give a client detached advice. . . .

*See also* Roger C. Cramton, "Enron and the Corporate Lawyer: Professional Responsibility Issues," 1324 PLI/Corp. 841, 853 (Aug.2002). According to the Restatement of Law Governing Lawyers § 122(2)(c), a client's consent is not effective " 'if, in the circumstances, it is not reasonably likely that the lawyer will be able to provide adequate representation. . . .' " *Id.*

The common law regarding attorney liability to nonclients for misstatements that are attributed specifically to him has been evolving steadily to address increasing concerns about attorney accountability or the lack thereof.

The Fifth Circuit has only twice addressed the issue of an attorney's duty to disclose information accurately to a third party in the context of alleged securities violations. In 1988, the Fifth Circuit, in a suit challenging the accountability of an underwriter's counsel for the alleged inaccuracy of the underwriter's offering statement to the investing public, reaffirmed the traditional rule that "lawyers are accountable only to their clients for the sufficiency of their legal opinions" because "any significant increase in attorney liability to third parties could have a dramatic effect upon our entire system of legal ethics," established to require the attorney to avoid conflicting duties, "remain loyal to the client," and "keep attorney client confidences." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1124 & nn. 18 and 19(5th Cir. 1988), *vacated on other grounds*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). The panel observed, "In general, the law recognizes such suits [by third parties] only if the non-client plaintiff can prove that the attorney prepared specific legal documents that represent explicitly the legal opinions of the attorney preparing them, for the benefit of the plaintiff." *Id.* at 1124 & n. 20 (noting that this rule, adopted by a growing number of states, reflects the increasing influence of the Restatement (Second) of Torts § 552, discussed *infra*). The Fifth Circuit did concede that an attorney who prepared a signed opinion letter for use by a third party might be liable under Rule 10b–5, but otherwise declined to depart from the traditional rule because it found "no binding authority creating a special rule in the field of securities law." *Id.* at 1124–25. In 1993 the Fifth Circuit held that even though its opinion in *Abell* was vacated by the Supreme Court as to issues under RICO, the decisions "remains authoritative on the non-RICO issues." *Abbott v. The Equity Group, Inc.*, 2 F.3d at 621 n. 23.

Nevertheless, in *Trust Company of Louisiana v. N.N.P.*, 104 F.3d 1478 (5th Cir. 1997), which makes only passing reference to *Abell*,[39] the Fifth Circuit concluded that

---

**39.** Rather than focusing on *Abell's* decision to follow the traditional privity rule for malpractice claims, *Trust Company* instead cites *Abell* for the proposition, "In order for an attorney to have a legal duty to supply correct information that he is liable to a non-client for malpractice, the plaintiff must show that the attorney provided legal services and that the attorney knew that the third party intended to rely upon those legal services." 104 F.3d at 1487, *citing Abell*, 858 F.2d at 1133. In *Trust*

*Company,* the Court found the attorney liable for negligent misrepresentation under Louisiana law, based on a duty to a third party "that flows from the codal provision that establishes liability for a *stipulation pour autrui*," or third party beneficiary. Having found that duty, the panel then determined that the plaintiff had satisfied all the elements for imposition of liability against the lawyer and his firm under Rule 10b–5.

the plaintiff, a non-client and the payee of notes (which the Court concluded were "securities" within the federal securities law) purportedly secured by the Government National Mortgage Association certificates ("GNMAs"), had satisfied all the elements of proof to show that the attorney and his firm owed the payee a duty under Louisiana law for negligent misrepresentation and for the imposition of primary liability under Rule 10b–5 (i.e., that the lawyer knowingly and with scienter made material misstatements in connection with the purchase of a security upon which the plaintiff justifiably relied and suffered injury). Specifically the attorney had assured the plaintiff that his firm had possession of and was the custodian for the GNMAs when counsel knew that the law firm did not have the certificates, but only assignments of interest in the certificates.

As noted earlier in footnote 24 of this memorandum and order, in *Klein v. Boyd,* a panel of the Third Circuit Court of Appeals held that once the law firm "elected to speak" by creating or participating in the creation of documents it knows would be distributed to investors, it could not make material misrepresentations or omit material facts in drafting the non-confidential documents. Fed. Sec. L. Rep. (CCH) ¶ 90,136, 90,323. The law firm's duty did "not arise from a fiduciary duty to the investors; rather, the duty arose when the law firm undertook the affirmative act of communicating with investors...." *Id.* at 90,323–24.[40] Thus the Third Circuit panel concluded that although the firm may not have a duty to blow the whistle on its client, once it chooses to speak, a law firm does have a duty to speak truthfully, to make accurate or correct material statements, even where the document does not

indicate that the attorney authored it. *Id.* and at 90,325. The panel did require that the lawyer's "participation in the statement containing a misrepresentation or omission of a material fact [be] sufficiently significant that the statement can properly be attributed to the person as its author or co-author," so that it would not fall within the parameter of conduct constituting aiding and abetting. *Id.*

Similarly, in *Rubin v. Schottenstein, Zox & Dunn,* 143 F.3d 263, 267 (6th Cir.1998), relying on the text of Rule 10b–5 (it is unlawful for any person [not excepting lawyers] to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...."), the Sixth Circuit, sitting *en banc,* concluded that an attorney for a corporation issuing securities, who agreed to speak directly to two potential investors about the corporation's financial condition as it related to the investment, had a duty not to misrepresent or omit material facts to those investors. The Sixth Circuit explained,

> Although under Rule 10b–5(b) and its predecessor, "only those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held liable as primary participants in the alleged deception[, a] duty to disclose naturally devolve[s] on those who h[ave] direct contacts with 'the other side.'" *SEC v. Coffey,* 493 F.2d 1304, 1315 (6th Cir.1974). "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a

---

40. *See also Anixter,* 77 F.3d at 1226–27 n. 12 (even where there is no fiduciary or other relationship of trust and confidence with non-clients, accountants may still have a "special

duty to disclose when they make affirmative statements on which they know the investors will rely").

security purchaser." *Id.* at 1315 n. 24. "A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." *SEC v. Washington County Util. Dist.*, 676 F.2d 218, 223 (6th Cir.1982).

*Id.* at 267.[41] It concluded that initially the attorney could have remained silent with no affirmative duty to disclose, but that once he chose to speak and make representations on behalf of the issuer, either alone or in participation with others, he had a duty to be accurate and complete about material matters and could not hide behind the attorney/client privilege. "In sum, while an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the financial condition of his client, he assumes a duty to provide complete and nonmisleading information with respect to the subjects on which he undertakes to speak." 143 F.3d at 268. In *dictum*, the appellate court

commented, "Admission to the bar, if anything, imposes a heightened, not a lessened, requirement of probity." *Id.* at 270. *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir.2002)(citing *Rubin*, 143 F.3d at 267–68, and concluding that if the plaintiff/investor can prove his allegations, "the lack of an independent duty [of Citibank to disclose its hedging strategy] is not, under such circumstances, a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues."). *See also Ackerman v. Schwartz*, 947 F.2d 841, 846, 848 (7th Cir.1991)(Easterbrook, J.)[42] ("Federal law requires persons to tell the truth about material facts once they commence speaking, but with rare exceptions it does not oblige them to start speaking"; "Under Rule 10b–5 ... the lack of an independent duty does not excuse a material lie. A subject of a tender offer or a merger bid has no duty to issue a press release, but if it chooses to speak it must tell the truth about material issues.... Although the

41. The Sixth Circuit's interpretation of "direct contacts" is broad. In *SEC v. Washington County Utility District*, 676 F.2d 218, 223 (6th Cir.1982), it explained,

> A duty to disclose naturally devolved on those who had direct contacts with the 'other side.' Direct contacts require neither physical presence nor face to face conversation. A person undertaking to furnish information which is misleading because of a failure to disclose material facts is a primary participant.

While *SEC v. Washington County* dealt with aiding and abetting claims before *Central Bank* was issued, *Rubin*, applying the same test, applies it to a primary Rule 10b–5 violator.

42. In *Ackerman*, 106 bilked investors in a fraudulent tax shelter, as third parties, sued an attorney, Howard Schwarz, and his law firm for securities violations on the grounds that he wrote an opinion letter for the promoters representing that the venture was legitimate and stating that investors could rely on the credits and reductions that the promoters of the tax shelter were touting to sell the

securities. The promoters subsequently absconded with the money and the IRS disavowed the deductions and credits and imposed interest and penalties on the investors. Schwarz argued that his duty ran only to the promoters to whom the opinion letter was addressed, and because the promoters knew the truth, the opinion letter's misrepresentations could not deceive them. Disagreeing, Judge Easterbrook wrote for the panel that Schwartz had consented to the distribution of his letter to accountants, attorneys, and tax advisors, who were agents of the investors, and that "[t]o give information to an agent is to give it to the principal ... so that it will affect the choice of investment." 947 F.2d at 847. Emphasizing that the case dealt with fraud, not negligence, the court concluded that Schwarz had acted recklessly, constituting the scienter for fraud, and that once he spoke and permitted the promoters to release his letter, he had a duty to tell the truth about material issues under *Basic*, 485 U.S. at 232–36, 108 S.Ct. 978. 947 F.2d at 847–48.

lack of duty to investors meant that [attorney] Schwarz had no obligation to blow the whistle ..., Schwarz cannot evade responsibility to the extent he permitted the promoters to release his letter [to agents of the investors].").

This Court notes that the circumstances in *Trust Company of Louisiana v. N.N.P.*, 104 F.3d 1478 (5th Cir.1997), in which an attorney was found liable for direct misrepresentations to a nonclient-prospective investor, fall within the parameters of the Sixth Circuit's *en banc* rule in *Rubin v. Schottenstein. See also Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 917–18 (6th Cir.1991)(holding under direct contacts test that an attorney who knowingly provided materially false or misleading information to investors may be liable as a primary participant under § 10(b)).

In Texas, it has long been established that a lawyer may be liable if he knowingly commits a fraudulent act or enters into a conspiracy with his client to defraud a third person. *Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 138 (1882)(where an attorney acting on behalf of his client participates in fraudulent activities, his conduct is "foreign to the duties of an attorney"); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex.Civ.App.-Houston [1st Dist.] 1985, no writ)("an attorney is liable if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person"); *Lewis v. American Exploration Co.*, 4 F.Supp.2d 673, 678 (S.D.Tex.1998); *Querner v. Rindfuss*, 966 S.W.2d 661, 666, 670 & n. 1 (Tex.App.-San Antonio 1998, writ denied). In the instant action, Lead Plaintiff alleges that Enron's lawyers, accountants, and underwriters participated together with Enron in a Ponzi scheme to enrich themselves, which, in a significant and essential part of the plan, defrauded third-party investors in Enron securities to keep funds flowing into the corporation.

The Restatement (Second) of Torts § 531 (1977) provides, "One who makes a fraudulent misrepresentation is subject to liability to the person or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." Although Texas has not formally adopted § 531, which does not require privity, the Texas Supreme Court recently stated that Texas' "jurisprudence, which focuses on the defendant's knowledge and intent to induce reliance, is consistent with the *Restatement* and with the law in other jurisdictions that have considered the issue." *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001). The high court observed, "[Texas] fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person to induce reliance" and pointed out instances where Texas courts "have held that a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct." *Id.* The Texas Supreme Court further commented, "While it is true that Texas courts have not used the words 'reason to expect' when discussing fraud's intent element, a defendant who acts with knowledge that a result will follow is considered to intend that result." *Id.* at 579, *citing Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48–49 (Tex.1998).

The facts in *Pacific Mutual*, summarized at 51 S.W.3d at 575–77, were that in

1982 InterFirst Corporation issued a series of notes. Subsequently, encountering financial problems, InterFirst tried to negotiate a merger with RepublicBank, which appeared to be a more profitable bank and had Ernst & Young audit RepublicBank's financial statements for the year ending in December 1996. The auditor's report gave an unqualified opinion[43] that these financial statements fairly represented Republic Bank's financial situation.

RepublicBank then incorporated that audit report and the audited financial statement into the 1996 annual report that RepublicBank provided to its shareholders and the audited financial statement into its 1996 Form 10–K annual report filed with the SEC. The merger took place in June 1987, and RepublicBank contemporaneously offered several securities. With InterFirst, Republic Bank issued a Joint Proxy and Prospectus requesting their shareholders to vote to approve the merger, as well as several other prospectuses for other stock and notes that incorporated by reference the Joint Proxy and Prospectus. All three prospectuses incorporated RepublicBank's 1986 Form 10K. Furthermore Republic Bank incorporated all three prospectuses into the Form S–3 registration statements that it filed with the SEC. Ernst & Young consented to the inclusion of its audit opinion and of its accounting information, as well as mention of its name in the "Experts" section of the prospectuses. In 1987, after reviewing public information about the merger including the three prospectuses, Plaintiff Pacific Mutual Life Insurance purchased $415,725 of the 1982 InterFirst notes a month after the merger and another $8 million a few months later, allegedly in reliance *inter alia* on the audit reports. Significantly it did not purchase any of the securities that were offered in the three prospectuses. RepublicBank filed for bankruptcy soon afterwards, and Pacific Mutual sued the auditing firm among others for fraudulent misrepresentation and noncompliance with GAAS.[44]

In *Pacific Mutual,* after the trial court granted summary judgment to Ernst & Young, the appellate court reversed, and Ernst & Young appealed. On review, rendering judgment, the Texas Supreme Court rejected Ernst & Young's contention that Pacific Mutual had to show that the auditor had direct intent to induce Pacific Mutual to rely on Ernst & Young's audit opinion and that Texas law requires privity to establish fraud. Nevertheless, the high court determined that the appeals court had not properly applied the reason-to-expect standard to the summary judgment evidence. *Id.* at 580. Finding that "[g]eneral industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent," the Texas Supreme Court focused on the language of comment d of § 531, stating that to show that an asserted "fraudfeasor had reason to expect reliance,"

> [t]he maker of the misrepresentation *must have information* that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and will influence their conduct. There must be something in the situation known to the maker that would lead a reasonable man to govern his conduct on the assumption

---

**43.** "An 'unqualified' or clean audit is the highest level of assurance that an auditor can give an organization's financial statements. Accountants will 'qualify' their opinion where discrepancies are identified in a client's financial statements." *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 663 n. 4 (3d Cir.2002).

**44.** Ernst & Young was the successor-in-interest to the actual auditing firm, Arthur Young & Co. 51 S.W.3d at 574 n. 1.

that this will occur. *If he has the information,* the maker is subject to liability under the rule stated here. [emphasis added]

51 S.W.3d at 581.

During the summary judgment litigation Pacific Mutual submitted evidence consisting of affidavits from two experts and an Ernst & Young employee demonstrating, in essence, that Ernst & Young had reason to expect that Pacific Mutual (based on generalized industry practice or understanding that prospectuses and proxy materials are widely distributed throughout the investment community), like other investors, would rely on such information. *Id.* at 580–81. Pacific Mutual cited as authority Restatement (Second) of Torts § 536 (1977), which states,

If a statute requires information to be ... filed ... for the protection of a particular class of persons, one who makes a fraudulent misrepresentation in so doing is subject to liability to the persons for pecuniary loss suffered through their justifiable reliance upon the misrepresentation in a transaction of the kind in which the statute is intended to protect them.

51 S.W.3d at 581. Comment c to § 536 states that one who meets "a statutory filing [with the SEC] requirement is presumed to have reason to expect that the information will reach and influence the class of persons the statute is trying to protect." *Id.* Comment d to § 536 further indicates that in identifying the protected class, "the focus is on the statute's purpose rather than the person furnishing the information." *Id.* Pacific Mutual argued that the laws and rules requiring SEC filings, which were enacted after the 1929 stock market crash, were "generally designed to protect investors." *Id.* at 582. Pacific Mutual emphasized that in deciding to purchase the InterFirst 1982 notes, it had relied on all the publicly available

information, including documents mandated by law to be filed with the SEC, that had incorporated subsequent audits prepared by Ernst. *Id.* at 581–82.

The Texas Supreme Court disagreed with Pacific Mutual and narrowly construed § 536. *Id.* at 582. It observed that Comment e of § 536 makes clear that the general purpose behind the law requiring public filings is to make the information available to anyone who considers it important in deciding what to do "in any type of transaction *with the corporation in question.*" *Id.* at 582 [emphasis added by this Court]. Pacific Mutual's purchase of InterFirst notes that were issued by InterFirst in 1982 prior to the merger with Republic was not a transaction with RepublicBank or with the proposed merger entity described in the offering by RepublicBank that incorporated the SEC filings. The court expressly chose not to decide if purchasers of securities issued by the merged entity or Republic Bank shareholders, which did not include Pacific Mutual, could rely on SEC filings, but emphasized that § 536's "reach [did not extend] to open-market purchases of unrelated securities." *Id.* at 582. Moreover, (1) because there was no counterpart to § 536 in Texas common law and other courts have rarely applied it, (2) because the case was originally brought in federal court under § 10(b) but was dismissed as time-barred, and (3) because investors have other remedies under federal and state securities laws, the Texas Supreme Court stated that "we are reluctant to apply section 536's presumption and subject market participants to liability for fraud damages to an almost limitless class of potential plaintiffs." *Id.* Because Pacific Mutual therefore had failed to prove the element of intent, under the high court's narrowly construed reason-to-expect standard, the court rendered judgment for the auditor.

As a relevant standard for comparison, in 1991 Texas has also recognized a duty of a professional to a nonclient to use reasonable care to supply accurate information under certain circumstances by adopting the Restatement (Second) of Torts § 552 (1977), defining a tort of negligent misrepresentation. *Federal Land Bank Association v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991). Section 552 provides,

(1) One who, in the course of his business, profession or employment, or in any transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Section 552 thus requires a species of intent that is closer to that for fraud than to that for negligence. Texas common law fraud requires that the defendant know that his representation was false or made recklessly without any knowledge of its truth and that the defendant intend to induce the plaintiff to act upon that representation. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983).

Moreover, eleven years after the Fifth Circuit issued *Abell*, which had followed the traditional rule that an attorney owes no duty regarding the sufficiency of its legal opinions to a third party in absence of privity of contract, but which also had noted the increasing influence of § 552, the Texas Supreme Court held that § 552 applies to lawyers. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex.1999).

The Texas Supreme Court observed that other courts, both state and federal, under Texas and other states' laws, have applied § 552 to other professions in addition to lawyers, including auditors, physicians, securities placement agents, accountants, real estate brokers, title insurers, as well as other types of evaluations issued by the professional, e.g., warranty deeds, title certificates, offering statements, offering memoranda, placement memoranda, deeds of trust, annual reports, and opinion letters. It determined that there "was no reason to exempt lawyers." *McCamish*, 991 S.W.2d at 791, 793, 795. Recognizing that "[t]he theory of negligent misrepresentation permits plaintiffs who are not parties to a contract for professional services to recover from the contracting professionals" and "imposes a duty to avoid negligent misrepresentation irrespective of privity," the Texas Supreme Court held that where a nonclient, not in privity with the attorney, receives and relies on an evaluation, such an opinion letter, prepared by another entity's attorney, he may sue under § 552 if the attorney is aware of the nonclient and intends that the nonclient rely on the information. *Id.* at 792–93. The high court also noted that the application of section 552 to attorneys was validated by what was then a tentative

draft of the Restatement (Third) of the Law Governing Lawyers § 73 (entitled "Duty of Care to Certain Nonclients"), which is now final.[45] That draft (as well as the final version) incorporates section 552 and provides in relevant part that irrespective of privity an attorney "owes a duty of care to a nonclient 'when and to the extent that: (a) a lawyer … invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the non-client so relies, and (b) the non-client is not, under applicable tort law, too remote from the lawyer to be entitled to protection.'" *McCamish*, 991 S.W.2d at 794–95.

The high court distinguished between liability for legal malpractice, which is based on "the breach of a duty that a professional owes his clients or others in privity," and liability for negligent misrepresentation, which is "based on an independent duty to a nonclient based on the professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely." *Id.* at 792. The Texas Supreme Court found that "applying section 552 to attorneys does not offend the policy justifications for the strict privity rule in legal malpractice cases" because a client still has control over the attorney-client relationship and potential liability to third parties does not create a conflict of duties nor threaten the attorney-client privilege because ethical rules, including Texas Disciplinary Rule of Professional Conduct 2.02 protect against such. *Id.* at 793. Nor does § 552 expose an attorney "to almost unlimited liability" because of its limitation on potential claimants to known parties to whom the attorney provided information for a known purpose and who justifiably relied upon that informa-

tion. *Id.* at 793–94. Comment h to § 552 explains the restrictions on standing to sue for negligent misrepresentation to "[p]ersons for whose guidance the information is supplied" and distinguishes it from standing to sue for fraudulent misrepresentation:

[The negligent supplier of information's liability] is somewhat more narrowly restricted than that of the maker of a fraudulent misrepresentation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it. Under this Section, as in the case of the fraudulent misrepresentation (see § 531), it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the misrepresentation intends to reach and influence either a particular person or persons, known to him, or a group or class of persons distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit this information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon

---

45. The final version of the part cited by the Texas Supreme Court in *McCamish*, and employing the same language as the draft, is Section 51, subsection 2 of the Restatement of Law Third–The Law Governing Lawyers (2000).

it, on the part of anyone to whom it may be repeated.

*See also Trust Co. of Louisiana v. N.N.P., Inc.,* 104 F.3d 1478 (5th Cir.1997)(under Louisiana law, to prevail on a claim by a nonclient against an attorney for negligent misrepresentation, the plaintiff must show that the attorney provided legal services and knew that the third party intended to rely on them).[46]

Thus, with respect to both fraudulent misrepresentation and negligent misrepresentation, Texas recognizes that an attorney has an established duty to third parties not to make material misrepresentations on which the attorney "knew or had reason-to-expect" that the parties would rely or the attorney intended to reach and influence a limited group that might reasonably be expected to have access to that information and act in reliance on it.[47] Plaintiffs must still prove

---

**46.** A number of other states have applied Section 552 to make attorneys liable to nonclients for negligent misrepresentation. *See Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.,* 892 P.2d 230, 236–37 (Colo. 1995)(based on attorney's opinion letter that the suit against his client had no merit); *Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354, 1360 (1995)("a lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services"); *Hines v. Data Line Sys., Inc.,* 114 Wash.2d 127, 787 P.2d 8, 21 (1990); *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.,* 106 N.M. 757, 750 P.2d 118, 122–23 (1988); *Collins v. Binkley,* 750 S.W.2d 737 (Tenn.1988); *Stinson v. Brand,* 738 S.W.2d 186, 190 (Tenn. 1987). Federal courts, applying state law, have done the same. *See, e.g., Greycas, Inc. v. Proud,* 826 F.2d 1560, 1564–65 (7th Cir.1987)(applying Illinois law and concluding that an attorney owed a lender a duty to reveal the borrower's true financial status), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988); *Menuskin v. Williams,* 145 F.3d 755, 760 (6th Cir.1998)(applying Tennessee law and holding that the attorney of a title insurance company who prepared warranty deeds on property bought by the plaintiff, stating that the property was free of all liens and encumbrances, might be liable if the plaintiff reasonably relied on the warranty deeds in making the purchase).

**47.** The Court is aware that the Fifth Circuit, in discussing what it surmised would be Texas' application of § 552 to accountants, reviewed three basic approaches to determining the scope of accountant liability for negligent representations to third parties that use and rely on the accountant's audit: (1) privity (the most restrictive); (2) foreseeability (the most expansive); and (3) the Restatement (Second) of Torts § 552, which falls in between, has

been adopted by the majority of states, and is found by many courts "to be the most consistent with the policy foundations underlying the tort of negligent misrepresentation." *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 611–14 (5th Cir. 1996), *cert. denied,* 519 U.S. 869, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996). In its analysis the Fifth Circuit observed that § 552's limitation of standing "to a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it" has been held by a number of jurisdictions to not include all potential investors because that "would render the requirement meaningless." *Id.* at 613. The appellate court feared that "[t]o predicate an accountants' duty to third parties on such things as the general knowledge that accountants possess about typical investors or tenuous inferences concerning future events would be to eviscerate the Restatement rule in favor of a de facto foreseeability approach—an approach which the Texas courts have refused to embrace." *Id.* at 614. It concluded after examining dicta in several Texas cases that "the Texas Supreme Court is unlikely to adopt a rule so universally avoided by sister states." Nevertheless the Fifth Circuit qualified that comment in a subsequent statement that "we conclude that such a potential investor is *generally* not within a 'limited group' under Texas law [emphasis added by this Court]." *Id.* at 613, 614. In reaching its view of how Texas might apply § 552 to accountants, the panel merely relied on dicta in *Cook Consultants v. Larson,* 700 S.W.2d 231, 236 (Tex.App.-Dallas 1985, writ ref'd n.r.e.)(observing that the defendant was a surveyor "[u]nlike, for example, future purchasers of shares of stock attempting to hold an accountant liable, Larson is not a member of an unlimited class...."); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d

that they did justifiably rely on the attorney's (or accountant's) misrepresentations about a corporation's financial strengths and suffered monetary loss as a result in deciding to purchase that corporation's securities. The standard for scienter (actual knowledge or reckless disregard) for liability under § 10(b) and Rule 10b–5 is closer to that for fraudulent misrepresentation than for negligent misrepresentation. Therefore in light of the Texas high court's conclusion that § 531 is fully compatible with the Texas common law of fraud, the standard in § 531 is particularly relevant to this Court's analysis of an attorney's duty to third parties under § 10(b), although, as noted, the intent element in § 552 is closer to fraud than negligence.

This Court concludes that professionals, including lawyers and accountants, when they take the affirmative step of speaking out, whether individually or as essentially an author or co-author in a statement or report, whether identified or not, about their client's financial condition, do have a duty to third parties not in privity not to knowingly or with severe recklessness issue materially misleading statements on which they intend or have reason to expect that those third parties will rely. Such a duty has been established in cases including *Klein v. Boyd*, *Caiola v. Citibank*, *Rubin v. Schottenstein*, *Ackerman v. Schwartz*, *Trust Company of Louisiana v. N.N.P.*, and *Ernst & Young v. Pacific Mutual Life Ins.* Moreover, with respect to the element of reliance, for purposes of § 10(b) as well as the tort of fraudulent misrepresentation, the Court is concerned about avoiding the danger of opening the professional liability floodgates to any and every potential investor or foreseeable user of the allegedly misleading informa-

408, 411 (Tex.App.-Dallas 1986, writ ref'd)(holding that "actual knowledge of a particular plaintiff is not necessary if the defendant should have had this knowledge" and that "when the auditors supplied the corporation with a number of audit reports, indicating knowledge by the auditors that third parties would be given these reports, 'one of a limited number of *existing* [as opposed to potential] trade creditors' was in a 'limited group' under Texas law.") 81 F.3d at 614. Nevertheless, the Fifth Circuit did state, "[W]e do not suggest that a potential purchaser can never be a member of a limited group." *Id.* at 614.

This Court finds that the facts in *Scottish Heritable* and the Texas cases it discusses are easily distinguishable from those alleged here, in many ways that are not necessary to explain. The key factor is that in *Newby*, Lead Plaintiff has alleged that a vital part of the Ponzi scheme was to draw in continually more and more investors' funds through the continued sale of Enron securities so that Enron could expand its operations (an expensive proposition given the allegations that the sham transactions it engaged in through the SPEs were financial "losers" and the SPEs served to conceal Enron's ever-increasing

debt) and to pay down its existing debt, including to the bank Defendants participating with Enron in the scheme. Thus the potential investors were allegedly the intended targets of the reports and documents drafted and issued by Arthur Andersen and Vinson & Elkins, whether for Enron which they allegedly expected to use the misrepresentations to lure in more investment funds or for the public via SEC filings. As the Texas Supreme Court indicated in *McCamish*, the "limited group" restriction protects against unlimited liability: "[t]his formulation limits liability to situations in which the attorney who provides the information is aware of the nonclient and intends that the nonclient rely on the information." 991 S.W.2d at 793. That is the circumstance alleged in the consolidated complaint. Furthermore, in *Pacific Mutual*, although a fraudulent misrepresentation case, the plaintiff was an institutional investor that relied on audits subsequently included in statements and filings following a merger. The reason why the plaintiff lost was not that it was merely a potential investor, but because the statements it relied on were issued by a different entity than the one whose notes the plaintiff purchased and the prospectuses related to other securities issued later by the bank with which the first issuer merged.

tion who might obtain and rely on the statement. Therefore this Court finds that a restrictive approach with respect to the group to which the attorney or accountant owes the duty and which thus should have standing to sue, such as that taken by Texas, is appropriate and necessary. In this suit, Lead Plaintiff has alleged as a crucial part of the Ponzi scheme that at least some fraudulent misrepresentations were made by Vinson & Elkins and Arthur Andersen and were aimed at investors to attract funds into Enron, as well as at credit rating agencies to keep Enron's credit rating high and bank loans flowing. Therefore the "limited group" that the attorneys or accountants allegedly intended, or might reasonably have expected, to rely on their material misrepresentations, and who allegedly did rely and suffered pecuniary loss, included Plaintiffs in this suit.

**2. Accountant/Auditor**

There is no accountant/client privilege analogous to that accorded to lawyers. The United States Supreme Court has held, "By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public." *United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

Significantly, although a major goal of the PSLRA was to limit the exposure of corporations to frivolous strike suits targeting "deep-pocket" defendants by heightening pleading standards and imposing procedural hoops, in contrast Congress expanded independent public accountants' watchdog duties. Harvey L. Pitt, et al., "Promises Made, Promises Kept: The Practical Implications of the Private Secu-

rities Litigation Reform of 1995," 33 San Diego L.Rev. 845, 848–51 (1996). Under 15 U.S.C. § 78j–1(a)(1), every audit must have "procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts[.]" If the accountant discovers a possibly illegal act, he must decide whether if it is likely to have occurred and determine its potential effect. 15 U.S.C. § 78j–1(b)(1)(A). If he finds an illegal act has taken place and that it is of consequence, he must as soon as "practicable" inform the appropriate management personnel of the issuer and "assure" its audit committee or, if there is no audit committee, its board of directors of its conclusions. 15 U.S.C. § 78j–1(b)(1)(B). That committee or board must notify the SEC within one day and send a copy of the notice to the accountant. 15 U.S.C. 78j–1(b)(2). If the accountant does not receive that notice, he must resign and report to the SEC. 15 U.S.C. § 78j-1(b)(3). The report must be submitted to the SEC within one day, regardless. *Id. See generally* William F. Dietrich, "Legal and Ethical Issues for Attorneys Dealing with Financial Data: Heightened Scrutiny after the Enron and Andersen Debacle," 1325 PLI/Corp 925, 945–46 (Aug.2002).

GAAS and GAAP represent the industry standard for measuring the performance of an examination by an accountant. *Escott v. BarChris Const. Corp.*, 283 F.Supp. 643, 703 (S.D.N.Y.1968); *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 663 n. 5 (3d Cir.2002); *SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 n. 2 (9th Cir.1979).

The discussions above regarding liability under § 10(b) and the duty of the professional to nonclients apply to accountants.

Under § 11, an accountant may be civilly liable for certifying or preparing any financial report that is included in a regis-

tration statement or prospectus which contains a material misrepresentation or omission. 15 U.S.C. § 77k. *See Herman & MacLean v. Huddleston*, 459 U.S. at 382 n. 11, 103 S.Ct. 683 ("Accountants are liable under § 11 only for those matters which purport to have been prepared or certified by them."). An accountant may establish a defense of due diligence to a § 11 claim if he demonstrates that "he had, after reasonable investigation, reasonable grounds to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(B)(i).

### 3. Underwriters

█ Section 11 imposes liability "[i]n case any part of [a] registration statement . . . contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading" on a number of players and specifically on "every underwriter with respect to such security." 15 U.S.C. § 77k(a). An underwriter of a public offering risks exposure to such liability under § 11, as well as to liability under § 10(b) for any material misstatements or omissions in the registration statement made with scienter, and thus has a duty to investigate an issuer and the securities that the underwriter offers to investors. *Hanly v. SEC*, 415 F.2d 589, 595–96 (2d Cir.1969)(holding that brokers and salesmen have a duty to investigate and to analyze sales literature and must not blindly accept recommendations made about a security); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)(an underwriter has a duty to investigate an issuer and may be liable under Rule 10b–5 for reckless failure to do so);

*SEC v. Dain Rauscher*, 254 F.3d 852, 857–58 (9th Cir.2001).

This investigative duty is placed on the underwriter because, as noted by the Seventh Circuit, its role is critical to the integrity of the market and the confidence of the investing public:

> An underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the public who must rely on published information. And the relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security. And since the underwriter is unquestionably aware of the nature of the public's reliance on his participation in the sale of the issue, the mere fact that he has underwritten it is an implied representation that he has met the standards of his profession in his investigation of the issuer [footnotes omitted].

*Sanders*, 524 F.2d at 1070. The Second Circuit has observed,

> Self-regulation is the mainspring of the federal securities laws. No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so. Since he often has a financial stake in the issue, he has a special motive thoroughly to investigate the issuer's

strengths and weaknesses. Prospective investors look to the underwriter, a fact well known to all concerned and especially to the underwriter, to pass on the soundness of the security and the correctness of the registration statement and prospectus.

*Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 370 (2d Cir. 1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 232, 38 L.Ed.2d 148 (1973).

The underwriter also may protect itself from liability by establishing a "due diligence" defense under Section 11, i.e., prove that it "had after reasonable investigation, reasonable ground to believe and did believe ... that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3). The legal standard for measuring whether the underwriter satisfies the due diligence test is "the standard of reasonableness ... required of a prudent man in the management of his own property." 15 U.S.C. § 77(k)(c); *Toolworks,* 50 F.3d at 621. Thus due diligence is "[i]n effect ... a negligence standard." *Id., quoting Hochfelder,* 425 U.S. at 208, 96 S.Ct. 1375.

The court in *Escott v. BarChris Construction Corp.,* 283 F.Supp. 643, 697 (S.D.N.Y.1968), observed in an influential opinion,

> To effectuate the statute's purpose the phrase "reasonable investigation" must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of "data presented" to them by the company. It should make no difference that this data is elicited by questions addressed to the company officers by the underwriters, or that the underwriters at the time believed that the company's officers are truthful and reliable.

In order to make the underwriter's participation in this enterprise of any value to the investors, the underwriters must make a reasonable attempt to verify the data submitted to them. They may not rely solely on the company's officers or on the company's counsel. A prudent man in the management of his own property would not rely on them.

In addition to the availability of a due diligence defense, an underwriter may rely on expertised parts of a prospectus, such as financial statements certified by an accountant, unless it had reasonable grounds to believe the statements were untrue. 15 U.S.C. § 77k(b)(3)(C); *In re Software Toolworks, Inc.,* 50 F.3d at 623.

## III. Lead Plaintiff's Allegations in Consolidated Complaint

### A. The Scheme, Generally

Lead Plaintiff asserts that Defendants participated in "an enormous Ponzi scheme, the largest in history," involving illusory profits "generated by phony, non-arm's-length transactions with Enron-controlled entities and improper accounting tricks" in order to inflate Enron's reported revenues and profits, conceal its growing debts, maintain its artificially high stock prices and investment grade credit rating, as well as allow individual defendants to personally enrich themselves by looting the corporation, while continuing to raise money from public offerings of Enron or related entities' securities to sustain the scheme and to postpone the collapse of the corporation, a scenario characterized by Lead Plaintiff as "a hall of mirrors inside a house of cards." Consolidated Complaint at 12. The consolidated complaint sets out an elaborate scheme of off-the-books, illicit partnerships, secretly controlled by Enron and established at times critical for requisite financial disclosures by Enron in order to conceal its actual financial status. These Enron-controlled entities typically

would buy troubled assets from Enron, which Enron would have had difficulty selling in an arm's length transaction to an independent entity and which otherwise would have to be reported on Enron's balance sheet, by means of sham swaps, hedges, and transfers, to record phony profits and conceal debt on Enron's balance sheet. Lead Plaintiff further paints a picture of participation in the scheme by Enron's accountants, outside law firms, and banks, which all were the beneficiaries of such enormous fees and increasing business, as well as investment opportunities for personal enrichment, with the result that their opinions were rubber stamps that deceived investors and the public.

According to the consolidated complaint, in 1997 Enron suffered a substantial financial setback because of a British natural gas transaction, resulting in a loss of one-third of its stock's value and analysts' downgrading its stock and lowering their forecasts of its future earnings' growth. Moreover, Enron had been involved in transactions with a special purpose entity ("SPE") [48] known as Joint Energy Development Incorporated ("JEDI"), which Enron, as a partner, had established in 1993 with an outside investor that held a 50% interest in JEDI. Because initially JEDI was independent, Enron was able to report JEDI's profits, but not carry JEDI's debt on Enron's books. According to the complaint, JEDI generated 40% of the profits that Enron reported in 1997 alone. In December 1997, ten months before the Class Period, a crisis arose when the independent investor sought to withdraw, forc-

ing Enron either to restructure with a new, independent investor or to consolidate JEDI with Enron, and thereby wipe out 40% of the profits that Enron had reported earlier in 1997, and to report JEDI's $700 million debt on Enron's balance sheet, as well as lose the ability to generate future profits by utilizing JEDI as an SPE.

Unable to find a legitimate, independent outside investor to replace the one withdrawing, Enron, along with Vinson & Elkins and Kirkland & Ellis, resorted to forming another entity, Chewco, totally controlled by Enron, to buy the outsider's investment in JEDI. Enron then arranged with Barclays Bank to lend $240 million to Chewco to allow Chewco to invest in JEDI and obtain the necessary 3% equity interest to maintain the appearance that JEDI was independent. According to the consolidated complaint at 275, pursuant to advice from Vinson & Elkins, Michael Kopper (an Enron employee who worked for Andrew Fastow) was made manager of Chewco because he was not a senior officer of Enron and therefore his role in Chewco would not have to be disclosed. Vinson & Elkins prepared the legal documentation for JEDI and Chewco. On December 12, 1997 Kopper transferred his ownership interest in Chewco to his domestic partner, William Dodson, in a sham transaction effected solely to make it appear that Kopper, and through him, Enron, had no formal interest in Chewco.

Because in actuality there was no outside, independent equity investor with a 3% stake in Chewco, Enron arranged for

---

48. As one means of effectuating the alleged Ponzi scheme to defraud investors, a series of partnerships and SPEs clandestinely controlled by Enron were allegedly created, structured, financed and utilized by Defendants to inflate Enron's profits and conceal its debt. The complaint explains, "A public company that conducts business with an SPE may treat the SPE as if it were an independent entity only if it does not control the SPE. At a bare minimum, two conditions must be met: (i) an owner independent of the company must make an equity investment of *at least 3% of the SPE's assets, and that 3% must remain at risk throughout the transaction; and (ii) the independent owner must exercise control of the SPE.*" Consolidated complaint at 15 (emphasis added by complaint).

Barclays Bank to lend $11.4 million to two "straw" parties, Little River and Big River, to permit them to make the requisite 3% "equity" investment in Chewco. *Id.* at 275–76.

According to the complaint, Kirkland & Ellis helped structure these deals and represented the straw parties, Little River and Big River, as part of the scheme to conceal Enron's debt and losses, and therefore the law firm had knowledge of the manipulation. Consolidated complaint at 275, 277. Barclays and the Enron Defendants prepared the documentation characterizing the advances as loans, while Enron and Chewco characterized them as equity contributions to serve as the 3% equity investment needed for nonconsolidation of JEDI. Consolidated complaint at 276. The loans were noted in documents that resembled promissory notes and loan agreements, but which were titled "certificates" and "funding agreements" that required the borrowers to pay "yield" at a particular percentage rate, i.e., interest. *Id.* Nevertheless, reflecting Barclays' knowledge about Chewco's lack of an independent third-party investor and the resulting creation of strawmen Little River and Big River, Barclays insisted that the borrowers/Enron secretly establish cash "reserve accounts" in the amount of $6.6 million to secure repayment of Barclay's $11.4 million. The complaint further states that a clandestine agreement for Enron to provide the $6.6 million to fund Chewco's reserve accounts for Big River and Little River was drawn up by Vinson & Elkins, which therefore had to have

knowledge of the manipulation and of the absence of outside equity. *Id.* at 276, 277. To fund the reserve accounts, JEDI wired $6.58 million to Barclay's on 12/30/97, thus cutting in half Chewco's illusory 3% equity interest in JEDI, essential for JEDI to be independent of Enron. *Id.* Because Chewco did not have the requisite equity at risk and did not qualify as an adequately capitalized SPE, it, like JEDI, should have been consolidated into Enron's consolidated financial statements from the outset, but was not. *Id.*

The complaint further alleges that Enron guaranteed the $240 million unsecured loan from Barclays to Chewco in December 1997, and that in exchange, Chewco agreed to pay Enron a guaranteed fee of $10 million up front (cash at closing) plus 315 basis points annually on the average outstanding balance of the loan. The fee calculation was not based on the risk involved, but on benefitting Enron's financial statement. Furthermore, during the year the loan was outstanding, JEDI, through Chewco, paid Enron $17.4 million under the fee arrangement. Enron characterized these payments as "structuring fees" and recognized income from the $10 million up-front fee in December 1997, when in actuality, the payments were improper transfers from one Enron pocket to another.

Thus Chewco was allegedly financed with debt, not equity, and neither JEDI nor Chewco was a valid SPE because neither met the requirements for nonconsolidation.[49] The establishment of Chewco not only allowed Enron to report JEDI profits

---

**49.** Lead Plaintiff points out that GAAP, Accounting Research Bulletin ("ARB") No. 51, states,

There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or

indirectly has a controlling financial interest in the other companies.

Consolidated complaint at 272. Moreover, FASB Statement of Financial Accounting Standards ("SFAS") No. 94 mandates consolidation of all majority-owned subsidiaries unless control is temporary or does not rest with the majority owner. Consolidated complaint at 273.

of $45 million illicitly, inflating Enron's 1997 reported profits, and to keep $700 million of debt off Enron's books, but it also provided Enron with the opportunity in the future to do non-arm's-length-transactions with an Enron-controlled entity that no independent entity would have done nor agreed to do and which provided a stream of sham profits onto Enron's books.

Chewco became a template for subsequent entities that Enron continued to establish in increasing numbers and size, all secretly controlled by Enron, which Enron and its banks would use to generate enormous phony profits and conceal massive debt. Moreover, contrary to representations made to investors, many of these entities were capitalized with Enron common stock, and Enron guaranteed that if the stock price declined below a certain "trigger" price level and Enron lost its investment grade credit rating, Enron would become liable for the debt of those entities. To pay such a debt, Enron would have to issue substantial amounts of new stock, which in turn would dilute the hold-

ings of current stockholders to their detriment. In sum, Chewco was less than 3% owned by parties independent of Enron, was improperly excluded from Enron's financial statements despite being controlled by Enron, and was never disclosed in Enron's SEC filings during the Class Period. Furthermore, Enron continued to use Chewco/JEDI in non-arm's-length transactions to generate false profits and conceal Enron's actual indebtedness from 1997 through 2001 in transactions that Vinson & Elkins participated in structuring and provided false "true sale" opinions to effectuate.

Two other SPEs, LJM Cayman L.P. ("LJM1")[50] and LJM2 Co–Investment, L.P. ("LJM2"), were structured, reviewed, and approved by Arthur Andersen LLP, Vinson & Elkins, Kirkland & Ellis, individual Enron Defendants, and certain Enron bankers, and controlled by Enron's Chief Financial Officer Andrew Fastow to inflate Enron's financial results by more than a billion dollars, as well as to enrich Fastow and selected others by tens of millions of dollars.[51] LJM1 provided En-

---

The complaint also quotes from FASB Emerging Issues Task Force Abstracts ("EITF"), Topic No. D–14, which provides guidance for non-consolidation of an SPE: Generally, the SEC staff believes that for nonconsolidation and sales recognition by the sponsor or transferor to be appropriate, the majority owner (or owners) of the SPE must be an independent third party who has made a substantive capital investment in the SPE, has control of the SPE, and has substantive risks and rewards of ownership of the assets of the SPE (including residuals). Conversely, the SEC staff believes that nonconsolidation and sales recognition are not appropriate by the sponsor or transferor when the majority owner of the SPE makes only a nominal capital investment, the activities of the SPE are virtually all on the sponsor's or transferor's behalf, and the substantive risks and rewards of the assets or the debt of the SPE rest directly or indirectly with the sponsor or transferor.

Consolidated complaint at 273 n. 7.

**50.** Lead Plaintiff asserts that LJM1 was utilized to allow Enron to engage in phony hedging transactions largely dependent on the value of Enron's own stock. The consolidated complaint details Enron's use of LJM1 to hedge its position in Rhythms NetConnections ("Rhythms") (at pp. 280–82, 413). Briefly, in 1999, to hedge Enron's gains on the value of Rhythms' stock, Enron transferred Enron stock to Rhythms in exchange for a note. The hedge was a sham because if the SPE had to pay Enron on the "hedge," Enron stock would be the source of that payment. Enron recognized $100 million from the hedging transaction in 1999.

**51.** As one reflection of their lack of independence, employees of both LJM partnerships allegedly were regular, full-time employees of Enron for benefits purposes. Consolidated complaint at 279.

ron employees an opportunity to enrich themselves personally and quickly. For instance, in March 2000, Enron employees Andrew Fastow, Michael Kopper, Ben Glisan, Kristina Mordaunt, Kathy Lynn and Anne Yaeger Patel obtained financial interests in LJM1 for initial contributions of $25,000 by Fastow, $5,800 each for Glisan and Mordaunt, and lesser amounts for the others, totaling $70,000. They quickly received extraordinary returns on their investments: on May 1, 2000, Fastow received $4.5 million, while Glisan and Mordaunt within a couple of months received approximately $1 million. Consolidated complaint at 282.

Lead Plaintiff labels the transactions with the two Enron-controlled LJM partnerships ("where Enron insiders would be on both sides of the transactions") as "the primary manipulative devices used to falsify Enron's financial results during the Class Period." Fastow, in particular, wore two hats, which allowed him to self-deal, according to the consolidated complaint. Because Enron insiders were on both sides of all LJM2 transactions, Defendants knew that LJM2 would be an extremely lucrative investment as the alleged Ponzi scheme proceeded, as evidenced by LJM1's early dealings. Lead Plaintiff alleges that therefore, top Enron officials and Merrill Lynch sent a confidential private placement memorandum, which Vinson & Elkins participated in drafting, to certain favored investment banks (including JP Morgan, Merrill Lynch, CIBC, and CitiGroup) and the banks' high-level officers and privileged Merrill Lynch clients. The memorandum, which was not a public document, invited them (1) to benefit from this "unusually attractive investment op-

portunity" arising from LJM2's connection to Enron, (2) emphasized that Fastow was Enron's CFO, (3) informed them that LJM2's day-to-day activities would be managed by Enron insiders Fastow, Michael Kopper, and Ben Glisan, (4) explained that LJM2 "expects that Enron will be the Partnership's primary source of investment opportunities" and that it "expects to benefit from having the opportunity to invest in Enron-generated investment opportunities that would not be available otherwise to outside investors," (5) noted that Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns," pointed out that investors in JEDI, another Fastow-controlled partnership, had done similar transactions with Enron and investors had tripled their investment in two years, (6) anticipated overall returns of 2,500% for LJM2 investors, and (7) and assured that investors would not be required to contribute additional capital if Fastow's dual role ended. Lead Plaintiff alleges that Enron's banks and high-level bankers were offered this investment opportunity as a reward for their ongoing participation in the Ponzi scheme. JP Morgan, CitiGroup, Credit Suisse Boston, CIBC, Merrill Lynch, Lehman Brothers, Bank America, Deutsche Bank and/or their top executives invested about $150 million and, at the same time, continued to issue positive analyst reports about Enron.

Lead Plaintiff claims that LJM2 was used to create a number of SPEs known as the Raptors,[52] which Defendants utilized in turn to artificially inflate profits and conceal debt that should have been included on Enron's balance sheet. Enron or Enron-related entities entered into twenty-four business relationships from June 1999 through September 2001,[53] crucially timed

---

**52.** See consolidated complaint at 287–92 for specific allegations about the Raptors and their purposes.

**53.** The consolidated complaint lists examples of manipulative transactions relating to un-

successful assets acquired by Enron that were sold to, and thereby shifted losses to, LJM1 or LJM2 when a legitimate buyer could not be found because the assets for sale were unattractive. Lead Plaintiff briefly describes how

just before financial reporting deadlines. These transactions included asset sales by Enron to LJM2 or vice versa; purchases of debt or equity interests by LJM1 or LJM2 in Enron affiliates or Enron SPEs or other entities in which Enron was an investor; purchases of equity investments by LJM1 or LJM2 in SPEs designed to mitigate market risk in Enron's investments; sale of a call option and a put option by LJM2 on physical assets; and a subordinated loan to LJM2 from an Enron affiliate. Furthermore these transactions were recorded as generating $229 million in "earnings" for Enron in the second half of 1999, out of total reported earnings of $549 million during that period.

Again with the help of its lawyers and bankers, Enron used other SPEs (Firefly and JV–Company) to conceal debt. Consolidated complaint at 292–93. It also manipulated financial results by treating transfers of assets, including energy related projects and dark-fiber broadband, to another Enron-related entity, e.g., the Osprey Trust and the Marlin Trust, as sales rather than loans so as to generate income and conceal debt. Consolidated complaint at 293. Enron guaranteed these transfers with promises to issue more Enron stock if the assets diminished in value and established triggers for the issuance of additional shares of Enron stock if the price of Enron stock declined below a certain point. Former Enron employees reported that many of the transferred assets declined in value by the second half of 2000 and that top management, including Jeffrey Skilling, was aware of the decline because of a daily 2–3 page report detailing the positions of the assets held by the company. Nevertheless Enron did not record charges to show the liabilities Enron had incurred and continued to record income from transactions with these entities.

The complaint asserts that these kinds of transfers of assets, with continuing involvement of and control by Enron, violated GAAP, SFAS No. 125, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, and should have been viewed as secured

each transaction was used to falsify Enron's financial results and financial condition. For instance, Enron shifted a 13% stake (sufficient to relieve it of "control" of that entity so that it did not have to consolidate its interest and report it on Enron's balance sheet) in a troubled power plant construction in Cuiaba, Brazil, to LJM1 for $11.3 billion in September 1999 so that Enron realized $34 million of mark-to-market income in the third quarter of 1999 and $31 million in the fourth quarter and another $41 million of mark-to-market income in the fourth quarter of 1999. (For an explanation of mark-to-market accounting, see pages 123–25 and nn. 58, 59 of this memorandum and order.) Then in August 2001 Enron repurchased LJM1's purchase for $14.4 million, giving LJM1 investors a tidy profit. Because Enron had always promised to make LJM1 whole, LJM1's investment in the Cuiaba power plant was never "at risk." Other examples included Enron North America ("ENA") collateralized loan obligations, the lowest rated of which were sold to Enron-controlled Whitewing Associates, LLP and to LJM2 with assurances from Enron that the investors would be made whole; the Nowa Sarzyna power plant under construction in Poland, which Enron temporarily "sold" to LJM2 for $30 million so that Enron could record a profit of $16 million, but then repurchased later for $31.9 million, giving LJM2 an approximately 25% rate of return; a 90% interest in MEGS LLC (a company owning a natural gas gathering system in the Gulf of Mexico), which Enron sold to and repurchased from LJM2 at the maximum allowed rate; certificates of a trust known as Yosemite, improperly sold to LJM2 on December 29, 1999 to hold for one day and then sold to Condor, allowing Enron to avoid reporting its interest in Yosemite in its year-end financial statement; and Backbone telecommunications assets, i.e., unactivated ("dark") fiber optic cable, sold to LJM2 in May 2000 so that Enron could meet its second quarter numbers. Consolidated complaint at 284–87.

borrowings. SFAS No. 125 permits accounting for transfers of financial assets as sales to the extent that consideration other than beneficial interests is received in exchange, when the transferor has surrendered control over the assets, if the following three conditions are met:

1. The transferred assets have been isolated from the transferor, i.e., they are beyond the reach of the transferor and its creditors.

2. One of the following is met:

a. The transferee obtains the unconditional right to pledge or exchange the transferred assets.

b. The transferee is a qualifying special-purpose entity and the holders of beneficial interests in that entity have the unconditional right to pledge or exchange those interests.

3. The transferor does not maintain effective control over the transferred assets either through an Offering that obligates the transferor to repurchase or redeem the assets before their maturity or through an Offering that entitles the transferor to repurchase or redeem transferred assets that are not readily obtainable.

Furthermore for the accounting scheme to work, Enron had to conceal its affiliation with and control of these entities, so Defendants created materially false and misleading financial statement disclosures during the Class Period to hide Enron's related-party transactions.[54] SFAS No. 57, Related Party Disclosures, requires financial statements to include the following disclosures in related-party transactions:

(a) the nature of the relationship(s) involved; (b) a description of the transactions ... for each of the periods for which income statements are presented and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amounts of the transactions for each of the periods for which income statements are presented; and (d)amounts due from or to related parties as of the date of each balance sheet presented, and, if not otherwise apparent, the terms and manner of settlement.

Moreover ¶ 3 of No. 57 provides that related-party transactions cannot be presumed to have been effected on an arm's length basis.

Similarly Item 404 of SEC Regulation S–K imposes requirements for disclosure

---

**54.** The Court notes that SEC Regulation S–X, 17 C.F.R. § 210.4–08(k)(1)(2001), requires identification of related party transactions and transaction amounts to be stated on the face of the balance sheet, income statement or statement of cash flows. William F. Dietrich, "Legal and Ethical Issues for attorneys dealing with Financial Data: Heightened Scrutiny After the Enron and Andersen Debacle," 1325 PLI/Corp 925, 947 and n. 57 (Aug.2002). While "related parties" include the parent company and its subsidiaries, an enterprise and its principal owners, management and members of their immediate families, and affiliates, the FASB's definition of "related parties" also reaches "other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent

that one of the transacting parties might be prevented from fully pursuing its own separate interests." *Id.* at 947 and nn. 58–60, citing FINANCIAL ACCOUNTING STANDARDS BOARD, Statement of Financial Accounting Standards No. 57: Related Party Disclosures, in 1 FINANCIAL ACCOUNTING STANDARDS BOARD, ORIGINAL PRONOUNCEMENTS: FASB STATEMENTS OF STANDARDS 1–100, at 556–57 (2001)("FAS 57"). There must also be disclosure of any control relationship when the reporting enterprise and another entity are under common ownership or management control that might affect the operating results or the financial status of the reporting enterprise, even if there are no transactions involved. *Id.* at 947–48, *citing* FAS 57 at ¶ 4 at 554.

of related-party transactions in non-financial statement portions of SEC filings, including proxy statements and the annual reports on Form 10–K. Among other things, Item 404(a) requires disclosure of transactions over $60,000 in which an executive officer has a material interest,

> naming such person and indicating the person's relationship to the registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s), and, where practicable, the amount of such person's interest in the transaction(s).

According to the instructions to this section, whether the information was material was determined by "the significance of the information in light of all the circumstances," including "[t]he importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transaction."

Furthermore under GAAP, financial statements are complete only when they contain all material information required to represent validly the underlying events and conditions. Statements of Financial Accounting Concepts 2, ¶ 279. In addition, a financial statement must disclose the financial effects of transactions and events that have occurred previously. Statement of Financial Accounting Concepts 1, ¶ 21.

Moreover, the complaint alleges that, as expected, during the next two years these LJM2 investors realized extraordinary distributions of hundreds of millions of dollars from the Raptor SPEs generated by illegal transactions ("manipulative devices") between Enron and the Raptors to falsify Enron's financial status. Thus the banks and bankers who became partners in LJM2 not only participated in the scheme to defraud, but were economic beneficiaries of that scheme, in addition to receiving their huge advisory fees, underwriter fees, and interest and loan commitment fees. Enron continued to sell to the SPEs assets that no independent third party would have purchased and that Enron wanted to get off its books.

The complaint states that Enron did not disclose Chewco and JEDI as related parties during the Class Period; its 2000 Form 10–K reported only that it had "entered into transactions with limited partnerships (the Related Party) whose general partner's managing member is a senior officer of Enron." It did not identify that the managing member of the general partners of LJM1 and LJM2 was Fastow or disclose that he received more than $30 million relating to his management and investment activities, a violation of SFAS No. 57 and Item 404 of Regulation S–K. The omission was intentional, as evidenced by significant discussion within Enron management and outside advisors as to how Enron could circumvent the mandated disclosure of Fastow's compensation from the related parties.

Citing specific examples,[55] the complaint charges that Enron's proxy statements,

---

55. For instance, in its May 2000 proxy statement Enron described each LJM partnership as "a private investment company that primarily engages in acquiring or investing in energy and communications related to investments," a statement that would not disclose to the reader either the nature of the transactions or their import. A similar statement was made in the Form 10–Q for second quarter 1999, with a nonspecific footnote saying, "A senior officer of Enron is managing member of LJM's general partner." Virtually identical "disclosures" were made in the third quarter Form 10–Q and the 1999 10–K. In its Form 1–Q for the second quarter of 2000, Enron stated about the LJM partnerships, "In the first half of 2000, Enron entered into transactions with limited partnerships (the Related Party) whose general partner's managing member is a senior officer of Enron. The limited partners of the Related Party are unrelated to Enron." From that time on, Enron did not identify LJM1 or LJM2 by

Form 10Q and 10–K filings obfuscated the true nature of the LJM partnerships and falsely assured investors that transactions with them were fair to Enron when they were not, while the illicit transactions involving these entities allowed Enron to pay off key Enron insiders, including Fastow, as well as reward favored banks and bankers for their participation in the scheme.

Timing, standardly at the end of a financial year, was critical with these SPE transactions to allow Enron to record huge sales gains and conceal debts to meet the rosy forecasts made by the corporation and other participants in the scheme and to conceal Enron's true debt levels. LJM2 had to be formed before the end of 1999 so it could be utilized to consummate transactions with Enron to create huge profits for Enron in the final quarter of that year and allow Enron not only to meet, but to exceed, its forecasted 1999 earnings. When Merrill Lynch was unable to raise suffi-

cient funds from outside investors to fund the partnership before the close of 1999, Enron, Fastow, Kopper, Arthur Andersen, Vinson & Elkins, Kirkland & Ellis, JP Morgan, CIBC, Deutsche Bank, and Credit Suisse First Boston created documentation that allowed the banks to advance virtually all of the moneys needed to "prefund" LJM2, much more than their allocated shares. After LJM2 was fully funded and after other investors contributed money, the banks' original "over-funding" in December 1999 was adjusted in subsequent capital contributions. Moreover, because LJM2 needed bank financing to effectuate Defendant's scheme to manipulate Enron's profits and debt, JP Morgan first gave a $65 million line of credit to LJM2, and then increased it to $120 million, while Credit Suisse Boston lent money to it insure that Enron, which was conducting deals [56] with LJM2 and its SPEs that were essential to avoid Enron's reporting a bad

name in financial statement disclosures. Consolidated complaint at 297–98.

**56.** The complaint identifies four examples. On December 22, 1999, Enron pooled purchaser collateralized loan rights ("CLOs") and sold the lowest-rated portion to an Enron Affiliate (Whitewing LLP) and LJM2. Whitewing in turn lent LJM2 the money to purchase Whitewing's interest in the CLOs. Enron surreptitiously guaranteed Whitewing's investment and its loan to LJM2. The deal allowed Enron to record a sale of millions of dollars in the fourth quarter of 1999 to an entity that was not independent and that should have been consolidated, with its debts listed on Enron's balance sheet.

Second, when it was unable to find an independent buyer before the end of 1999, Enron sold LJM2 a 75% interest in Nowa Sarzyna power plant for $30,000,000 (part loan, part equity). This transaction removed millions of dollars of debt from Enron's balance sheet and allowed Enron to record a gain of about $16 million from the sale. Although the debt financing required that Enron retain ownership of at least 47.5% of the equity until the project was completed, the lender waived this requirement until March

31, 2000, by which time Enron and Whitewing reacquired LJM2's equity interest and repaid the loan for a total of $31.9 million, providing LJM2 with a 25% rate of return.

Similarly, on December 29, 1999 Enron sold to LJM2 a 90% equity in MEGS LLC, a natural gas system in the Gulf of Mexico, thus avoiding consolidation and having to report millions of dollars in debt on Enron's balance sheet for that year. Enron also repurchased LJM2's interest in MEGS early the next year.

Finally, Enron made it appear that it sold certificates in a trust named Yosemite to LJM2 on December 29, 1999, to reduce Enron's interest in Yosemite from 50% to 10%, to avoid disclosing the certificates on Enron's 1999 financial statement. In actuality the transaction did not actually occur until February 28, 2000, but the legal documentation was clearly and deliberately back-dated to December 29, 1999. Meanwhile on December 29, 1999, Condor, which was an affiliate of Whitewing and was controlled by Enron, loaned $35 million to LJM2 so that it could buy the certificates. The next day, LJM2 transferred the certificates to Condor, satisfying the one-day loan.

4th quarter for 1999. The complaint further states that JP Morgan and CitiGroup administered all financial affairs of LJM2, about which they were fully knowledgeable.

In these end-of-the-year transactions, according to the complaint, Enron typically promised to and did, in the next year, buy back the assets it sold to LJM2 before the close of the financial year and in the process gave the LJM2 partnership large profits on each transaction even if the asset had declined in market value, while the transactions created "earnings" on the books for Enron. Often Enron in advance of the transaction guaranteed the LJM partnerships against any loss. In this manner the . LJM partnerships functioned solely as vehicles to aid Defendants in the manipulation, falsification, and artificial inflation of Enron's reported financial results while simultaneously enriching LJM2's favored investors at exorbitant rates.

The consolidated complaint additionally alleges that as part of the pattern of fraud, Enron repetitively engaged in hedging transactions that gave an appearance that a third party was obligated to pay Enron the amount of large losses from its trading investments when the third party actually was an entity in which Enron had a substantial economic stake, e.g., funding the SPEs with Enron common stock so that if the value of the investments and the value of its stock fell at the same time, the SPEs would not be able to meet their obligations and the hedges would fail. This possibility put great pressure on participants in the fraudulent scheme to keep the price of the stock at artificially inflated levels. Once in

late 2000 and again in 2001 the Raptors experienced such a dangerous decline.[57] They lacked sufficient credit capacity to pay Enron on the sham hedges and were in danger of coming unwound, with the potential of causing Enron to take a multimillion-dollar charge against its earnings and exposing the earlier falsification of its financial results. That in turn would cause the stock price to plunge and trigger the issuance of more stock. To avoid disaster, with the participation of Arthur Andersen, Vinson & Elkins, Kirkland & Ellis, and some of the banks, Enron restructured and capitalized the Raptor SPEs in December 2000 through more sham transactions that transferred rights to more shares of Enron stock to these SPEs in exchange for notes.

Furthermore, the complaint alleges that Enron employed accounting tricks to defraud investors. In particular it used and abused "mark-to-market" or "fair value" accounting to inflate the current and future success of the company by computing the economic value or profit that it would ultimately obtain on a multi-year contract, discount that figure to present value, and recognize the entire profit in the current period. In other words, Enron improperly and prematurely accelerated revenue recognition. Such accounting is permissible under GAAP only where contract revenue streams are predictable and are based on historical records of similar transactions. Enron had no historical track record for many of the transactions to which it applied mark-to-market accounting. In addition, unless the expected profit on the transaction was properly hedged, Enron was required in each following quarter to

---

**57.** According to the complaint, in phony hedging arrangements in 2000–01 Enron funded the Raptors with its own stock, supposedly to hedge against declines in the value of Enron's merchant investments, but the "hedges" were actually manipulative or deceptive devices to circumvent accounting rules. Enron always retained most of the risk because it provided most of the capital with which the SPES would pay; if the value of Enron stock declined, the SPEs could not meet their obligations and the "hedges" would fail.

recompute or readjust the profit computation, taking into account changing economic values. Mark-to-market accounting is appropriate only where the company has a long track record that allows it to estimate accurately and forecast future values with some certainty. Enron abused this mark-to-market accounting first by assigning unrealistic values to the ultimate transaction, which in turn inflated current period profits. Moreover, in reviewing its computations on a quarterly basis, it consistently increased the estimated value of the transaction even when data revealed a decrease in the estimated value to compensate for the anticipated loss, a practice known within Enron as "moving or shifting the curve."[58] The complaint alleges that during the Class Period, Enron misused mark-to-market accounting throughout its business operations in order to swell its reported revenues and profits, helped by managers who obtained larger bonuses from the inflated values.[59] The abuse was particularly evident in Enron's wholesale energy transactions, where un-

realistic valuation greatly inflated current period income. In its new retail energy services operation Enron had no long-term track record to support use of mark-to-market accounting, but Enron used the technique anyway, falsifying the requisite historical earnings. Enron also used it to record huge current period profits on long-term, highly speculative retail energy risk-management contracts where Enron had no basis on which to project the amount of any future revenue streams, no less a profit, and where it knew that losses were likely. Similarly it had no track record in its broadband business, which, itself, was not a proven market, but abused the technique to create millions of dollars of illusory profits in several transactions, in particular its Blockbuster/Enron Video–On–Demand ("VOD") joint venture. Application of mark-to-market accounting was particularly improper in the broadband context because it involved service contracts, for services that had not yet been provided, rather than income from commodity components.[60]

**58.** The complaint recites, "A former employee noted, 'shifting the curve and making new deals to bury the losses from the past is constantly the strategy.' Another former trader stated: 'It was very simple. You just tweaked the assumptions on different variables, which were changed to make the return higher.'" Consolidated complaint at 305.

**59.** The complaint states, "Because most DSM deals were losing money when their curves were re-marked, Enron had to keep signing new contracts each quarter to show a profit—what a DSM manager described as 'feeding the beast.'" Complaint at 305–06. Recognizing earnings for long-term contracts in the quarter when the contract was signed forced Enron into increasingly aggressive and riskier deals, gave rise to enormous and growing accumulation of off-balance-sheet debt, contingent liabilities, and, by early in 2001, restricted opportunities to re-finance and restructure old deals, as well as to create new deals. Consolidated complaint at 306.

**60.** The complaint at 465 quotes from *U.S. News & World Report* regarding Enron's aggressive abuse of mark-to-market accounting since the early 1990's:

... Traditional accounting would book revenue from a long-term contract when it came in. But Skilling wanted Enron to book all anticipated revenue immediately. The practice is known as mark-to-market—or more colloquially, counting your chickens before they hatch. Whatever the term, it was the third time in five years that Enron had significantly changed its accounting.

Tallying all expected profits immediately would mean a huge earning kick for a company obsessed with debt. But it would also put Enron on a treadmill: To keep growing, it would have to book bigger and bigger deals every quarter. The result, in hindsight, was predictable: a shift from Enron developing economically sound partnerships to doing deals at all costs. "The focus wasn't on maintaining relationships and serving customers," says a former Enron

Falsified rosy financial statements were also issued regarding Enron's retail energy services business (EES), which attempted to manage energy needs of corporate customers for multi-year periods in return for fees to be paid over a number of years (demand-side management ("DSM") contracts). During the Class Period, Enron presented EES as tremendously successful by continually signing new multi-million or multi-billion dollar contracts that exceeded Enron's internal forecasts and representing that EES had become profitable in the 4th quarter of 1999 and achieved substantial profits afterward. In actuality it was losing hundreds of millions of dollars because to induce large corporations to sign long-term energy management contracts and make the business seem instantly successful from the start, Enron entered into contracts that it, along with its accountants and lawyers, knew would probably result in enormous losses and that required Enron to make immediate, large expenditures for more efficient energy equipment and thereby additionally further strap Enron for cash.[61] Mark-to-market accounting was applied to EES also to overvalue grossly the ultimate worth of these contracts and to inflate greatly current period profits from transactions that in reality were producing little or no current period cash. To conceal the huge losses that the EES was suffering, Enron moved the losses into a larger wholesale energy operation and abused mark-to-market accounting and phony hedges with SPEs.[62]

official. "The quality of the deals deteriorated." The turning point, some say, was a deal involving a British power facility that earned Enron brass big bonuses. Yet, says one executive, the deal was "a disaster" that forced Enron to cough up $400 million when gas prices moved the wrong way.

The new accounting made workers eligible for fatter payoffs. Enron employees were urged to work together on deals. But the new arrangements created an incentive to cut out colleagues, because bringing them in meant carving more slices in the bonus pie. "It was a very intense and urgent form of accounting," says Dan Riser, a former employee who worked with Skilling.

61. As an example of such abuse in order to permit Enron to book improperly huge, illusory profits up front, the complaint at 306–07, describes a DSM with Eli Lilly. The complaint at 307 quotes from *The Washington Post*, 2/18/02:

Eli Lilly and Co., the Indianapolis pharmaceutical manufacturer, signed a $1.3 billion contract in February 2001 turning all its energy requirements over to Enron for 15 years. But Enron paid Eli Lilly $50 million upfront to win the deal, according to a former senior executive of Enron.

. . . . .

*Such upfront payments were not unusual, said Glenn Dickson, a former EES director of asset operations. "It was fairly* common on the really big deals to pay the customer to lose money, in effect, on the contract, whether you were paying the customer or losing the money you were charging less than it really cost."

*What made it all work, Dickson said, was a form of accounting in which the company counted future projected earnings as current income. "It [w]as huge amounts of money that covered up those cash outlays."*

The complaint also identifies companies which made deals with Enron to which Enron improperly applied mark-to-market accounting, including J.C. Penney, IBM, Owens Illinois, and Quaker Oats. *Id.* at 307, 310–11.

62. Lead Plaintiff quotes several passages of a letter written to Enron's Board by an EES manager in August 2001:

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrongdoings of the various management teams at Enron ... (i.e., EES's management's ... hiding losses/SEC violations).

... [I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all deals they had booked. ... [I]t will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion ... [T]hey decided ... to hide the $500MM in losses that EES was

Enron also misrepresented the status and growth of its broadband services business ("EBS"), an 18,000–mile fiber optic network that Enron was constructing and using to engage in trading access to Enron's and other companies' fiber optic cable capability ("Broadband Intermediation"). It represented that the network was being and had been successfully constructed, that it was state of the art and offered unparalleled quality of service, and that the trading business was succeeding and achieving much higher trading volume and revenues than expected, i.e., "exponential growth." One of its ventures was the Blockbuster VOD, mentioned *supra*. Enron stated that the twenty-year agreement, announced in July 2000, had a billion dollar value and was a first-of-its-kind whereby consumers would be able to enjoy

video-on-demand, provided by Blockbuster, in their homes via Internet because of technological advances made possible by the high quality of Enron's fiber optic network.[63] The consolidated complaint charges that along with an investment from CIBC in the deal after a no-loss guarantee from Enron, Enron abused mark-to-market accounting to claim a profit of over $110 million in the fourth quarter of 1999 and the first quarter of 2000. In reality EBS was a failure because Enron lacked the technology to deliver the product as represented and because Blockbuster had not and could not obtain the legal right to deliver movies from movie studios in a digital format, a necessity for VOD. According to the complaint at 301, when the deal was announced, Defendant Ken Rice told an engineer whom Rice was recruiting that Enron "can't deliver" on the deal.[64] Eight weeks after the deal was

experiencing.... EES has knowingly misrepresented EES['s] earnings. This is common knowledge among all the EES employees, and is actually joked about. But it should be taken seriously.

**63.** The complaint alleges that at the commencement of the deal, Enron created another partnership, EBS Content Systems LLC, or "Project Braveheart," again finagling to make it appear to be an independent entity when it was not and obtaining funding from CIBC with a guarantee from Enron, to improperly record $111 million in revenue from the sham Blockbuster deal. Consolidated complaint at 300–01. EBS then transferred its interest in the Blockbuster deal, fraudulently valued at $124.8 million, to Braveheart. No revenue should have been recorded from the Blockbuster deal because (1) Braveheart was not independent of Enron; (2) EBS could not provide the service it promised and thus could not earn the projected revenue; (3) most of the projected customers did not yet exist and were unlikely to pay for the severely restricted services (40 movies loaded onto a Sun Server in four test cities) that were actually provided; and (4) the improper use of mark-to-market accounting resulted in sham estimates of future revenue streams. A former employee stated, "[T]he Blockbuster deal was a fraud, and Enron's top management knew it."

The complaint describes another misuse of mark-to-market accounting in a broadband deal involving Rice University. The deal, for $14 million over ten years, was that EBS would provide broadband to Breimen University in Germany, a sister university to Rice. Enron recognized all $14 million earnings up front by applying mark-to-market accounting during the second and third quarters of 2000. Furthermore, to secure the deal, Lay gave Rice a $5 million donation to build a wing. Under the deal Breimen could cancel at any time and did so in early 2001. Thus the revenue stream had not been earned and was not collectible at the time it was recognized. Consolidated complaint at 308.

**64.** The complaint asserts that, as is typical of Enron's usual unfounded projections and manipulated calculations, in trying to decide how much it would cost to do VOD per subscriber, Enron developers "came up with a figure out of thin air-$1.20. There was no rational basis for this amount. However, it was used to calculate future profits to be derived from the project." Consolidated complaint at 301. In contrast, McKinsey Consulting told EBS that it would have to spend between $1,200–$1,600 per subscriber for equipment to get VOD to work.

announced with great fanfare and only weeks after representing that the system had been successfully tested in four cities and was being launched nationwide, Enron abandoned the venture. Yet Enron did not reverse the huge profits that it had clandestinely and improperly reported on this transaction previously because such a disclosure would have exposed its ongoing abuse and misuse of mark-to-market accounting and caused the price of its stock to decline, thus triggering prices in the SPEs that would obligate Enron to pay off investors in the SPEs. Furthermore, aware of the fragility of Enron's financial condition and CIBC's overall exposure to Enron, CIBC did not demand that Enron honor its secret guarantee and refused to disclose its economic relationship with Enron or its affiliates, but instead used boilerplate disclosures in its analyst reports on Enron to conceal its investment and its resulting conflicts of interest.

In 2000, Enron owned millions of shares of stock in and controlled a private company known as New Power. According to the complaint, to obtain desperately needed profit to perpetuate its alleged Ponzi scheme, Enron decided to take New Power public and create a trading market in its stock in order to recognize a profit on the gain in value on its shares by a sham hedging transaction with an LJM2 SPE. With Credit Suisse Boston, CitiGroup, and CIBC, Enron effected a huge New Power initial public offering ("IPO") (27.6 million shares at $21 per share) in October 2000. Meanwhile Enron retained 13.6 million shares of New Power common stock and warrants to purchase 42 million more shares. Pursuant to a deal structured before the IPO, Enron, along with Vinson & Elkins, Arthur Andersen and CIBC, used LJM2 to hedge Enron's gain in the value of its New Power stock and create an enormous phony profit of $370 million in the fourth quarter of 2000. Immediately after the October IPO, Enron, Vinson &

Elkins, Kirkland & Ellis, Arthur Andersen, and CIBC created an SPE designated Hawaii 125-0. CIBC and several other Enron banks, including Credit Suisse First Boston, made a sham "loan" of $125 million to Hawaii 125-0, but actually Enron gave the banks a secret "total return swap" guarantee that protected them from any loss. Enron sold millions of its New Power warrants to Hawaii 125-0 to "secure" the banks' loans while recording a $370 million profit on the claimed gain on the New Power warrants made possible by the IPO. Hawaii 125-0 simultaneously allegedly hedged the warrants with another entity created and controlled by Enron called "Porcupine," into which LJM2 had placed $30 million to capitalize it and facilitate the sham hedge of the New Power warrants; a week later, however, Porcupine paid back the $30 million to LJM2 along with $9.5 million profit, leaving Porcupine stripped of assets. When New Power stock fell sharply in 2001, Enron's alleged gain on its Power equity holdings was converted into a loss of about $250 million. The consolidated complaint alleges that Enron, Vinson & Elkins, Kirkland & Ellis, and Arthur Andersen agreed to, and did, conceal that loss until October 2001, when Enron disclosed a $1 billion write-off and a $1 billion reduction in shareholder equity.

Lead Plaintiff further alleges that in September 2001, when Enron's stock value was dipping to precarious "trigger" levels and threatening the possibility of large asset write downs, Enron and Qwest, another Arthur Andersen client, with the aid of Arthur Andersen and Vinson & Elkins, effected another deal to limit the writeoffs and conceal Enron's financial situation by creating an appearance of healthy operating earnings. On September 30, 2001, the final day of the third quarter, solely for accounting purposes, they arranged a "swap" by which Quest agreed to overpay for Enron's "dark (i.e., not yet active) fi-

ber" between Salt Lake City and New Orleans, Enron agreed to buy "lit wavelength" (active fiber optic cable services) from Quest's network over a twenty-five year period, and the companies exchanged checks for about $112 million. Enron thus reported a sale and avoided reporting a loss on its dark fiber assets,[65] whose value on the open market was far lower than the price on Enron's books.[66]

As another "manipulative device" to conceal its true financial condition, the complaint claims that with some of Enron's banks Enron engaged in loans disguised as commodity (oil and gas) trades, with the ultimate cost differential in favor of the banks actually constituting the "interest" on the hidden loan. For example, JP Morgan set up, controlled, and utilized an entity known as "Mahonia," located in the Channel Islands off the coast of England. Enron, Mahonia, and JP Morgan got Vinson & Elkins to provide a false legal opinion that these disguised loans were legitimate commodities trades. Through this manipulative device, JP Morgan and Enron concealed some $3.9 billion in debt.

The loans were disguised as hedging or derivative transactions so that Enron would not have to record the $3.9 billion as debts on Enron's balance sheet. For in-stance, between December 1997 and December 2000, Enron Natural Gas Marketing Corporation or Enron North America Corporation, as sellers, entered into six different agreements, characterized as "forward sales contracts," supposedly to provide for the delivery of crude oil and natural gas over a four-to-five-year period, with either Mahonia or Mahonia Gas serving as the purchasers. In actuality the forward sales contracts, amounting to $2.2 billion, were loans to Enron disguised as hedging contracts. Enron never intended to deliver the crude oil and natural gas, as is evidenced by (1) its failure to enter into contracts with suppliers to hedge its obligations to deliver the crude oil and gas under the six contracts; (2) the fact that Mahonia did not enter into contracts for delivery of the oil and gas to be supplied by Enron under the terms of the contracts, but instead secured them with surety bonds; (3) and the fact that Mahonia was not listed as a firm transportation customer of any of the pipelines at which the natural gas deliveries were to be made under the sales contracts, even though Mahonia expressly represented and warranted that it had the capacity and intended to take delivery of the natural gas and that it was acquiring the natural gas in the ordi-

---

**65.** "Dark fiber" refers to fiber optic cables that have been laid, but are not yet in use, or "lit." Consolidated complaint at 302.

**66.** The complaint asserts that Enron had a practice of engaging in swapping capacity of deliberately overvalued dark fiber and broadband trading with other telecom companies (including Dynegy, Williams, El Paso, Metromedia Fiber, Acrie Networks, Qwest, Level 3, 360 Networks, and Touch America). Many of these swaps were effected to create the illusion of trading activity and to report sham income, thus manipulating Enron (and other entities') financial results. Most of the $120 million of revenue in 1999 that Enron reported for broadband was from such dark fiber swaps. Consolidated complaint at 302–03. In June 2000, for example, Enron sold dark fiber cable for $100 million to LJM2. LJM2 paid Enron $30 million in cash and gave Enron an interest-bearing note for $70 million, even though the dark fiber was not worth even close to that price. Enron recognized $67 million in pre-tax earnings that year from the asset sale. In the third quarter of 2000, a similar deal took place worth more than $300 million, so that Enron could "make its numbers," but that arrangement failed to follow protocol because network developers and traders were not informed about it until after it was accomplished. Complaint at 303. Sometimes the broadband traders traded among various Enron-controlled entities, breaking one transaction into a number of transactions, to create the impression of multiple and increasing numbers of deals.

nary course of business. Complaint at 311–12. Furthermore on the same day that Enron entered into the forward sales contracts with Mahonia, December 28, 2000, Enron entered into an agreement with Stoneville Aegean Ltd. to buy the same quantity of gas that Enron was supposed to sell to Mahonia, to be delivered on the same future dates that Enron was supposed to deliver the same quantities of gas to Mahonia. Moreover, Mahonia and Stoneville are offshore corporations established by the same company, Mourant du Feu & Jeune, with the same director, Ian James, and the same shareholders, Juris Ltd. and Lively Ltd. Mahonia, had agreed in its contract to pay Enron $330 million for gas on the same day that they entered into the contract, December 28, 2000; Enron agreed to pay Stoneville $394 million to buy back the same quantities of gas on the same delivery schedule, but with the $394 million to be paid at specified future dates, i.e., the equivalent of a 7% loan.

In a valid pre-paid forward sales contract, the purchaser wants long-term delivery of gas, but is exposed to the risk that the market price may decrease during the month and will be lower than the price pre-paid by the purchaser. Here J.P. Morgan assumed no economic risk that the price of natural gas might change because it or its related companies simultaneously bought and sold the same quantities of gas at pre-arranged prices to the same party, Enron. Thus the price or the availability of the gas was irrelevant; the transaction was a loan rather than a pre-paid sales contract.

Furthermore, allegedly knowing Enron's actual precarious financial condition, JP Morgan attempted to insure against default by Enron on the "loans" by buying performance bonds from several insurance companies. After Enron defaulted on the trade contracts after filing for bankruptcy, those insurers subsequently have refused to pay and contend that the commodity trades were fraudulent and a subterfuge to hide the fact that the transactions were done to disguise loans to Enron.

The consolidated complaint also asserts that CitiGroup (from early 1999 through early 2002) engaged in subterfuge to disguise large loans amounting to $2.4 billion to Enron as a series of prepaid swaps,[67] and that Credit Suisse First Boston (in 2000) made loans of $150 million to Enron disguised as trades in derivatives, in order to paint a false picture of Enron's liquidity, financial condition, and balance sheet. Specifically, CitiGroup lent Enron $2.4 billion in a series of "pre-paid" swaps (the

---

67. In a "true swap," according to the complaint,

> two parties trade the future returns on investments over a set period of time. One party pays a small amount to receive a fixed interest rate on a corporate bond in lieu of uncertain gains on the same corporation's stock. The counterparty accepts the payment and swaps the return on the bond for the return on the stock. Neither party actually needs to hold the underlying assets as long as the payments are made. Typically, neither party in a true swap exchange receives all the agreed payments up front. In the Enron transactions, though, CitiGroup paid up front an estimate of the fair value of its portion of the swaps—hundreds of millions of dollars each time—payments made *immediately. Enron was obliged to repay the cash over five years.* These Delta transactions, though technically derivative trades known as prepaid swaps, perfectly replicated loans and were, in fact, manipulative devices to disguise what were, in reality, loans. Enron's balance sheet misrepresented these transactions. Enron posted the loans as "assets from price risk management" and as "accounts receivable," admitted Charlie Leonard, a spokesperson for Andersen. The repayments that Enron owed the banks were listed as "liabilities from price risk management" and possibly a small amount of accounts payable, Leonard said.

Consolidated complaint at 361.

"Delta transactions") by utilizing a Citi-Group Cayman Island subsidiary named Delta, based in the Cayman Islands. Citi-Group paid the estimated fair value of its portion of the swaps, hundreds of millions of dollars, immediately each time, but Enron was only obliged to repay the cash over five years. These Delta transactions were actually loans, though never disclosed as such on Enron's balance sheet, which reported them as assets and liabilities from price risk management and accounts payable and receivable.

Similarly Credit Suisse First Boston allegedly made loans disguised as trades in derivatives to Enron. In 2000, it gave Enron $150 million, to be repaid over two years with those repayments to vary based on the price of oil.[68] Enron kept the loans from Credit Suisse First Boston and CitiGroup off its balance sheet by characterizing them as "assets from price risk management" and perhaps as "accounts receivable" according to Arthur Andersen spokesman Charlie Leonard, so that investors, credit rating agencies, and industry analysts would not perceive the risk created by the debt incurred in obtaining new financing.[69]

The consolidated complaint details other fraudulent practices, such as Enron's inflation of revenues with respect to long-term construction contracts[70] and improper snowballing of costs on unsuccessful bids,[71]

**68.** The complaint quotes *The New York Times* on February 17, 2002:

Technically, the transaction was a swap. But because CS First Boston paid Enron up front, the transaction took on the characteristics of a loan—a reality noted by the bank. "It was like a floating-rate loan," said Pam Pendleton, a CS First Boston spokesman. "We booked the transaction as a loan."

Complaint at 314.

**69.** The complaint discusses similar loans disguised as transactions, e.g., at p. 315–16, with the Connecticut Resources Recovery Authority ("CRRA") and Connecticut Light and Power Company ("CL & P"), which involved a loan disguised as an energy contract for which revenue could be reported. In March 2001 the CL & P paid an Enron subsidiary $220 million, purportedly for the Enron entity to assume a contract to purchase the CRRA's trash-generated steam electricity, with the Enron subsidiary agreeing to repay CRRA in monthly installments nearly $2.4 million per month (constituting interest plus principal) until May 31, 2012, when the contract would expire. Enron never actually purchased the electricity; Enron entered into the transaction to obtain the immediate $220 million cash infusion, another deal in its regular practice of shoring up the company's precarious financial condition for the present through a deal that made no long-term financial sense.

**70.** Enron International, a subsidiary of Enron, could properly recognize as revenue approximately 5% of a contract's value for construction services provided to Enron. Former employees, however, have reported that Enron International, in violation of GAAP, improperly recognized as revenue 10% of construction services contract values upon signing. Furthermore, it utilized a percentage of completion method of accounting, recognizing income as work progresses on the contract, for long-term construction contracts, a business practice which was false and misleading and resulted in an overstatement of revenues and earnings.

**71.** In 1997 and 1998, according to the complaint, Enron regularly capitalized, rather than expensed, costs related to unsuccessful bids for projects and improperly included them in costs for future projects. The costs were finally written off in the first quarter of 1999, but to conceal the true nature of the writedown, the expenses were attributed to a "change in accounting." This practice of accumulating capital expenditures incurred on unsuccessful project proposals was known by accounting and finance personnel throughout Enron as "snowballing." The complaint alleges that the "snowball grew exponentially," to the point that an international accounting officer told Enron's CAO Richard Causey that Enron had to take a writedown because so many proposals were no longer even arguably viable. But Causey, directed by Jeffrey Skilling, responded that "corporate did not have room" to take a writedown because reducing

followed by obfuscated "disclosures" to mislead investors about the true nature of the write down. Consolidated complaint at 316–19. The complaint claims that Enron also falsified its financial statements by omitting losses for the impairment or deterioration in value of long-term assets and investments, e.g., of Azurix Corporation, Broadband Services, the New Power Company, TGSS, the Dabhol Power Plant, PromiGas, and projects in Nicaragua, Puerto Rico, and Brazil, in violation of GAAP, SFAS No. 115.[72] Enron only belatedly announced a write down of $1 billion in assets on October 16, 2001, even though the impairment occurred long before. Consolidated complaint at 319–25.

The complaint further alleges that Enron, in a phony transaction on June 29, 2001, sold its interest in Project Timber, a methanol and MTBE refinery, to Enron Oil Transportation and Trade ("EOTT"), an entity in which Enron was one-third owner and general partner, after Enron was unable for six years to sell that interest legitimately. MTBE is water soluble and is a potential carcinogen. The best price offered to Enron for Project Timber during the six years was $50 million, but Enron sold it to EOTT for $200 million. EOTT agreed to the terms because Enron guaranteed that it would purchase all the MTBE that the plant produced and would cover any liability. From that sale Enron improperly recognized $117 million, more

---

the snowball would result in Enron's earnings going below expectations. By 1997, the snowball on about 75 projects in Central and South America and the Dabhol power plant in India was about $100 million and dwarfed revenue returns. When Enron recorded an after-tax charge of $131 million in the first quarter of 1999, it misled investors by making the accumulated writeoff costs (improperly recorded as assets rather than expenses on the balance sheet for years) appear to be the result of the initial adoption of two new accounting pronouncements, including Statement of Position 98–5, Reporting on the Costs of Start-up Activities, which requires that costs for all start-up activities and organization costs be expensed as they are incurred.

72. The complaint maintains that SFAS No. 121 requires companies to review long-term assets to determine if they are impaired and in ¶5 identifies the following as circumstances requiring reassessment:

 a. A significant decrease in the market value of an asset

 b. A significant change in the extent or manner in which an asset is used or a significant physical change in an asset

 c. A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator

 d. An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset

 e. A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.

... 6. If the examples of events or changes in circumstances set forth in paragraph 5 are present or if other events or changes in circumstances indicate that the carrying amount of an asset that an entity expects to hold and use may not be recoverable, the entity shall estimate the future cash flows expected to result from the use of the asset and its eventual disposition. Future cash flows are future cash inflows expected to be generated by an asset less the future cash outflows expected to be necessary to obtain those inflows. If the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss in accordance with this Statement. Otherwise, an impairment loss shall not be recognized; however, a review of depreciation policies may be appropriate.

SFAS No. 115 also requires that a loss be recorded for impairment in investments if the impairment is not temporary. Consolidated complaint at 319–20.

than a third of its second quarter 2001 earnings, even though the revenue was not realizable and the transaction was not arm's length. The transaction was a total return swap and should not have been recognized as revenue. Furthermore, Enron did not disclose that it recognized earnings from the "sale" or that it assumed liabilities under the contract.

The complaint summarizes that these improper accounting tactics violated GAAP because they violated general, fundamental accounting principles: that interim financial reporting should be based on the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶ 10); that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1 ¶ 34); that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that alter those resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40); that financial reporting should provide information about how the management of an enterprise had discharged its stewardship responsibilities to its stockholders for the use of enterprise resources entrusted to it, especially when it voluntarily heightens its responsibility of accountability .to prospective investors and the public generally when it offers securities of the enterprise to the public (FASB Statement of Concepts No. 1 ¶ 50); that financial reporting should provide information about an enterprise's financial performance during a period so investors can assess the enterprise's prospects (FASB Statement of Concepts No. 1 ¶ 42); that financial reporting should be reliable (FASB Statement of Concepts No. 2); that the information is complete and nothing is omitted

that is necessary to insure that the financial report represents the underlying events and conditions (FASB Statement of Concepts No. 2 ¶ 79); and that conservatism should be used as a prudent reaction to uncertainty in an attempt to ensure that uncertainties and risks inherent in business situations are adequately considered and the report truly represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶ 95, 97). Consolidated complaint at 326–27. Furthermore SEC regulations, regulations of the national stock exchanges, and customary business practice require disclosure of the kind of information concealed by Defendants, as corporate officials and their legal and financial advisors knew.

During 2001, Enron's stock price precipitously declined and the Raptor SPEs were imperiled by a lack of credit capacity, portending a "death spiral" for Enron. Fully aware of the situation, JP Morgan and CitiGroup, when Enron's "financial chicanery" had created a desperate "liquidity crunch," greatly increased the monies flowing into Enron as phony oil and gas trades and swaps to prop up Enron's diminished finances without disclosing that these two banks had just lent Enron between $4–6 billion, according to the complaint. If these phony commodity and swap trades had been treated as the loans they were, the internal procedures at both banks would have required a syndication of those loans to other banks, thus increasing the number of entities with knowledge of Enron's liquidity problems. Moreover, even structuring consolidation of loans of this size would have exposed Enron's problems to the financial community and would have been reported in specialized journals and then in the financial press focusing on bank lending syndication activity. With its financial fragility exposed, a substantial downgrade of Enron's credit rating would likely have followed, endangering its ability to borrow and activating stock issuance

price triggers. Lead Plaintiff emphasizes that even though under Enron's investment-grade rating at the time, Enron could have borrowed money at 3.75–4.25% interest, the fraudulent Mahonia and Delta transactions were structured to pay off JP Morgan and CitiGroup with, under the circumstances, "extortionate" interest rates between 6.5–7.0%, amounting to a big profit for the banks. Moreover, to reduce the economic risk, JP Morgan purchased security bond insurance by attempting to deceive the insurance companies into believing they were insuring commodity trades rather than loans, and obtained letters from other financial institutions with the same deception. For the same purpose, CitiGroup sold Enron-linked securities as notes, including the Delta loans.

The complaint represents that Enron has conceded that in prior years it did not make audit adjustments and reclassifications proposed by Arthur Andersen that would have reduced Enron's net income because it considered the adjustments "immaterial." For instance the proposed adjustment for 1997 was $51 million, or 48% of its net income and 10% of its recurring net income.[73]

Ultimately Enron did restate its financial statements for 1997 through the second quarter of 2001, an action which the complaint characterizes as "an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material." Consolidated complaint at 299. Under GAAP, APB No. 20 at ¶¶ 7–14, the type of restatement made by Enron was to correct material errors in prior financial statements, a disfavored procedure because it diminishes investor confidence in financial statements. GAAP approves of restricting restatements to limited circumstances, e.g., when there is a change in the reporting entity or in accounting principles or to correct an error in a previously issued financial statement. In Enron's case, Lead Plaintiff quotes a February 22, 2002 article on *Accounting Malpractice.com:* "The emerging question is not whether a more conservative restatement would have reflected smaller profits, but whether a proper restatement would have reflected any profits from 1997 and forward." Consolidated complaint at 300.

In sum, the consolidated complaint charges that Defendants caused Enron to violate GAAP and SEC rules in order to overstate Enron's assets, shareholders' equity, net income and earnings per share, and to understate its debt. Defendants also caused Enron to present materially misleading statements in Enron's financial statements (including press releases and SEC filings, such as Form 10–Qs for interim results and Form 10–Ks for annual results), which were incorporated into (Registration Statements and Prospectuses filed during the Class Period). Enron also made misrepresentations about Defendants' manipulations, all concealed

---

**73.** The complaint quotes SEC Staff Accounting Bulletin No. 99, which, although issued in August 1999 after Enron and Arthur decided not to make the adjustments, states that it did not create new GAAP, but merely reemphasized existing GAAP:

Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading.

by the following numerous, improper accounting ploys: not consolidating illicit SPEs into Enron's financial statements to properly reflect reduced earnings and debt on Enron's balance sheet; improperly accounting for common stock issued to a related-party entity that should have been treated as a reduction in shareholders' equity, but was identified as a note receivable; improperly accounting for broadband transactions; abusing mark-to-market accounting; characterizing loans as forward contracts to conceal Enron's debt; improperly accounting for long-term contracts; failing to record required write-downs for impairment in value of Enron's investments, long-term assets, and its broadband and technology investments in a timely manner; failing to record an aggregate of $92 million in proposed audit adjustments from 1997 until the end of the Class period; failing to disclose related-party transactions; and misstating Enron's debt-to-equity ratio (measured as debt to total capitalization, a figure which rating agencies use to determine a company's credit rating) and ratio of earnings to fixed charges. Even while demonstrating the contrast between Enron's original financial statements and its restatement results, the consolidated complaint notes that many of Defendants' manipulations are not included in the restatement, such as the effects of Enron's abuse of accounting techniques.

Lead Plaintiff describes Enron's "corporate culture" as characterized by "a fixation on the price of Enron stock" and on pushing that price ever higher. Throughout Enron's Houston corporate headquarters, TV monitors constantly displayed the current market price of its stock. A repeated maxim was that managers were always to be "ABCing," i.e., "always be closing" deals to create revenue and profit even if they were questionable. Corporate managers and executives were compensated for closing transactions and placing high values on them, regardless of the economic realities of the deals, to generate profit when "marked to market." There was pressure to do anything necessary to make the numbers, and it was common knowledge that revenues and earnings were being falsified at the direction of top executives. Bonuses went to those who facilitated the company-wide fraudulent behavior. In August 2001, Sherron Watkins, an Enron executive and a former Arthur Andersen accountant, wrote to Kenneth Lay that Enron was "nothing but an elaborate accounting hoax" and that nothing "will protect Enron if these [SPE] transactions are ever disclosed in the bright light of day," while warning that many Enron employees believe, "[W]e're such a crooked company."

In 2001, matters at Enron began to fall apart, according to the complaint. In March 2001, just prior to the end of the quarter, it appeared that Enron would have to take a pre-tax charge against more than $500 million because of a shortfall in the credit capacity of the Raptor SPEs. To avoid the loss and its more dire consequences, Enron, Arthur Andersen, Vinson & Elkins, Kirkland & Ellis and some of the banks "restructured" the Raptors by transferring to them more than $800 million of contracts to receive Enron stock for no consideration; this transfer was accounted for as an increase in equity and assets, in violation of GAAP. As with so many other previously described contrivances, the transfer allowed the participants in the scheme to continue concealing losses in Enron's merchant investments[74]

---

74. Under GAAP, SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities, companies must record unrealized gains and losses on investments in securities that do not have readily determinable values as a separate component of stockholders' equity. Only unrealized holding gains and loss-

and kept the alleged Ponzi scheme working. Yet during early 2001, Enron also continued to report record results, certified by Arthur Andersen, and Enron's lawyers and bankers continued to make very positive statements about the business.

In June 2001, when Enron stock was trading at around $48.50 a share, statements made at a meeting between an Enron manager and two Credit Suisse First Boston managing directors reflected that Credit Suisse First Boston knew about the nature and extent of Enron's off-balance sheet exposure and Enron's falsification of its financial statements. The bank's directors made the following comments to the Enron manager: "How can you guys keep doing this?," in reference to Enron's repeated statements to the market that its stock was under valued. Even at $40 per share, Enron's stock was still overvalued in the bank directors' view, as reflected in their comments to the Enron manager: "Do employees actually believe it's worth what management is saying?"; "[Y]ou guys are at a critical price point right now"; that if Enron's stock price continued to fall, that drop would cause Raptor to unwind and the debt balance to come due; when the Enron executive stated that he thought Enron's off-balance sheet debt was between one and two billion dollars, the bank representatives responded, "Try eight to 12 billion."; and that if Enron's stock dips to $20 per share, things would come falling down and "you guys are gonna be fucked." Complaint at 37–38. Yet despite this knowledge, Credit Suisse First Boston issued a report on August 14, 2001, rating Enron a "Strong Buy" with a price target of $84.

According to the complaint, on July 13, 2001, Jeffrey Skilling told Kenneth Lay that he was going to quit because he knew that the Enron house of cards was crumbling. They and other top Enron officials made up a story that Skilling was resigning for personal reasons to hide the true reason and limit damage to the price of Enron's stock. On August 14, 2001, Fastow, Skilling and other top executives and bankers announced that Skilling, who had only become CEO a few months earlier, was resigning for personal reasons, that his departure did not raise "any accounting or business issues of any kind," that Enron's financial state "had never been

---

es for trading securities, i.e., securities bought and held primarily to be sold in the near future, should be included in current earnings. SFAS No. 115 further provides that the fair value of an equity security is readily determinable if sales prices or bid-and-ask quotations are currently available on a securities exchange registered with the SEC or in the over-the-counter market, provided that those prices or quotations for the over-the-counter market are publicly reported by the National Association of Securities Dealers Automated System or by the National Quotation Bureau. Restricted stock does not qualify. Complaint at 309–10.

The complaint, *id.*, asserts that during the Class Period, Enron made false and misleading financial statements, first overvaluing holdings in various portfolio companies ("Merchant Assets"), and then misrepresenting that many had pretax gains of easily de-terminable values under the definition in SFAS No. 115, permitting Enron to record such unrealized gains as current income. They should have been reported as unrealized gains and losses and reported net of applicable income taxes in a separate component of stockholders' equity. For instance Enron recognized pretax gains from sales of merchant assets and investments by an Enron division known as Assets and Investments, which *inter alia* was involved with building power plants worldwide, operating them, selling off pieces of them and investing in debt and equity securities of energy- and technology-related business. The complaint states that Enron recognized pretax gains from sales of merchant assets and investments totaling $628 million in 1998 and $756 million in 1999 and claimed much of them had readily determinable value recordable as income. *Id.* at 309.

stronger" and its "future had never been brighter," that there was "nothing to disclose," that Enron's "numbers look good," that there were "no problems" or "accounting issues," and that the Enron "machine was in top shape and continues to roll on—Enron's the best of the best."

The consolidated complaint quotes Enron management employees in August 2001 complaining to the Board about the fraud [75] Nevertheless, Enron's directors

75. Sherron Watkins wrote,

Skilling's abrupt departure will raise suspicions of accounting improprieties and valuation issues. Enron has been very aggressive in its accounting—most notably the Raptor transactions and the Condor vehicle. We do have valuation issues with our international assets and possibly some of our EES MTM positions.

The spotlight will be on us, the market just can't accept that Skilling is leaving his dream job.... How do we fix the Raptor and Condor deals? ... [W]e will have to pony up Enron stock and that won't go unnoticed.

We have recognized over $550 million of fair value gains on stock via our swaps with Raptor, much of that stock has declined significantly—Avici by 98% from $178 mm to $5 mm. The New Power Co. by 70%, from $20/share to $6/share. The value in the swaps won't be there for Raptor, so once again Enron will issue stock to offset these losses. Raptor is an LJM entity. It sure looks to the layman on the street that we are hiding losses in a related company and will compensate that company with Enron stock in the future.

*I am incredibly nervous that we will implode in a wave of accounting scandals.... [T]he business world will consider the past successes as nothing but an elaborate accounting hoax....*

*[W]e booked the Condor and Raptor deals in 1999 and 2000, we enjoyed a wonderfully high stock price, many executives sold stock, we then try and reverse or fix the deals in 2001 and it's a bit like robbing the bank in one year and trying to pay it back 2 years later. Nice try, but investors were hurt, they bought at $70 and $80/share looking for $120/share and now they're at $38 or worse.* We are under too much scrutiny and there are probably one or two disgruntled "redeployed" employees who know enough about "funny" accounting to get us in trouble.

I realize that we have a lot of smart people looking at this.... *None of that will protect Enron if these transactions are ever disclosed in the bright light of day ....*

*There is a veil of secrecy around LJM and Raptor. Employees question our accounting propriety consistently and constantly* .... a. Jeff McMahon was highly vexed over the inherent conflicts of LJM. *He complained mightily to Jeff Skilling* .... 3 days later, Skilling offered him the CEO spot at Enron Industrial Markets....

b. *Cliff Baxter complained mightily to Skilling and all who would listen about the inappropriateness of our transactions with LJM.*

c. I have heard one manager level employee ... say *"I know it would be devastating to all of us, but I wish we would get caught. We're such a crooked company."* ... *Many similar comments are made when you ask about these deals.*

A second Enron employee wrote the following statements:

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrong doings of the various management teams at Enron. However ... I'm sure the board has only scratched the surface of the impending problems that plague Enron at the moment. (*i.e.,* EES's ... hiding losses/SEC violations ... lack of product, etc.)

[I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all the deals they had booked. (JC Penney being a $60MM loss alone, then Safeway, Albertson's, GAP, etc.) Some customers threatened to sue if EES didn't close the deal with a loss (Simon Properties-$8MM loss day one).... Overnight the product offerings evaporated.... Starwood is also mad since EES has not invested the $45MM in equipment under the agreement.... Now you will loos [sic] at least $45MM on the deal.... You should also check on the Safeway contract, Albertson's, IBM and the California contracts that are being negotiated.... It will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion.... This is when they decided to merge the EES risk group with Wholesale to hide the

did not investigate or disclose the matters the employees had raised. Instead, according to the consolidated complaint, they brought in Vinson & Elkins to cover up the wrongdoing. Vinson & Elkins issued a whitewash report dismissing these detailed complaints of fraud even though the law firm knew the allegations were true because it was involved in structuring many of the manipulative devices.

By May 2001, as the price of Enron stock continued to fall, criticism of Enron's aggressive accounting, termination of the Blockbuster VOD venture, and worries about Enron's broadband business caused the price to fall below "trigger" levels, thus forcing Enron to issue large amounts of additional stock to its SPEs. The Raptors' credit problems became unsolvable. Unable to avoid any longer a multi-million dollar loss in the third quarter of that year and recognizing the threat of disclosure of their previous misconduct, Enron and Arthur Andersen allegedly began destroying documents that reflected their fraudulent course of conduct. On October 16, 2001 Enron revealed charges of $1 billion and a reduction of shareholders' equity by $1.2 billion. The SEC began investigating and Fastow resigned. In a Form 8–K filed on November 8, 2001 Enron announced it would restate its annual financial statements for the years 1997, 1998, 1999 and 2000, and conceded that Chewco had never met SPE accounting requirements and, because JEDI's nonconsolidation status depended on Chewco's, neither did JEDI.

Enron then consolidated Chewco and JEDI retroactive to 1997, resulting in a massive reduction in Enron's reported net income and a massive increase in its reported debt. In addition Enron confessed that it had failed to correct $51 million in errors found by Arthur Andersen for 1997 and that it was restating its 1997, 1998, 1999 and 2000 financial results to eliminate $600 million in previously reported profits and approximately $1.3 billion in shareholders' equity. Yet, according to the complaint, the restatements "just scratched the surface of the true extent of the prior falsification of Enron's financial statements, failing to eliminate additional hundreds of millions of dollars of phony profits as Enron, Arthur Andersen, Vinson & Elkins and the banks were still trying to keep Enron afloat and trying to conceal how extensive the fraud had really been." Consolidated complaint at 42.

In October 2001, in an effort to limit their own legal exposure and to stop Enron from becoming insolvent and preclude the investigations and revelations that insolvency would give rise to, Enron insiders, JP Morgan, and CitiGroup tried to effectuate the sale of Enron to, or a "salvation merger" with, Dynegy, a transaction that would also provide each bank with a $45 million fee. Consolidated complaint at 43. To preclude exposure of the two banks' participation in the alleged Ponzi scheme, according to the complaint, in late November 2001 Robert Rubin, the Vice Chairman of CitiGroup, and William Har-

---

$500MM in losses that EES was experiencing. But somehow EES, to everyone's amazement, reported earnings for the 2nd quarter. According to FAS 131 Statement of Financial Accounting Standards (SFAS) # 131, "Disclosures about Segments of an Enterprise and related information", EES has knowingly misrepresented EES' earnings. This is common knowledge among all the EES employees and is actually joked about. . . .

Some would say the house of cards are falling. . . .
You, the board have a big task at hand. You have to decide the moral, or ethical things to do, to right the wrongs of your various management teams.
But all of the problems I have mentioned, they are very much common knowledge to hundreds of EES employees, past and present.

Consolidated complaint at 39–41.

rison, the Chairman of JP Morgan, called Moody's Investment Service ("Moody's") and pressured it to keep Enron's investment grade credit rating in place until the sale of Enron to Dynegy was completed. They failed. Dynegy's due diligence investigations uncovered and its investment bankers discovered that Enron's financial condition was much worse than had been publicly disclosed at that point, Dynegy refused to acquire Enron. By November 28, 2001 the rating agencies had downgraded Enron's publicly traded debt to "junk" status, and Enron filed for bankruptcy on December 2, 2001.

The consolidated complaint charges that Enron's publicly filed reports disclosed the existence of the LJM partnerships, but not the essence of the transactions between Enron and the partnerships, nor the nature or extent of Fastow's financial interests in the partnerships. Instead the disclosures were crafted and approved by Enron's outside Arthur Andersen auditors and counsel (Vinson & Elkins and Kirkland & Ellis) in meetings with Enron top insiders. Moreover, Enron's manipulative devices, contrivances, and related-party transactions were extraordinarily lucrative for Fastow and investors in the LJM partnerships despite the relatively risk-free deals that protected them. Lead Plaintiff quotes a *Newsweek* article from the January 28, 2002 edition: "The key to the Enron mess is that the company was allowed to give misleading financial information to the world for years." Lead Plaintiff concludes that "the scheme to defraud Enron investors was extraordinary in its scope, duration and size," that it "was accomplished over a multi-year period through numerous manipulative devices and contrivances and misrepresentations to investors," and that it "was designed and/or perpetrated only via the active and knowing involvement of Enron's general counsel, Vinson & Elkins, the law firm for the LHM2 entity and its SPEs, Kirkland

& Ellis, Enron's accounting firm, Arthur Andersen, and Enron's banks, including JP Morgan, CitiGroup, CS First Boston, Merrill Lynch, Deutsche Bank, Barclays, Lehman Brothers and Bank America." Consolidated complaint at 45.

The Consolidated Complaint at 328–39 lists the offering documents and describes the kinds of allegedly false and misleading statements in Enron's offering documents for securities offerings from July 7, 1998 through July 18, 2001, which incorporated by reference prior Enron Form 10–Ks and 10–Qs, and which also misstated or misled the public about material matters and failed to disclose the fraudulent activity described above and its resulting deceptive version of Enron's financial status and results. These acts included Enron's deliberate failure to consolidate non-qualifying SPEs, straw transactions with banks, bogus hedging transactions leveraging Enron's own stock equity as credit support, misleading the public about Enron's financial risk management and credit risk, and false statements about its failing nascent businesses that were more conceptual than real, including EBS, EIN, and EBOS.

## B. Defendant–Specific Allegations

### 1. The Banks

Lead Plaintiff alleges that the banks participated in the Ponzi scheme for personal enrichment and for continuing business generating spectacular fees (such as the "long gravy train" of lucrative underwriting of Enron stock and bond offerings). Moreover, according to the complaint, once they were involved, their continued participation was also to limit their exposure to risk, salvage their financial investments, and save their reputations.

The charges against the banks are a blend of repetitive, conclusory, cookie-cutter contentions and of assertions that are unique or limited to only a few Defendants.

In the former group, the consolidated complaint alleges that the banks structured and/or financed the partnerships and non-qualifying SPEs secretly controlled by Enron and advanced these illicit entities funds at key times to allow them and Enron to complete bogus transactions just before year- or quarter-end in order to create fake profits and to conceal billions of dollars of Enron debt that should have been reported on its balance sheet. Aware of Enron's financial fragility, the banks further made loans to Enron to insure its liquidity and continuing operations, while simultaneously aiding Enron in selling securities to public investors so that Enron could continue to pay down its short-term commercial paper and bank debt and keep the fraudulent Ponzi scheme afloat. The banks were central players in inflating and supporting the price of Enron stock through issuance of glowing research reports with misleading information about Enron.

JP Morgan, CitiGroup, and Credit Suisse First Boston also concealed billions of dollars in loans to Enron that were disguised as sales transactions. In return for their participation in the Ponzi scheme, the banks and/or their top executives were rewarded in part with the opportunity to invest in the LJM2 partnership, with expectations of exorbitant returns because Enron officials were wearing the hats on both sides of its transactions, a conflict of interest constituting "blatant self-dealing" that was made explicit in the private offering memorandum inviting the banks and bank officers' investment. As discussed *supra*, the bank and banker Defendants knew that for Enron to avoid a very bad fourth quarter and 1999 year-end report, LJM2 had to be formed before the end of 1999 for Enron to create illusory profit and hide debt. Because Merrill Lynch was unable to raise the necessary funds from outside, J.P. Morgan, CIBC, CitiGroup, Deutsche Bank, Credit Suisse First Boston, Lehman Brothers and Merrill Lynch (the underwriter of LJM2),[76] aware of the fact that Enron officers would improperly control both sides of its transactions and thus insure high returns, on December 22, 1999 put up virtually 100% of the funds (far more than their allocated shares) needed to fund LJM2, with JP Morgan additionally providing a loan of $65 million. This infusion of cash enabled Enron to engage in the deals involving Whitewing, CLO, Nowa Sarzyna Power Plan, MEGS natural gas and Yosemite certificates to create phony profits and conceal debt before the year's end. They also benefitted from the distributions from the Raptor SPEs to LJM2, generated by illicit transactions between Enron and the Raptors used to falsify Enron's financial results. Furthermore the banks enjoyed enormous financial benefits from participating in the scheme in the form of interest and underwriting, consulting, and advisory fees, which by inference caused them to act contrary to their profession's principles and requirements.

The complaint asserts that the banks as lenders had to have detailed information about the actual financial condition of Enron throughout the Class Period and had to know that its financial condition was far worse than Enron was publicly disclosing. Banks are required not only by their individual internal procedures, but by the governmental regulation and oversight to perform an extensive credit analysis of any applicant for a commercial loan or credit facility and retain documentation in their files. Such an analysis must include the borrower's actual and contingent liabilities,

**76.** The Consolidated Complaint at 345 quotes an article from *Business Week*, 2/11/02, stating that "[a]s many as 100 of Merrill's own top executives put their personal money into the deal."

its liquidity position, any equity issuance obligations with the potential of adversely affecting its shareholders' equity, any potential debt even if it is not directly on the borrower's books, the quality of the borrower's earnings, and its actual liquidity, including sources of funds to repay any loans. For large loans for commitments to credit facilities for a corporation, the bank had to monitor the company closely, frequently review its financial condition and ongoing operations for material changes, and require the borrower's top financial officers to keep the bank informed of the borrower's current business and financial condition.

The complaint further asserts that in addition to knowledge about the nature and purpose of LJM2, the bank Defendants knew that Chewco was engaging in the same kind of non-arm's-length transactions with Enron for the same purpose. Lead Plaintiff also claims that the banks knew about Enron's actual precarious financial position and false public disclosure because Enron was falsifying its financial results, was manipulating mark-to-market accounting, was utilizing illicit entities that it secretly controlled to move debt off its own balance sheets, and was involved in transactions, which Enron supported with its own stock and which would require Enron to issues millions of shares of common stock if the price of its stock dropped below a specified trigger price so as to make the debt of the SPEs become recourse to Enron.

### a. JP Morgan Chase & Co.

JP Morgan, an integrated financial services institution that, through its subsidiaries and divisions (J.P. Morgan Securities and Chase Securities, collectively, "JP Morgan"), is sued under § 10(b) and § 11 of the federal statutes and under the Texas Securities Act. According to the complaint, JP Morgan provided commercial and investment banking services and advi-

sory services, including acting as an underwriter in the sale of Enron securities and issuing investment analyses and opinions about Enron.

The complaint alleges that JP Morgan helped to structure or finance one or more of Enron's illicit partnerships or SPEs, including LJM2, and to falsify its financial statements, misrepresenting Enron's financial condition by hiding almost $4 billion in debt that should have been on Enron's balance sheet. Concurrently JP Morgan's analysts issued rosy, false and misleading reports on Enron. JP Morgan was a main bank lender to LJM2 and provided more than a $65 million credit line to that partnership. That money enabled LJM2 to form and finance several SPEs including the Raptors, which Enron in turn used in manipulative devices and transactions to inflate its reported profits and conceal debt by moving it off its balance sheet into the SPEs. As a reward for JP Morgan's participation, top executives in JP Morgan were given the opportunity to invest and did invest at least $25 million in the lucrative LJM2. Lead Plaintiff pleads that during the Class Period top officials of the bank constantly interacted on an almost daily basis with Enron's top executives, i.e., Lay, Skilling, Causey, McMahon, and Fastow, with whom it discussed all aspects of Enron's business. JP Morgan's specific involvement in the fraudulent course of conduct and business included loans of over $4 billion to Enron during the Class Period, helping to structure and finance certain of the illicit SPEs and partnerships controlled by Enron to serve as vehicles for false reporting of its financial results, and engaging in transactions with Enron to disguise loans to Enron and to falsify for public perception Enron's financial condition, liquidity, and creditworthiness.

The complaint charges that JP Morgan acted as a consolidated, unified entity with-

out "Chinese walls" to seal off from its securities analysts information garnered by its commercial and investment banking service section.[77] Even if restrictions were imposed on the flow of such information, the complaint alternatively asserts that the Chinese was inadequate and therefore the knowledge and scienter of JP Morgan's commercial and investment entity should be imputed to its analysts.

The complaint at 349–50 lists five Enron offerings (two within the Class Period), for which the bank acted as underwriter or reseller of billions of dollars of Enron securities, two (both within the Class Period) of other Enron-related securities, and six instances (three within the Class Period) where it served as lender on Enron's main credit facilities, while helping to syndicate over $4 billion in loans to Enron and related entities. Two of the loans, a $1 billion and $3 billion commercial paper back up of credit facilities, permitted Enron to remain liquid and maintain access to the commercial paper market so that it could borrow billions to finance its day-to-day operations, for which JP Morgan received huge commitment fees. JP Morgan also arranged about $1.5 billion (lending part of the money and syndicating the rest) so that Enron could finance the illicit Sequoia, Choctaw, Cherokee and Cheyenne SPE/partnerships and the JEDI partner-ships to move debt off Enron's balance sheet and improperly recognize millions in illusory profits. Not only did JP Morgan receive enormous fees and interest payments for the loans and syndication services, but it was also limiting its own risk of exposure[78] by working to maintain for Enron an investment-grade credit rating, credible strong forecasts of revenue and profit growth, and access to the capital markets to raise fresh capital from public investors so that Enron could continue to repay or reduce its commercial paper debt and loans, including those from JP Morgan.

The complaint further charges that JP Morgan as a lead underwriter made false statements in Registration Statements and Prospectuses, including interim and financial statements as well as statements regarding Enron's relationship to SPEs and related parties and the value and condition of its business operations and assets. JP Morgan is allegedly liable for its participation in Enron's February 1999, 27.6–million–share stock offering, and its resale of Enron zero coupon convertible notes on and after July 18, 2001.

Lead Plaintiff also alleges that JP Morgan analysts' reports (including those dated 6/9/99, 7/15/99, 9/23/99, 11/26/99, 1/21/00, 2/9/00, 5/3/00, 5/15/00/ 7/3/00, 7/19/00,

77. Section 15(f) of the Exchange Act, 15 U.S.C. § 78o(f) provides,

> Every registered broker or dealer shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such broker's or dealer's business, to prevent misuse ... of material, nonpublic information by such broker or dealer or any person associated with such broker or dealer.

The Act also permits the SEC to make appropriate rules or regulations about these policies and procedures. *See* 17 C.F.R. §§ 230.137, 230.138, 230.139. Thus an investment bank is required to erect a Chinese wall between its securities analysts' research department and its divisions providing commercial banking, underwriting, or other services to issuers of securities to prevent information from the latter influencing the former.

78. As a prominent example, the complaint at 351 highlights the fact that JP Morgan wrote hundreds of millions of dollars of "credit default puts" on Enron's publicly traded debt securities, including zero coupon notes that it helped Enron to sell in 2001. (Zero coupon notes pay no interest, but are sold at a discount and redeemed upon maturity at face value.) These "puts" required JP Morgan to make good on Enron's publicly traded debt if Enron defaulted. Thus JP Morgan had an additional reason to keep Enron solvent.

9/15/00, 9/29/00, 3/13/01, 3/23/01, 5/18/01, 6/15/01, 7/10/01, 7/21/01, 8/15/01, 8/17/01, 10/17/01, 10/20/01, 10/23/01, and 11/2/01) contained false and misleading statements to the securities markets about Enron's business, finances, and financial condition and prospects and thereby helped to artificially inflate the value of Enron's publicly traded securities. JP Morgan knew that if the value of the stock fell below the various "trigger" prices, Enron would have to issue millions of additional shares of stock, thus reducing shareholder equity by hundreds of millions, if not billions, of dollars and endangering its investment-grade rating and access to capital markets, a threat to the alleged ongoing Ponzi scheme feeding profits and repayments to JP Morgan and its partners.

JP Morgan also purportedly participated in the scheme to finance or otherwise involve itself in manipulative devices and illicit transactions that would enable Enron to continue to falsify its financial condition. Specifically, as detailed previously, JP Morgan and Enron engaged in fraudulent transactions involving over $5 billion, structured to appear to be natural gas futures contracts, or commodity trades, between Enron and Mahonia, Ltd., an entity secretly controlled by JP Morgan. In fact the transactions were disguised loans from JP Morgan to Enron to appear to boost its liquidity since Enron booked them as revenue while concealing over $3.9 billion in debt that should have been recorded on Enron's balance sheet. Because JP Morgan knew these transactions were manipulative devices and contrivances and because it knew that Enron's financial condition was precarious and the company might default, JP Morgan insured the

"contracts" to protect itself from loss. After Enron filed for bankruptcy and JP Morgan filed claims with the insurance carriers that had issued surety bonds for the purported commodities trades between Enron and JP Morgan-controlled entities, the carriers refused to pay on the grounds that the trades were fraudulent and were in reality a series of loans from JP Morgan to Enron. The complaint points out that the Mahonia transactions were also frequently timed to occur just before the end of a quarter or of a year reporting periods.

The complaint also reiterates that in November 2001, desperate to arrange the sale of the failing Enron to Dynegy the Chairman of JP Morgan and Vice Chairman of CitiGroup called Moody's to pressure it to keep Enron's investment grade credit rating in place.

As a similar instance of JP Morgan's and Citigroup's practice of keeping the alleged Ponzi scheme operational, the complaint points to another lawsuit *Unicredito Italiano v. JPMorgan Chase Bank and CitiGroup*. In that suit [79] the plaintiff, an Italian bank, has claimed that JP Morgan and CitiGroup had represented to Unicredito that there had been no changes in Enron's financial condition as of 10/25/01. Unicredito relied on that representation and, to its detriment, funded a $22 million credit facility for Enron.

As evidence that JP Morgan's conduct was intentional and a regular course of business used to defraud, the complaint states that JP Morgan used the same contrivance in previous years with Sumitomo Trading Company, employing ostensible trading on copper futures to disguise what were actually loans. [80] The complaint as-

---

79. This case, which is still pending, was recently transferred from the United States District Court for Delaware to the Southern District of New York. No. 02–104 GMS, 2002 WL 1378226 (D.Del. June 26, 2002).

80. The *New York Times* has reported a number of times that in 1996 the Sumitomo Corporation of Japan learned that one of its copper traders, Yasuo Hamanaka, during the previous ten years had lost $2.6 billion.

serts that it was JP Morgan that suggested to Enron the idea of using disguised commodity trades to hide Enron's debt, while Enron provided JP Morgan with profits through excessive interest rates and fees for its services in putting together the sham Mahonia transactions.

Lead Plaintiff also claims that JP Morgan knew that Enron was falsifying its publicly reported financial results and situation because, as Enron's lead lending bank, JP Morgan had access to Enron's internal business and financial information and because it intimately interacted on a nearly daily basis with Enron's top executives (Lay, Skilling, Causey, McMahon and Fastow).

### b. CitiGroup

Citigroup, sued under § 10(b) of the Exchange Act, is a large integrated financial services institution. Through its subsidiaries and divisions, including Salomon Smith Barney (collectively, "Citigroup"), Citigroup provided commercial and investment banking services, commercial loans, and advisory services regarding the structuring of financial transactions, including those at issue relating to derivatives and hedging. CitiGroup also acted as an underwriter in the sale of securities to the public and provided investment analysis and opinions through reports by its securities analysts.

The complaint asserts that like JP Morgan, CitiGroup enjoyed huge underwriting, advisory and transactional fees, interest,

---

Sumitomo sued J.P. Morgan and Chase Manhattan, which had not yet merged, alleging that the two banks engineered loans disguised as trades, or copper swaps, that allowed Hamanaka to hide the losses. The swaps appeared to involve the purchase of copper and exposure to fluctuating copper prices over time, but in actuality there was no copper physically traded nor financial transactions whose value was dependent on copper prices.

As discussed on pages 133–35 and 162–65 of this memorandum and order, in the instant litigation JP Morgan allegedly entered into deals to transfer commodities (oil and gas) that in reality were just paper transactions camouflaging loans. JP Morgan paid Enron upfront for the ostensible future deliveries. According to the complaint, knowing the "trades" were fraudulent, JP Morgan attempted to limit its risk exposure by "guaranteeing" Enron's performance on the purported trades (through Mahonia) by obtaining surety bonds from eleven insurance companies. After Enron declared bankruptcy and defaulted on payments, the insurance companies refused to pay JP Morgan, arguing that the banks deliberately camouflaged loans as trades to hide their fraudulent scheme. JP Morgan then sued the insurance companies in federal district court in Manhattan for a declaratory judgment that the insurance companies were liable on six surety bonds because Enron entities had defaulted on their performance on the natural gas and crude oil forward sales contracts. The defendant insurers responded with a fraudulent inducement/fraudulent concealment claim that the sales contracts "were part of otherwise undisclosed circular transactions that, when revealed in their entirety, were nothing more than disguised loans that the defendants could not and would not have insured if they had known the full facts." *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 362–63 (S.D.N.Y.2002). The judge, the Honorable Jed S. Rakoff, rejected a motion for summary judgment by J.P. Morgan to force immediate payment on the bonds and ruled that there was sufficient evidence to raise a factual issue for trial about whether the surety bonds were part of a larger fraudulent scheme involving Stoneville Aegean Ltd. to disguise loans as a sale of gas. *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 189 F.Supp.2d 24, 29 (S.D.N.Y.2002). Judge Rakoff has also ruled that JP Morgan may pursue a breach of contract claim against the insurers. The suit is currently being tried.

An attorney for three of the insurance companies being sued by JP Morgan was also the attorney for the Sumitomo Corporation in the still pending suit that Sumitomo filed against JP Morgan in 1999, and he has contended there is a pattern of such loans disguised as trades by JP Morgan.

and commitment charges, and that some of its executives were given the opportunity to invest and did invest $15 million in LJM2 for lucrative returns. Its senior executives also allegedly interacted nearly daily with top executives at Enron, discussing its business in detail. It participated in the fraudulent course of conduct and business through loans to Enron of over $4 billion during the Class Period, helping Enron raise over $2 billion from the investing public through the sale of securities during the Class Period; it helped to structure and finance one or more of the illicit partnerships or SPEs that Enron used to inflate its earnings and conceal its debt; and it engaged in disguised loans to Enron that allowed Enron to falsify its financial situation.

Lead Plaintiff also claims that CitiGroup functioned as a unified entity and there was no "Chinese wall" to seal its analysts from information collected by CitiGroup's commercial and banking services, or if there were restraints, they were inadequate and therefore all knowledge and scienter possessed by the CitiGroup commercial and investment entity should be imputed to its securities analysts.

The complaint at 358 lists fifteen instances (four within the Class Period) when CitiGroup served as an underwriter for Enron securities, and one within the Class Period for Enron-related (Yosemite) securities. CitiGroup also was lead underwriter in the sale of 27.6 million shares of New Power stock in its IPO at $21 per share by means of an allegedly false and misleading prospectus. The complaint asserts that CitiGroup, by deceiving the public and creating a market for these shares, knowingly enabled Enron, using a bogus, non-arm's-length transaction with an SPE controlled by LJM2, to report a $370 million, fourth-quarter 2000 profit by claiming a gain in value on the 13.6 million shares and 42.1 million warrants of New Power

that Enron continued to hold. Furthermore during the Class Period CitiGroup was one of Enron's principal lending banks, acting with JP Morgan as lead bank on Enron's main credit facilities, loaning hundreds of millions of dollars to Enron, and participating in syndicating over $4 billion in bank loans to Enron. CitiGroup was involved in a 6/01 loan of over $600 million to the disastrous Indian Dabhol power project, a 7/01 $582 million loan to Enron, an 8/01 $3 billion transaction for an Enron credit facility to back up commercial paper, an 11/01 $1 billion secured loan to Enron, and a 5/98 $500 million loan to JEDI.

According to the complaint, because CitiGroup knew that Enron's financial position was far more unstable than it was disclosing to the public and that Enron was falsifying its financial position and results, in an unusual procedure, purportedly the largest hedge of its kind ever, CitiGroup created securities issued from 8/00 to 5/01 that functioned as insurance policies for its own potential credit exposure of $1.4 billion to Enron. CitiGroup set up paper companies in the Channel Islands, the first in 8/00 and three more in 5/01, that offered highly rated five-year, credit-linked notes, i.e., notes linked to Enron's credit status, to investors. The arrangement was that if all went well, CitiGroup would return investors' principal when the five years had elapsed. Should Enron end up in bankruptcy, however, CitiGroup would stop paying the premium return to investors, take possession of the high-quality securities and keep the investors' principal, and give the investors Enron's worthless or impaired unsecured debt.

The complaint asserts that CitiGroup enjoyed and would continue to enjoy enormous profits, fees, interest payments for loans and syndication services as long as the Enron scheme continued in operation.

As long as Enron retained its investment-grade credit rating and continued to report (though not actually have) strong current financial results with credible forecasts of future revenue and profit growth, Enron's access to capital markets would permit it regularly to raise enormous sums of money, fresh capital, from public investors that Enron could then use to repay its existing commercial and bank indebtedness, including that to CitiGroup.

The complaint alleges that CitiGroup helped to finance or participated in illicit transactions with Enron that CitiGroup knew would contribute materially to Enron's ability to continue to falsify its financial conditions and keep the Ponzi operational. From late 1999 until 2001, CitiGroup lent Enron $2.1 billion in a series of manipulative devices and transactions, i.e., the Delta pre-paid swaps discussed earlier.

CitiGroup purportedly also made false and misleading statements in the Registration Statements and Prospectuses for Enron securities sales for which it was an underwriter, including false interim and annual financial statements and statements regarding the structure of and Enron's relationship to SPEs and related parties. The complaint asserts that CitiGroup is liable for its participation as lead underwriter in the resale of the Enron zero coupon convertible notes on or after 7/18/01.[81]

Lead Plaintiff further complains that CitiGroup issued numerous analysts' reports on Enron that contained false and misleading statements about Enron's financial condition, including those dated 10/22/98, 1/27/99, 5/25/99, 7/20/99, 8/20/99, 9/20/99, 10/20/99, 4/12/00, 9/21/00, 3/12/01, 3/22/01, 5/18/01, 6/7/01, 7/13/01, 10/16/01, and 10/19/01, all serving to artificially inflate the price of Enron's publicly traded securities.

The complaint also charges CitiGroup with active participation in structuring and financing LJM2 and notes that CitiGroup's top executives were rewarded with the opportunity to invest about $13 million in that vehicle. These executives invested their money early, around 12/22/99, to enable LJM2 to fund four SPEs to effect deals with Enron before year end to create huge profits so that Enron could meet its '99 profit forecasts.

The complaint references the last-minute effort to arrange the "salvation merger" with Dynegy in October–November 2001, for which CitiGroup was paid a fee of $45 million.

### c. Credit Suisse First Boston

Credit Suisse, which provided both commercial banking and investment banking services to Enron, is sued under § 10(b) of the 1934 Act and Rule 10b–5. According to the complaint, this financial services enterprise received huge fees, interest and commitment charges from Enron, and its executives were rewarded by the opportunity to invest and did invest at least $22.5 million in LJM2.

The complaint states that Credit Suisse First Boston helped structure and finance several of Enron's illicit partnerships or SPEs and helped Enron to falsify its financial statements and misrepresent its financial condition, while Credit Suisse First Boston's securities analysts continued to issue rosy reports about Enron's business success and positive prospects for strong revenue and earnings growth in the future. Its top executives also regularly interacted with Enron's top executives during the Class Period and discussed Enron's busi-

---

**81.** Lead Plaintiff now concedes that it no longer pursues claims on the 7% Exchangea-ble notes regarding which it previous asserted a claim against Citigroup *inter alia*.

ness and financial situation in detail. Credit Suisse First Boston participated in over $4 billion of loans and in syndicating loans to Enron [82] and helped Enron raise over $3 billion from the investing public through sales of new securities during the Class Period. The complaint charges that Credit Suisse First Boston also had no "Chinese Wall" to preclude information from its commercial and investment banking services to Enron flowing to its securities analysts, or, if there were restraints, they were inadequate to preclude imputation of all knowledge and scienter by one section to the other.

Credit Suisse First Boston served as underwriter for nine sales (three during the Class Period) of Enron securities. Complaint at 365. Furthermore it was lead underwriter in the New Power IPO on 10/4/00, selling 27.6 million shares at $21, and bogus hedge transaction with an LJM2–controlled SPE, leading to Enron's recording of a $370 million profit on the gain in value of the New Power shares and warrants that Enron continued to hold. It also acted as underwriter in the Azurix IPO, selling 38.5 million shares of Azurix stock at $19 per share. Enron sold 19.5 million shares of Azurix stock in the offering and received $370 million in new capital. Credit Suisse First Boston also acted as underwriter for other Enron-related securities, including $1 billion in notes for Osprey Trust/Osprey I Inc., $500 million 6.19% and 6.31% notes for Marlin Water Trust/Marlin Water Capital Corporation II, and $650 million in 10.375% and 10.75% senior notes for Azurix. It also served as an Enron advisor about the $2 billion sale of Portland General Electric and helped Enron dispose of its international asset portfolio in the second half of '01 for between $5–7 billion in assets. It further

advised Enron on several other merger and acquisition transactions.

The complaint claims that Credit Suisse First Boston participated in the fraudulent Ponzi scheme for enormous profits through syndication and investment banking fees and interest payments and so that Enron would have continued access to capital from investors to pay off its commercial paper debt and loans from the banks, thus limiting Credit Suisse First Boston' own risk.

The complaint charges that Credit Suisse First Boston made false and misleading statements (including interim and annual financial statements and statements about the structure and nature of Enron's relationship to SPEs and related parties) in the Registration Statements and Prospectuses for Enron securities sales where Credit Suisse First Boston was an underwriter. Credit Suisse First Boston was lead underwriter in a February 1999 sale of 27.6 million shares of Enron stock at $31.34 each and the resale of Enron zero coupon convertible notes on or after July 18, 2001. It also issued analysts' reports containing false and misleading statements, including those dated 7/6/99, 7/13/99, 9/2/99, 9/22/99, 10/12/99, 11/30/99, 1/18/00, 1/21/00, 2/28/00, 4/13/00, 10/18/00, 2/20/01, 4/17/01, 8/14/01, 8/17/01, 10/19/01, and 10/23/01, directed at the investing public to keep Enron's stock price inflated.

In addition to the bank's own false and misleading statements, the complaint asserts, Credit Suisse First Boston participated in the fraudulent scheme by financing or otherwise becoming involved in illicit transactions with Enron that would materially support Enron's ability to continue to misrepresent its financial conditions and support the Ponzi scheme.

---

**82.** The complaint at 366 lists five facilities for Enron in which Credit First Suisse Boston was involved.

Like JP Morgan and CitiGroup, Credit Suisse First Boston made disguised loans to Enron to hide Enron's actual credit situation, liquidity, and debt levels. Initially it lent Enron money using trades in derivatives: in 2000, it gave Enron $150 million, to be repaid over two years by payments that varied with the price of oil. Although the deal was characterized as a swap and misrepresented on Enron's books, Credit Suisse First Boston, through spokesman Pen Pendleton, admitted that it paid Enron up front so that it was in essence "a floating-rate loan."

Credit Suisse First Boston, through a group of ten of its bankers headed by Lawrence Nath, also created some of the illicit SPEs, a process dubbed "structured products," including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors. Moreover Credit Suisse First Boston helped Enron sell assets at inflated prices to these entities, even though Enron could never have sold them at such prices in arm's-length transactions for profit, and thereby created sham profits and concealed massive debt. Lead Plaintiff alleges that Laurence Nath and Credit Suisse First Boston worked closely with Vinson & Elkins and Arthur Andersen to create and document these SPEs and transactions. When an asset was sold to one of the SPEs as a quick-fix solution to remove that asset from Enron's balance sheet, it was referred to as "monetising" the asset. Laurence Nath would go to Houston for a week or two, meet with a group from Enron's treasury and global finance departments ("Fastow's field marshals"), including Jeff McMahon or Ben Glisan (successive treasurers of Enron), and create a solution in order to doctor the Enron books. According to the complaint, most of the vehicles created in this manner by Nath shared the same unusual feature: the SPEs held Enron stock to reassure lenders and secure an investment grade rating, but there were set "trigger points," or prices between $83–$19 per share, at which the stock's declining value would require Enron to put more shares into the entity or even force liquidation if Enron's credit rating was downgraded. At that point the debt of the SPEs became recourse to Enron. A knowledgeable banker stated, "Taken in combination, these partnerships clearly posed a material risk for the company." Complaint at 369. An Enron insider remarked, "There's no question that senior people at CSFB knew what was going on and that it was a house of cards." *Id.* One individual who attended stated that the triggers were discussed by senior Enron executives and Credit Suisse First Boston bankers at a meeting in July 2001, when Enron's stock had fallen into the $40s. It was reported that the bankers remarked, "If this thing hits the $20s, you better run for the hills," and "There was no question that they knew exactly what lay inside the structures, when the triggers went off—everything. You could almost say they knew more about the company than people in Enron did." *Id.* at 369–70.

As another indication that the bankers had knowledge about the nature and extent of Enron's off-balance sheet exposure was the discussion during a meeting in June 2001 between an Enron manager and two Credit Suisse First Boston managing directors, described on pages 147–48 of this memorandum and order.

The complaint asserts that Credit Suisse First Boston also helped to structure and finance LJM2 and that some of its senior executives invested $22.5 million in equity money into it by using DLJ Fund Investing Trust Partners and Merchant Capital. They invested the money early enough in December 1999 to allow LJM2 to fund four SPEs for timely deals with Enron to create huge end-of-'99 profits so Enron could meet Wall Street forecasts. Credit Suisse

First Boston additionally provided LJM2 with a credit line of more than $120 million to engage in such transactions to falsify its financial results for the year.

The complaint states that Credit Suisse First Boston knew that Enron was falsifying its publicly reported financial results and that its financial position was more endangered than the public knew because, as Enron's lead lending bank, it had unlimited access to Enron's internal business and financial information and because it enjoyed intimate interaction with Enron's top officials almost daily.

### d. CIBC

CIBC is sued under both the 1933 and the 1934 Acts. The complaint alleges that CIBC, which provided commercial and investment banking services to Enron, also helped structure and/or finance one or more of the illicit partnerships or SPES,[83] helped Enron falsify its financial statements and misrepresent its financial condition at the same time that CIBC analysts were providing rosy reports about Enron's business success, strong financial condition, and prospects for strong revenue and earnings growth. Its top executives also allegedly met nearly daily with top officials at Enron to discuss Enron's business picture. The complaint alleges that there was no "Chinese wall" to seal off information known by its commercial banking and investment services from its securities analysts, or that any such restraint was ineffectual, so that the knowledge and scienter of one area should be imputed to the other. Like the others, CIBC involved itself in the alleged Ponzi scheme because of the

enormous profits it generated for CIBC, including huge fees and interest payments for millions of dollars of loans and syndication services, as long as the participants could keep the scheme operating and Enron's access to capital markets open so that Enron could raise additional fresh capital from investors through offerings underwritten in part by CIBC to repay or reduce its commercial debt and loans, including CIBC's.

CIBC purportedly joined in and furthered Enron's fraudulent conduct and course of business through various acts. First, it participated in loans of over $3 billion to Enron during the Class Period. It also raised over $3 billion for Enron or the entities Enron controlled from the investing public through sales of securities during the Class Period. Specifically, CIBC acted as an underwriter on six offerings, two during the Class Period, listed in the complaint at page 372. In addition it acted as one of Enron's principal commercial lending banks. *Id.*[84] Moreover, in July 2001, CIBC acted as an underwriter for some Enron-related securities, specifically $1 billion, 6.31% and 6.19% Marlin Water Trust II and Marlin Water Capital Corporation II notes. Furthermore, CIBC, along with Credit Suisse First Boston and CitiGroup, was a lead underwriter in the New Power IPO on October 4, 2000, which sold 27.6 million shares at $21. By creating a trading market and a purported value for New Power stock, CIBC enabled Enron to report enormous profit on the gain in value of the 80 million shares that Enron continued to hold through a sham hedge transaction with an LJM2–con-

---

**83.** As with the other banks, the complaint alleges that CIBC helped structure and finance LJM2, and that its executives were rewarded for participation in the Ponzi scheme by being allowed to invest and did invest approximately $15 million in the partnership. They, too, provided the funds around December 22, 1999 to provide cash

for LJM2 to fund four SPEs by year-end so that Enron could "cook its books" for 1999 year-end and first-quarter 2000 reports.

**84.** The complaint at 372 lists three transactions before the Class Period and one in August 2001, a $3 billion committed credit facility for Enron to back up its commercial paper.

trolled SPE, effected by Vinson & Elkins, Arthur Andersen, CIBC, and Enron, together. See previous discussion at 130–31 of this memorandum and order.

Where it acted as an underwriter, CIBC allegedly made false and misleading statements in the Registration Statements and Prospectuses. Lead Plaintiff asserts that CIBC is liable under § 11 in particular for its participation in May 1999 in an offer of $500 million, 7–and–3/4% Enron notes.[85]

Furthermore, throughout the class period, CIBC analysts issued reports with false and misleading statements to the securities market about Enron's business, including those dated 7/15/98, 10/14/98, 1/25/99, 4/14/99, 7/14/99, 10/7/99, 10/13/99, 1/6/00, 1/18/00, 1/21/00, 4/12/00/ 10/19/00, 4/19/01, 8/15/01, and 10/17/01, which helped to artificially inflate the price of Enron's publicly traded securities.

In addition, according to the complaint, CIBC and Enron engaged in fraudulent transactions using an entity controlled by the two known as "Project Braveheart," discussed at page 128 n. 63 of this memorandum and order, to improperly report more than $110 million in sham profits in the fourth quarter of 2000 and the first quarter of 2001, relating to Enron's VOD joint venture with Blockbuster. Although Enron and CIBC made glowing state-ments about the joint venture after it was first announced in July 2000, the complaint asserts that Enron and CIBC knew the joint venture was risky and plagued by technical and legal problems that made it unlikely that it would ever, or at least for a long time, advance beyond a pilot project stage. Nevertheless CIBC and Enron worked together so that Enron could employ mark-to-market accounting to the project to improperly accelerate and record over $110 million in desperately needed profit for Enron from the Blockbuster joint venture in year-end 2000 and first quarter of 2001 to conceal Enron's actual financial condition.

Specifically, on December 28, 2000, CIBC and Enron formed a partnership, EBS Content Systems LLC, known as "Project Braveheart." They immediately assigned an arbitrary and unrealistic value of $124 million to the partnership, and CIBC agreed to invest, not loan, $115 million in it in return for a large up-front fee and the right to receive 93% of Enron's profits from the VOD joint venture over the next 20 years. This investment enabled Enron to recognize over $110 million in fraudulent profits for what was actually no more than a failing pilot project, in the fourth quarter of 2000 and the first quarter of 2001.[86] Moreover because the

---

85. CIBC has objected that CIBC World Markets Corporation, and not CIBC, was the underwriter of the May 1999 offering and that CIBC, which represents that it is the parent company, is the only CIBC-related entity Lead Plaintiff has sued. It objects that Lead Plaintiff has defined "CIBC" to refer to the Bank and to its "controlled subsidiaries and divisions (such as CIBC Oppenheimer or CIBC World Markets)." As with JP Morgan and Lehman Brothers, if CIBC wishes to challenge Lead Plaintiff for naming the wrong party as a defendant, or to join others, it needs to file an appropriate motion with evidence and a brief.

86. The complaint, at 376–77, quotes an article from the *Wall Street Journal* reporting the bogus transaction. It notes that the partnership had no separate staff and no assets other than Enron's stake in the venture. It reports a Blockbuster spokesperson as stating, "It was nothing but a pilot project.... I don't know how anyone could have been booking revenues," and that Blockbuster never accounted for any financial gain or loss from the short-lived venture. The article also quotes an Enron employee who helped create some of the SPEs and was familiar with the partnership deals and the secret guarantees by Enron to repay investment amounts fully in order to attract investors who would otherwise doubt the deals: "The banks didn't care about the assets they invested in and that's how it got out of control." In view of the fact

CIBC–Enron project was a sham, CIBC demanded and got Enron to secretly guarantee repayment of CIBC's investment in Braveheart on the event of failure, so that CIBC was not a true investor nor at risk. Moreover, to create the appearance of a legitimate SPE with a 3% outside equity investor participation, CIBC and Enron got a company known as nCUBE, a contractor for Enron on the VOD project, to invest $2 million in Braveheart at year-end 2000, but CIBC and Enron secretly promised to return the $2 million right after the year end. As noted, not only was the financing phony, but the entire VOD partnership was an illusion because Enron did not have workable technology to deliver the content over its fiber optic network, as evidenced by its failure in a test of the system in late 2000, and Blockbuster did not have the legal right, nor could it obtain that legal right, to provide the VOD venture content (movies) in digital form. Although Enron abandoned the VOD venture in February 2001, only eight months after it was commenced, significantly Enron did not reverse the more than $110 million in sham profits that it had recorded from the project. Furthermore, because CIBC knew that Enron was unable to honor its secret guarantee to repay CIBC its $115 million investment in Braveheart, CIBC agreed to carry that amount for Enron until later on so that the alleged Ponzi scheme could continue.

### e. Merrill Lynch & Co.

Merrill Lynch, a financial services firm that provided investment banking services to Enron, is sued under § 10(b) and Rule 10b–5. According to the complaint it helped structure and finance one or more of Enron's illicit partnerships at the same time that its securities analysts were issuing very positive reports about Enron's financial circumstances. As with the other banks, Merrill Lynch's top executives had daily contact with Enron's, including Lay, Skilling, Causey, McMahon and Fastow, and they discussed Enron's business and financial condition, plans, needs, partnerships, SPEs, and future prospects in detail. Furthermore, the wife of Schyler Tilney, head of Merrill Lynch's Energy Investment banking operation, was an Enron Managing Director, involved in Enron's EES operations, thereby providing Schyler Tilney with unique access to information about the serious problems affecting EES operations. Merrill Lynch allegedly furthered Enron's fraudulent course of conduct and business by helping to raise billions of dollars from investors through the sale of new securities during the Class Period, as well as aiding in structuring and financing some of Enron's illicit SPEs and partnerships, the primary vehicle used by Enron to falsify its reported financial results. The complaint asserts that Merrill Lynch also functioned as a consolidated and unified entity without effective Chinese walls to keep its securities analysts from information obtained by Merrill Lynch's commercial and investment banking services, so that all knowledge and scienter possessed by the entity should be imputed to the analysts.

Merrill Lynch served as lead underwriter for Enron on a number of public offer-

that Enron claimed a multi-million dollar profit within the first two weeks of commencing the Blockbuster venture, the article quotes one Enron employee as asking at the time, "How can they monetize this asset when we're still putting it together? It doesn't make any sense to me." ("Monetize" was a buzzword at Enron for a quick-fix solution for undesirable assets by selling them off to Enron-controlled SPEs to conceal debt and recognize sham profits.) When Enron recorded another $57.9 million profit from Blockbuster in the first quarter of 2001, that same employee noted that he "was just floored. I mean, I couldn't believe it."

ings. The complaint at 381 lists six, two of which occurred in the Class Period. Moreover, its relationship with Enron was of such wide scope that Merrill Lynch underwrote the sale of about one third of Enron's outstanding bond issues.

Merrill Lynch helped Enron structure Azurix, Enron's would-be global water company. The complaint asserts that Merrill Lynch knew that Enron's main reason for purchasing Wessex Water for $2.3 billion to create Azurix and take it public was to compensate Rebecca Mark–Jusbasche after she lost out in a power struggle with Jeffrey Skilling to become Enron's CEO. Merrill Lynch was fully aware that the price Enron paid for Wessex Water was more than excessive, that the purchase was made without a detailed feasibility study or carefully designed business plan, and that Enron's worldwide water business was unlikely to succeed. In February 2000 Merrill Lynch acted as a lead underwriter for the Azurix IPO of 38.5 million shares at $19 per share, which brought in $370 million of needed capital for Enron. Later it was lead underwriter of over $650 million of 10.375% and 10.75% Azurix senior notes, raising millions for the water company.

Merrill Lynch allegedly participated in creating LJM2, which was an essential part of the Ponzi scheme, with full awareness that Enron officials would be operating on both sides of the transactions, virtually insuring certain enormous profits for its investing partners. Merrill Lynch's placement memorandum made clear that Enron would be the "source" of most, if not all, the deals to be done by LJM2, that Fastow, Kopper and Glisan would run the deals, and that LJM2 would benefit from investment opportunities that "would not be available otherwise to outside investors." See discussion on pages 111–12 of this memorandum and order. Merrill Lynch also told potential investors in LJM2 that in an earlier similar partnership run by Fastow doing deals with Enron, i.e., JEDI, investors had tripled their money in two years. The complaint at 382 states that Merrill Lynch made a "blatant offer to the investors to profit from self-dealing transactions with Enron whereby the investors were virtually guaranteed to reap huge returns." Lead Plaintiff alleges that Merrill Lynch participated in the decision to allow favored banks or officers of those banks to invest in LJM2. Moreover, top Merrill Lynch executives, including Bayly, Tilney, and Vice Chairman Thomas Davis, invested almost $22 million in LJM2 in late 1999, early enough to give LJM2 cash to fund four SPEs to do deals with Enron at year-end '99 to create huge profits so that Enron could meet its '99 profit forecasts. In addition, Merrill Lynch placed the remaining LJM2 partnership units with highly favored clients of Merrill Lynch. All this time Merrill Lynch knew that LJM2 was not independent of Enron, that the partnership would be used for non-arm's-length transactions to boost Enron's reported profits while improperly keeping debt off its balance sheets on terms that could not have been acceptable to independent, unrelated third parties. Merrill Lynch also provided a $120 million line of credit to LJM2 to provide financing needed for LJM2 to engage in transactions with the illicit SPEs and Enron, so that the falsification of Enron's records could continue.

Lead Plaintiff alleges that Merrill Lynch's motivation to participate in the Ponzi scheme increased in 2000–01 when Merrill Lynch pocketed millions of dollars by writing hundreds of millions of dollars of "credit default puts" on Enron's publicly traded debt securities, especially Enron's zero coupon convertible notes. These "puts" required Merrill Lynch to pay Enron's publicly traded debt if Enron defaulted within a given time period, thus exposing Merrill Lynch potentially to enormous

losses. As long as Merrill Lynch could keep Enron looking strong, Enron would continue to have access to the credit market to raise additional money that could be used to repay or reduce its commercial paper debt and loans.

As with the other banks, Merrill Lynch participated in the ongoing fraudulent scheme for continuing enormous profits, fees for services, and opportunities for its executives to gain personally from LJM2 investments.

Merrill Lynch also issued false and misleading statements in Registration Statements and Prospectuses for securities sales for which it was one of the lead underwriters, in particular the offering of 27.6 million shares of Enron stock at $31.34 in February 1999.

Furthermore, to help artificially inflate the trading prices of Enron's publicly traded securities, because Merrill Lynch knew that Enron would have to issue substantial additional shares of stock if the price dropped below the various trigger points in its capitalization of a number of Enron-controlled entities and that Enron's investment grade credit rating would be in danger, Merrill Lynch's securities analysts issued reports containing false and misleading statements to the securities markets about Enron's business, finances, financial condition, and future prospects, including reports dated 1/20/99, 3/31/99, 4/13/99, 4/15/99, 7/14/99, 10/12/99 (Donato Eassey, *Bloomberg*), 10/12/99, 1/18/00, 1/24/00, 4/12/00, 4/13/00 (Donato Eassey, *Houston Chronicle*), 10/17/00, and 10/9/01.

The complaint asserts that from the beginning of the Class Period Merrill Lynch knew that Enron was falsifying its financial results and that its financial condition was far more precarious than it was disclosing to the public because Merrill Lynch had access to Enron's internal business and financial information as one of Enron's main underwriters and financial advisors, as well as its daily interaction with Enron executives.[87]

---

87. Although the Consolidated Complaint does not mention two significant potential sham transactions between Merrill Lynch and Enron in December 1999 that have been in the news recently with respect to Congressional investigations and criminal complaints arising out of the Enron debacle, the Court notes that the allegations regarding these transactions fit the pattern of fraudulent activities alleged in the complaint.

In December 1999 Enron sold Merrill Lynch an interest in a group of barges located off the coast of Nigeria in time to record a multi-million dollar profit in the final quarter of the year and meet Wall Street projections. (Although not included in the complaint, Lead Plaintiff briefly references this deal in its opposition to Vinson & Elkins' motion to dismiss (# 843 at 13) and in its opposition to Merrill Lynch's motion to dismiss (# 846 at 14–15)). Purportedly Enron guaranteed that it would repurchase the ownership stake within six months. After six months LJM bought the barges from Merrill Lynch, again at a purported profit of $8 million for Merrill Lynch, even though no arm's-length independent buyer could be found. Moreover, during the same time, Merrill Lynch analysts continued to promote Enron's stock to investors by positive statements about its financial performance. Lead Plaintiff does mention the barges in its opposition to the motions to dismiss: Lead Plaintiff alleges that "Merrill Lynch also helped Enron artificially boost its 99 results by taking a $500,000 payoff to pretend to purchase electricity-producing barges off the coast of Nigeria from Enron, **accepting a secret a no-loss guarantee from Enron,** as well as a promise by Enron to repurchase or find a buyer for Merrill Lunch's Nigerian barges within six months, which Enron did in 7/00 causing LJM2 to repurchase the barges from Merrill Lynch." # 846 at 14–15.

Also during the final days of 1999, there was purportedly a much larger deal involving Enron North America ("ENA"), whose chairman was J. Clifford Baxter, who committed suicide last year. The deal involved a complex set of gas and power trades regarding the future output of a group of power plants under construction in the Midwest. When no

#### f. Barclays PLC

Barclays, a financial services institution, which is sued only under § 10(b), provided commercial banking and investment banking services to Enron, helped Enron structure and finance one or more of its illicit partnerships or SPEs, including the year-end deal in 1997 where Chewco was formed to purchase an outside investor's interest in JEDI. Barclay's senior executives interacted with Enron's on an almost daily basis during the Class Period and discussed the details of Enron's business and finances. Barclays allegedly knew that Enron was falsifying its financial results because of its unlimited access as one of Enron's lead lending banks, to Enron's internal business and financial information. Moreover, Barclays participated in the fraudulent course of conduct and business by participating in loans to Enron of over $3 billion during the Class Period, helped raise almost $2 billion from investors through the sale of new securities during the Class Period, and helped Enron structure and finance some of the illicit SPEs and partnerships controlled by Enron and used to falsify its reported financial results.

Along with CitiGroup, Deutsche Bank, JP Morgan, and Bank America, Barclays acted as a placement agent or reseller in a February 2001 public offering of $1.9 billion zero coupon convertible bonds.[88] It underwrote sales of Enron-related securities, including $240 million 8.75% Yosemite–Enron–linked obligations. It was also one of the principal commercial lending banks to Enron during the Class Period in more than $3 billion of bank loans. For instance, Barclays was lead lender on a $2.3 billion debt facility to finance Enron's purchase of Wessex Water in 1998; it was co-arranger of a $250 million loan to Enron in November 1997; it participated in the September 1998, $1–billion credit facility for Enron and the August 2001, $3–billion debt facility, both used to back up Enron's commercial paper debt; it participated in a September 1998, $250–million revolving credit facility for Enron in November 1998; and it helped to arrange and participated in a $500–million credit facility for JEDI in May 1998.

As with the other bank Defendants, Barclays allegedly participated in the scheme to receive the huge investment banking fees, interest payments, and syndication fees. It viewed its risk as limited because as long as it and the other banks helped Enron maintain its investment-grade credit rating and reports of strong financial results and credible expectations of continuing revenue and profit growth, Enron would have access to the capital markets to raise additional money to continue to repay or reduce its commercial paper debt and loans, including its indebtedness to Barclays.

In addition to loans to Enron and entities associated with the SPEs secretly controlled by Enron, Barclays and Enron en-

---

third-party energy company could be found to participate, Enron made the deal with Merrill Lynch, which operated its own energy trading unit. The deal allowed Enron to record a year-end $60 million profit from the purported sham transaction. Moreover, Enron and Merrill Lynch allegedly had agreed that the deal would be canceled after the end of 1999, and after Enron had met earnings forecasts, and purportedly it was.

**88.** According to the complaint at 188, after the price of its stock surged, Enron, as usual in desperate need of cash, sold this extraordinarily large offering of zero coupon convertible notes to the banks, which then resold the notes or hedged their risk of loss on the notes by shorting Enron common stock. Enron had promised to register and did register the zero coupon convertible notes with the SEC within six months so that the purchasers could resell them. The proceeds were used by Enron to reduce its short-term debt, i.e., commercial paper and/or bank debt to JP Morgan or CitiGroup and to keep the Ponzi scheme alive.

gaged in fraudulent transactions using Chewco. See pages 106–110 of this memorandum and order. When the scheme finally collapsed and Enron was forced to restate its earlier financial results, the impact of Barclays' and Enron's illicit transactions with Chewco was tremendous.

### g. Lehman Brothers Holding Inc. is sued under both § 10(b) and § 11 and under the Texas Securities Act.

The complaint repeats many of the same general claims asserted against other banks against Lehman Brothers: during the Class Period Lehman Brothers provided Enron with commercial and investment banking services, helped to structure and finance one or more of Enron's illicit SPEs or partnerships, and helped Enron falsify its financial statements and misrepresent its financial condition while Lehman's analysts continued to issue very positive reports about the company. As a reward, top executives of Lehman's were invited to invest and did invest at least $10 million in the lucrative LJM2 partnership. Top officials from Lehman Brothers interacted on a daily basis with Enron executives and discussed Enron's business and finances in detail, and therefore Lehman knew that Enron was falsifying its publicly reported financial results and financial condition. Lehman participated in the fraudulent scheme by helping Enron and its related entities to raise over $4 billion through the sale of securities to public investors, helped structure and finance some of the illicit partnerships and SPEs that served as Enron's main vehicles to falsify its reported financial results, and engaged in transactions with Enron to conceal loans to Enron and helped misrepresent its actual financial condition, liquidity and creditworthiness. According to the complaint, Lehman Brothers, too, functioned as a unified entity and had no effective Chinese wall to seal off its securities analysts from information known to its commercial and investment bankers. Lehman was motivated to participate in the Ponzi scheme for past and future enormous profits, huge investment banking and syndication fees, and interest payments that the scheme provided to Lehman. Lehman allegedly was limiting its risk because it knew that with the involvement of the other banks helping Enron to maintain its investment-grade credit rating and issuing continued reports of strong current financial results and credible forecasts of strong ongoing revenue and profit growth, Enron could continue to raise fresh capital from investors to pay off or reduce its commercial paper debt and loans, including those from Lehman.

More specifically, the complaint alleges that Lehman acted as an underwriter for billions of dollars of Enron securities. The complaint at 390 lists eight instances, four within the Class Period. It also lists two instances when Lehman served as an underwriter for billions of dollars of Enron-related securities: (1) in October 2000 for 27.6 million shares of New Power at $21 per share and (2) in July 2001 for $1 billion 6.375% and 7.79% Osprey Trust and Osprey I Inc. notes. The complaint asserts that Lehman is liable under § 11 for allegedly making false and misleading statements in the Registration Statements and Prospectuses for a May 1999, $500–million sale of 7–and–3/8% Enron notes and a May 2000, $500–million sale of Enron notes, for which Lehman served as an underwriter, including interim and annual financial statements and false statements about the structure and nature of Enron's relationships to the SPEs and partnerships, as well as the financial condition of Enron's business operations and assets.

The complaint further charges Lehman with liability for false and misleading statements by its analysts in reports to the securities markets, knowingly made to help artificially inflate the trading prices of

Enron's publicly traded securities so that the various trigger prices in Enron's deals would not be reached and the Ponzi scheme endangered. The Lehman analysts' reports included those issued on 12/9/98, 4/7/99, 5/7/99, 9/21/99, 10/1/99 (Ted. A. Izatt, Lehman Brothers Senior Vice President, quoted in *CFO Magazine* ), 1/21/00, 4/13/00, 10/18/00, 3/12/01, 4/18/01, 7/26/01, 8/14/01, 8/15/01, 8/17/01, 10/23/01, and 10/24/01.

### h. Bank America Corporation

Bank America, which is sued under § 10(b) and § 11, provided both commercial and investment banking services to Enron during the Class Period. The complaint generally asserts that it, too, helped to structure and finance one or more illicit partnerships or SPEs, and helped Enron falsify its financial statements and misrepresent its financial condition while Bank America's analysts issued glowing reports about Enron. In return Bank America received huge underwriting and consulting fees and other payments, while top officials of Bank America were allowed personally to invest and did invest at least $45 million in the LJM2 partnership. Bank America's top executives also interacted nearly daily with those of Enron and they discussed Enron's business and financial situation in detail throughout the Class Period. Thus Bank America knew that Enron was falsifying its financial situation, which in actuality was precarious. Bank America became involved in the fraudulent scheme by participating in loans of over $4 billion during the Class Period, helping to raise over $2 billion from the investing public through securities sales during the Class Period, helped structure and finance some of the illicit partnerships and SPEs that

served as the primary vehicles for manipulating Enron's financial results, and engaged in transactions with Enron to disguise loans to Enron and thereby conceal its actual financial condition, liquidity and creditworthiness from the public. The complaint here, too, charges that Bank America acted as a unified entity without effective Chinese walls to preclude information from its commercial and investment banking services from reaching its securities analysts and thus all knowledge and scienter of the former should be imputed to Bank America as an entity. Like the others, Bank America was allegedly motivated to participate in the Ponzi scheme by past, and hope for continuing, enormous profits that the scheme generated for Bank America, including huge investment banking and syndication fees and interest payments. Bank America, too, believed that it was limiting its risk because it knew the other banks would be shoring up Enron, helping to maintain its investment-grade credit rating with reports of strong financial results and projections for continued strong revenue and profit growth so that Enron could continue to obtain fresh capital from sales of securities to the investing public and to use those monies to repay or reduce Enron's commercial paper and bank indebtedness, including indebtedness to Bank America.

More particularly, Bank America is allegedly liable under § 11 for false and misleading statements that it made in Registration Statements and Prospectuses for offerings where it served as lead underwriter, including a May 1999 sale of $500 million of 7.375% Enron notes, an August 1999 sale of $222 million of 7% Enron exchangeable notes, and a May 2000 sale of $500 million of 8.375% Enron notes.[89]

---

**89.** Bank America contends that Lead Plaintiff's claims under § 10(b) and § 11 with respect to the 8.375% Notes fail because neither of the proposed representatives for the sub-

class (Hawaii Laborers Pension Plan and the Archdiocese of Milwaukee), as reflected in their certifications (Appendix Exs. 5 and 6), purchased any of these notes at any time.

Furthermore, throughout the Class Period, Bank America's analysts issued reports to the securities markets containing false and misleading statements about Enron's business, finances, financial conditions, and prospects, including those dated 9/30/99, 10/12/99, 10/15/99, 12/16/99, 1/12/00, 1/18/00, 1/20/00, 4/17/00, 10/17/00, 8/15/01, 8/28/01, and 10/16/01. These false and misleading statements were intended to inflate the trading prices of Enron securities to avoid the trigger prices that would require Enron to issue additional shares of stock, substantially reduce shareholders' equity, and endanger Enron's credit rating, which in turn would adversely affect its ability to raise new capital by new sales of securities so that it could repay its indebtedness to the banks and would expose the Ponzi scheme from which all the banking defendants were profiting.

Bank America also is alleged to have helped structure and finance LJM2. Bank America's top executives, too, were given the opportunity to invest and did invest about $45 million in equity money to finance the LJM2 early enough in December 1999 to allow LJM2 to fund four other SPEs to manipulate year-end profits for Enron.

### i. Deutsche Bank AG

Lead Plaintiff sues Deutsche Bank only under §§ 10(b) and 20(a) of the 1934 Act and Rule 10b–5. The complaint alleges that Deutsche Bank provided Enron with commercial banking and investment banking services during the Class Period, helped structure or finance one or more of the illicit SPEs and partnerships, and helped Enron falsify its financial statements and misrepresent its financial condition as well as its prospects for strong earnings and revenue growth, even while Deutsche Bank's securities analysts [90] were issuing glowing reports about Enron. Deutsche Bank's top officials had detailed daily interchanges with Enron's executives about Enron's business and financial situation and knew that Enron was falsifying its financial reports. Deutsche Bank joined the fraudulent scheme and furthered it by participating in loans of over $2 billion to Enron during the Class Period and helping to raise over $5 billion from the investing public through sales of securities. It also helped structure and finance some of the illicit partnerships and SPEs and engaged in transactions with Enron to disguise loans to Enron and help it falsify its actual financial condition, liquidity, and credit-worthiness. The complaint also claims that Deutsche Bank functions as a unified entity without effective Chinese Walls or restraints to seal off from its securities analysts information obtained by its commercial and investment banking services and thus the latter's knowledge and scienter should be attributed to the bank as a whole. Deutsche Bank willingly joined the fraudulent scheme because of the enormous profits, huge commercial and investment banking fees, and interest payments, as well as syndicating fees that it received from that scheme. Deutsche Bank also helped Enron structure and finance LJM2. As a reward for Deutsche Bank's participation in the alleged Ponzi scheme, its top executives were permitted to invest at least $10 million in LJM2. The executives

Lead Plaintiff has not responded to the objection. Bank America also argues that the § 11 claims based on the 7% Exchangeable Notes must be dismissed because the only Plaintiff to have purchased them, Murray Van de Velde, bought them more than two years after the securities issued and thus cannot plead or prove reliance on the offering statements. In response Lead Plaintiff has stated that it no longer pursues its § 11 claims based on those notes and the 7% Exchangeable Notes. Memorandum in Opposition to Motion to Dismiss by Bank of America at p. 51, n. 38. and 92.

90. Deutsche Bank identifies Deutsche Bank Ales. Brown as its research arm.

made the investments early enough for LJM2 to fund four other SPEs to help manipulate Enron's year-end profit report. Deutsche Bank also allegedly believed it was limiting its risk because it knew the other banks participating in the scheme would help Enron maintain its investment-grade credit rating and report current strong financial revenue and provide credible forecasts of future performance to keep the Ponzi scheme afloat and maintain access to capital markets for fresh infusions of funds from investors to repay Enron's indebtedness, including to Deutsche Bank.

Specifically the complaint at 398 lists three instances that Deutsche Bank acted as an underwriter for billions of dollars of Enron securities, two of which (February 1999 for 27.6 million shares of Enron common stock at $31.34 per share; and February 2001 for $1.9 billion Enron zero coupon convertible notes) were within the Class Period. It lists two other times during the Class Period that Deutsche Bank acted as underwriter for the sale of Enron-related securities: July 2001, for $1 billion 6.31% and 6.19% Marlin Water Trust I and Marlin Water Capital Corporation II notes; and September 2000 for $1 billion of 6.375% and 7.797% Osprey Trust and Osprey I Inc. notes.

In addition Deutsche Bank served as underwriter for the Azurix IPO on June 9, 1999, selling 38.5 million shares at $19 each. In that offering Enron sold at least 19.5 million shares of Azurix stock to obtain $370 million in much needed capital.

Deutsche Bank also purportedly made false and misleading statements in Registration Statements and Prospectuses for sales of Enron securities where Deutsche Bank served as a lead underwriter. Specifically the complaint asserts that Deutsche Bank is liable for its participation in Enron's 27.6 million-share common stock offering in February 1999 and in the resale of the Enron zero coupon convertible notes on or after July 18, 2001.

Throughout the Class Period, Deutsche Bank's analysts issued reports containing false and misleading statements about Enron's financial picture to the securities market to artificially inflate Enron's stock price, including reports dated 1/13/99, 1/20/99. 4/13/99, 5/25/99, 1/28/00, 4/14/00, 5/26/00, 7/25/00, and 9/15/00.

As one of Enron's principal commercial lending banks during the Class Period, Deutsche Bank, along with CitiGroup, functioned as a lead bank on Enron's main credit facilities, loaning over a billion dollars to Enron while helping to syndicate over $4 billion in loans to Enron or related entities. The complaint lists four examples, including two in the Class period: In November 1998 a $582 million Enron credit line and in July 2001 a $650 million Enron credit line.

### 2. Law Firms

The consolidated complaint claims that Vinson & Elkins, Enron's outside general counsel during the Class Period, and Kirkland & Ellis participated in writing, reviewing, and approving Enron's SEC filings, shareholder reports and financial press releases, and in creating Chewco, JEDI, LJM1, LJM2, and nearly all the related SPEs' transactions. They knew that LJM2's principal purpose was to engage in transactions with Enron and that Enron insiders Fastow, Kopper and Glisan were operating on both sides of the transactions, to virtually insure lucrative returns for the entities' partners.

### a. Vinson & Elkins L.L.P.

Enron was Vinson & Elkins' largest client, accounting for more than 7% of the firm's revenues. Over the years more than twenty Vinson & Elkins lawyers have left the firm and joined Enron's in-house legal department.

The complaint recites a long history of alleged improprieties by Vinson & Elkins as part of the elaborate Ponzi scheme.

The complaint asserts that Vinson & Elkins participated in the negotiations for, prepared the transactions for, participated in the structuring of, and approved the illicit partnerships (Chewco/JEDI and the LJMs) and the SPEs (Raptors/Condor, etc.) with knowledge that they were manipulative devices, not independent third parties and not valid SPEs, designed to move debt off Enron's books, inflate its earnings, and falsify Enron's reported financial results and financial condition at crucial times. Vinson & Elkins repeatedly provided "true sale" [91] and other opinions that were false and were indispensable for the sham deals to close and the fraudulent scheme to continue. Vinson & Elkins also

allegedly drafted and/or approved the adequacy of Enron's press releases, shareholder reports, and SEC filings, including Form 10Ks and Registration Statements that Vinson & Elkins knew were false and misleading. Vinson & Elkins also drafted the disclosures about the related party transactions, which it also knew were false and misleading because they concealed material facts. It also was involved in structuring and providing advice about the bogus commodity trades utilized by JP Morgan and Enron with the involvement of Mahonia. Moreover, the firm continually issued false opinions about the illegitimate business transactions, such as that they were "true sales." When the scheme began to collapse in August 2001 and Skilling resigned, whistle-blower Sherron Watkins [92] sent her August 9, 2001 memo-

91. The complaint explains, "[T]rue sales opinions are letters that law firms write vouching for the fact that the business transactions meet particular legal requirements." Complaint at 404.

92. Sherron S. Watkins was an Enron executive, a vice president of corporate development, who had come to Enron eight years earlier from Arthur Andersen, LLP and was very knowledgeable about accounting practices. The complaint at 425–27 quotes excerpts from her letter and references portions of it at various times. See footnote 75 of this memorandum and order for the contents of Watkins' memorandum. Other portions not quoted in footnote 75 (pp. 148–50) of this memorandum and order include the following:

Skilling is resigning now for "personal reasons" but I think he wasn't having fun, looked down the road and knew this stuff was unfixable and would rather abandon ship now than resign in shame in 2 years. Is there a way our accounting guru's can unwind these deals now? I have thought and thought about how to do this, but I keep bumping into one big problem—*we booked the Condor and Raptor deals in 1999 and 2000, we enjoyed a wonderfully high stock price, many executives sold stock, we then try and reverse or fix the*

*deals in 2001 and it's a bit like robbing the bank in one year and trying to pay it back 2 years later. Nice try, but investors were hurt, they bought at $70 and $80/share looking for $120/share and now they're at $38 or worse.* We are under too much scrutiny and there are probably one or two disgruntled "redeployed" employees who know enough about the "funny" accounting to get us in trouble.

My concern explain the transactions. If adequately explained, the investor would know that the "Entities" described in our related party footnote are thinly capitalized, that equity holders have no skin in the game, and all the values in the entities comes from the underlying value of the derivatives (unfortunately in this case, a big loss) AND Enron stock and N/P. *Looking at the stock we swapped, I also don't believe any other company would have entered into the equity derivative transactions with us at the same prices or without substantial premiums from Enron.*

\* \* \* \* \* \*

Raptor looks to be a big bet, if the underlying stocks did well, then no one would be the wiser. If Enron stock did well, the stock issuances to these entities would decline and the transactions would be less noticeable. *All has gone against us. The*

randum warning Kenneth Lay not to use Vinson & Elkins to handle an investigation of her voiced concerns about Enron's accounting practices because Vinson & Elkins had a conflict in that "they provided some 'true sale' opinions on some of the [Condor and Raptor] deals." Complaint at 402, 404. Despite Watkins's warning, Vinson & Elkins was called and allegedly conducted a whitewash investigation of what it knew were accurate allegations of fraudulent misconduct that also involved Vinson & Elkins. Vinson & Elkins received over $100 million in legal fees from Enron.

Specifically, the complaint asserts that Vinson & Elkins provided advice in structuring virtually every Enron off-balance sheet transaction and prepared the transaction documents, including opinions, for deals involving the following vehicles used to defraud investors and the securities markets: Azurix; Canvasback; CASHco.; Cayco; Condor; Cortez Energy; EES; Egret; Enron Brazil; Enron Broadband; Enron Global Power; Firefly; Iguana; JEDI; JEDI/Big River/Little River; JEDI/Condor; JEDI/Osprey/Whitewing/Condor; JEDI/Whitewing; JEDI II; JEDI I/Ontario; LJM; LJM/Condor/Raptor; LJM/Brazil Power Plant; LJM2; LJM2/Chewco; LJM2/Raptors I, II, III, IV; Mahonia Ltd.; Marengo; Marlin; Newco; Osprey; Red River; Sonoma; Sundance; Wessex; Whitewing; Yosemite; and Yukon. Vinson & Elkins alleged-

ly had to know about and joined in the fraudulent Ponzi scheme because of its continuing, intimate involvement in the formation of and transactions with these blatantly fraudulent entities, created solely to cook Enron's books.

For instance, Lead Plaintiff points to Vinson & Elkins' involvement in the eleventh-hour formation of Chewco in late 1997 when JEDI's outside investor withdrew and JEDI had to be restructured or Enron would have to consolidate JEDI on its books, carry JEDI's debt on its balance sheet, and lose its ability in the future to continue to generate profits from an independent SPE. See pages 106–110 of this memorandum and order. Vinson & Elkins prepared the documents for Chewco's financing and falsified them to make it appear that Chewco was independent of Enron. Because the arrangement had to be completed by year's end, Vinson & Elkins with Kirkland & Ellis drafted a side agreement, dated December 30, 1997, providing for Enron to give the required $6.6 million in cash to fund Chewco by means of clandestine reserve accounts for Big River Funding and Little River Funding. Furthermore, to avoid disclosure of the arrangement, because making Fastow manager of Chewco would necessitate disclosing that interest in Enron's SEC filings and potentially expose the non-arm's-length nature of the whole transaction, Vinson & Elkins, with Fastow, arranged

*stocks, most notably Hanover, The New Power Co., and Avici are underwater to great or lesser degrees.*

\* \* \* \* \* \*

I firmly believe that the probability of discovery significantly increased with Skilling's shocking departure. Too many people are looking for a smoking gun.
Summary of Raptor Oddities:

\* \* \* \* \* \*

2. *The equity derivative transactions do not appear to be at arms length.*

a. Enron hedged New Power, Hanover, and Avici with the related party at what now appears to be the peak of the market. New Power and Avici have fallen away significantly since. The related party was unable to lay off this risk. This fact pattern is once again very negative for Enron.
b. *I don't think that any other unrelated company would have entered into these transactions at any price.* What else is going on here? What was the compensation to the related party to induce it to enter into such transactions?

for Michael Kopper to be the manager and thus conceal Enron's financial relationship with Chewco from Enron shareholders. Kopper allegedly objected that there was a conflict of interest because Kopper was also an Enron employee, but the two law firms disregarded his concern. Neither law firm insisted on disclosure of the arrangement in Enron's SEC filings even though the impropriety was obvious. Moreover, Enron continued to use Chewco/JEDI to generate sham profits from 1997 through 2001 in transactions that Vinson & Elkins participated in structuring and providing bogus "true sale" opinions to facilitate, all for the same purpose.

In another example, Vinson & Elkins issued opinions to Enron, Mahonia and JP Morgan stating that the forward sales contracts of natural gas and oil by Enron were legitimate commodities trades when it knew they were a sham, manipulative devices to disguise loans from JP Morgan to Enron so that it would not have to record approximately $3.9 billion of loans as debts on Enron's balance sheet. Physical delivery of the gas and oil was not required or even contemplated.

Similarly Vinson & Elkins participated in the creation of both LJM partnerships and knew the reason for their establishment, i.e., so that Enron could effectuate transactions that it could not otherwise do with an independent entity, such as purchasing Enron assets that Enron otherwise was unable to sell at prices it would never otherwise receive. As discussed previously, LJM2, formed at the critical end of 1999, pursuant to documentation prepared by Vinson & Elkins that allowed the banks to advance 100% of the money needed to fund the partnership in suffi-

cient time to falsify the books for the reporting period. LJM2 was one of the primary manipulative devices to misrepresent Enron's financial results, was also secretly controlled by Enron, and was used to create a number of SPEs, including the Raptors, which in turn served to falsely inflate Enron's profits and conceal its debts. Usually Enron provided the bulk of the capital to set up the SPEs, which the SPEs would then pay to Enron, so that Enron was always at risk. Furthermore Fastow's dual role at Enron and LJM2, by which he could and did self-deal to enrich himself and the other favored investors in the lucrative partnership, rewarded various participants in the Ponzi scheme for their roles. Vinson & Elkins structured a number of critical year-end transactions involving LJM2, including the Collateralized Loan Obligations ("CLOs"), Nowa Sarzyna power plant, MEGS, LLC, and Yosemite.[93] *See* page 113 n. 53 and pages 120–21 n. 56 of this memorandum and order. Typically transactions were timed near the end of financial reporting periods to manipulate, falsify, and artificially inflate Enron's reported financial results while enriching the investors in LJM2. Enron frequently agreed in advance to, and did, buy back the assets after the close of the financial reporting period, always at a profit for the LJM partnerships even if the market value of the assets declined, or the corporation promised to protect the LJM partnerships against any loss. Other transactions that Vinson & Elkins participated in that served as contrivances and manipulative devices to circumvent accounting rules and misrepresent Enron's financial results included the sham hedging transactions involving

---

**93.** The complaint asserts that the one-week Yosemite fraudulent transaction was created and structured by Fastow, Vinson & Elkins, Kirkland & Ellis and others, and that its legal documents were drafted by Kirkland & Ellis

and approved by Vinson & Elkins, then clearly and deliberately back dated during February 2000. See footnote 56 on pp. 120–21 of this memorandum and order.

Rhythms stock and the Raptor SPEs that were funded principally with Enron's own stock to "hedge" against loss of value in Enron's merchant investments.

As the end of 2000 neared, two of the Raptor SPEs were in danger of unwinding. Vinson & Elkins and Enron then restructured and capitalized them by transferring even more Enron stock to them, only adding to the pressure to keep the price of Enron's stock artificially high. Again in March 2001, Vinson & Elkins restructured the Raptors by transferring more than $800 million of contracts to receive Enron stock before the quarter end. That transfer insured that Enron would not have to take a pre-tax charge of more than $500 million against earnings, and so that it could conceal substantial losses in its merchant investments and remove millions of dollars of debt from its balance sheet, thus keeping the alleged Ponzi scheme afloat.

According to the complaint, Vinson & Elkins was also involved in the New Power transactions. Before the IPO it structured the deal which permitted Enron to take a large phony profit by utilizing LJM2. After the IPO, Vinson & Elkins created Hawaii 125–0, with which, Vinson & Elkins knew, CIBC and several other banks finagled a "total return swap" that guaranteed CIBC's loan of $125 million to the SPE. Disclosures in the following SEC filings, drafted and approved by Vinson & Elkins, concealed material facts about the JEDI/Chewco, LJM, and/or Raptor transactions:

A. Quarterly Reports (on Form 10–Q) filed on: 8/16/99; 11/15/99; 5/15/00; 8/14/00; 11/14/00; 5/15/01; and 8/14/01.

B. Annual Reports (on Form 10–K) filed on 3/31/98; 3/31/99; 3/30/00; and 4/02/01.

C. Annual Proxies filed on: 3/30/99; 5/02/00; 5/01/01.

D. Report on Form 8–K, filed 2/28/01.

Furthermore, Enron related-party disclosures from Enron's previous Report on Form 10–K and Report on Form 10–Q were incorporated by reference into the following Registration Statements and Prospectuses for Enron securities offerings: the resale of zero coupon convertible senior notes, due 2021, filed 7/25/01; 7.875% notes due 6/15/03, filed 6/2/00; 8.375% notes due 5/23/05, filed 5/19/00; 7% exchangeable notes due 7/31/02, filed 8/11/99; 7.375% notes due 5/15/2019, filed 5/20/99; common stock, filed 2/12/99; 6.95% notes due 7/15/2028, filed 11/30/98; and floating notes due 3/30/00, filed 9/28/98. The disclosures consistently misrepresented that terms of Enron's transactions with related third parties were representative of terms that could have been obtained from independent third parties. Both Sherron Watkins' letter and the Powers' Report[94] concluded that the transac-

94. After revelations of Sherron Watkins' letter of August 2001 raising concerns about the questionable partnerships and accounting and after being briefed on Vinson & Elkins' subsequent investigation report in October, 2001, Enron's board of directors created a special investigative committee, composed of a number of individuals who had been involved in some way in either creating the partnerships at issue or reviewing the transactions, but headed by outsider William C. Powers, Jr., dean of the University of Texas School of Law. The committee performed a review and issued a 217–page report (the "Powers' re-port"), drafted by a former enforcement director of the SEC, William McLucas, partner in Wilmer, Cutler & Pickering, in February, 2002 that concluded that Enron executives had intentionally manipulated the company's profits and inflated them through a series of transactions with a complex tangle of partnerships that served no economic purpose other than such manipulation and failed to comply with federal securities and accounting law, while personally enriching themselves. It also criticized Enron's auditor, Arthur Andersen, and lawyers at Vinson & Elkins, as well as Enron's board of directors.

tions were not arm's length, lacked true economic import, and were such that no independent third party would have accepted.

More specifically, the complaint states that in Enron's Reports on Form 10–K for year-end 1997–2000, Vinson & Elkins approved a description of JEDI as an unconsolidated affiliate only 50% owned by Enron. In its Report on Form 10–K filed 3/30/00, Vinson & Elkins drafted and approved the following disclosure: "At December 31, 1999 JEDI held approximately 12 million shares of Enron Corp. common stock. The value of the Enron Corp. common stock has been hedged. In addition, an officer of Enron has invested in the limited partner of JEDI and from time to time acts as agent on behalf of the limited partner's management." These purported disclosures were false and misleading because Chewco, which was not independent of Enron, was not capitalized with outside equity at risk, but was capitalized by JEDI and an Enron guaranty. Enron did not disclose that Chewco was a limited partner of JEDI until Enron announced its catastrophic restatement on 11/8/01. Nor was it disclosed that JEDI's transactions were not true commercial, economic transactions comparable to those of independent third-parties in arm's-length bargains.

The complaint speaks to Vinson & Elkins' alleged false and misleading disclosures about JEDI/Chewco. In March 2001, Enron paid Michael Kopper and his domestic partner, William Dodson, $35 million in a "purchase" of Chewco's limited partnership interest in JEDI so that Kopper could buy Fastow's interest in the LJM partnerships. The deceptive disclosure [95] about the buyout, drafted and approved by Vinson & Elkins for inclusion in Enron's reports on Form 10–Q filed on 5/15/01 and 8/14/01, never stated that it was a deal among some Enron officers, Kopper and Fastow or that it included the $2.6 million gift to Kopper and Dodson. Moreover, the buyout was erroneously characterized as having a net positive effect on Enron's financial statements, when in actuality the consolidation of JEDI resulted in a massive reduction in Enron's reported net income and shareholders' equity and a massive increase in its reported debt.

The complaint quotes the Powers' report regarding false and misleading disclosures relating to LJM and the Raptor entities that were drafted and approved by Vinson & Elkins:

> [T]hese disclosures were obtuse, did not communicate the essence of the transactions completely or clearly, and failed to convey the substance of what was going on between Enron and the partnerships. The disclosures also did not communicate the nature or extent of Fastow's financial interest in the LJM partnerships. This was the result of an effort to avoid disclosing Fastow's financial interest and, in some respects, to disguise their substance and import.

Tracking the language in the Powers' report, the complaint asserts that common to all Enron related-party disclosures, drafted and approved by Vinson & Elkins, was

---

**95.** The disclosure was as follows:

In March 2001, Enron acquired the limited partner's interests in an unconsolidated equity affiliate, Joint Energy Development Investments Limited Partnership (JEDI), for $35 million. As a result of the acquisition, JEDI has been consolidated. JEDI's balance sheet as of the date of acquisition consisted of net assets of approximately $500 million, including an investment of 12 million shares of Enron common stock valued at approximately $785 million, merchant investments and other assets of approximately $670 million and third-party debt and debt owed to Enron of approximately $950 million. Enron repaid the third-party debt of approximately $620 million prior to March 31, 2001.

concealment of the following material matters known to Vinson & Elkins: (1) that the transactions were not true commercial, economic transactions comparable to those with independent third-parties; (2) the "disclosures" concealed the real substance and effect of the transactions on Enron and on its financial statements, e.g., that the transactions should have been consolidated on Enron's financial statements; and (3) they failed to disclose Fastow's actual financial interest in or compensation from the LJM partnerships. Instead the disclosures in SEC filings through the Class Period gave the impression that each transaction was fair to the company, not contrived, but made at arm's length as it would have been if made with an independent third party.[96] In actuality the transactions, which were controlled only by Enron, Fastow or Kopper through the LJM entities, were bogus, contrived to enrich individual Defendants, and, according to the Powers-led special investigative committee, designed "to accomplish financial results, not achieve *bona fide* economic objectives or to transfer risk." Complaint at 405, 420.[97] In nearly every transaction, Fastow or Kopper made millions of dollars while bearing little or no risk, and Enron obtained favorable financial-statement results while bearing all the risk.

In Enron's report on Form 10–Q, approved by Vinson & Elkins and filed on 8/14/01, a statement "disclosed" that Fastow, "who previously was the general partner of [the LJM] partnerships, sold all of his financial interests ... and no longer has any management responsibilities for these entities." In actuality, Fastow sold his interest to Kopper, who was also closely connected to and controlled by Enron, so the LJM partnerships were no more legitimate than when Fastow owned them.

The complaint contends that Vinson & Elkins throughout the Class Period drafted and approved as adequate disclosure statements with false and misleading descriptions about related-party transactions using LJM and the Raptors. These include disclosures in Enron's Reports on Form 10–Q filed 8/16/99 and 11/15/99 that only relate to, but fail to identify, the Rhythms transactions:

> In June 1999, Enron entered into a series of transactions involving a third party and LJM Cayman, L.P. (LJM). LJM is a private investment company which engages in acquiring or investing primarily in energy related investments.

---

**96.** For example, in Enron's Report on Form 10–Q, filed on 8/16/99, is a statement drafted and approved by Vinson & Elkins: "Management believes that the terms of the transactions were reasonable and no less favorable than the terms of similar arrangements with unrelated third parties."

**97.** The complaint at 405–06 quotes additional critical passages from the Powers' report:

1. The Powers' report "sharply criticizes the firm for 'an absence of ... objective and critical professional advice.'"

2. A number of transactions among the SPEs and partnerships "were implemented—improperly, as we are informed by our accounting advisors—to offset losses". They allowed Enron to conceal from the market very large losses resulting from En-

ron's merchant investments by creating an appearance that those investments were hedged ... when in fact that third party was simply an entity in which only Enron had a substantial economic stake.

3. Vinson & Elkins "provided advice and documentation" for many of the partnership deals and "assisted Enron with the preparation of its disclosures of related-party transaction in the proxy statements and the footnotes to the financial statements in Enron's periodic SEC filings."

4. Enron's board and management "relied heavily on the perceived approval by Vinson & Elkins of the structure and disclosure of the transactions." It concludes that Vinson & Elkins "should have brought a stronger, more objective and more critical voice to the disclosure process."

A senior officer of Enron is managing member of LJM's general partner. The effect of the transactions was (i) Enron amended with the third party certain forward contracts to purchase shares of Enron common stock, resulting in Enron having forward contracts to purchase 3.3. million Enron common shares at the market price on that day, (ii) LJM received 3.4 million shares of Enron common stock subject to certain restrictions and (iii) Enron received a note receivable and a put option related to an investment held by Enron. Enron recorded the assets received and equity issued at estimated fair value.... Management believes that the terms of the transactions were reasonable and no less favorable than the terms of similar arrangements with unrelated third parties.

The complaint charges that this "disclosure" was false and misleading because there was no true third party to give a stamp of legitimacy to the transaction, but only self-dealing: Fastow filled the shoes of the third party, and LJM's general partner was capitalized with Enron stock provided by Enron. Because it did not consolidate LJM, Enron was able to overstate its net income by $95 million in 1999 and by $8 million in 2000.

Similar oblique references are made in inadequate "disclosures" of bogus hedges involving the Raptors, the purported "third parties" that were actually entities created by Enron and LJM2 and capitalized with Enron's stock, while the Raptors' credit capacity was largely determined by the price of Enron stock. In these transactions, LJM2 received its profits and capital from the Raptors up front, before any ostensible hedging took place, so Enron was the only entity left with a stake in the purported counterparty. The complaint at 422 quotes from "disclosures" describing the Raptors' transactions with related parties, drafted and approved by Vinson & Elkins, made in Enron's reports on Form 10–Q, filed on 8/14/00 [98] and 11/14/00 [99], on Form 10–K filed on 4/01/01,[100] and references to similar statements in reports on Form 10–Q filed on 5/15/01 and 8/14/01 and in a Proxy filed on 3/17/01. The complaint states that these alleged disclosures were

**98.** The statement provides,

In the second quarter of 2000, Enron entered into transactions with the Related Party to hedge certain merchant investments. As part of the transactions Enron contributed to newly-formed entities (the Entities) assets valued at approximately $800 million, including 3.7 million restricted shares of outstanding Enron common stock, $100 million in Enron notes payable and the right to receive up to 11.7 million shares of outstanding Enron common stock in March 2003 (subject to certain conditions).

**99.** This disclosure stated,

In the third quarter of 2000, Enron entered into derivative transactions with the Entities with a combined notational value of approximately $1.2 billion to hedge certain merchant investments and other assets.

**100.** The 4/02/01 Form 10–K disclosure provides,

In 2000, Enron entered into transactions with the Related Party to hedge certain merchant investments and other assets. As part of the transactions, Enron (i) contributed to newly-formed entities (the Entities) assets valued at approximately $1.2 billion, including $150 million in Enron notes payable, 3.7 million restricted shares of outstanding Enron common stock and the right to receive up to 18.0 million shares of outstanding Enron common stock in March 2003 (subject to certain conditions) and (ii) transferred to the Entities assets valued at approximately $309 million, including a $50 million note payable and an investment in an equity that indirectly holds warrants convertible into common stock of an Enron equity method invitee....

In 2000, Enron entered into derivative transactions with entities with a combined notational amount of approximately $2.1 billion to hedge certain merchant investments and other assets.

false and misleading because (1) the "share settled options" were purchased by Enron when the transaction was actually based on a future material decrease in the price of Enron's stocks; (2) the disclosures of related party transaction did not disclose that Enron controlled the entities or vehicles; and (3) the transactions were structured to permit LJM2 to receive its profits and capital up front before any hedging (risk of loss), and because Enron carried the ultimate risk of the investment. These concealed matters, if disclosed, would have revealed that Enron was not dealing with valid SPEs and there was no real hedging since the hedges were of Enron investments with the value of Enron stock.

The complaint asserts that Vinson & Elkins also drafted and approved related-party disclosures concerning Enron's merchant assets sales and purchases that were false and misleading because they hid facts that would have demonstrated that Enron was playing a shell game to falsely inflate its 1999 net income by more than $130 million. The complaint quotes the related-party disclosures in Enron's report on Form 10–K filed on 3/30/00: "In the fourth quarter of 1999, LJM2, which has the same general partner as LJM, acquired, directly or indirectly, approximately $360 million of merchant assets and investments from Enron, on which Enron recognized pre-tax gains of approximately $16 million." Similar disclosures were made in Enron's report on Form 10–K, filed on 4/02/01: "In 1999, the Related Party acquired approximately $371 million, merchant assets and investments and other assets from Enron. Enron recognized pre-tax gains of approximately $16 million related to these transactions." A Proxy filed on 3/27/01 states, "[D]uring 2000, LJM2 sold to Enron certain merchant investment interests for a total consideration of approximately $76 million." Complaint at 423. Lead Plaintiff claims that these dis-

closures are false and misleading because Enron was merely buying back the same assets and investments that it was selling to Fastow. Sometimes the repurchase of assets was made within months, even before Enron filed its report on Form 10–K on 3/30/00 with the related-party disclosures indicating that Enron was selling the assets. Furthermore, in the third and fourth quarters of 1999, Enron sold seven assets to LJM to rid its balance sheet of debts before the end of the financial reporting period. After the close of the reporting period, Enron bought back five of the seven assets in the transactions referenced, including the sale in 9/99 and subsequent repurchase of Enron's stake in the Cuiaba, Brazil power plant construction; the sale on 12/22/99 and subsequent repurchase of ENA collateralized loan obligations; the sale on 12/21/99 and subsequent repurchase of Enron's interest in the Nowa Sarzyna, Poland power plant construction; the sale on 12/29/99 and subsequent repurchase of Enron's equity interest in MEGS LLC; and the sale in 5–6/00 and subsequent resale of dark fiber (Enron's EBS sold the dark fiber to LJM2 and then resold it for LJM2). The disclosures drafted and approved by Vinson & Elkins did not reveal that in each repurchase, the LJM partnerships profited by millions of dollars, even when the assets had lost value.

The Enron investigative committee led by Dean Powers further found, "The failure to set forth Fastow's compensation from the LJM transactions and the process leading to that decision raise substantial issues." The complaint asserts that Vinson & Elkins knew important facts about Fastow's interest in the LJM transactions but did not reveal them in related-party disclosures [101] drafted and approved by Vinson & Elkins during the Class Period, in spite of specific requirements in SEC regulations that such economic inter-

---

**101.** As examples, the complaint at 424 references disclosures in Enron's Proxies filed on 5/02/00 and 5/01/01.

ests be disclosed. Had these facts been disclosed, they would have alerted investors that Fastow and the LJM partnerships were paid to move debt off of Enron's financial statements and not as part of commercial transactions. As a specific example, the complaint focuses on the Rhythms transaction which, before the Proxy was filed on 5/02/00, was terminated by a $30 million payment to Fastow's Swap Sub. Enron's special investigative committee determined that the termination was effected on the following terms: the Rhythms options held by Fastow's Swap Sub. were terminated; Fastow's Swap Sub. returned 3.1 million Enron shares to Enron, but retained $3.75 million in cash received from LJM1; and Enron paid Fastow's Swap Sub. $16.7 million, which included $30 million, plus $500,000 accrued dividends on Enron's stock held by Swap Sub., less $3.75 million in cash in Swap Sub., less $10.1 million in principal and interest on a loan Enron made to Swap Sub. just before the transaction's termination.

The complaint points out that although Sherron Watkins' August 2001 letter to Ken Lay represented that Vinson & Elkins had been involved in the fraud and had a clear conflict of interest, Lay still turned to top Vinson & Elkins' partners to find out how to cover up the allegations. Furthermore, Vinson & Elkins despite this obvious conflict, agreed to conduct an investigation into the charges and to issue a letter or report dismissing the allegations of fraud that Vinson & Elkins knew were true. Vinson & Elkins also agreed not to "second guess" the accounting work or judgments of Arthur Andersen and to limit its inquiry to top level executives at Enron. Vinson & Elkins' review took place between August 15 and October 15, 2001.

The complaint at 427–28 also quotes from a letter sent on August 29, 2001 by a management level employee at Enron's EES operation to Enron's Board of Directors detailing concealed losses and misrepresentations at Enron's EES.[102] The complaint claims the letter describing an-

---

**102.** The letter stated,

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrong doings of the various management teams at Enron. However, based on my experience with this company, I'm sure the board has only scratched the surface of the impending problems that plague Enron at the moment. (*i.e.*, EES's ... hiding losses/SEC violations ... lack of product, etc.).

... I feel it is my responsibility to bring to the Board's attention the various ongoing [sic] that I observed during my short tenure (9 months) with the company.

EES Management

... [I]t became obvious that EES has been doing deals for 2 years and was long money on almost all the deals they had booked. (JC Penney being a $60MM loss alone, then Safeway, Alberto's, GAP, etc.). Some customers threatened to sue if EES didn't close the deal with a loss (Simon Properties—$8MM loss day one).... Overnight the product offerings evaporated.

The only product left is for the hotel and mall customers. Except that Starwood is also mad since EES has not invested the $45MM in equipment under the agreement. Enron was supposed to invest $45MM over the first 3 years of the contract. The people who negotiated the contract FORGOT to put in, at Enron's discretion ... it turns out that it doesn't make financial sense for Enron to put in the equipment, but Starwood wants it. Now you will loose [sic] at least $45MM on the deal. The Crisis was set in motion. You should also check on the Safeway contract, Alberto's, IBM and the California contracts that are being renegotiated.... It will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion....

This is when they decided to merge the EES risk group with Wholesale to hide the $500MM in losses that EES was experiencing. But somehow EES, to everyone's amazement, reported earnings for the 2nd quarter. According to FAS 131 Statement

other area of fraud caused "an explosion" at Enron.

During its investigation, according to the complaint, Vinson & Elkins only interviewed top level executives that Vinson & Elkins knew were involved in the fraud and would deny it. On October 15, 2001 the law firm issued a letter to Enron dismissing all of Sherron Watkins' allegations even though Vinson & Elkins knew they were true from its own involvement. The letter is quoted in part in the complaint at 429-31 [emphasis added by the complaint]:

> You requested that Vinson & Elkins L.L.P. ("V & E") conduct an investigation into certain allegations initially made on an *anonymous* basis by an employee of Enron Corp. ("Enron"). Those allegations question the propriety of Enron's accounting treatment and public disclosures for certain deconsolidated entities known as Condor or Whitewing and certain transactions with a related party, LJM, and particularly transactions with LJM known as Raptor vehicles. The anonymous employee later identified herself as Sherron Watkins, who met with Kenneth L. Lay, Chairman and Chief Executive Officer of Enron, for approximately one hour to express her concerns and provided him with materials to supplement her initial anonymous letter....

> In general, the scope of V & E's undertaking was to review the allegations

raised by Ms. Watkins' *anonymous* letter and supplemental materials to conduct an investigation to determine whether the facts she has raised *warrant further independent legal or accounting review.*

By way of background, some of the supplemental materials provided by Ms. Watkins proposed a series of steps for addressing the problems she perceived, which included retention of independent legal counsel to conduct a wide-spread investigation, and the engagement of independent auditors, apparently for the purpose of analyzing transactions in detail and opining as to the propriety of the accounting treatment employed by Enron and its auditors Arthur Andersen L.L.P. ("AA"). *In preliminary discussions with you, it was decided that our initial approach would not involve the second guessing of the accounting advice and treatment provided by AA, that there would be no detailed analysis of each and every transaction and that there would be no full scale discovery style inquiry. Instead the inquiry would be confined to a determination whether the anonymous letter and supplemental materials raised new factual information that would warrant a broader investigation.*

\* \* \* \* \* \*

Interviews were also conducted with various Enron personnel based either on

of Financial Accounting Standards (SFAS) # 131, "Disclosures about Segments of an Enterprise and Related Information," EES has knowingly misrepresented EES' earnings. This is common knowledge among all the EES employees, and is actually joked about....

> There are numerous operational problems with all the accounts.

\* \* \* \* \* \*

> ... Some would say the house of cards are falling....

> You are potentially facing Shareholder lawsuits, Employee lawsuits ... Heat from

the Analysts and newspapers. The market has lost all confidence, and it's obvious why.

> You, the board have a big task at hand. You have to decide the moral, or ethical things to do, to right the wrongs of your various management teams.

\* \* \* \* \* \*

> ... But of all the problems I have mentioned, they are very much common knowledge to hundreds of EES employees, past and present.

> Check out the 7th floor.... They are very talkative at the moment.

their connection with the transactions involving Condor/Whitewing, LJM and Raptor, or because they were identified in materials provided by Ms. Watkins as persons who might share her concerns. Those persons interviewed were: Andrew S. Fastow, Executive Vice President and Chief Financial Officer; Richard B. Causey, Executive Vice President and Chief Accounting Officer; Richard B. Buy, Executive Vice President and Chief Risk Officer; Greg Whalley, President and Chief Operating Office (formerly Chairman of Enron Wholesale); Jeffrey McMahon, President and Chief Executive Officer, Enron Industrial Markets (formerly Treasurer of Enron); Jordan H. Mintz, Vice President and General Counsel of Enron Global Finance; Mark E. Koenig, Executive Vice President, Investor Relations; Paula H. Rieker, Managing Director, Investor Relations; and Sherron Watkins, the author of the anonymous letter and supplemental materials.

Interviews were also conducted with David B. Duncan and Debra A. Cash, both partners with AA assigned to the Enron audit engagement.

\* \* \* \* \* \*

*In summary, none of the individuals interviewed could identify any transaction between Enron and LJM that was not reasonable from Enron's standpoint or that was contrary to Enron's best interests* . . . .

As stated at the outset, the decision was made early in our preliminary investigation not to engage an independent accounting firm to second guess the accounting advice and audit treatments provided by AA. Based on interviews with representatives of AA and Mr. Causey, all material facts of the Condor/Whitewing and Raptor vehicles, as well as other transactions involving

LJM, appeared to have been disclosed to and reviewed by AA. In this regard, AA reviewed the LJM solicitation materials and partnership agreement to assure that certain safeguards were provided that would permit LJM to be a source of third party equity in transactions conducted with Enron. AA likewise reviewed specific transactions between Enron and LJM to assure that LJM had sufficient equity in transaction to justify the accounting and audit principles being applied.

\* \* \* \* \* \*

Enron and AA representatives both acknowledge that the accounting treatment on the Condor/Whitewing and Raptor transactions is creative and aggressive, but no one has reason to believe that it is inappropriate from a technical standpoint. In this regard, AA consulted with its senior technical experts in its Chicago office regarding the technical accounting treatment on the Condor/Whitewing and Raptor transactions, and the AA partners on the Enron account consulted with AA's senior practice committee in Houston on other aspects of the transactions. Enron may also take comfort from AA's audit opinion and report to the Audit Committee which implicitly approves the transaction involving Condor/Whitewing and Raptor structures in the context of the approval of Enron financial statements.

\* \* \* \* \* \*

Notwithstanding the expression of concern in Ms. Watkins' anonymous letter and supporting materials regarding the adequacy of Enron's disclosures as to the Condor/Whitewing and Raptor vehicles (which, to a large extent, reflect her opinion), AA is comfortable with the disclosure in the footnotes to the financials describing the Condor/Whitewing and Raptor structures and other relationships and transactions with LJM.

AA points out that the transactions involving Condor/Whitewing are disclosed in aggregate terms in the unconsolidated equity footnote and that the transactions with LJM, including the Raptor transactions, are disclosed in aggregate terms in the related party transactions footnote to the financials.

The concern with adequacy of disclosures is that one can always argue in hindsight that disclosures contained in proxy solicitations, management's discussion and analysis and financial footnotes could be more detailed. *In this regard, it is our understanding that Enron's practice is to provide its financial statements and disclosure statements to V & E with a relatively short time frame with which to respond with comments.*

\*　　\*　　\*　　\*　　\*　　\*

*Based on the findings and conclusions set forth with respect to each of the four areas of primary concern discussed above, the facts disclosed through our preliminary investigation do not, in our judgment, warrant a further widespread investigation by independent counsel and auditors....*

*... Finally we believe that some response should be provided to Ms. Watkins to assure her that her concerns were thoroughly reviewed, analyzed, and although found not to raise new or undisclosed information, were given serious consideration.*

We have previously reported verbally to Mr. Lay and you regarding our investigation and conclusions and, at your request, have reported the same information to Robert K. Jaedicke, in his capacity of Chairman of the Audit Committee of Enron's Board of Directors. At Dr. Jaedicke's request, we gave a verbal summary of our review and conclusions to the full Audit Committee.[103]

**103.** The Court observes that this letter alone raises issues of a serious conflict of interest and the propriety of Vinson & Elkins' undertaking this investigation on behalf of Enron. In light of the fact that Enron was Vinson & Elkins' biggest client and of Vinson & Elkins' extensive involvement in the structuring and documenting of the specific transactions with the SPEs that Lead Plaintiff has identified as devices and contrivances manipulated to defraud investors, commentator Roger C. Cramton, evaluating the ethical and legal implications of the law firm's investigation, has opined, "The investigation required V & E to assess objectively, as if it had not been there at all, the soundness and propriety of its prior representations. Thus the situation presented a huge conflict between Enron's presumed interest in an objective investigation and V & E's own interests.... [T]here remains a serious question whether [Enron's] consent was a valid one, and even if it was, whether ... the objective standard that the lawyer reasonably believe the representation will not be adversely affected by the lawyer's conflict of interest ... was satisfied." Cramton, 1324 PLI/Corp at 854. Cramton critically observes,

In any event, there remains a serious doubt whether V & E's conflict would not "ad-versely affect" its performance of the investigation. V & E's opinion letter stated that the Enron transactions it facilitated and approved were "creative and aggressive," suggesting that they went to the outer edge of legality. The letter also concluded that "because of bad cosmetics involving the LJM entities and Raptor transactions, coupled with the poor performance of the merchant investment assets placed in those vehicles and the decline in the value of Enron stock, there is a serious risk of adverse publicity and litigation." It was reasonably foreseeable, as has happened, that the litigation would include V & E as a defendant and that Enron officers, directors, and other co-defendants would defend themselves by blaming V & E for giving poor advice. Under these circumstances, the conflict appears to be too severe to be undertaken: a reasonable lawyer would not believe that his representation would not be adversely affected.

... The adequacy of the investigation is also questionable. V & E interviewed only seven high-level officials, most of whom were directly implicated in the self-dealing and fiduciary violations raised by the Watkins

The complaint recites that although Lay wanted to fire Watkins, he and Vinson & Elkins agreed that discharge would be a mistake and would lead to a wrongful termination suit, disclosing Watkins' allegations about transactions at Enron. So she was shifted to another position at Enron where she would have less exposure to information damaging to Enron.

### b. Kirkland & Ellis

The complaint alleges that Kirkland & Ellis actively engaged in the scheme to defraud and course of business that operated as a fraud on Enron investors. Kirkland & Ellis began working with Fastow, Enron, and Vinson & Elkins in the early '90's to create and use off balance sheet investment partnerships and SPEs that allowed Enron to engage in transactions designed to increase or maintain its credit rating by artificially inflating its profits and moving debt off of its balance sheet. The law firm's relationship with Fastow began in the 1980's when Fastow worked for Continental Bank in Chicago and intensified during the Class Period at Enron; in light of this close relationship, Jordon Mintz, Vice President and General Counsel of Enron Global Finance, referred to the firm as "Fastow's attorneys."

Lead Plaintiff asserts that Enron hand-picked Kirkland & Ellis to provide ostensibly "independent" representation for Chewco, JEDI, LJM1, LJM2, and other SPEs, but in actuality that the firm was selected by Fastow because it was willing to take direction from Fastow and Enron. Along with Arthur Andersen, Vinson & Elkins, and Enron's banks, Kirkland & Ellis under Enron's direction participated in structuring the manipulative devices at the heart of the scheme, including the partnerships and SPEs (LJM1 and 2, Chewco and the Raptors) and their related transactions to present a false picture of Enron's financial condition and results, with the law firm's full knowledge of that purpose. In addition to structuring the entities, Kirkland & Ellis allegedly participated in the monetization of assets, in the preparation of partnership and loan agreements for Chewco, LJM1, and LJM2, and in the offering and sale of partnership interests in LJM2 through private placement memoranda. The firm also allegedly generated false legal opinions about the structure, legality and *bona fides* of the SPEs and their transactions, representing that these were legitimate business deals. The complaint charges that Kirkland &

allegations. V & E relied on the denials of wrong doing by those officers and on the fact that none of the persons interviewed could identify a specific transaction that was illegal. Although McMahon, one of those interviewed, mentioned nine lower-level employees who might be good sources of information concerning Fastow's self-dealing, V & E failed to interview any of them. V & E was informed of the "mistake" that was made concerning the failure of the Chewco transaction to meet the required degree of outside equity participation, but never pursued the issue. The investigation as a whole, when compared to the subsequent investigation by the board's special committee, using the services of Wilmer, Cutler & Pickering, appears perfunctory. As the Powers Report stated, the result of the V & E investigation "was

largely predetermined by the scope and nature of the investigation and the process employed." It was performed with "insufficient skepticism." ... There is a serious question of whether adequate representation was provided to the entity client, as distinct from satisfying the manager's apparent desire to have a protective document.

*Id.* at 854. Cramton closes with the suggestion that these issues regarding the investigation might provide grounds not only for a malpractice claim against the law firm by Enron, but, along with other allegations, might give rise to a suit by shareholders and employees charging that Vinson & Elkins "participated as a principal along with Enron managers and directors and others in intentional violations of the federal securities acts." *Id.*

Ellis issued opinions related to numerous transactions and entities, including the following: JEDI I, Big River LLC, Little River LLC, LJM1, LJM2, Raptor I, Raptor II (Timberwolf), Raptor III (Condor), Raptor IV (Bobcat), Honer, Chewco, Bob West Treasure LLC, Cortez LLC, ENA CLO, Yosemite Securities, Southampton Place, Condor, SONR#1 LLC, and SONR#2 LLC. The firm's opinions were essential for effecting the transactions. Nevertheless, because the transactions were shams to inflate Enron's financial performance while favored insiders siphoned off Enron's assets and because the transactions were conducted on terms inconsistent with disclosures being made to investors by Enron, Vinson & Elkins, the banks, and Arthur Andersen, Kirkland & Ellis' opinions were also false. Kirkland & Ellis knew that the SPEs were contrived, manipulative devices that were not independent of Enron, but, like Kirkland & Ellis, acting under the control and direction of Fastow, Kopper, Skilling, Lay and other Enron officials. These Enron insiders directed the SPEs without regard for the legal or economic interests or rights of the SPEs, in whose behalf Kirkland & Ellis was purportedly served as independent counsel. Kirkland & Ellis received tens of millions of dollars in fees for its work, and most of that money was paid directly to it by Enron, even though the law firm was supposed to·be representing entities independent of Enron and with economic interests adverse to those of Enron.

More specifically, the complaint asserts that when Enron was unable to find a legitimate buyer for the outside investor's interest in JEDI in 1997 in time for year-end reporting, Kirkland & Ellis, directed by Fastow and Enron, along with Vinson & Elkins, Fastow and Kopper, created Chewco (controlled by Enron and Michael Kopper), Big River Funding and Little River Funding to purchase that stake in JEDI. Kirkland & Ellis did so even though it was supposed to be providing independent representation of Chewco and its equity investors. Kirkland & Ellis knew that Chewco lacked an independent outside investor with a 3% stake, required for independent third-party status for Chewco, and that Barclays' loan of $240 million to Chewco (guaranteed by Enron) and loans to straw parties by means of a $6 million cash deposit with Barclays to provide the money for the equity investment in Chewco, were an improper effort to circumvent that requirement for a valid SPE. Kirkland & Ellis and Vinson & Elkins prepared the documentation for Chewco's financing and falsified the documents to make it appear that Chewco was independent. They also prepared a side agreement, dated 12/30/97, reflecting that Enron would provide the necessary cash to fund Chewco through clandestine reserve accounts for Big River Funding and Little River Funding. The Kopper/Enron side agreement drawn up by the two firms indicates that no outside equity was used to fund Chewco and therefore it was not a viable SPE, but merely a manipulative device to further the fraud.

Kirkland & Ellis did more to conceal the real situation. If, as originally intended, Fastow were to have managerial control of Chewco, that interest would have to be disclosed in Enron's SEC filings and the non-arm's-length nature of the deal would be revealed. Kirkland & Ellis therefore arranged for Kopper, Fastow's subordinate, to manage the SPE.

In addition, during December 1997, Kirkland & Ellis restructured the transaction to avoid disclosure of Enron's financial relationship to Chewco at year end. Kirkland & Ellis converted the general partner of Chewco from a limited liability company to a limited partnership and made Kopper the manager of the general

partner instead of Fastow. Although Kopper expressed concern about the conflict of interest because he was simultaneously an Enron employee and the owner of both Chewco's general partner and of the equity of limited partner Big River Funding, Kirkland & Ellis went ahead anyway. Furthermore, Kirkland & Ellis, with Arthur Andersen, Fastow, Kopper and Vinson & Elkins, participated in the concealment of Kopper's managerial position with Chewco by "transferring" Kopper's ownership interest in Big River Funding and Little River Funding to Kopper's domestic partner, Dodson, and completing the purchase of the 50% interest in JEDI by Chewco. Kirkland & Ellis knew that Chewco/JEDI was not a valid SPE, should have been consolidated, and was now available for Enron to use in more non-arm's-length transactions, which the law firm would also help structure from 1998–2001, to create billions of dollars of sham profits for Enron and conceal the true nature of its indebtedness.

Even though Kirkland & Ellis was supposed to be providing independent representation of the LJM partnerships and their SPEs, Kirkland & Ellis participated in creating, structuring, reviewing and approving the two LJM partnerships, which served as manipulative devices for Fastow and others to enrich themselves and for Enron to inflate its financial results. Kirkland & Ellis knew the partnerships were established to allow Enron to effect transactions that it would have been unable to accomplish with independent third-parties. Kirkland & Ellis was involved in transactions between the LJMs and Enron or its affiliates that occurred close to the end of financial reporting periods to perpetuate the alleged Ponzi scheme, including Enron's sale of interests in seven assets near the end of the third and fourth quarters of 1999, five of which Enron bought back after the close of the period as previously agreed among the parties, and on all of which the LJMs made profits even when the value of the assets had declined. The firm participated in June 1999 in structuring LJM1's purchase of an equity interest in Enron's Cuiaba power plant in Brazil, which was burdened with substantial debt that Enron did not want on its balance sheet. Enron sold to LJM1, with a promise to make LJM1 whole, a 13% stake in the Cuiaba plant, effective 9/99, and thus reduced Enron's ownership below the level at which it would have to consolidate its interest, so that Enron could once again "cook its books," but repurchased it in August 2001. The transaction was neither arm's length nor *bona fide*. Kirkland & Ellis also helped structure sham hedging transactions, including in 6/99 the Enron Rhythms stock deal, and transactions involving Enron's merchant assets with the Raptors in 2000–01. Kirkland & Ellis also helped to create the documentation to enable the banks to advance essentially all the money needed to fund LJM2 just before year-end 1999 to avoid reporting a very bad quarter for Enron, as well as to write the offering memorandum for LJM2, with its invitation to benefit from insider self-dealing transactions. In accordance with direction from Enron or Fastow, the firm also helped structure transactions and provided opinions required for year-end deals between LJM2 and Enron before the close of 1999 so that Enron could report strong growth: the CLOs, the Nowa Sarzyna (Poland Power Plant), MEGS LLC, and Yosemite.[104] These deals were then reversed in

---

104. The complaint asserts that the documents for the Yosemite transaction that were prepared in February 2000, but deliberately back-dated to make it look as if the sale occurred before year-end 1999 and to conceal the fraudulent scheme from Enron's shareholders, were approved and drafted by Kirkland & Ellis.

the first quarter of 2000, reflecting that they were merely manipulative devices and contrivances designed by Kirkland & Ellis and others to manipulate Enron's financial results.

On March 20, 2000, with Fastow and Kopper, Kirkland & Ellis created a partnership agreement for Southampton Place L.P., with its general partner being Big Doe LLC, and funded it with $70,000 contributed by several Enron employees (Glisan, Mordaunt, Lynn and Patel) for the purpose of acquiring part of the interest held in LJM1 by an existing limited partner. Glisan even objected to Kirkland & Ellis that the transaction should be accounted for as a related-party transaction and should be disclosed. To further the fraudulent scheme, however, the law firm opined that even though these Enron employees were involved, Southampton's transaction with LJM1 and/or Enron did not have to be disclosed.

In May 2000, to generate revenue in Enron's fiber optic business (EBS) so that Enron could meet its earnings estimates for the quarter, when no legitimate purchaser could be found Fastow and Kirkland & Ellis structured a sale of Enron's dark fiber optic cable to LMJ2 for $100 million even though it was not worth even close to that amount. A second deal was effected in the third quarter of 2000 for more than $300 million so that Enron could make its numbers.

During 2000 Kirkland & Ellis and Vinson & Elkins structured increasingly aggressive SPEs to perpetuate the alleged Ponzi scheme. Functioning as both Fastow's personal counsel and as counsel to LJM2, Kirkland & Ellis devised mechanisms for Enron to abuse mark-to-market accounting to create sham income through the four Raptor entities, which were created by Kirkland & Ellis working with Fastow, Arthur Andersen, and Vinson & Elkins. Kirkland & Ellis knew the trans-

actions were structured so that if the value of Enron's stock fell, the SPEs would be unable to meet their obligations and the sham hedges with Enron stock would fail.

In late 2000 and in early 2001, the Raptor SPEs lacked sufficient credit to pay Enron on the hedges and Enron faced having to record a "credit reserve" that would reveal the change in value of its merchant investments. Moreover by year-end 2000 two Raptor SPEs were in danger of coming unwound because of insufficient credit capacity to support their credit obligations. If that happened Enron would have to take a multi-million dollar charge against earnings, which would expose the earlier falsification of Enron's financial results, cause its stock price to plunge, and activate the stock issuance triggers, i.e., precipitate a death spiral for the Ponzi scheme. To avoid this impending catastrophe, Kirkland & Ellis helped restructure and capitalize the Raptor SPEs at the end of 2000 by transferring even more shares of Enron stock to them. Again in 2001, to avoid taking a pre-tax charge against Enron's earnings of more than $500 million because of a credit capacity shortfall by Raptor entities and to conceal substantial losses in Enron's merchant investments, Kirkland & Ellis again helped restructure Raptor vehicles by having Enron transfer to them just before year's end more than $800 million of contracts to receive Enron's stock, with no consideration and in violation of accounting rules.

Kirkland & Ellis also participated in the New Power transaction by involvement in the creation of the Hawaii 125-0 SPE, which the law firm knew was financed by a $125 million "loan" from the banks that were guaranteed against loss through a "total return swap" by Enron.

Finally, Kirkland & Ellis participated in Enron's misleading disclosures. Indeed,

near the close of the Class Period, the law firm admitted to a senior Enron employee responsible for preparing Enron's SEC disclosures that there was no precedent for the law firm's rationalization for not disclosing various LJMs and LJM transactions. Kirkland & Ellis reviewed the SEC filings by Enron and knew that the related party transactions were unfair to Enron contrary to its false assertion that the transactions were on terms similar to those it could have obtained with independent third parties. Kirkland & Ellis continued to work on restructuring LJM2 in May 2001 to avoid having to disclose that SPE under Regulation S–K. Indeed throughout the Class Period the law firm evaded or finagled applicable disclosure requests by various means, including having Fastow and Kopper sell some of their ownership interests to others. One senior Enron employee responsible for Enron's SEC disclosures was so suspicious of Kirkland & Ellis that it hired another law firm to review Kirkland & Ellis' work.

### 3. The Accountant/Auditor: Arthur Andersen LLP[105]

Noting that an independent auditor is supposed to be the "investing public's watch dog," the complaint at 447 quotes the United States Supreme Court in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984):

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to

the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

The complaint charges that Arthur Anderson, which is sued under § 10(b) and § 11 of the federal statutes and under the Texas Securities Act, abandoned its responsibilities to Enron investors and to the investing public and violated professional standards in perpetrating a massive accounting fraud.

The consolidated complaint maintains that Arthur Andersen was not independent of its client. Enron was Arthur Andersen's second largest client and Arthur Andersen was economically dependent on Enron, which generated approximately $50 million in fees annually for Arthur Andersen and expectations for more in the future. Indeed Arthur Andersen estimated internally that its fees for services for Enron could increase to $100 million per year. To generate even more fees, Arthur Andersen pressured, and provided incentive compensation to, its audit partners to solicit and market non-audit consulting services, which were far more lucrative, from Enron as well as other clients. David Duncan in the Houston office was earning as much as $2 million a year based largely on the level of fees he "controlled" or sold to his clients. The complaint asserts that the pressures on partners to generate more fees created a conflict of interest for auditors on the Enron engagement and were a substantial factor in Arthur Andersen's abandonment of its independence, objectivity, and integrity on the Enron financial statement audits and reviews.

Furthermore, Arthur Andersen's close relationship with Enron's management

---

105. The Court does not address the allegations against the international Arthur Andersen entities because they have reached a proposed settlement for which they are in the process of obtaining approval.

also impaired the auditor's independence and objectivity in its audits of Enron during the Class Period. The complaint points to more than three hundred accounting and finance positions at Enron, many in mid-level and senior management, that were filled with former Arthur Andersen auditors and professionals. The complaint comments that Enron Defendants were comfortable with this fact because they knew the Arthur Andersen auditors were less likely to question improper accounting if done by their former co-workers and bosses, who were now officers and managers at Enron.

Arthur Andersen examined and opined on Enron's financial statements for 1997–2000 and reviewed its interim results and press releases from 1997–2001. Lead Plaintiff charges that Arthur Andersen not only permitted Enron to falsify its financial results, but falsely represented that Enron's financial statements from 1997–2001 were in accordance with GAAP, claimed that its audits of Enron's financial statements were performed in accordance with Generally Accepted Auditing Standards ("GAAS"),[106] certified the fraudulent figures, and actively engaged and participated in structuring the transactions (including involvement in the illicit partnerships and SPEs, misuse of mark-to-market accounting, and arranging dark fiber swaps with other Arthur Andersen clients, including Qwest and Global Crossing, in the telecom business) to participate in falsifying Enron's financial results. Anderson also agreed that its reports on Enron's financial statements could be incorporated into Enron's Form 10–Ks for those years and into ten of Enron's Registration statements: registration of $1 billion in Enron Debt Securities, Warrants, Preferred Stock and Depository Shares filed on 12/17/97; registration of 488,566 shares of common stock filed on 1/12/98; registration of 34.4 million shares of common stock filed on 4/28/98; registration of $1 billion in Enron Debt Securities, Warrants, Preferred Stock and Depository Share filed on 1/12/99; registration of 7.6 million shares of common stock filed on 4/5/99; registration of ten million Exchangeable Notes filed on 7/23/99; registration of 4.9 million shares of common stock filed on 4/4/00; registration of 616,778 shares of common stock on 6/15/00; registration of $1 billion in Enron Debt Securities, Warrants, Preferred Stock and Depositor Shares filed on 7/19/00; and registration of $1.9 billion in Zero Coupon Convertible Senior Notes due 2021 and filed on 6/01/01. Arthur Andersen agreed to the use of its name as an expert in each Prospectus filed and issued pursuant to these offerings, including the Prospectus for the Zero Coupon Notes filed on 7/25/01/.[107] In the fall of 2001, after Enron's collapse and the federal investigation began, despite its professional duty to retain and preserve any documents and in-

---

106. GAAS are standards established by the Auditing Standards Board of the American Institute of Certified Public Accountants for the conduct of auditors in the performance of an examination. *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 663 n. 5 (3d Cir.2002), citing *SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 n.2 (9th Cir.1979); *Ziemba*, 256 F.3d at 1200 n. 3. The complaint charges Arthur Andersen with violating the public's trust and the American Institute of Certified Public Accountant's ("AICPA's") Code of Professional Ethics which calls for "an unswerving com-

mitment to honorable behavior, even at the sacrifice of personal advantage" and "discharge [of] their responsibilities with integrity, objectivity, due professional care, and a genuine interest in serving the public." Complaint at 449.

107. The complaint asserts that Arthur Andersen's issuance of and multiple consents to reissue materially false reports on Enron's 1997–2000 financial statements are violations of GAAS.

formation needed to support and defend the conclusions it had reached and the work it had performed during its audit and review services for Enron, Arthur Andersen, along with Enron, destroyed documentary evidence that would implicate it in fraud at Enron and reveal that Arthur Andersen had violated an SEC consent decree arising out of its involvement in the Waste Management accounting scandal[108] by again participating in the cover-up of accounting fraud at another of its biggest clients. The complaint emphasizes that Arthur Andersen "is a repeat offender with a history of failed audits, conflicts of interest and document destruction in some of the most egregious cases of accounting fraud in history." Complaint at 455. After describing Arthur Andersen's improper conduct in Waste Management,[109] Sunbeam Corporation,[110] Baptist Foundation of Arizona,[111] Colonial Realty Company,[112]

108. The complaint, at 455–56, states that following a 1998 investigation of accounting fraud at Waste Management, which during that year restated its 1992–96 financial statements that had been audited by Houston's Arthur Andersen office, the SEC found that Arthur Andersen's internal documents demonstrated that Arthur Andersen not only knew of Waste Management's fraud, but was deeply involved in covering it up. Once exposed, Arthur Andersen, which signed the consent decree, was enjoined from such fraudulent conduct in the future and penalized with a $7 million fine, the largest civil penalty imposed on an accounting firm in the SEC's history, while several high-level partners were sanctioned for inappropriate behavior.

109. The complaint asserts at 456,
As with Enron, Andersen's willingness to keep quiet about fraudulent accounting to protect the huge fees it earned played a significant role in Waste Management's ability to perpetrate one of the largest frauds in history. Andersen recognized Waste Management's "aggressive" accounting as early as 88, according to SEC documents, and by 93, Andersen had documented that Waste Management was a "high-risk client" and that the client inflated profits by more than $100 million. However, during the same time frame, Andersen was relentlessly marketing its consulting services to the client, resulting in consulting fees more than double the size of the audit fees. Even when Waste Management refused to fix the improper accounting practices recommended by Andersen in prior years, Andersen caved in and continued to sign off on the company's annual audits. This went on for the next three years. According to the SEC those decisions were backed at the highest levels of Andersen's Chicago office, including Andersen's Practice Director, the firm's Managing Partner and the Audit Division Head for the firm's National office in Chicago.... Several parallels exist between Andersen's conduct on Waste Management and Enron. For example: Enron and Waste Management were Andersen's two largest clients. Andersen's Houston office audited both Waste Management and Enron. Further Andersen partners, including Swanson and Goolsby [who signed the consent decree for Andersen in the Waste Management SEC action], had oversight responsibility over both the Waste Management and Enron engagements.

110. The complaint at 456–57 asserts,
In 5/01, the SEC filed an injunctive action against Andersen partner Philip E. Harlow, the former engagement partner on the Sunbeam account, for authorizing the issuance of unqualified audit opinions on Sunbeam's 96 and 97 financial statements, even though he was aware of many of the company's accounting improprieties and disclosure failures. In 01, Andersen paid $110 million to settle shareholder lawsuits in connection with Sunbeam's restatement of six quarters of financial results.... In this case, as in Enron, Andersen's document destruction was a common theme. In fact, an Andersen partner testified that months after the restatements were announced and after the shareholder lawsuits had been filed, the firm ordered its Fort Lauderdale employees to dispose of any work papers or correspondence that did not agree with the final documentation of the Sunbeam restatement.

111. The complaint at 457–58 observes that the Arizona Attorney General filed suit on behalf of investors, many retirees, who lost $590 million of their savings in a Ponzi

Lincoln Savings/ACC,[113] the complaint [114] maintains that Arthur Andersen's conduct in these cases shares certain common characteristics with its role in Enron's fall and that Arthur Andersen has had a callous, reckless disregard for its duty to investors and the public trust for decades. The complaint contends that rather than change its improper behavior, Arthur Andersen merely sees the settlement sums as a cost of doing business.

Arthur Andersen knew that the critical factor to increasing its fees was to maintain Enron's investment-grade credit rating, requiring a careful balance between creating outside entities to hold assets and the debt Enron was incurring to finance them and making it appear that Enron was not controlling these entities to avoid

consolidation of their assets and debts into Enron's financial statements under GAAP. Aware of the risk, in a meeting on February 2001 about Enron's accounting issues, top level Arthur Andersen partners from the Houston and Chicago offices decided that the potential for doubling its fees to $100 million a year justified retaining Enron as a client. Furthermore when partner Carl Bass objected to and opposed the improper accounting practices used at Enron in 1999–2000, and thereby upset Enron management, top level Arthur Andersen partners removed him from his oversight role on the Enron audits.

Arthur Andersen operated its consulting services in a manner that revealed its lack of independence in audits and reviews. During the early to mid–90's, to take audit

scheme run by individuals at the Baptist Foundation of Arizona, which was audited by Arthur Andersen. In a settlement Arthur Andersen agreed to pay the investors $217 million, and Arizona is in the process of revoking the licenses of three auditors, while three individuals from the Foundation have pled guilty to felony charges and five others have been indicted. A senior Arthur Andersen partner on the audit, Jay Steven Ozer, who had also been involved in audits of Charles Keating's Lincoln Savings & Loan, has agreed to give up his Arizona accounting license. As was typical of accounting in the Enron debacle, the Foundation used off-balance-sheet entities to hide significant losses in real estate investments from investors. The Foundation sold real estate at inflated prices to a company known as ALO, a related-party controlled by the Foundation, in exchange for an IOU rather than cash. Although several outside accountants and professionals warned the Arthur Andersen auditors for two years that they were suspicious of fraudulent accounting at the Foundation, Arthur Andersen paid no heed. Review of public records of AOL revealed that it had a negative worth of $106 million and was not capable of making good on its debt to the Foundation. From the first warning until the Foundation failed, Arthur Andersen issued two more unqualified opinions that permitted the Foundation to raise another $200 million of investor savings.

112. The complaint represents that the State of Connecticut revoked Arthur Andersen's license to practice because of audits for a national real estate syndication firm, Colonial Realty Company, following its collapse. Colonial Realty was involved in a Ponzi scheme arising from exaggerated valuations of Colonial Realty properties. Arthur Andersen provided unqualified opinions supporting the inflated values and claims and assisted in preparing private placement memoranda in connection with public offerings that caused investors to suffer substantial losses. Furthermore, in conduct like that alleged at Enron, the Connecticut Attorney General found that Arthur Andersen employees had destroyed incriminating documents under the excuse that it was complying with Arthur Andersen's document retention policy.

113. In 1984 and 1985, according to the complaint at 458, Arthur Andersen issued "clean" or unqualified audit opinions on the ACC/Lincoln financial statements that were included in SEC filing and aided Charles Keating to "promote an illusion of prosperity that was used to market notes to investors" and to bilk them out of more than $500 million. Arthur Andersen paid approximately $30 million to settle the suit that arose out of the fraud.

114. See complaint at 455–59.

oversight away from Enron's internal auditors and have Arthur Andersen provide such services on an outsourced contract basis, Arthur Andersen and the other big accounting firms successfully lobbied the AICPA to allow them to provide both internal and external auditor services, despite many critics' complaints that the dual role was an outrageous conflict of interest. The complaint maintains that by stripping Enron of its internal audit function and assuming most of those responsibilities, Arthur Andersen in essence eliminated the possibility that another, independent body might discover and report the fraud. An Enron employee involved in the transition commented, "Going forward, Skilling was left to run a casino for a business with a day-care center for an auditor."

Arthur Andersen's commitment to generating fees and its assumption of Enron's internal audit function together impaired its integrity, objectivity and independence. On March 11, 2002, after Paul Volker accepted the chairmanship of the blue ribbon committee, established and funded by Arthur Andersen to look into its policies because of Enron's collapse, Volker rapidly concluded that if the conflicts of interest and impairment of independence that caused the problems in its Enron's audits were to be remedied, Arthur Andersen had to split its auditing and consulting practices, to ban current financial incentives that connected the auditors' compensation to their sales of consulting services, to refrain from reporting internal audit work on audit clients, and to adopt a waiting period before Arthur Andersen partners could become employees of a client.

The complaint identifies a number of "red flags," or significant indicators, of financial statement fraud at Enron, discussed below.

The complaint alleges that Arthur Andersen had direct knowledge of Enron's improper accounting and knew the risk of fraudulent financial reports was very high. Professional accounting standards, pursuant to SAS No. 82 (AU [115] §§ 316, 110), require that in designing and effecting audit procedures, auditors assess the risk of material misstatements due to fraud and plan an audit to increase the likelihood that fraud will be discovered. AU § 316 sets out categories of fraud risk factors for making that assessment. The complaint charges that Arthur Andersen knew that Enron possessed many of the risk factors delineated in AU § 316.16–.18, including,

Overly complex organizational structure involving numerous or unusual legal entities, managerial lines of authority, or contractual arrangements without apparent business purpose.

Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

Significant, unusual, or highly complex transactions, especially those close to the year end, that pose difficult "substance over form" questions.

Significant bank accounts or subsidiary or branch operations in tax haven jurisdictions for which there appears to be no clear business justification.

Arthur Andersen was fully aware of Enron's unusually complex organization because it helped structure hundreds of complicated partnerships, many with no business purpose other than to conceal debt and losses. The number of related-party transactions was enormous, and in many Enron maintained control over the entities and deliberately and improperly did not consolidate them. Andersen knew

---

**115.** The complaint explains at 449 that "AU" refers to the American Institute of Certified Public Accountants' Auditing Standards, which are "recognized by the AICPA as the interpretation of GAAS."

that Enron utilized at least 600 offshore tax haven entities to shift income, minimize taxation, circumvent United States laws, and maintain secrecy. It also knew that many of the Fastow-controlled partnerships were formed in offshore havens. Even Arthur Andersen's tax and consulting departments knew that Enron's use of such entities was excessive and that many had no business justification.

AU § 316.17(a) lists as risk factors relating to management's characteristics and influence over the control environment:

Management failing to correct known reportable conditions on a timely basis.

Management setting unduly aggressive financial targets and expectations for operating personnel.

A significant portion of management's compensation represented by bonuses, stock options, or other incentives, the value of which is contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow.

An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices.

A practice by management of committing to analysts, creditors, and other third parties to achieve what appear to be unduly aggressive or clearly unrealistic forecasts.

The complaint charges that Arthur Andersen knew Enron management had an excessive and an unusual interest in maintaining the company's stock price. Arthur Andersen knew that Enron was recognizing income from the inflation of its own stock, that Enron's hedges depended upon keeping the price up, that insider trading constituted a substantial portion of management's income, and that Enron executives were enjoying millions of dollars from bonuses when they successfully hit a series of stock-price targets based on a program dubbed "Performance Unit Plan." Enron's business and management practices were focused on highly aggressive targets. Arthur Andersen also knew that Enron had failed to make audit adjustments of about $51 million recommended by Arthur Andersen in 1997 (discussed at ¶ 517 of the complaint). The presence of other risk factors at Enron, identified in AU § 316.17(c), included unusually rapid growth or profitability, especially compared with that of other companies in the same industry, and significant pressure to obtain additional capital necessary to stay competitive in view of the financial position of the entity, including the need for funds to finance major research and development or capital expenditures. Lead Plaintiff charts Enron's dramatic growth in net sales between 1995 and 2000 at 461 of the complaint: 1995, $9.2 billion; 1996, $13.3 billion; 1997, $20.3 billion; 1998, $31.3 billion; 1999, $40.1 billion; and 2000, $100.8 billion.

Thus because of its extensive audit, review, tax, internal control, and other consulting services that Arthur Andersen rendered to Enron (its fees in 2000 alone were $52 million), Arthur Andersen knew that all these and nearly every other fraud factor identified by AU § 316 applied to Enron during the Class Period. As a result, Arthur Andersen knew that these risk factors at Enron, taken collectively, meant that the risk of fraudulent financial reporting was extremely high. In fact in 2002 Arthur Andersen acknowledged this fact during Congressional hearings: a 10/9/01 e-mail, sent by an Arthur Andersen Chicago "risk-management" auditor Mark Zajac to Arthur Andersen partners on the Enron account, including David Duncan, was disclosed that reflected the same conclusion. The e-mail warned the partners that after these and other risk factors had been considered in a routine analysis to

determine the risk of fraud, the test had triggered a "red alert," meaning a heightened risk of fraud.. Moreover, Arthur Andersen knew that these factors were present throughout the Class Period, but turned a blind eye to the many red flags and continued to issue "clean" audit opinions in order to generate big fees and increase the compensation of Arthur Andersen partners.

A number of surviving Arthur Andersen documents reveal that Arthur Andersen knew, was concerned about, yet covered up or ignored fraudulent accounting practices by Enron. For instance, Arthur Andersen Professional Standards Group ("PSG") [116] partner Carl Bass sent an e-mail on 12/19/99 to Defendants Steward and Neuhausen expressing opposition to Enron's accounting for LJM2 and urged that Arthur Andersen not support it. Again on 2/4/00 Bass sent another e-mail to Stewart stating that Bass thought that a particular SPE had no real substance and that he was annoyed that Enron would receive appreciation on the Enron stock that had been contributed to that SPE. That information was also sent to Bauer, Cash, and David Duncan. In an e-mail to Stewart and Neuhausen three days before, Bass had described several transactions at a different partnership and commented that "this whole deal looks like there is no substance." Later, on March 4, 2001, just before Bass was removed as PSG advisor for the Enron audit team, Bass sent Stewart another e-mail criticizing Enron's accounting for the Blockbuster and Raptor transactions, which, aggregated, constituted at least $150 million in improperly recognized income or avoided losses at year-end 2000. The complaint asserts that David Duncan, Cash, Steward and Neuhausen, with others, were heavily involved in structuring LJM2 and decisions to allow Enron to account improperly for the entity, as well as aware of Bass' disagreement with LJM2 accounting beginning in 2000.

During a meeting on February 5, 2001, top Arthur Andersen executives from the Chicago headquarters participated in a teleconference with top Houston and Gulf Coast partners assigned to the Enron engagement about whether to retain Enron as a client. Defendants Swanson, Stewart, Jones, David Duncan, Bauer, Lowther, Odom, Goolsby, Goddard, Bennett and partner Kutsenda were among those attending. The minutes of the meeting reflect a discussion, and therefore the participants' knowledge, of the accounting issues that ultimately caused Enron's collapse, including significant related-party transactions with LJM, the materiality of such amounts to Enron's income statement, and the amount retained "off balance sheet"; Fastow's conflict of interest in serving as CFO of Enron and LJM fund manager; Fastow's compensation for his services and participation in LJM; disclosures of transactions in the financial footnotes; Enron's mark-to-market earnings, described as "intelligent gambling" [117]; Enron's reliance on its credit rating to maintain solvency; and Enron's aggressive transaction structuring. They decided to keep Enron as a client despite the red flags because of the potential $100 million fee they could receive, and a few weeks later Arthur Andersen issued a "clean" audit opinion on Enron's 2000 financial statements.

116. Elsewhere Lead Plaintiff identifies PSG as "Andersen's oversight authority." # 854 at 1–2.

117. In a 2/01 e-mail, Arthur Andersen Partner Michael D. Jones wrote, "A significant discussion was also held regarding Enron's MTM earnings and the fact that it was 'intelligent gambling.' We discussed Enron's risk management activities including authority, limits, valuation and position monitoring." Complaint at 465.

On August 20, 2001, Sherron Watkins called Arthur Andersen audit partner James A. Hecker and warned him about ongoing improper accounting practices at Enron. Hecker called an emergency meeting the next day with other Arthur Andersen partners, including Duncan, Swanson, Cash, and Odom, to discuss Watkins' concerns about "the propriety of accounting for certain related-party transactions" with LJM, which were similar to those expressed and then dismissed by Arthur Andersen in February 2001: Enron's repeated addition of its own stock to the collateral underlying an obligation owed to Enron by a related party without recognizing that fact in its financial statement; the failure to record on Enron's books Enron's stock contributions/issuances to LJM; incomplete or incomprehensible disclosures on Enron's financial statements about the Fastow entities and transactions; and the distribution of LJM's equity to its shareholders, including Fastow and CIBC concurrently or shortly after LJM's original formation. Watkins told Hecker that "she was concerned enough about these issues that she was going to discuss them with Ken Lay, Enron's Chairman, on Wed., 8/22/01."

Arthur Andersen also consulted on and reviewed many of the manipulative transactions involving Enron's broadband business and signed off on Enron's related mark-to-market accounting, which resulted in reporting more than $110 million in earnings, as discussed previously. *The New York Times* reported on 1/30/02, " 'Nobody in the division could comprehend how they got Arthur Andersen to sign off on that,' one former senior executive in the broadband division said. 'It just didn't make any sense. When we heard what they did, everybody's mouth just hung open. We weren't doing business on any scale even close to those numbers.' " Complaint at 464. Arthur Andersen's destruction of the documents relating to broadband, including documents in its Portland office where much of the broadband work was done, shows that it was involved in the improper accounting for the broadband swaps. The Associated Press reported on 3/15/02,

> Last October or November, after Arthur Andersen learned that the U.S. Securities and Exchange Commission was investigating Enron, a team of auditors from Houston asked a Portland employee to "clean up the files," Wilborn told the newspaper.
>
> The files were for Enron Broadband, the now-defunct telecommunications arm that for a time was based in Portland, he said.
>
> Enron Broadband is now the focus of investigators because it booked hundreds of dollars worth of revenue by posting sales to Enron's notorious partnerships and by swapping capacity on its fiberoptic network with struggling telecom companies, a technique that investors claim was fraudulent.

The complaint asserts that Arthur Andersen and partners Steward, Petersen, and Neuhausen, continued to approve Enron's use of mark-to-market accounting, while Enron's revenue recognition became even more flagrant.

According to the complaint, the Enron Defendants, Arthur Andersen, and Enron's lawyers and banks, which participated in a scheme of structuring and accounting to keep debt off Enron's books and record income from purported third parties, knew that whenever Enron retained control over entities that it had created to doctor its books, GAAP required consolidation of the SPEs and partnerships into Enron's consolidated financial statements. GAAS also required certain strategies, methods, and procedures to conduct a proper audit. As noted, because of the comprehensive services it provided to En-

ron, Arthur Andersen knew of the audit risks inherent at Enron and in the industries in which it operated. The complaint highlights the fact that Arthur Andersen billed Enron $5.7 million for its advice regarding the LJM and Chewco entities, a sum that reflects 28,000 hours of consulting and accounting work at an average hourly rate of $200. Moreover, the accounting decisions relating to the SPEs were made at the highest levels of Arthur Andersen. Enron communicated with Arthur Andersen Houston partners, including Cash, Duncan, Bauer, and Bass, with Arthur Andersen's National Office Group ("NOG"), and with PSG in Chicago. A former Enron tax manager stated that Enron's internal policies about whether certain SPEs would be consolidated on Enron's books were determined by Arthur Andersen and that whenever anyone at Enron asked how to structure a deal, the question was referred to Arthur Andersen engagement partner David Duncan, who would then consult with the Chicago office.

Arthur Andersen was required by AU § 334.09 to evaluate Chewco, JEDI, and LJM transactions carefully.[118] Arthur Andersen ignored its duty to understand the transactions and the business purpose for them and failed to demand that Enron make adequate disclosure and proper accounting for them. It knew that Enron's employees and officers had interests in and control over certain SPEs; that Enron had recorded as an asset a note receivable in exchange for stock issued in 2000; that Barclay's investment in the Chewco deal had a reserve of $6.6 million so that there was not 3% independent equity in the partnership and Chewco (and by extension, JEDI) was not a qualifying SPE; and that Arthur Andersen's extensive involvement with JEDI and Chewco transactions is reflected in the $5.7 million it billed Enron for its work.

The complaint claims that Enron's practice of not consolidating its joint investments can be traced back to at least 1993 with the formation and capitalization of the JEDI joint venture, the first red flag signaling possible fraud. The formation of Chewco, in which Arthur Andersen assisted and for which it billed Enron $80,000 (equivalent to about 400 hours of review at an hourly rate of $200) at the end of 1997, discussed previously, raised numerous significant red flags regarding Enron's control of the SPE and the substance or questionable business purpose of the SPE. Specifically, Arthur Andersen knew (1) that Chewco's general partners were sen-

---

118. AU § 334.09 provides,

.09 After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. Procedures that should be considered include the following:

a. Obtain an understanding of the transaction.

b. Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

c. Determine whether the transaction has been approved by the board of directors or other appropriate officials.

d. Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in financial statements.

e. Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.

f. Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

ior financial employees at Enron; (2) that the arrangement did not meet the minimum requirement of a 3% independent, at risk, controlling capital because Barclays collateralized the loans with a reserve account deposit of $6.6 million and, according to Enron employees, Arthur Andersen was provided with documentation demonstrating the reserve; and (3) that Barclays' funding was more like a loan than an equity investment. Nevertheless Arthur Andersen ignored what it knew and helped Enron improperly keep the Chewco deal off its books, overstate its profits by $405 million, and understate its debt by hundreds of millions of dollars.

The LJM transactions also sent up red flags that Arthur Andersen ignored. With Arthur Andersen's approval, Enron designed and entered into the transactions with LJM mainly to hide debt and losses and to enrich personally certain Enron financial officers, including Fastow. Arthur Andersen read the partnership's private placement memorandum, the first few pages of which state clearly that (1) Enron would retain significant economic or operating interests in the investments; (2) the General Partner was owned and controlled by Fastow, Kopper and Glisan; (3) some of the banks that were original investors in LJM2 which were guaranteed that their investment would be returned and they would enjoy large profits before LJM2 entities could enter into hedging transactions with Enron; (4) senior-level Enron financial executives would manage LJM2 on a day-to-day basis; (5) LJM2 would invest in the assets "sold" by Enron, but Enron would also require that LJM2 retain significant economic or operating interests in them. The document's representation that the investors would enjoy superior returns because LJM2's general partners were senior Enron finance executives, with access to inside information and resources, also raised a red flag. The memorandum further disclosed that $17

billion of Enron assets, or 33%, were "financed off-balance sheet" and that even though Enron might sell some, "in many cases, [Enron sought] to maintain an active or controlling role in the underlying investment."

Arthur Andersen's accounting work on LJM2 informed it clearly of the following accounting improprieties in LJM2 and other SPEs: (1) Enron management controlled LJM2, which should have been consolidated in accordance with accounting rules; (2) Arthur Andersen's failure to investigate thoroughly the business purpose and substantive reasons for accounting about 33% of Enron's total assets on an off-balance sheet basis, especially in view of the fact that Enron had at least $17 billion in assets and associated liabilities carried off of its balance sheet; (3) Enron's regular retention of control of its off-balance sheet investments; (4) Enron finance executives and insiders received tens of millions of dollars in management fees and quick profits; (5) the "sale" to LJM2 and swift reacquisition of Enron's assets at a gain for LJM2, even when the value of the assets had declined; (6) Enron's use of its own stock as security for alleged hedges of other Enron investments.

According to the complaint, Arthur Andersen also knew about the improper accounting for the Raptors. It permitted Enron to improperly account for notes received for stock issued. Arthur Andersen billed Enron in 2000 at least $335,000 (about 1,675 hours at $200 per hour) for its work relating to the Raptor deals, which resulted ultimately in a $1 billion reduction in shareholders' equity when the accounting errors were corrected. The complaint at 470 quotes an article from *Bloomberg*, dated 11/12/01:

Lynn Turner, who was the SEC's chief accountant for three years until he

resigned in August, said Enron and Andersen ignored a basic accounting rule when they overstated shareholder's equity.

Explaining the equity reduction last week, Enron said it had given common stock to companies created by Enron's former chief financial officer in exchange for notes receivable, and then improperly increased shareholder equity in its balance sheet by the value of the notes.

### "Basic Accounting"

"What we teach in college is that you don't record equity until you get cash for it, and a note is not cash," said Turner, who is now director of the Center for Quality Financial Reporting at Colorado State University. "It's a mystery how both the company would violate, and the auditors would miss, such a basic accounting rule, when the number is one billion dollars."

The complaint asserts that Arthur Andersen knowingly violated several accounting rules: (1) a company may not recognize an increase in the value of its capital stock in its income statement except under limited circumstances not present here, yet the substance of the Raptors and other transactions allowed Enron to report net income and gains on its income statement that were secured almost entirely by Enron stock and contracts to receive Enron stock that were held by the Raptors (i.e., the transactions created net income out of the air); (2) in the frequent consultations with the PSG in Chicago, which originally required the Enron engagement team to analyze whether there was a minimum 3% independent, at-risk equity investment at the inception and each time a derivative transaction was commenced, Arthur Andersen later improperly agreed that the analysis only needed to be done at the inception and that a subsequent deterioration of the interest was insignificant; (3) e-mails among Cash, David Duncan and Stewart throughout the Class Period reveal that Arthur Andersen officials, including David Duncan, Cash, Lowther, Odom, and Steward among others, were responsible for Arthur Andersen's decision to allow Enron to improperly record individual impairment charges for Raptor investments that had significantly and permanently declined in value; (4) Arthur Andersen accountants failed to demonstrate objectivity, charged Enron about $1.3 million for Raptor-related services, offered advice throughout the Raptors' existence that Enron followed, and, in the 2001 restatement, did not require revision of the $1 billion in prior earnings improperly derived from the Raptors.

In its audits of Enron's financial statements in 1997, Arthur Andersen identified $51 million of adjustments where the accounting was improper. Arthur Andersen knew these adjustments altogether constituted almost 50% of Enron's $105 million net income for that year and were therefore clearly material to the financial statements and needed to be made if those statements were not to be misleading. Nevertheless, Enron informed Arthur Andersen it did not want to make those adjustments, which would radically reduce the net income that management wanted to report to the public. Arthur Andersen acquiesced in order to retain its lucrative client, and it abandoned its role as a public watch dog and violated GAAS. To justify not making such large adjustments, Arthur Andersen obfuscated the information by calculating the $51 million as an immaterial 8% of a contrived figure that it denominated as "normalized earnings," requiring no adjustment, instead of as a very material 51% of Enron's net income for 1997, which would require an adjustment. The complaint asserts that in 2001, too late for thousands of investors who lost billions of dollars because they relied on earlier years' financial statements, Enron restated its financial statements for 1997–2000 and

Arthur Andersen commented that the audit reports covering the year-end financial statements for 1997–2000 "should not be relied upon."

Arthur Andersen was required by GAAS to consider whether Enron's disclosures accompanying its financial statements were adequate. SAS No. 32, set forth in AU §§ 431.02–.03 provides,

.02 The presentation of financial statements in conformity with generally accepted accounting principles includes adequate disclosure of material matters. These matters relate to the form, arrangement, and content of the financial statements and their appended notes, including, for example, the terminology used, the amount of detail given, the classification of items in the statements, and bases of amounts set forth. An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time.

.03 If management omits from the financial statements, including the accompanying notes, information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and should provide the information in his report, if practicable, unless its omission from the auditor's report is recognized as appropriate by a specific Statement on Auditing.

The requisite disclosures included information about related parties, about which auditors must gather sufficient information to ensure that they understand the relationships between or among the parties and the effects of any transactions on financial statements. The auditor must be satisfied after his investigation that the disclosure is adequate.[119]

In sum, the complaint lists Enron's "woefully inadequate" disclosures regarding its accounting practices and related parties, many known to Arthur Andersen because it helped develop accounting for them, including transactions involving Chewco, management involvement in LJM, manipulative transactions involving the Raptors, improper and abusive use of mark-to-market accounting, improper use of its own stock to generate income, manipulative practices involving broadband, and many other accounting manipulations.

From September to November 2001, believing that civil litigation and government investigation of Enron was imminent, in compliance with Arthur Andersen's "document retention policy" developed in the wake of its Waste Management debacle, Arthur Andersen offices destroyed "tons" of documents in the United States (in Houston, Portland, and Chicago) and in London that could implicate Arthur Andersen in fraud at Enron. Arthur Andersen was indicted for obstruction of justice in the Justice Department's investigation of the collapse of Enron.[120] The complaint at 474–77 discusses alleged memoranda and e-mails exchanged between Arthur Ander-

119. AU § 334.11, complaint at 473, provides,
For each material related party transaction (or aggregation of similar transactions) or common ownership or management control relationship, for which FASB Statement No. 57 [AC section R36] requires disclosure, the auditor should consider whether he has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements.

He should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements.

120. Since Lead Plaintiff's complaint was filed, Arthur Andersen has been found guilty of obstruction of justice by a jury and sentenced by this Court.

sen's Chicago and Houston offices; Arthur Andersen's in-house lawyer, Nancy Temple's "reminder" to personnel about the document retention policy and insistence on deletion of key e-mail, as well as removal of any references to her on accounting memoranda; Michael Odom's October 10, 2001 conference regarding the importance destruction of documents; meetings held among Arthur Andersen officials; and the subsequent shredding. The complaint also identifies a number of Principles and Rules of the Code of Professional Conduct, which the bylaws of AICPA require members to abide by, that Arthur Andersen allegedly violated.[121]

Arthur Andersen had the responsibility as Enron's independent auditor, but failed, to gather "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§ 150, 110. Arthur Andersen also intentionally ignored information indicating that Enron's financial statements did not "present fairly" Enron's financial position. By its false statements, its knowledge of improper accounting, its failure to identify and modify its reports to reveal Enron's false financial reporting, and its lack of independence, Arthur Andersen violated numerous GAAS standards.[122]

---

**121.** ET § 53—Article II—The Public Interest

Members should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism.

ET § 102 Integrity and Objectivity

.02 Knowing misrepresentation in the preparation of financial statements or records. A member shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET section 102.01] when he or she knowingly—

a. Makes, or permits or directs another to make, materially false and misleading entries in an entity's financial statements or records shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET section 102.01]. . . .

ET § 501—Acts Discreditable

.05 501.4—Negligence in the preparation of financial statements or records. A member shall be considered to have committed an act discreditable to the profession in violation of rule 501 [ET section 501.01] when, by virtue of his or her negligence, such member—

a. Makes, or permits or directs another to make, materially false and misleading entries in the financial statements or records of an entity; or

b. Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

c. Signs, or permits or directs another to sign, a document containing materially false and misleading information.

AU § 220 Independence

.01 The second general standard is:

In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

.02 This standard requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business but also to creditors and those who may otherwise rely (in part, at least) upon the auditor's report, as in the case of prospective owners or creditors.

**122.** As examples the complaint lists the following: (1) that the audit should be performed by persons having adequate technical training and proficiency as auditors; (2) auditors should maintain independence in mental attitude in all matters relating to the engagement; (3) due professional care should be exercised in the audit and preparation of the report; (4) the audit should be properly

#### 4. Fraud–On–The–Market Doctrine and Safe Harbor

Finally, the consolidated complaint insists that the presumption of reliance under the fraud-on-the-market doctrine applies here to its § 10(b) and Rule 10bS–5 claims. It points out that at all relevant times the market for Enron's publicly traded securities was efficient for a number of reasons including that (1) Enron's securities were listed and actively traded on the NYSE and the Over–the–Counter Market, both of which are efficient markets; (2) as a regulated issuer, Enron filed periodic public disclosure reports with the SEC; (3) Enron communicated with public investors through established market mechanisms on a regular basis, including press releases, analyst conferences, and conference calls; (4) and several securities analysts followed Enron and wrote reports that were published, distributed, and entered the public market place. The market promptly absorbed all current information from all publicly available sources and reflected that information in the price of Enron stock. Therefore, concludes the complaint, all purchasers of Enron publicly traded securities during the Class Period suffered similar injury by purchasing these securities at artificially inflated prices.

Finally Lead Plaintiff contends that the PSLRA's statutory safe harbor does not apply to the forward-looking statements pled in the complaint because (1) it does not apply to Enron's financial statements or financial results; (2) with the exception of conference calls on 11/12/01 and 11/14/01 Enron did not give any safe harbor warning in its conference calls during the Class Period; (3) the cautionary statements issued by Enron during the Class Period were not meaningful because the Enron Defendants all actually knew of Enron's financial problems and each speaker knew that each forward looking statement he made was false and that it was authorized and/or approved by an executive officer of Enron who also knew that it was false.

### III. Motions to Dismiss and the Court's Rulings

#### A. Defendants' Common Objections

· A number of Defendants argue that Lead Plaintiff's allegations that Defendants knew of the Ponzi scheme and yet poured millions of dollars into it or risked their reputations to conceal the scheme merely for fees, payments and profits, and subsequently, once caught in the scheme, shored it up in order to limit their exposure to liability and obtain what payments they could on Enron's debts to them, are inherently irrational, implausible, and/or illogical and the alleged actions are against Defendants' own self-interest. This Court notes that what may have been implausible two or three years ago is hardly so today, in light of a plethora of revelations, investigations, evidence, indictments, guilty pleas, and confessions of widespread corporate corruption and fraud by companies, auditors, brokerage houses, and banks. Lining one's pockets with gold, at the expense of investors, employees, and the public, appears too often to be a dominating ambition, and public scepticism about the market is very prevalent.

planned and assistants properly supervised; (5) the auditor should obtain a sufficient understanding of internal controls to be able to plan the audit and determine the nature, timing and extent of the tests to be performed; (6) the auditor should obtain sufficient competent evidential matter to constitute a reasonable basis for an opinion on the financial statements under audit; (7) the report should state whether the financial statements are presented in accordance with GAAP; (8) the report shall identify circumstances in which GAAP has not been consistently observed; the informative disclosures are regarded as reasonably adequate unless the report indicates otherwise; and (9) the report shall contain an expression of opinion or present reasons why an opinion cannot be given.

The third-party entities have objected with justification to the undifferentiated, boiler-plate allegations repetitively applied to all or many defendants or with generalized references to "the bank defendants" or "the law firm defendants," without the requisite entity-specific and particularized factual allegations for pleading fraud under § 10(b), as required by Rule 9(b) and the PSLRA. They also criticize claims of misconduct based on what are common, legitimate business actions or practices (e.g., loans, commodity swaps, passive investments, underwriting securities offerings, regular working relationships with a company's executives, issuance of analyst reports, and desire to earn profits) that are not inherently improper or fraudulent. This Court responds that the activities must be viewed in context, i.e., within the totality of surrounding circumstances, to determine whether they are merely ordinary and legitimate acts or contrivances and deceptive devices used to defraud. Moreover it is fully aware that more is needed than conclusory allegations to defeat a motion to dismiss under § 10(b) and Rule 10b–5.

Emphasizing the complaint's reliance on language like "assisting," "participating in," "helped," and "complicity in," the motions also argue that, at most, Plaintiff in essence is charging these third-party defendants with aiding and abetting violations that are barred in claims under § 10(b) and Rule 10b–5 by *Central Bank*. Defendants argue that they made no public misrepresentations or omissions in misreporting Enron's financial condition, but point the finger at Enron as the responsible party for any such conduct. Moreover some Defendants have argued that they can only be liable under § 10(b) and Rule 10b–5 for a material misrepresentation or omission.

The Court has indicated its interpretation of and the test it has selected for liability under *Central Bank* and will apply both to determine whether the allegations against each Defendant constitute a primary violation or merely an aiding and abetting violation. See "Applicable Law" section of this memorandum and order at 39–61. The Court has also indicated that in addition to claims under Rule 10b–5(b), plaintiffs may sue for securities law violations under Rule 10b–5(a) and (c) for conduct other than material misrepresentations or omissions.

In addition, Defendants emphasize that the complaint lacks particularized factual allegations that would give rise to strong inferences of scienter, which in turn under Fifth Circuit law requires pleading more than financial motive and opportunity. They justifiably underline that instead, Lead Plaintiff substantially relies on conclusory allegations, such as that Defendants knew of the fraudulent scheme because their executives interacted almost daily with Enron's or that they had unlimited access to Enron's business and financial information as Enron's lead lending banks, or that the banks in extending commercial loans or credit facilities were required to perform extensive credit analyses of the borrower financial situation. As will be discussed, such allegations are insufficient under Rule 9(b) and the PSLRA.

The Defendants contend that the complaint only conclusorily negates the existence of "Chinese Walls" that would keep any information from research analysts that was known to the investment banking services section of the banks. Defendants additionally object that the complaint charges that Defendants' analysts issued misleading reports, but fails to identify any misleading statements or plead any specific facts showing that the analysts had contemporaneous knowledge of facts contradicting specific statements in their reports.

In the complaint Lead Plaintiff explains that for decades after it was enacted fol-

lowing the stock market crash of 1929, the Glass Steagall Act prohibited banks from acting in dual capacities as both commercial banks and brokerages, making loans to and selling the securities of their corporate customers. The Glass Steagall Act was repealed in 1999 and financial establishments were permitted to offer both commercial and investment banking services and trusted to establish Chinese walls between the two.

While the Court agrees that the absence of effective Chinese walls is only conclusorily asserted by Lead Plaintiff, the Court observes that the Chinese wall issue is another allegation that must be viewed in the total context, including facts unearthed in current investigations by the SEC and by prosecutors like Eliot Spitzer, the attorney general of New York. It has been widely reported that internal documents from firms including Merrill Lynch and Credit Suisse First Boston have revealed that their analysts issued recommendations to buy or sell stock even though their own research results were contrary to those recommendations, and that they conceded that the recommendations served to help attract business to their investment banking service. Moreover, ten of Wall Street's largest brokerage firms and investment banks are currently working with Mr. Spitzer and Stephen M. Cutler, director of enforcement for the SEC, to work out a settlement agreement with regulators to cure problems with stock re-

search and possibly to subsidize stock research by independent companies that do not also operate investment banks underwriting stocks. In addition, Citigroup has just announced that it is separating its stock research and brokerage, in a new unit to be called Smith Barney, from its investment banking service to eliminate possible conflicts of interest.

Moreover reports abound daily as to what appears to be a standard absence of effective Chinese walls on Wall Street. In recent weeks the news has been filled with allegations about an e-mail suggesting that Salomon Smith Barney's former telecom analyst Jack Grubman raised his rating on AT & T's stock from "hold" to "buy" in 1999 to obtain admittance of his twin children into an exclusive nursery school through efforts of Citigroup's chairman Sandy Weill, who sat on the board of AT & T and asked Grubman to "take a fresh look" at his rating of its stock. A few months later, after Weill's firm reaped large fees from helping AT & T to sell investors shares in its wireless division and after obtaining admission for his twins, Grubman downgraded the stock, but only after it lost 50% of its value between Grubman's upgrading of the stock when it was valued at $57.43 and downgrading it when it was selling at $28.88. Investors lost approximately $80 billion in value.[123]

 Defendants contend that Lead Plaintiff has not adequately pleaded facts

**123.** Gretchen Morgenson, "Does the Rot on Wall Street Reach Right to the Top?," Section 3 (Money & Business) at 1, *The New York Times*, Nov. 17, 2002. In an article on the Op–Ed page of November 15, 2002's *New York Times at A27*, a former research analyst at Goldman Sachs, in defending analysts by explaining the difficulties of predicting what the stock market will do and the reasons why their role is misunderstood, perfunctorily stated, "[A]nalysts are subject to internal and external pressures to be positive on essentially every stock they cover. From the inside, in-

vestment bankers arm-twist analysts to write and speak favorably about their firms' existing and prospective clients. From the outside, some executives bypass their bankers and go straight to the analysts, hoping to win a higher rating (and hoping, no doubt, that the fruits of that rating will enable them to buy more gold umbrellas stands and diamond-studded shower rods)." See also Marcia Vickers & Mike France, "Wall Street: How Corrupt is It?," *Business Week*, May 13, 2002 at 36–44, Ex. 1 to Lead Plaintiff's Appendix in Support of Plaintiffs' Oppositions to

showing that the analysts did not merely accurately report information provided to them by Enron and argue that the statements in those reports constitute either puffery or opinion and are therefore not actionable. The Court observes that Lead Plaintiff's complaint for claims under § 10(b) focuses in large part on pleading adequately the secondary-actors Defendants' involvement, with scienter, in acts, deceptive devices, contrivances, and scheme and/or course of business to defraud the public, i.e., primary violations of Rule 10b 5(a) and (c). The very nature of Defendants' personal and intimate knowledge of the fraud from the alleged direct participation in the Ponzi scheme necessarily makes their highly positive public statements and buy-stock recommendations misrepresentations of the truth. Thus the legal basis of the claims makes irrelevant a specific analysis of each statement, which would be required if they were asserting only claims of a material misrepresentation or omission under Rule 10b–5(b). The alleged absence of effective Chinese walls, which the Court has found adequate in light of the totality of the circumstances, makes knowledge gained in the lending and commercial areas of the banks imputable to their analysts.

██ Various Defendants have contended that specific claims under § 10(b) and Rule 10b–5 are time-barred as a matter of law. A private right of action under § 10(b) "must be commenced within one year after discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

Lead Plaintiff has responded that it is not seeking to recover damages for alleged

misconduct that occurred more than three years before suit was filed, but is pleading such purported violations solely to establish evidence of a scheme and of scienter. Such evidence is admissible for this purpose. *Ashdown,* 509 F.2d 793 (5th Cir. 1975)(mail fraud); *United States v. Blosser,* 440 F.2d 697, 699 (10th Cir. 1971)(same); *Fitzgerald v. Henderson,* 251 F.3d 345 (2d Cir.2001)(Title VII). The Court agrees and considers those allegations to be admissible solely for the purpose of establishing a scheme and/or scienter.

Defendants have also argued that despite Lead Plaintiff's disclaimer that it is not grounding its Section 11 claims in fraud, Lead Plaintiff has incorporated allegations of fraud and its claims are based on the same fraudulent scheme as its § 10(b) and Rule 10b–5 claims, and therefore must be pleaded, but have not been, with Rule 9(b) particularity. *Lone Star Ladies Inv. Club,* 238 F.3d at 368; *Melder,* 27 F.3d at 1100 & n. 6. The Court disagrees. See pages 70–71 of this memorandum and order.

██ A few Defendants have maintained that they are not liable for alleged misstatements in analysts' reports because the investors could not have reasonably relied on them, not only in light of their use of qualified language (e.g., "we believe," "we forecast," "we expect," "we feel very comfortable"), but also because of express disclaimers, such as "does not warrant its completeness or accuracy," "past performance is not indicative of future results," or "the recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein." The Court disagrees. Generally a disclaimer is

---

Motions to Dismiss (# 858), To dismiss Lead Plaintiff's allegation of ineffective Chinese walls and to not consider it as a circumstance relevant to the alleged fraud would be remiss and contrary to common sense.

enforceable only where it "tracks the substance of the alleged misrepresentation." *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir.1984). *See also Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993)(to be effective a disclaimer "must contain explicit disclaimers of the particular representations that form the basis" of the fraud claim). Under both the statutory safe harbor and the bespeaks caution doctrine, as discussed, the warnings may not be vague, generic, cursory disclaimers, but instead must be "meaningful cautionary statements" identifying important factors that might cause material differences in actual results, or must be adequate and specific. Moreover if the party is found to have the requisite scienter for fraud, i.e., knows the statements or omissions are materially misleading or untrue or is severely reckless about the truth of his statements, the safeguards will not apply.

Some Defendants have also argued that the plaintiff who purchased 7% Notes on November 5 and 9, 2001, Murray van de Velde, did so more than two years after the effective date of the registration (August 10, 1999) and after the issuance of an earning statement covering at least twelve months thereafter, not to mention a number of negative public disclosures about Enron.[124] Therefore van de Velde cannot plead or prove the requisite actual reliance of the alleged misstatements in the prospectus, as required by § 11, 15 U.S.C. § 77k(a).[125] *See, e.g., Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65, 71 n. 2 (S.D.Tex.1984)("Reliance is required under the one year provision of Section 11(a)...."); *Rudnick v. Franchard Corp.*, 237 F.Supp. 871, 873 n. 1 (S.D.N.Y. 1965)("in all likelihood, the purchase and price of the security purchased after publication of [a subsequent earning statement] will be predicated on that statement rather than on the information disclosed upon [the original] registration")(citing H.R.Rep. No. 1838 (1934)).

Lead Plaintiff has conceded this point and no longer pursues claims based on the 7% Exchangeable Notes.[126]

124. For instance by November 1, 2001, a number of securities fraud and shareholder derivative suits had already been filed against Enron alleging that its public disclosures were materially misleading, the SEC had launched a formal investigation into its accounting practices, and Moody's had downgraded its long-term debt ratings. On November 8, 2001 Enron filed a Form 8–K stating that it would be restating previous financial statements back to 1997 and warned investors not to rely on those prior statements, which included those incorporated into the prospectus for the 7% Notes.

125. Section 77k(a) provides in relevant part, If such a person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement of such person.

126. Defendants have also contended that Van de Velde has not claimed that he purchased in the initial public offering of those notes. They argue that the rule in *Gustafson v. Alloyd Co., Inc.* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), that standing to sue under § 12(2) of the 1933 Act, 15 U.S.C. § 771(a)(2), is restricted to persons who purchased securities in the initial public offering, and thus those who purchased their securities in private initial offerings or on the secondary market are deprived of the antifraud protection of § 12(2), also applies to claims under § 11, 15 U.S.C. § 77k(a).

After reviewing the law, this Court is persuaded by the three federal appellate courts that have thus far addressed this issue. They

Defendants also insist that no facts have been pleaded to support the conclusory allegations of controlling person liability under § 15 of the 1933 Act, § 20(a) of the 1934 Act, and article 581– § 33(F) of the Texas Securities Act. Lead Plaintiff has not addressed the question of controlling person liability in its response to the secondary-actor Defendants' arguments that the complaint does not plead that any defendant exerted actual control over Enron or the other defendants so all claims under the appropriate provisions of the three statutes should be dismissed. The Court defers ruling on the issue under the federal and Texas statutes until it has thoroughly reviewed all the individual Defendants' motions.

■ In addition, Defendants have moved to dismiss the Washington State Investment Board's claim relating to the underwriters of the 6.95% Notes and the 6.40% Notes under the Texas Securities Act, Tex.Rev.Civ. Stat. Ann. art. 581–33, for lack of a nexus between the sales of the securities and the State of Texas, i.e., an allegation that the sales occurred in Texas. Moreover, they maintain, because the claim also sounds in fraud, it must be pleaded with particularity under Rule 9(b). One Defendant claims that Plaintiff has not pleaded under which provision in the Texas Securities Act the Board's claims are brought.

Lead Plaintiff responds that the misconduct alleged, including false statements to sell Enron debt, occurred in and/or emanated from Texas in substantial part, justifying suing under article 581–33. Therefore, Lead Plaintiff maintains that Defendants cannot meet their burden of proof under Texas law for claiming foreign law applies: they must show the existence of a true conflict of laws and demonstrate which law should apply to Lead Plaintiff's claims based on state contacts. *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 650 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.). As an example Lead Plaintiff contends that Enron's Form 10–K for 1997, which was incorporated into the Registration Statement for the sale of the Notes, was materially false because it concealed the debt moved off Enron's balance sheets and into the JEDI/Chewco entity. This illicit entity was formed *inter alia* by Vinson & Elkins, Enron, Enron employees, and Arthur Andersen employees in Houston, Texas.

Moreover, Lead Plaintiff observes that the Texas statute is a broad remedial stat-

---

have concluded that the *Gustafson* rule does not apply to § 11 in part because (1) § 11's language, "any person acquiring such security ... may sue," is more expansive that § 12(2)'s language providing that any person who "offers or sells a security" by means of a "prospectus or oral communication" that contains a material false statement or omission shall be liable to "the person purchasing such security from him"; (2) § 11(a)'s provision that a person who has acquired a security "after the issue has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effect date of the registration statement" must prove actual reliance on the registration statement to recover would be redundant or meaningless; (3)

the same would be true of § 11(e)'s damages provision establishing as the baseline for damages the difference in the amount for which the security is sold and the amount paid, not exceeding the price at which it was offered to the public, if the only plaintiffs with standing were those who bought at the initial offering at the offering price; and (4) the Congressional purpose behind the statutes, i.e., the 1933 Act was intended to regulate the initial distribution of securities while the 1934 Act was passed to regulate trading in the open market. *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 976–77 (8th Cir.2002); *Joseph v. Wiles*, 223 F.3d 1155, 1159–60 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1079–82 (9th Cir. 1999).

ute intended not only to protect Texas residents but also "non-Texas residents from fraudulent securities practices emanating from Texas." *Baron v. Strassner,* 7 F.Supp.2d 871, 875 (S.D.Tex.1998); *Rio Grande Oil Co. v. State,* 539 W.W.2d 917, 921 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.)("A state is damaged if its citizens are permitted to engage in fraudulent practices even if those injured are outside its borders."). Lead Plaintiff insists it "does not have to show that the sale of the securities was primarily linked to Texas because the statute applies if any act in the selling process of securities covered by the Act occurs in Texas." *Id.* at 921–22; *see also Texas Capital Sec., Inc. v. Sandefer,* 58 S.W.3d 760, 776 (Tex. App.-Houston [1st Dist.] 2001, pet. ref'd)(same).

The Court agrees with Lead Plaintiff and finds that the objection to the Texas Securities Act claims lacks merit.

## B. Section 10(b) Claims Against Defendants Individually

Rather than focusing upon deficiencies in the complaint, especially conclusory or boiler plate allegations, of which the Court agrees that there are many, the Court examines what Lead Plaintiff has specifically and successfully pled in this complaint against each Defendant to determine whether it adequately states a claim with specificity under § 10(b) and raises a strong inference of the requisite scienter that warrants denial of its motion to dismiss.

### 1. Legal Standards

As indicated for violations of § 10(b), Lead Plaintiff may assert and has asserted claims under all three prongs of Rule 10b–5, and is not limited to the second prong's material misrepresentation or omission category:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Furthermore, Plaintiff must allege specific facts sufficient to give rise to a strong inference of scienter, i.e., intent to deceive, manipulate or defraud, or at least knowing misconduct, which in this Circuit must reach the level of severe recklessness, "highly unreasonable omissions or misrepresentations [and/or use of manipulative and deceptive devices and contrivances to defraud and/or engagement in a practice or scheme or course of business that operated as a fraud upon the public in connection with the sale and purchase of Enron securities] that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson,* 267 F.3d at 408. Furthermore, scienter must be evaluated in view of the totality of alleged facts and circumstances, together as a whole, with all reasonable inferences drawn in Lead Plaintiff's favor. *Abrams,* 292 F.3d at 431.

This Court applies the SEC's test for primary liability for a material misrepresentation or omission under § 10(b) and the second prong of Rule 10b–5: "when a person, acting alone or with others, creates a misrepresentation [on which the investor-plaintiffs relied], the person can be liable as a primary violator ... if ... he acts with the requisite scienter." SEC's Brief

(# 821) at 18. "Moreover it would not be necessary for a person to be the initiator of a misrepresentation in order to be a primary violator. Provided that a plaintiff can plead and prove scienter, a person can be a primary violator if he or she writes misrepresentations for inclusion in a document to be given to investors, even if the idea for those misrepresentations came from someone else." *Id.* Furthermore, "a person who prepares a truthful and complete portion of a document would not be liable as a primary violator for misrepresentations in other portions of the document. Even assuming such a person knew of misrepresentations elsewhere in the document and thus had the requisite scienter, he or she would not have created those misrepresentations." *Id.* at p. 19.

Lead Plaintiff must plead reliance on the alleged material misrepresentation or omission. As discussed *supra*, the fraud-on-the-market theory is applicable.

■■■ Moreover, under Rule 10b–5(a) and (c), where a group of Defendants allegedly participated in the scheme to defraud the public and enrich themselves in connection with the purchase or sale of securities, any Defendant that itself, with the requisite scienter, actively employed a significant material device, contrivance, scheme, or artifice to defraud or actively engaged in a significant, material act, practice, or course of business that operated as a fraud or deceit upon any person in connection with the purchase or sale of any security may be primarily liable. As noted, the phrase "in connection with the purchase or sale of any security" must be construed broadly and flexibly to effectuate Congress' remedial goal in enacting the statute of insuring honest securities markets and promoting investor confidence. *O'Hagan,* 521 U.S. at 658, 117 S.Ct. 2199; *Zandford,* 122 S.Ct. at 1903. Reliance under prongs (a) and (c) can also be established by the fraud-on-the-market

doctrine: Lead Plaintiff has alleged that the identified contrivances, deceitful devices, schemes and courses of business operated to present a falsely positive picture of Enron's financial condition and maintain its high credit ratings, thereby artificially inflating the value of Enron's publicly traded securities and continuing to attract funds from the investing public or encouraging shareholders not to sell.

### 2. Primary Violations by Specific Defendants

Lead Plaintiff alleges a scheme or course of business in which the various participant Defendants engaged in and concealed a pattern of conduct involving the creation of unlawful SPEs and utilizing fraudulent transactions with these entities having no economic purpose other than as contrivances or deceptive devices to misrepresent Enron's financial condition and defraud investors into continuing to pour money into Enron securities to keep the Ponzi scheme afloat and thereby enrich themselves in a variety of ways. It has also asserted that as part of this scheme Defendants knowingly made material misrepresentations upon which investors in Enron securities relied. Moreover, the purchase of Enron securities by unknowing investors was an integral part of the scheme, necessary to keep the house of cards out of bankruptcy and to further a scheme so lucrative for Defendants.

■■■ As a factor common to all, the Court initially finds that the scienter pleading requirement is partially satisfied by allegations of a regular pattern of related and repeated conduct involving the creation of unlawful, Enron-controlled SPEs, sale of unwanted Enron assets to these entities in clearly non-arm's length transactions and often with guarantees of no risk, in order to shift debt off Enron's balance sheet and sham profits onto its

books at critical times when quarterly or year-end reports to the SEC, and by extension the public, were due, followed in many cases by the undoing of these very deals once the reports had been made. These transactions were not isolated, one-of-a-kind instances of violations of the statutes, but deliberate, repeated actions with shared characteristics that were part of an alleged common scheme through which Defendants all profited handsomely, many exorbitantly. The very pattern that is alleged undermines claims of unintentional or negligent behavior and supports allegations of intent to defraud. Furthermore, the intrinsic nature of these devices and contrivances was fraudulent so that those intimately involved in structuring the entities and arranging the deals, especially more than one, would have to have been aware that they were an illicit and deceptive means to misrepresent Enron's actual financial state and mislead investors about Enron securities, or at minimum, would have had to have been severely reckless as to that danger.

Moreover, Lead Plaintiff has pleaded effectively the common motive of, fixation on, and obsession with monetary gain. It has not only alleged that extraordinary fees, interest rates, etc., were pocketed by the secondary actor Defendants, which only inflated with the expanding mirage of corporate success that they allegedly fraudulently created. It has also described credit default puts that obligated Defendants to maintain Enron's strong financial image to avoid exposure to large losses. It has claimed that Defendants not only aided in structuring and funding the fraudulent entities from which they derived concrete, extraordinary benefits, but they also sold stock to the public investors and were repaid from the proceeds of those sales. The Court finds that the facts pled here constitute allegations of motive and opportunity that meaningfully enhance the strength of the inference of scienter,

though they do not alone suffice. *Nathenson*, 267 F.3d at 412.

Similarly, conclusory allegations asserted against all or most of the secondary actor Defendants, such as the long-term, continuous, intimate and extensive relationships with Enron and daily interaction with Enron's top executives, necessarily raise the specter of potential and unusual opportunities to learn about and take an active role in Enron's financial affairs, open access to nonpublic information about Enron, intimacy blending into complicity fueled by financial interests, and involvement in formulating, funding, drafting, and decision-making about key aspects of Enron's business, including the structuring and financing of Enron's secretly controlled partnerships with no economic purpose other than to defraud. In addition, the provision of both commercial banking and investment banking services to Enron raises the possibility of conflicts of interest and the standard mandatory in-depth credit analyses required of borrowers by lenders, etc., which should have raised red flags, are all background factors to be considered. Nevertheless, without some particular facts about specific involvement of each Defendant in fraud that would alert a reasonable party to recognize its participation in a fraudulent scheme and indicate either actual knowledge or reckless disregard by that Defendant of the wrongdoing to misrepresent Enron's financial condition, such general allegations applied to every Defendant across the board are not sufficient by themselves to raise a strong inference of scienter. Defendants have complained that they are being targeted for performing the normal functions of their businesses, e.g., lending money, underwriting stocks, accounting and auditing, or drafting legal documents. Obviously, regular business conduct within the bounds of the law would not support a claim of securities law violation; instead

the allegations must demonstrate that they knowingly or with reckless disregard stepped outside the boundary of legitimate and professionally acceptable activities in performing material acts to defraud the public.

The Court addresses party-specific, concrete factual allegations against each Defendant whose motion to dismiss is under review to see if Lead Plaintiff has asserted with specificity some material misrepresentation or omission, use of a deceptive device or contrivance or participation in a scheme or course of business to defraud investors in connection with the purchase or sale of securities that would raise a strong inference of scienter, sufficient for Lead Plaintiff's § 10(b) claims to survive. Where Lead Plaintiff has once adequately alleged that a party took such an affirmative step with scienter, not only that immediate act or material misrepresentation or omission, which without adequate public disclosure directly or indirectly manipulated the financial picture of Enron or the value of its securities, any alleged subsequent activity by that party, such as continuing to lend funds to Enron-controlled SPEs or soliciting or selling Enron securities or even silence, necessarily becomes suspect as further complicity in, expansion of, and perpetuation of the alleged Ponzi scheme.

### a. The Banks

#### (i) J.P. Morgan

 Viewing the specific allegations together, the Court finds that Plaintiff has stated a claim against J.P. Morgan as a primary violator under § 10(b) and Rule 10b–5. Among the alleged circumstances that portray J.P. Morgan as knowingly or at least with severe recklessness making a material misrepresentation or employing a device, scheme, or artifice to defraud or engaging in an act, practice, or course of business that operated as a fraud or deceit upon Enron investors and that in combination give rise to a strong inference of scienter are the following.

The private placement memorandum/invitation-to-invest for LJM2, with its express indication that Andrew Fastow would be wearing two hats in a blatant conflict of interest and with an obvious opportunity for self-dealing, and its promise of extraordinary returns to investors,[127] among which were J.P. Morgan's executives, who invested at least $25 million, allegedly served as a reward to executives of Defendants that participated in the Ponzi scheme. The allegations constitute an invitation for a highly lucrative, potentially illicit investment opportunity. More, however, is needed for pleading liability under § 10(b) and Rule 10b–5. Lead Plaintiff argues that the "prefunding" in amounts higher than each Defendant's allocated share just before the '99 year-end reports were due gave rise to the requisite scienter. The Court disagrees. The Court finds that Lead Plaintiff has failed to allege precise facts that would have alerted any of the various Defendant investors to suspect that their December 22, 1999 secret initial investment funds to capitalize LJM2 were to be used specifically to fund the CLOs, Nowa Sarzyna power plant, MEGS, LLC, and Yosemite deals through LJM2 in order to doctor Enron's balance sheet in time for the 1999 year-end reports or that these investors would have known

---

**127.** Some Defendants argue that the private placement memorandum also discussed significant steps that Enron would take to avoid a conflict of interest, such as that "Richard Causey, Executive Vice President and Chief Accounting Officer of Enron, will, in behalf of Enron, monitor and mediate conflict-of-interests between Enron and the Partnership." The Court notes that the allegations in the complaint imply that such steps were either never initiated or ineffective.

any particulars about those four deals merely because they put up money on an expedited basis. The Court does find, however, that Lead Plaintiff's claim that in a short time these investors were rewarded by actual, exorbitant returns (up to 2,500% on one deal and 51% overall within the first year), in view of the implied promises of private placement memorandum, would raise red flags to any objective party investing in it and especially a party having other business dealings with Enron. Nevertheless Lead Plaintiff provides no details about how, when, where or who of the investors learned what about the various entities and transactions involving Chewco. Moreover, Lead Plaintiff states generally that the greatest returns to the investors occurred sometime from 2000 to 2001 from deals involving the Raptors, somewhat later in the Ponzi scheme. Thus the Court finds that further involvement, beyond the fact of prefunding and investment in LJM2, is necessary to raise a strong inference of scienter regarding each Defendant's alleged participation in the purported Ponzi scheme.

Moreover in light of the substantial sum J.P. Morgan, a sophisticated business banking entity, poured into LJM2 in the prefunding personal investment and the $65 million line of credit J.P. Morgan extended to the partnership, the Court finds noncredible any contention that the bank would not have reviewed the structure and activities of that entity with care and would sooner or later have discovered its alleged illicit purpose. Nevertheless, as noted, Plaintiff has made cookie cutter allegations against all the bank Defendants, but failed to provide crucial specific facts identifying specifically why, how, when or what J.P. Morgan or any of the other prefunders learned about the individual SPEs and their transactions. The complaint does assert that J.P. Morgan funded at least four SPEs (Sequoia, Choctaw, Cherokee, and Cheyenne, generally as additional En-

ron-controlled entities used solely to artificially inflate Enron's profits and conceal its debt), but gives no particulars about their deals or what, when or how J.P. Morgan knew about them.

Lead Plaintiff has also generally alleged that J.P. Morgan and Citigroup administered the financial affairs of LJM2, including profit distributions and capital calls, and were thus informed about LJM2's deals, finances and distributions to investors. Such a role would necessarily have given both banks access to confidential information about the entity. These general allegations, along with many others in the complaint, are significant factors for consideration, but are clearly inadequate by themselves to raise a strong inference of scienter without some detailed facts pled that would indicate when and what particular information J.P. Morgan was aware of or that what it was severely reckless in disregarding.

■ Lead Plaintiff does provide sufficient details to meet the pleading and scienter standards for § 10(b) claims relating to J.P. Morgan regarding JP Morgan's repeated "loans" of about $5 billion to Enron, disguised as commodities trades between 1997 and 2000. These loans were frequently made for years at critical junctures, just before quarter-end or year-end, by J.P. Morgan, utilizing its controlled entity Mahonia, as alleged manipulative or deceptive acts or contrivances, overseen by a senior credit officer at J.P. Morgan, Mark Shapiro, to falsify Enron's financial condition. These allegations do raise a strong inference of scienter. Lead Plaintiff has further asserted that these loans resemble a scheme that J.P. Morgan is accused of perpetrating earlier with a commodities trader from Sumitomo Corporation, which is currently being challenged as fraudulent in another suit. Lead Plaintiff's additional claims regarding the ef-

forts of J.P. Morgan to insure against Enron's default on the disguised loans by purchasing performance bonds from insurance companies, also at issue in litigation elsewhere, and the alleged excessive rate of interest J.P. Morgan charged for the disguised loans (more than 3% higher than normal rates, yielding an extra $120 million per year to be collected by J.P. Morgan) imply that it was aware of Enron's precarious financial condition and that it sought personal gain out of the ordinary from its fraudulent conduct, while simultaneously contributing to a strong inference of scienter. Moreover, these alleged disguised loans, which, the complaint notes, investigating Congressional officials have criticized as having no legitimate economic purpose but instead as appearing to be devices to "allow Enron to covertly borrow hundreds of millions of dollars in undisclosed loans," are part of a pattern of subterfuge loans painted by the complaint that include the Delta transactions with Citigroup and the fake swap in which Credit Suisse First Boston lent Enron $150 million to be repaid over two years. Along with all the other general allegations of J.P. Morgan's extensive involvement with Enron, the pleadings relating to the bank's participation in, inflated benefits from, and failure to adequately disclose these transactions, as well as its awareness that LJM2, with its conflict of interest and potential for self-dealing, was enjoying extraordinary returns, imply J.P. Morgan had knowledge of the alleged illegitimacy of Enron's ongoing business dealings and the inaccuracy of its financial reports. Furthermore, according to the complaint, there were material misrepresentations in its analysts' consistently positive reports and registration statements, which purportedly did not change in any substantive way from the formation of LJM2 and the executives' undisclosed pre-funding. See pages 132–35, 159–65 of this memorandum and order.

For these reasons, the Court finds that Lead Plaintiff has alleged primary violations of § 10(b) and Rule 10b–5 and raised a strong inference of scienter, and it accordingly denies J.P. Morgan's motion to dismiss.

### (ii) Citigroup

Viewing the specific allegations together, the Court finds that Plaintiff has stated a claim against Citigroup as a primary violator under § 10(b) and Rule 10b–5. Among the alleged circumstances that portray Citigroup as knowingly, or at least with severe recklessness, making a material misrepresentation or employing a device, scheme, or artifice to defraud or engaging in an act, practice, or course of business that operated as a fraud or deceit upon Enron investors, and that together give rise to a strong inference of scienter, are the following.

As indicated, the private placement memorandum/invitation-to-invest for LJM2, with its express indication that Andrew Fastow would be wearing two hats in a blatant conflict of interest and obvious opportunity for self-dealing, and its promise of extraordinary returns to investors, among which were Citigroup executives, and, most importantly, followed in a short time by actual, exorbitant returns, would raise flags to any objective party investing in it and doing continuing business with Enron. By themselves, however, the Court finds these investments insufficient, without more, to raise a strong inference of scienter.

In light of the substantial sums of money Citigroup, a sophisticated business banking entity, poured into LJM2, i.e., $1,500,000 in pre-funding on 12/22/99 (many times more than its allocated share), and a $15 million dollar personal investment by its executives, the Court finds noncredible any contention that the

bank would not over time have scrutinized the structure and activities of the illicit entity. Moreover, beyond the significant investment in the partnership, Lead Plaintiff has alleged that Citigroup and JP Morgan administered the financial affairs of LJM2 from 1999–2001, including profit distributions and capital calls, and Citigroup thus would have been access to information about LJM2's financial operations and transactions, and those with its "spin-off" SPEs.

More specific are the allegations of Citigroup's involvement in the New Power IPO scheme in 10/00. With other banks it made a loan to fund Hawaii 125–0 and received a "total return swap" guarantee to protect it from any loss, while Enron sold its New Power warrants to that entity and falsely hedged it with the help of Enron-controlled LJM2 and Porcupine.

In addition, Citigroup, through its Cayman Island subsidiary, also allegedly participated in a repeated pattern of pre-paid swaps, i.e., disguised large loans to Enron totaling $2.4 billion that were never disclosed on its balance sheet, through the Delta transactions, at interest rates nearly double the normal borrowing rate, providing Citigroup with nearly $70 million annually for its participation in the Ponzi scheme. Moreover, Lead Plaintiff additionally alleges that to reduce Citigroup's own risk exposure in the event that Enron defaulted on what Citigroup knew were very dangerous transactions, Citigroup sold Enron-linked securities as notes, including the disguised Delta loans. While the Court does not disagree with Citigroup that credit-linked notes are "a well-recog-

nized derivatives instrument, issued and traded in huge volumes each year by a wide variety of entirely proper purposes" in order to spread risk over a larger number of guarantors, as allegedly used in the context of the allegations in this case, they raise an inference that Citigroup knew how precarious the financial condition of Enron was in contrast to its positive public representations.[128]

The Court finds that the allegations of primary violations of § 10(b) and Rule 10b–5, which simultaneously raise a strong inference of scienter, warrant denial of Citigroup's motion to dismiss.

### (iii) Credit Suisse First Boston

Viewing the specific allegations together, the Court finds that Plaintiff has stated a claim against Credit Suisse as a primary violator under § 10(b) and Rule 10b–5. Among the alleged circumstances that portray Credit Suisse First Boston as knowingly or at least with severe recklessness employing a device, scheme, or artifice to defraud or engaging in an act, practice, or course of business that operated as a fraud or deceit upon Enron investors, and that together give rise to a strong inference of scienter, are the following.

The private placement memorandum/invitation-to-invest for LJM2, with its express indication that Andrew Fastow would be wearing two hats in a blatant conflict of interest and obvious opportunity for self-dealing, and its promise of extraordinary returns to investors, among which were Credit Suisse First Boston executives, and, most importantly, followed in a

---

**128.** The Court is also aware from reports in the press of current Congressional investigations of two particular deals between Enron and Citigroup that fit the pattern of many alleged by Lead Plaintiff. One, an off-the-books partnership known as Bacchus, in which Citigroup invested 3% equity, is an echo of the 3% equity investment in JEDI by Barclays via Chewco, with an alleged guarantee by Enron that Citigroup's investment in Bacchus would not be at risk. The second is a venture known as Sundance, which Citigroup's own risk managers and other employees objected was too aggressive and risky, but which Citigroup purportedly went forward with despite the warnings.

short time by actual, exorbitant returns, would raise flags to any objective party investing in it and doing continuing business with Enron. Moreover, in light of the substantial sums of money Credit Suisse First Boston, a sophisticated business banking entity, poured into LJM2, i.e., a $120 million plus credit line to the partnership and a $22.5 million dollar personal investment by its executives, the Court finds noncredible any contention that the bank would not over time have scrutinized the structure and activities of the illicit entity. Lead Plaintiff, however, has failed to plead sufficiently specific facts that would demonstrate scienter with respect to the investments.

Lead Plaintiff does succeed in pleading claims cognizable under § 10(b) and Rule 10b–5 with its additional allegations relating to Credit Suisse First Boston's alleged involvement in Enron's scheme to recognize a profit by taking New Power public. The complaint asserts that pursuant to a secret deal made before and carried out after the New Power IPO, for which Credit Suisse First Boston served as lead underwriter, Credit Suisse First Boston, together with other banks, made a sham loan of $125 million to Hawaii 125-0, when the banks actually and secretly received a total return swap guarantee from Enron against any loss. Credit Suisse under these allegations would have known its loan was a deceptive device or contrivance. Enron then sold millions of New Power warrants to Hawaii 125-0 to "secure" the banks' loans and to create a $370 million profit for itself on the purported gain on these warrants. Hawaii 125-0 then purportedly "hedged" the warrants with Porcupine, also controlled by Enron, which LJM2 had previously capitalized with $30 million for the hedge of the New Power warrants. One week later, Porcupine emptied its coffers when it paid back the money plus $9.5 million to LJM2, another source of significant and suspi-

cious fast returns for LJM's investors, which included top officials of Credit Suisse First Boston. See pages 130–31 of this memorandum and order.

Credit Suisse First Boston is also alleged to have made another disguised "loan" or sham swap of $150 million, to be repaid over two years to Enron in 2000 in payments varying with the cost of oil. According to the complaint, it was not a swap because Enron was paid up front. Moreover, Credit Suisse First Boston's spokesman, Pen Pendleton, is quoted as conceding, "It was like a floating-rate loan. We booked it as a loan."

Lead Plaintiff's specific explanation of how Credit Suisse First Boston regularly participated in the Ponzi scheme by designing, structuring and funding the SPEs that were the primary vehicles utilized by Enron to falsify its financial condition and misrepresent profits also constitutes a scheme to defraud investors raises a strong inference of scienter. The complaint charges that a group of ten bankers from Credit Suisse First Boston, headed by Laurence Nath, created some of the illicit SPEs, a process dubbed "structured products," including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors, to which Credit Suisse First Boston helped Enron sell assets at inflated prices in non-arm's-length transactions to create sham profits and conceal massive debt for Enron. Lead Plaintiff specifically explains that Laurence Nath and Credit Suisse First Boston worked closely with Vinson & Elkins and Arthur Andersen to create and document these SPEs and transactions. When an asset was sold to one of the SPEs as a quick-fix solution to remove that asset from Enron's balance sheet, it was referred to as "monetising" the asset. Laurence Nath would regularly go to Houston for a week or two, meet with a group from Enron's treasury and global finance de-

partments ("Fastow's field marshals"), including Jeff McMahon or Ben Glisan (successive treasurers of Enron), and create a solution to new problems in order to doctor the Enron books. According to the complaint, most of the vehicles created in this manner by Nath shared the same unusual feature: the SPEs held Enron stock to reassure lenders and secure an investment grade rating, but there were set "trigger points," or prices between \$83 \$19 per share, at which the stock's declining value would require Enron to put more shares into the entity or even force liquidation if Enron's credit rating was downgraded. At that point the debt of the SPEs became recourse to Enron. Not only does such specific involvement in the scheme give rise to a strong inference of scienter, but the alleged acts of Nath and his team would constitute primary violations of the statute.

The complaint also describes discussions that it claims reflect Credit Suisse First Boston's actual knowledge of Enron's real financial condition underneath the cloak of false representations. The complaint quotes an Enron insider as remarking, "There's no question that senior people at CSFB knew what was going on and that it was a house of cards." One individual who attended a meeting in July 2001, when Enron's stock had fallen into the \$40s, stated that the triggers were discussed by senior Enron executives and Credit Suisse First Boston bankers. It was reported that the bankers remarked, "If this thing hits the \$20s, you better run for the hills," and "There was no question that they knew exactly what lay inside the structures, when the triggers went off—everything. You could almost say they knew more about the company than people in Enron did." See page 173–74 of this memorandum and order. While the content of these remarks may be subject to other interpretation, with respect to a Rule 12(b)(6) motion, the Court views the pleaded facts in favor of Lead Plaintiff.

The complaint also refers to a discussion at a meeting in June 2001, when Enron stock was trading at around \$48.50 a share, between an Enron manager and two Credit Suisse First Boston managing directors reflecting that Credit Suisse First Boston knew about the nature and extent of Enron's off-balance sheet exposure and Enron's falsification of its financial statements. The bank's directors asked an Enron manager: "How can you guys keep doing this?," in reference to Enron's repeated statements to the market that its stock was under valued. Even at \$40 per share, Enron's stock was still overvalued in the bank directors' view, as reflected in their comments to the Enron manager: "Do employees actually believe it's worth what management is saying?"; "[Y]ou guys are at a critical price point right now"; that if Enron's stock price continued to fall, that drop would cause Raptor to unwind and the debt balance to come due; when the Enron executive stated that he thought Enron's off-balance sheet debt was between one and two billion dollars, the bank representatives responded, "Try eight to 12 billion."; and that if Enron's stock dips to \$20 per share, things would come falling down and "you guys are gonna be fucked."

In light of these specific allegations, Plaintiff's somewhat conclusory allegations that Credit Suisse First Boston's analysts' reports and recommendations and its Registration statements contained material misrepresentations about Enron's stock and financial condition carry more weight than they might otherwise be entitled to. Lead Plaintiff has pointed out that the bank's boilerplate disclosures remained the same as they were before the funding of LJM2 in December 1999, never mentioning specifically the investments of its top

executives in the entity, its funding of the partnership during 2001, its concealed loan transactions, or any of the significant conflicts of interest that would cast doubt on its analysts' objectivity and honesty in evaluating Enron stock. It has also identified specific positive statements in reports, including those in paragraphs 154, 158, 167, 171, 180, 191, 198, 205, 213, 229, 268, 285, 290, 319, 345, 354, 374, 378, 612–41, and 704 of the complaint, which, when set against its factual allegations of ongoing fraud which the Court presumes for purposes of the motion to dismiss to be true, constitute material misrepresentations. While Plaintiff has not sufficiently alleged scienter as to most of them, it has asserted reasons why from early in the Class Period Credit Suisse First Boston was aware of, or recklessly disregarded, obvious warning signs of illicit, fraudulent conduct by Enron and its officers more than sufficient for it to question if not truth or accuracy of its statements about particular matters, certainly the truth or accuracy of its unqualified, glowing picture of Enron, which in turn served to increase the sales and price of Enron's publicly traded securities, from which it derived monetary benefits.

### (iv) CIBC

Beyond the global allegations of the complaint, such as that the bank "had an extensive and extremely close relations" with Enron, provided it with commercial and investment banking services, lent Enron substantial sums, underwrote numerous Enron-related securities and raised billions from the sale of Enron and Enron-related securities, helped structure and fund several of Enron's controlled partnerships and illicit transactions with its SPEs, and pocketed millions annually in interest payments and fees, Lead Plaintiff makes specific assertions against CIBC that, if true, would constitute primary violations of § 10(b) and Rule 10b–5 and give rise to a strong inference of scienter.

CIBC allegedly provided $2.25 million, much more than its allocated share, to prefund LJM2, with CIBC executives among those receiving the suggestive private placement memorandum and secretly invested in LJM2 and, from its self-dealing transactions, management by Fastow with Enron insiders on both sides of the transactions, enjoyed the extraordinarily lucrative returns that should have alerted them to questionable dealings and practices. Ultimately CIBC invested $15 million in LJM2.

Second, Lead Plaintiff alleges that the New Power transactions permitted Enron again to falsify its financial results and improperly recognize sham profits and perpetuated the Ponzi scheme. According to the complaint, while serving as the lead underwriter in the New Power IPO, CIBC engaged in the secret deal structured before the New Power IPO to create and fund Hawaii 125-0 after it. CIBC and other banks "lent" money to Hawaii 125-0, but were protected from any risk by a total return swap, so that Enron could transfer millions of New Power warrants to the SPE and create a $370 million profit from the purported gain on them, which Enron recognized in the fourth quarter of 2000. Enron in a sham hedge "to secure" the banks' loan had LJM2 put $30 million into another Enron-controlled SPE, Porcupine, but Porcupine paid LJM2 back with profit in a week, so that there was no hedge. New Power stock's swift collapse shortly afterward turned the "gain" into a loss of about $250 million, which was concealed.

Third, according to the complaint, in 2000–01 CIBC was also involved in the Blockbuster VOD venture and worked with Enron to make this risky venture appear to be successful, first of its kind,

and worth more than $1 billion to Enron. The complaint states that to maintain Enron's public image as a highly successful business, including its new Broadband content delivery business, CIBC cooperated with Enron's misuse of mark-to-marketing accounting to improperly accelerate and record over $100 million of profits in year end 2000 and first quarter 2001. CIBC also allegedly participated in the creation of EBS Content Systems LLC, a/k/a Project Braveheart, to which without, any basis, they arbitrarily assigned a value of $124 million. CIBC purportedly "invested," not loaned, $115 million to Project Braveheart, but only after demanding and receiving a secret guarantee from Enron so that CIBC was not at risk from what it knew was a troubled business without the necessary technology or rights to provide the VOD venture content in digital form from the movie studios, and thus most unlikely to succeed. Enron then recognized $110 million in profits from this transaction in the fourth quarter of 2000 and first quarter of 2001. Moreover, to give the appearance that the partnership was a valid SPE, CIBC and Enron purportedly got a company named nCUBE, which worked as a contractor for Enron on the VOD project, to put $2 million (or 3% outside equity) into Project Braveheart at the end of 2000 by secretly promising that the money would be returned immediately in 2001. Just a few months later, in March 2001 Enron abandoned the VOD venture, but it did not reverse the more than $110 million in sham profits that it had recognized on its books. The complaint also asserts that because CIBC knew that Enron's financial situation was precarious, it did not require Enron to honor its guarantee but carried over the loan so that the Ponzi scheme could continue. The complaint in addition quotes a statement from Blockbuster employee Ms. Raskopf about the venture found in a *Wall Street Journal* article: " 'It was nothing

but a pilot project ... I don't know how anyone could have been booking revenues' " and that "Blockbuster ... never accounted for any financial gain or loss from the short-lived venture." The article further states that three former Enron employees familiar with the pattern of partnership deals employed by Enron, commented that the kind of guarantee made to CIBC to repay full value if the investment fails, "was designed to attract investors who otherwise might worry about the viability of the deals. 'The banks didn't care about the assets they invested in and that's how it got out of control,' says one former Enron employee who helped create some of the partnerships."

During the New Power and Project Braveheart deals, in which CIBC's alleged involvement would have had to give rise to its actual knowledge or a reckless disregard of fraud, the complaint points out that CIBC continued to issue positive analyst reports with boilerplate disclosures that did not change from the time its executives first secretly invested in LJM2.

### (v) Merrill Lynch & Co.

Merrill Lynch also allegedly was "intimately involved in creating, structuring and helping to finance" LJM2. As the placement manager it sold interests in LJM2 (though no allegations of specific day-to-day control or knowledge gained through particular exposure are made), purportedly to other participants in the Ponzi scheme to reward them for their participation, its executives invested at minimum $22 million in LJM2, lent money to it in the form of a $120 million line of credit in December 1999, and raised $390 million in private equity funds for LJM2. It too reaped the excessive returns that should have served as a red flag that LJM2 was involved in illicit transactions.

But such conclusory allegations alone are insufficient to create a strong inference of scienter. The complaint fails to assert any specific facts to give rise to actual knowledge of or reckless disregard of fraud.

Nevertheless, the Court notes that Lead Plaintiff was required without any discovery to file its consolidated complaint on an expedited schedule to allege securities violations in an extraordinarily complex scheme that even experts are struggling to decipher. In his opposition to Merrill Lynch's motion to dismiss Lead Plaintiff has made reference to Merrill Lynch's role in the purported Nigerian barge transaction in 1999. As the Court has indicated in footnote 87 of this memorandum and order, it is one of two potential sham transactions between Enron and Merrill Lynch, the other involving ENA, which in the wake of Congressional investigations have raised significant questions about possible fraud that have drawn substantial attention through media reports. Moreover, these two transactions fit the patterns of the scheme alleged by Lead Plaintiff throughout the complaint. See footnote 87 of this memorandum and order. In the interests of justice, this Court will allow Lead Plaintiff to supplement its claims to include one or both these issues. Because the facts asserted about these two transactions in the news would raise a strong inference of scienter, provided that Lead Plaintiff supplements its complaint, the Court denies Merrill Lynch's motion to dismiss.

**(vi) Barclays**

■ Barclays, which provided commercial lending and underwriting services to Enron, is sued only under § 10(b) for alleged affirmative acts in furtherance of the fraudulent scheme. Lead Plaintiff's allegations about Barclays' direct involvement in the formation and funding of JEDI/Chewco in 1997 are sufficient by the very nature of the transactions to state a claim under § 10(b) and Rule 10b–5. According to the complaint Barclays, along with Lay, Skilling, and Fastow, formed Chewco, which Enron and Barclays controlled, as a sham independent entity to buy a purported independent, outsider's interest in JEDI. Barclays purportedly loaned Chewco $240 million and money to the two strawmen, Little River and Big River, to provide the $11.4 million for the 3% equity investment in Chewco. In addition, giving rise to a strong inference of scienter that it knew the transactions were non-arm's length and fraudulent, it demanded that Enron provide a secret guarantee that it would be repaid and that Chewco would establish a $6.6 million cash reserve deposit paid to Barclays to insure against risk of loss. Barclays lent an additional $500 million to JEDI in 1998. Its subsequent loans and lending commitments of over $4 billion and the $1.9 billion in raised by underwriting and selling Enron securities give rise to a strong inference of Barclay's intent to keep the Ponzi scheme in operation.

**(vii) Lehman Brothers Holding, Inc.**

■ The Court finds that Lead Plaintiff has failed to plead adequately a cause of action under § 10(b) against Lehman. Although the complaint alleges that Lehman executives were among those who personally invested in LJM2, prefunding it with $1.5 million and ultimately putting $10 million into it, the profits of which should have raised red flags to the bank to ask questions, that alone is not sufficient to establish the requisite strong inference of scienter. Unlike with respect to the other Defendants discussed thus far, the complaint fails to identify any specific act or material statement or omission or involvement in the alleged Ponzi scheme that would give rise to a strong inference of scienter.

### (viii) Bank America Corporation

Bank America is sued under both § 11 of the 1933 Act and § 10(b) of the 1934 Act and Rule 10b–5. As is the case with the § 10(b) claims against Lehman, the § 10(b) allegations against Bank America fail to raise a strong inference of scienter. The complaint's only specific allegations relate to Bank America and/or its executives' investment of $45 million in LJM2, which made it the largest investor in LJM2. This investment was not properly disclosed to the investing public, and Bank America enjoyed lush returns from it. As indicated, the Court does not find the mere fact that it invested in a questionably profitable entity, without more to indicate how, when, and what it learned about the nature of the entities LJM2 dealt with and of the transactions it effected, sufficient to state a securities violation under § 10(b) and Rule 10b–5.

### (ix) Deutsche Bank AG

Deutsche Bank is sued only under the 1934 Act. Lead Plaintiff alleges that Deutsche Bank's top executives (through BT Investment Partners) were among those who prefunded LJM2. Deutsche Bank executives purportedly provided $1.5 million for that purpose and subsequently invested personally $10 million in LJM2, and thereafter enjoyed extraordinary distributions from that investment. Nevertheless, the complaint fails to allege any other involvement that would give rise to a strong inference of scienter, sufficient to establish liability based on its alleged false and misleading statements or loans or securities offerings under Rule 10(b) and Rule 10b–5.

### b. The Law Firms

### (i) Vinson & Elkins

Contrary to Vinson & Elkins' contention, the situation alleged in the consolidated complaint is not one in which Vinson & Elkins merely represented and kept confidential the interests of its client, which has "the final authority to control the contents of the registration statement, other filing, or prospectus." Vinson & Elkins' motion to dismiss (# 648) at 11 n. [citation omitted]. Instead, the complaint alleges that the two were in league, with others, participating in a plan, with each participant making material misrepresentations or omissions or employing a device, scheme or artifice to defraud, or engaging in an act, practice or course of business that operated as a fraud, in order to establish and perpetuate a Ponzi scheme that was making them all very rich.

Vinson & Elkins was necessarily privy to its client's confidences and intimately involved in and familiar with the creation and structure of its numerous businesses, and thus, as a law firm highly sophisticated in commercial matters, had to know of the alleged ongoing illicit and fraudulent conduct. Among the complaint's specific allegations of acts in furtherance of the scheme are that the firm's involvement in negotiation and structuring of the illicit partnerships and off-the-books SPEs, whose formation documentation it drafted, as well as that of the subsequent transactions of these entities. It advised making Kopper manager of Chewco so that Enron's involvement in and control of the SPE would not have to be disclosed, drafted "true sales" opinions that Lead Plaintiff asserts were essential to effect many of the allegedly fraudulent transactions. Vinson & Elkins was materially involved in the New Power IPO, and it structured and provided advice on the Mahonia trades, all actions constituting primary violations of § 10(b). In other words, it "effected the very" deceptive devices and contrivances that were the heart of the alleged Ponzi scheme. *SEC v. U.S. Environmental,* 155 F.3d at 112. According to the allegations in the complaint, Vinson & Elkins chose to

engage in illegal activity for and with its client in return for lucrative fees. Contrary to the Rules of Professional Conduct, it did not resign and thereby violated its professional principles and ethics. Nevertheless, had Vinson & Elkins remained silent publicly, the attorney/client relationship and the traditional rule of privity for suit against lawyers might protect Vinson & Elkins from liability to nonclients for such alleged actions on its client's (and its own) behalf.

But the complaint goes into great detail to demonstrate that Vinson & Elkins did not remain silent, but chose not once, but frequently, to make statements to the public about Enron's business and financial situation. See pages 203–22 of this memorandum and order.[129] Moreover in light of its alleged voluntary, essential, material, and deep involvement as a primary violator in the ongoing Ponzi scheme, Vinson & Elkins was not merely a drafter, but essentially a co-author of the documents it created for public consumption concealing its own and other participants' actions. Vinson & Elkins made the alleged fraudulent misrepresentations to potential investors, credit agencies, and banks, whose support was essential to the Ponzi scheme, and Vinson & Elkins deliberately or with severe recklessness directed those public statements toward them in order to influence those investors to purchase more securities, credit agencies to keep Enron's credit high, and banks to continue providing loans to keep the Ponzi scheme afloat. Therefore Vinson & Elkins had a duty to be accurate and truthful. Lead Plaintiff

has alleged numerous inadequate disclosures by Vinson & Elkins that breached that duty.

Vinson & Elkins protests that its purported "whitewash" investigation and report in the wake of Sherron Watkins' August 1999 memorandum were not disclosed to the public until after Enron waived the attorney/client privilege and produced the report for Congressional hearings in 2002, after the Class Period ended, and thus cannot be the basis of a § 10(b) misrepresentation claim by the investors. Nevertheless the investigation and report can serve as the basis of a § 10(b) and Rule 10b–5(a) or (c) claim alleging use of a device, scheme or artifice to defraud or engagement in an act, practice or course of business that operated as a fraud in the perpetuation of the Ponzi scheme.

Furthermore, the complaint references, summarizes, and quotes from the Powers' investigative committee report the negatively critical findings about Vinson & Elkins' substantial and dubious role in the events of the Class Period, as delineated in the complaint, which support Lead Plaintiff's allegations. See pages 206–08, 213–14 of this memorandum and order.

For these reasons the Court finds that Lead Plaintiff has stated claims under § 10(b) against Vinson & Elkins.

**(ii) Kirkland & Ellis**

 The Court agrees with Kirkland & Ellis that Lead Plaintiff has only alleged that Kirkland & Ellis represented some of the illicit Enron-controlled, non-public

---

129. Lead Plaintiff has charged Vinson & Elkins with drafting and approving over years a great many of Enron's "disclosures" for public SEC filings, press releases, and shareholder reports, which it knew or had reason to expect potential investors to have access to and rely upon in deciding to invest in Enron securities. The complaint asserts that these fraudulent "disclosures" were necessary to

expand and perpetuate the scheme. The public reports and statements contained numerous alleged fraudulent misrepresentations, carefully detailed by Lead Plaintiff, with respect to various transactions (devices or contrivances) involving the Enron-controlled SPE. See pages 203–23 of this memorandum and order.

SPEs and partnerships that Enron, but not Kirkland & Ellis, used for transactions (devices or contrivances) to hide its debt and record sham profits, disguising its true financial condition, and performed legal services on their and Enron's behalf. The complaint does not allege that Kirkland & Ellis invested in any partnership or profited from any dealings with Enron other than performing routine legal services for the partnerships. All the assertions against the firm are conclusory and general. While the allegations against Kirkland & Ellis may indicate that it acted with significant conflicts of interests and breached professional ethical standards, unlike its claims against Vinson & Elkins, Lead Plaintiff has not alleged that Kirkland & Ellis exceeded activities would be protected by an attorney client relationship and the traditional rule that only a client can sue for malpractice because it never made any material misrepresentations or omissions to investors or the public generally that might make it liable to nonclients under § 10(b). Any documents that it drafted were for private transactions between Enron and the SPEs and the partnerships and were not included in or drafted for any public disclosure or shareholder solicitation. Any opinion letters that the firm wrote are not alleged to have reached the plaintiffs nor been drafted for the benefit of the plaintiffs. It was not Enron's counsel for either its securities filings or its SEC filings. Thus the Court grants Kirkland & Ellis' motion to dismiss.

### c. The Accountant/Auditor: Arthur Andersen

 Lead Plaintiff has identified numerous violations by Arthur Andersen of GAAS, GAAP, risk factors for fraud, accounting rules, and rules of professional conduct for accounts that Arthur Andersen violated. Yet Arthur Andersen certified that Enron's financial statements for 1997–2000 were in compliance with GAAP and

its audits of the financial statements complied with GAAS. Moreover it knew its reports would be relied upon by present and potential investors in Enron securities. It also consented to having the audited financial statements included in registration statements, prospectuses, and annual shareholders' reports that were filed by Enron during the Class Period. Lead Plaintiff has also alleged that Arthur Andersen destroyed documents to conceal its fraudulent accounting. All of these constitute primary violations under § 10(b).

 Furthermore Lead Plaintiff has alleged specific facts giving rise to a strong inference of scienter. Arthur Andersen's comprehensive accounting, auditing, and consulting services to Enron necessarily made it intimately privy to the smallest details of Enron's alleged fraudulent activity. Lead Plaintiff has described several similar prior fraudulent audits of other companies, establishing a pattern of such conduct, and the SEC's and courts' repeated imposition of penalties on Arthur Andersen and its employees, including the consent decree and injunction from the Waste Management fraud which was in effect at the time Lead Plaintiff alleges that Arthur Andersen violated § 10(b) in auditing Enron. Lead Plaintiff has also alleged details of the February 5, 2001 teleconference meeting of senior Arthur Andersen partners (including individual Defendants Bauer, Bennett, Goddard, Goolsby, Jones, Lowther, Odom, Steward and Swanson) from Chicago and Houston and the Gulf Coast when they discussed material concerns at the heart of the consolidated complaint: related-party transactions with LJM, Fastow's conflicts of interest, disclosures of transactions in financial footnotes, Enron's mark-to-market earnings, and Enron's aggressive transaction structuring, in essence the risk of continuing fraudulent accounting for Enron and

retaining it as a client. They decided to continue because Enron's business was so lucrative, and a few weeks later they issued a clean audit opinion on the 2000 financial statements. Moreover, it has described e-mails and internal memoranda between and among Arthur Andersen employees (Carl Bass, who had previously objected on December 18, 1999 to accounting on an Enron entity, Thomas Bauer, John Stewart, John Stewart Benjamin Neuhausen, and Debra Cash) before the '99 financial statements were issued that reflect Arthur Andersen's knowledge and intent to continue in the fraudulent scheme. Lead Plaintiff even mentions that Sherron Watkins in August 2001 called Arthur Andersen audit partner James Hecker about her concerns regarding improper accounting practices [130] at Enron and that she was going to discuss them with Ken Lay. Hecker called an emergency meeting of Arthur Andersen partners on August 21, 2001, one day after Sherron Watkins' wrote her memorandum to Lay.

Because Lead Plaintiff has alleged numerous violations of GAAP and GAAS and pleaded facts giving rise to a strong inference of scienter, he has pleaded a securities fraud claim against Arthur Andersen. *Melder*, 27 F.3d at 1103 ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more does not establish scienter. The party must know that it is publishing materially false information or the party must be severely reckless in publishing such information.").

## C. Section 11 Claims

To plead a claim under § 11, a plaintiff must allege (1) that the defendant's registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material, that it would have misled a reasonable investor about the nature of his investment. *Krim v. BancTexas Group, Inc.*, 989 F.2d at 1445.

Lead Plaintiff has alleged numerous material transactions (deceptive devices and contrivances) in the complaint that were not clearly and adequately disclosed in registration statements. Moreover, given the fact that the complaint is filled with allegations of red flags and warnings at least some of which should have alerted an underwriter doing a due diligence investigation to look deeper and question more, the Court finds that the complaint adequately alleges Section 11 claims grounded in negligence and/or fraud against the following Defendants:

(1) Credit Suisse First Boston for material misrepresentations or omissions in registration statements filed on 2/99 for an offering of 27.6 million shares of Enron stock; on 10/00 for New Power stock; around July 18, 2001 for the resale of Enron zero coupon convertible notes;

(2) CIBC for its 5/99 Registration Statement of $500 million of Enron 7.375

---

130. The complaint at 463 lists the following as examples:

How Enron could, with its own capital stock, repeatedly add to the collateral underlying an obligation owed to Enron from a related party without recognizing it in the financial statements.

Enron's stock contributions/ issuances to LJM did not appear to be recorded on Enron's books.

Enron's financial statement disclosures related to the Fastow investment-company relationships and transactions were (putting it kindly) hard to understand or incomplete. The LJM equity had been distributed to its shareholders, including Fastow and CIBC, concurrently, or shortly after, its original formation.

notes due on 5/15/2019; 2/99 Registration Statement for sale of 27.6 million shares of Enron stock at $31.34; 5/99 Registration Statement filed on 5/20/99 for the sale of $500 million of Enron 7.375% notes; and the 10/00 New Power Registration Statement for sale of 27.6 million shares of New Power stock;

(3) Lehman with regard to the registration statements for the sale of Enron's 7.375% Notes in May 1999 and the 7.875% Notes in May 2000; and

(4) Bank America for the sale of $500 million of 7.375% Enron Notes due 5/15/2019, pursuant to the Registration Statement filed on 5/15/99.

### D. Claims under the Texas Securities Act, Article 581–33

Because there are no heightened pleading requirements and because the Texas Act does not require proof of reliance, scienter, or a duty to disclose on the part of the offeror or sellers, the Court finds that Lead Plaintiff has stated a claim under the Texas Securities Act against J.P. Morgan, Lehman, and Arthur Andersen.

Accordingly, for the reasons indicated above, the Court

ORDERS the following:

(1) CIBC's motion to dismiss(# 615) is DENIED;

(2) Citigroup's motion to dismiss (# 629) is DENIED;

(3) J.P. Morgan Chase & Co.'s motion to dismiss (# 632) is DENIED;

(4) Barclays' motion to dismiss (# 653) is DENIED;

(5) Credit Suisse First Boston's motion to dismiss (# 658) is DENIED;

(6) Bank of America Corporation's motion to dismiss (# 664) is GRANTED as to claims under § 10(b) and Rule 10b–5, but DENIED as to Lead Plaintiff's claim under § 11 for the 7.35% Notes due on 5/15/09, pursuant to the Registration Statement of 5/19/99;

(7) Provided that Lead Plaintiff supplements its complaint as indicated *supra*, Merrill Lynch & Co.'s motion to dismiss (# 667) is DENIED;

(8) Lehman Brothers Holdings Inc.'s motion to dismiss (# 679) is GRANTED as to Lead Plaintiff's claims under § 10(b) and Rule 10b–5, but DENIED as to claims under § 11 and the Texas Securities Act;

(9) Deutsche Bank AG's motion to dismiss (# 716) is GRANTED;

(10) Kirkland & Ellis's motion to dismiss (# 660) is GRANTED;

(11) Vinson & Elkins L.L.P.'s motion to dismiss (# 648) is DENIED; and

(12) Arthur Andersen LLP's motion to dismiss (# 650) is DENIED; and

(13) Lead Plaintiff's § 10(b) claims relating to the 7% Exchangeable Notes and 8.375% Notes are DISMISSED.